**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STEVEN MUSKAL, as Independent Administrator
of the Estate of James B. Muskal,

     Plaintiff,

v.  POINT DIGITAL FINANCE, INC., a Delaware
Corporation, and DEER PARK 1850 FUND, L.P.

     Defendants.

**COMPLAINT**

**I. Nature of Action**

1.    State and federal laws create strong protections and disclosure rules for homeowners in mortgage lending, where people's homes and financial security are on the line. Defendant Point Digital has designed a very complex mortgage product called a Home Equity Investment (HEI) loan that poses greater risks than traditional mortgages, but purports to be exempt from all mortgage laws protecting homeowners.  After plaintiff accepted a lump sum payment, Point got a mortgage on his home.  The Point HEI mortgage loan imposes astronomical interest rates – 21.94% APR in plaintiff's first year unless his home value had declined by over 20%; then 20% APR over plaintiff's first two years unless his home value had declined.  Point's assertion this is not a mortgage loan is false, and its misleading disclosures and fraudulent claims of "no interest" violated federal and state laws.  In an Arizona action between the parties on an HEI loan used in Arizona, that court has already held that Point's HEI contract is a mortgage loan such that TILA's prohibition against arbitration applies; and that holding is binding here as well under collateral estoppel.  The remedies for Point's violation of federal mortgage protections include rescission of this loan.

## II.     Jurisdiction and Venue

2.      Jurisdiction of this Court arises under 15 U.S.C. §1640, 28 U.S.C. §§ 1331; and supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

3.      Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## III.     Parties

4.      Plaintiff Steven Muskal is the Cook County Illinois court-appointed Independent Administrator of the Estate of James B. Muskal and is authorized to act on behalf of the Muskal Estate to instigate this lawsuit to recover James B. Muskal's property.

5.      James B. Muskal ("Muskal" or "plaintiff" below) was born on July 28, 1938, and passed away in Chicago, Illinois, on March 13, 2025, at age 86.

6. Upon information and belief, Defendant Point Digital Finance, Inc. ("Point"), is a Delaware corporation with its principal place of business in the State of California.

7. Defendant Deer Park 1850 Fund, L.P. is an interested party having been assigned Point's mortgage loan on the Property and recorded such assignment.

## General Allegations

8. On or about January 20, 2023, Defendant Point Digital Finance entered into a contract with James B. Muskal, a copy of which is attached hereto as Exhibit 1 (the "Contract" or "loan").

9. At the time, James owned real property located at 1312 N. Astor St. in Chicago (the "Property") as an individual.

10. His spouse Cheryl was not on title and did not sign the Contract, but on information and belief Cheryl signed a Consent of Spouse form at the same time as the Contract, and the form stated: "I am aware that the legal, financial and related matters contained in the Agreement are complex

2

and that I am encouraged to seek independent professional guidance or counsel with respect to this consent."

11. Unlike Cheryl, James – who actually signed the Contract -- was never told by Point that "the legal, financial and related matters contained in the Agreement are complex."

12.  Unlike Cheryl, James – who actually signed the Contract -- was never told by Point "that I am encouraged to seek independent professional guidance or counsel with respect to this Agreement."

13. James passed away on March 13, 2025, and on February 15, 2025, Cheryl had passed as well.

14. Pursuant to the Contract, Point paid James an up-front sum of $350,000, less closing costs, which Point refers to as their "investment amount."

15. Point then recorded a deed of trust against the Property.

16. Instead of a traditional interest rate based upon the principal amount of the loan, Point instead contracted to receive (1) a 44.2% interest in the future price changes of the home from the assessed value of $2.2 million; plus (2) a repayment of $622,272 –$272,272 more than the $350,000 amount plaintiff actually borrowed.

17. The additional $272,272 is owed because the agreed-upon starting value utilized in Point's contract is already discounted substantially from the assessed fair market value of the home of 2.2 million dollars at the time of the contract -- in this case discounted by 28%, essentially insulating Point from any market risk.  The 28% discount of the actual appraised value of the home times 44.2% equals $272,000.

18. In effect, in order for Point to lose money on the transaction, the value of the Property would

3

have to plummet 28% from its true starting assessed fair market value.

19. In the "About My Point Agreement" (attached as Exhibit 2) sent to plaintiff, Point wrote, "To determine the Original Agreed Value, Point lowered the assessed value of my home by 28%. This is called the risk adjustment."

20. The reduction in assessed value by Point by 28% was not a "risk adjustment" but a measure to guarantee profits by immediately having plaintiff owe an additional $272,272 on his $350,000 loan, subject to the "Homeowner Protection Cap" described below.

21. Alternatively, Point includes a maximum rate of return of profit on their "investment" here at a purported "20.00%" rate, which the agreement calls a "Point Proceeds Cap Factor." Ex. 1.

22. The actual rate of the "Point Proceeds Cap Factor" is not the implied 20% annual rate, but instead is compounded monthly for an actual undisclosed APR of 21.94%.

23. Point misleadingly refers to its maximum rate of return of 21.94% APR as the "Homeowner Protection Cap" on its closing disclosure sent to plaintiff.

24. Past a short period of time, however, the "Homeowner Protection Cap" becomes mathematically meaningless - after only five years, the "cap" on Point's profits above the loaned $350,000 proceeds has grown to $942,624. At the expiration of the 30-year option period, the "cap" on Point's profit is $134,416,865.86

25. Upon information and belief, the typical market rate for 10-year home equity lines of credit in mid-January 2023 was approximately 7% simple interest.

26. The Point mortgage product immediately imposes on plaintiff extraordinarily high interest rates after applying both the "risk adjustment" and the "Homeowner Protection Cap" terms – 21.94%

4

APR in the first year in the case of plaintiff, unless his home value had declined by over 20%; then 20% APR over the first two years for plaintiff unless his home value had declined.

27. Point provides no mechanism by which a borrower can pay down accumulated interest to prevent compounding or pay down the "investment" balance without a full refinance.

28. Point deceptively and misleadingly states that "no interest accrues" on its loan, asserting that "no interest accrues" in both the Point Option Agreement Estimate document provided to plaintiff shortly before closing, as well as in the Point Option Closing document provided to plaintiff at their closing on the loan. Examples of both documents provided to plaintiff are attached as Exhibit 3 (these particular documents concerned the Arizona Point HEI with plaintiff further described below).

29. The term of Point's "option" is 30 years; essentially, by paying a strike price of $350,000, Point has the right to force a sale of the Property either at the expiration of the 30-year term or the occurrence of certain triggering events, at which time Point acquires a 44.2% interest in the *entire* value of the Property.

30. Point deliberately backloads the remaining option consideration to disguise the nature of the transaction; functionally, it acquired a 44.2% interest in all future appreciation of the Property by paying less than 25% of the already-discounted starting value; the "exercise price" becomes mathematically meaningless to the borrower except to all but guarantee that Point's initial investment must be paid back in the future and create the illusion of sufficient consideration.

31. However, Point also profits based on the rarity of anyone staying in one home for 30 years.

32. The median period of time that Americans live in one home is approximately 11.9 years.

Plaintiff Muskal entered into the Point contract at age 83, and thus was likely to pass away or sell his home long before the 11.9 year average.

33. Functionally, there are only three ways to exit Point's product:

    a. First, hold the Property for the full 30-year term, and Point does not elect to exercise the option. The likelihood of this scenario is statistically extremely remote; in the case of the Subject Property, the Property's fair market value in 2054 would need to be less that the already-discounted initial agreed-upon value of $1,584,000 before Point fails to cover its initial investment of $350,000 and less than $1,188,000 for Point to receive nothing at all.

    b. Second, hold the Property for the full 30-year term, and Point exercises its option and forces a sale. For the reasons stated in *a.* above, the statistical likelihood of Point not exercising the option after 30 years is functionally zero.

    c. Third, pay off Point's initial $350,000 back, plus its 44.2% share of appreciation (limited to no more than 20% interest, compounded monthly), either by refinancing, selling the Property, or otherwise paying Point in full. As stated in *a.* above, there is essentially no statistically plausible scenario where Point declines to exercise its option on its own in the event of a sale of the Property.

34. Point's product is deliberately designed to minimize risk to Point at the expense of the homeowner - if the homeowner buys Point out within a relatively short period of time, Point's

substantial discount on the agreed-upon initial value of the Property nearly guarantees that Point's return on its initial investment will be calculated using the exorbitant compounding-interest "cap," substantially outpacing the expected return of nearly any relatively stable investment product available on the market. If Point's option remains for more than a few years, Point has functionally bought into the housing market by diverting a substantial fraction of the homeowner's accumulated real estate wealth from the individual to Point's shareholders, all while also charging equally exorbitant application, processing, and other fees to further strip equity from homeowners.

35. On its face, the Contract fails to identify the initial investment amount of $350,000 as a loan.

36. On its face, the Contract fails to identify the Point Proceeds accurately as a balloon payment.

37. On its face, the Contract falsely identifies the Exercise Payment as part of consideration for the Contract.

38. Point misleadingly states that no interest accrues on the balance of the loan.

39. Point misleadingly describes a 20% monthly compounding interest rate as "protecting" the homeowner.

40. The Contract misleadingly describes Point's profits capped at an annual interest of 20% where under the actual monthly compounding the APR interest rate imposed is 21.94%.

41. James Muskal relied upon the misrepresentations and misleading language in the contract in agreeing to enter the Contract, ultimately unknowingly agreeing to pay far more to Point than any conventional loan or HELOC would have charged.

42. Plaintiff has requested rescission of the Point loan on the property, and the request has not been

accepted.

43. The Property was assessed in 2025 at $1,800,000, and under such assessment plaintiff will owe Point's assignee Deer Park a total of $445,472 upon sale, for a loss of $95,472 after repaying the $350,000 from just three years ago.

**<u>Application of the Arizona court case between the parties to this matter</u>**

44. Plaintiff and Point are litigating another HEI contract case in Arizona involving the same borrower -- James B. Muskal -- in Arizona state court, Maricopa County Case No. CV2025-024855. In the Arizona court case, Point sought arbitration pursuant to sections 7.10 and 7.20 of the Arizona HEI agreement, which is identical to the arbitration provisions in sections 7.10 and 7.20 of the Illinois agreement here.

45. In an 11-page October 13, 2025, brief, plaintiff asserted that the TILA prohibition of arbitration for residential mortgage loans under 15 U.S.C. § 1639c(e)(1) barred application of the arbitration provision. Plaintiff's brief noted that TILA defines a "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage" (§ 1602(dd)(5)), and "credit" is defined by TILA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." Id. § 1602(f). Plaintiff's brief explained that the HEI at issue constituted "debt" under the standard dictionary definitions such as "liability on a claim" or "something owed" (p. 3-4), as well as under numerous recent court cases examining extremely similar HEI agreements such as *Olson v. Unison Agreement Corporation*, 2025 WL 2254522 (9th Cir. 2025).

46. In Point's 13-page October 21, 2025, brief responding to plaintiff, Point argued that the TILA prohibition of arbitration was not applicable because Point's products are "excluded from the definition of 'credit' and therefore do not meet definition of a 'residential mortgage loan' under TILA." (p. 4). Point agreed that TILA applied to "credit," which is the right to "incur debt and defer its payment" (p. 4), but then argued: "Here the Option does not create a 'debt,' as Owners are not liable for a specific sum of money and have no obligation to repay the $210,000 Investment Amount." (p. 5). Point concluded: "Point's product is not governed by TILA, and therefore the applicable arbitration provision is valid and enforceable." (p. 13).

47. On December 17, 2025, after a hearing on the merits, the Arizona court issued its order denying arbitration because "the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act."

48. The Arizona court's decision between plaintiff and Point operates as collateral estoppel between the same parties in this Court pursuant to Seventh Circuit law in *Gilldorn Sav. Asso. v. Commerce Sav. Asso.*, 804 F.2d 390 (7th Cir. 1986), where the Arizona court's decision was fully briefed and heard. Accordingly, Point is precluded in this Court from further relitigating the issues of whether the loans herein are considered "residential mortgage loans" subject to the TILA, and whether the TILA 15 U.S.C. § 1639c(e)(1) prohibition on arbitration of such mortgage loans applies here.

## COUNT I

## VIOLATION OF TILA

49. Plaintiff incorporates the foregoing paragraphs 1-45 as though the same were set forth at length herein.

50. The Contract is a residential mortgage loan as defined by 15 U.S.C. § 1602(dd)(5).

51. James Muskal was a natural person.

52. The transaction was entered into primarily for personal, family, and household purposes.

53. Point is a creditor.

54. The Contract fails to comply with the disclosure requirements of the Truth in Lending Act in that it, among other things:

a.     Fails to adequately disclose the annual percentage rate associated with the Contract.

b.     Fails to adequately disclose the finance charge associated with the Contract.

c.     Fails to identify the initial payment of $350,000 to plaintiff as the "amount financed."

d.     Fails to provide a statement of the consumer's right to obtain, upon written request, a written itemization of the amount financed.

e.     Fails to disclose in conspicuous type a good faith estimate of the total cost of the mortgage to the consumer expressed as a table of annual rates.

f.     Fails to disclose the projected total cost of the Contract

g.     Fails to disclose in conspicuous type size that "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan" as required by § 1639(a)(1)(B);

h. Fails to accurately disclose the annual percentage rate as required by § 1639(a)(2), instead falsely stating that "no interest accrues" on the loan;

i. Fails to provide required disclosures at least three business days prior to consummation of the transaction as required by § 1639(b); and

j. Fails to provide a good faith estimate of the total cost of the mortgage expressed as a table of annual percentage rates as required for high-cost mortgages.

55. The conduct of Defendant was a direct and proximate cause of serious injuries, actual damages and harm to Muskal that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff under 15 U.S.C. § 1640 for the full amount of actual and statutory damages, along with the attorneys' fees and the costs of litigation, as well as such further relief as may be permitted by law.

56. Plaintiff is also entitled to rescission of the Point agreement and voiding of all associated recorded instruments by Point and Deer Park based on the agreement pursuant to 15 U.S.C. § 1635(a) and (f) and 12 CFR § 1026.23(a)(3).

WHEREFORE, plaintiff respectfully requests the opportunity for rescission pursuant to 15 U.S.C. § 1635(a) and (f) and 12 CFR § 1026.23(a)(3), as well as all statutory relief, statutory and other damages, costs, and attorneys' fees available pursuant to TILA, and for such other relief as is equitable and just.

## COUNT II

## HOME OWNERSHIP EQUITY PROTECTION ACT

57. Plaintiff incorporates the foregoing paragraphs 1-56 as if the same were set forth at length herein.

58. Point's conduct herein constitutes violations of the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1639, *et. seq*.

59. Point's HEI loan with plaintiff was a high-cost mortgage loan. The loan initially imposes for several years an APR of 20% or more which exceeds the Average Prime Offer Rate (APOR) by more than 8.5 percentage points. The loan's "risk adjustment" also imposes total points and fees on the loan which exceed 5% of the total loan amount after the first year of the loan.

60. Point failed to provide accurate disclosures as required by section 1639(a)(1) and (2), including the APR disclosure.

61. Point failed to provide the specific disclosures as required by section 1639(a)(1) and (2).

62. Point's "risk adjustment" to increase the owed loan amount from $350,000 to $722,000 in just a few years without a change in home value is an indirect financing of points in violation of section 1639(m).

63. Point failed to provide a good faith estimate of the total cost of the mortgage expressed as a table of annual percentage rates as required for high-cost mortgages.

64. Plaintiff is entitled to relief under section 1640 of the Act for all the above violations against both Point Digital as well as Deer Park pursuant to section 1641(d).

WHEREFORE, plaintiff respectfully requests all statutory relief including rescission, damages, statutory damages, costs, attorneys' fees, and for such other relief as is equitable and just.

## COUNT III

## ILLINOIS HIGH RISK HOME LOAN ACT

12

65. Plaintiff incorporates the foregoing paragraphs 1-66 as if the same were set forth at length herein.

66. Point's conduct herein constitutes violations of the Illinois High Risk Home Loan Act, 815 ILCS 137/1, *et seq*.

67. Point's HEI loan with plaintiff was a high risk loan under the Act.  The loan initially imposes for several years an APR of 20% or more which exceeds the Average Prime Offer Rate (APOR) by more than 8.5 percentage points.  The loan's "risk adjustment" also imposes total points and fees on the loan which exceed 5% of the total loan amount after the first year of the loan.

68. Point employed fraudulent or deceptive acts or practices in the making of a high risk home loan, including numerous misrepresentations about its loan to plaintiff, including but not limited to: (1) there was "no interest on the loan"; (2) interest was capped at 20% when it was actually 21.92% per year; and (3) reducing plaintiff's home value by 28% for the transactions at issue was a "risk adjustment."

69. Point employed fraudulent or deceptive acts or practices in the making of a high risk home loan by not making proper disclosures in violation of TILA and HOEPA.

70. Point violated section 55 of the Act where its "risk adjustment" to increase the owed loan amount from $350,000 to $722,000 in just a few years without a change in home value is an indirect financing of points.

71. Point violated section 95 of the Act by not making the required disclosure.

72. Point violated section 110 of the Act in not informing Muskal of the provisions of the Mortgage Awareness Program.

73. Plaintiff is entitled to relief under section 135 of the Act for these violations against both Point Digital as well as Deer Park pursuant to section 135(d).

WHEREFORE, plaintiff respectfully requests all relief including rescission of the Point agreement and any assignment, damages, statutory damages, costs, attorneys' fees, and for such other relief as is equitable and just.

**COUNT IV**

**ILLINOIS CONSUMER FRAUD ACT**

74. Plaintiff incorporates the foregoing paragraphs 1-73 as if the same were set forth at length herein.

75. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act") declares that unfair methods of competition and unfair or deceptive acts or practices are unlawful, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact. 815 ILCS 505/2.

76. In its violations of the TILA, Point concealed, suppressed and omitted from the plaintiff the material facts and true nature of his mortgage loan, and these violations of TILA also constitute Consumer Fraud Act violations.

77. Point also made numerous misrepresentations about its loan to plaintiff, including but not limited to: (1) there was "no interest on the loan"; (2) interest was capped at 20% when it was actually 21.92% per year; and (3) reducing plaintiff's home value by 28% for the transactions at issue was a "risk adjustment."

14

78. Point numerous misrepresentations about its loan constitute Consumer Fraud Act violations.

79. Point's violations of the HOEPA also constitute Consumer Fraud Act violations.

80. Point's violations of the High Risk Home Loan Act also constitute Consumer Fraud Act violations.

81. Point committed its misrepresentations, concealment, suppression and omission of material facts regarding the HEI loan with the intent that Muskal rely upon the misrepresentation, concealment, suppression or omission of such material facts.

82. Point's misrepresentation, concealment, suppression or omission of such material facts regarding its HEI loan was intentional and part of its standard business practice across numerous home-owners. Moreover, Point's targeting of the same elderly homeowner Muskal for separate HEI transactions on properties in both Illinois and Arizona demonstrates a deliberate pattern of predatory conduct. Punitive damages to deter such intentional and widespread consumer fraud against Muskal and others is particularly appropriate. Point's conduct was willful, intentional, and done with an evil motive and reckless indifference to the rights of Muskal.

WHEREFORE, plaintiff respectfully requests compensatory damages, reimbursement of fees and costs pursuant to 815 ILCS 501/10(c), appropriate prejudgment interest and postjudgment interest, punitive damages of over $1 million, and for any such other and further relief or alternate damages statutory or otherwise against the Bank as the Court deems equitable and just.

### Jury Trial Demand

Plaintiff demands trial by jury on all issues so triable.

By:_____/s/ Michael Steigmann_____

                                         Attorney for Plaintiff

Michael Steigmann
150 S. Wacker Dr. #2400
Chicago, Illinois 60601
(312) 833-5945

16

Option Agreement ID: 2022155-ESOLO

## POINT DIGITAL FINANCE OPTION PURCHASE AGREEMENT

This Point Digital Finance Option Purchase Agreement is entered into as of January 20, 2023 ("**Effective Date**"), by and between James B. Muskal and Point Digital Finance, Inc., a Delaware corporation. **"We"**, **"us"**, **"our"** and **"Point"** refer to Point Digital Finance, Inc. and its successors and assigns. **"You"**, **"your"** and **"Owner"** refer to James B. Muskal and Owner's permitted assigns under this Agreement. Capitalized terms used but not defined in the text of this Agreement have the meanings set forth in the attached Appendix A.

### Section One:
### Option Terms

1.1 **Grant of Option and Consideration.** You agree to sell to us an exclusive and irrevocable option (the **"Option"**) to purchase an undivided percentage interest of fee simple title ownership (the **"Option Percentage"**) in and to the Property in exchange for our agreement to pay you the Option Investment Payment. Point may exercise the Option and purchase the Option Percentage by paying you the Exercise Payment. The Property is commonly known as 1312 N ASTOR ST, CHICAGO, IL 60610 and is more specifically described on Schedule 1 (the **"Property"**).

You hereby agree to the specific terms of our Option as set forth below in the column entitled "Owner's Information":

| | Definition | Owner's Information |
|---|---|---|
| **Option Investment Payment** | the first payment of the Option Consideration, to be paid shortly after execution of this Agreement | $350,000.00 |
| **Option Percentage** | the percentage interest of Appreciation that Point shares in; also the percentage interest of the Property that we would acquire upon Option Exercise | 44.2000% |
| **Original Agreed Value** | the starting value of the Property for calculating Appreciation and Point Proceeds | $1,584,000.00 |
| **Point Proceeds Cap Factor** | the factor used to determine the Point Proceeds Cap which limits the Point Proceeds | 20.00% |
| **Exercise Payment** | the payment Point will make to you if Point exercises the Option | $350,128.00 |
| **Option Consideration** | the total purchase price for the Option Percentage, which is the sum of the Option Investment Payment and the Exercise Payment | $700,128.00 |
| **Amount of Acknowledged Pre-Existing Loans** | Acknowledged Pre-Existing Loan is defined in Appendix A | $733,867.28 |
| **Expiration Date** | the date on which the Option Term expires | January 20, 2053 |
| **Legal Form of Ownership of Property** | -- | as an individual |
| **Owner Occupied Property vs. Non-Owner Occupied Property** | both terms are defined in Appendix A | Owner Occupied Property |
| **Property Type** | -- | Single Family Home |

Page **1** of **26**

© 2023 Point Digital Finance, Inc.                                                              DOCSET: IL22.1

**POINT**                                        EXHIBIT 1

1.2 **Term of Option and Term of Agreement.** The term of the Option you grant to us (the **"Option Term"**) will commence on the Effective Date and will expire at 11:59 p.m., Pacific Time, on the Expiration Date, unless otherwise extended pursuant to Sections 2.2.1 or 7.9. The term of this Agreement will continue until the receipt of the full amount of our Point Proceeds following (i) an Owner Option Repurchase or (ii) an Option Exercise. Certain obligations and provisions of this Agreement shall survive termination as provided in Section 7.8.

1.3 **Payment of Option Consideration.** We will pay you the total Option Consideration in two parts as set forth below.

    1.3.1 **Payment of the Option Investment Payment and Option Grant Closing.** We shall pay you the Option Investment Payment within five Business Days of confirmation by an Escrow Agent that the escrow for the granting of the Option has closed including, but not limited to, confirmation of the following (the **"Option Grant Closing"**):

        (a) You have executed and delivered to the Escrow Agent each of the following Option Documents: (i) a signed original of this Agreement; (ii) a signed and notarized original of the Security Instrument; and (iii) any other required documents;

        (b) the Security Instrument and any other required documents are properly recorded in the appropriate state or county recorder's office; and

        (c) Point has been added as an additional named insured under your insurance policies in compliance with Section 4.1.1.

    1.3.2 **Payment of the Exercise Payment.** If you choose to repurchase the Option, Point will calculate the Point Proceeds and account for the Exercise Payment according to Schedule 2. If Point exercises the Option, Point will credit the Exercise Payment against its share of proceeds from a Property Sale except as indicated in Section 2.3.

1.4 **Payment of Point Proceeds.** Except as otherwise noted, your obligations under this Agreement will cease once you pay us our Point Proceeds, which will always be calculated per Schedule 2. This will typically occur by (a) your election to terminate and repurchase the Option by paying us the Point Proceeds (an **"Owner Option Repurchase"**), or (b) our election to exercise the Option upon the events specified in Section 1.4.2 event and be paid the Point Proceeds in a Property Sale. The Calculation of the Point Proceeds takes into account a cap (the **"Point Proceeds Cap"**) that may limit the amount of Point Proceeds you are obligated to pay to Point. The Point Proceeds Cap is based, in part, on the length of time that has elapsed between the Effective Date and the date Point receives the Point Proceeds.

    1.4.1 **Owner Option Repurchase.** At any time during the Option Term, you may elect to repurchase and thereby terminate the Option by paying us the Point Proceeds. To initiate an Owner Option Repurchase, you must deliver written notice to us at least 15 days prior to the proposed closing date. You may be required to provide additional notice if you are repurchasing the Option in connection with a Property Sale or at the Expiration Date. The closing of the Owner Option Repurchase will be scheduled to allow us to conduct an Appraisal, at your cost, to determine the Ending Agreed Value.

    We shall retain the right to reject any tender by you of the Point Proceeds that is less than the full amount of the Point Proceeds, is less than $0, is not actually received by Point or is not tendered within the time frame agreed to by you and Point, or is in violation of applicable law. Upon our acceptance of the Point Proceeds, the Option shall terminate.

© 2023 Point Digital Finance, Inc.         DOCSET: IL22.1

**POINT**



1.4.2 **Option Exercise Triggers.** At any time prior to you consummating an Owner Option Repurchase, we have the right to exercise the Option upon the following events: (a) any Transfer of the Property or any portion of the Property as provided in Section 2.1; (b) at the Expiration Date, as provided in Section 2.2; (c) upon an Event of Default as provided in Section 2.3; or (d) upon special circumstances as provided in Sections 4.4 and 4.5.

1.5 **Recording and Securing the Option.** You grant us the right to secure your performance under the Agreement and our right to our Option Percentage through a Security Instrument (a Deed of Trust or Mortgage), substantially in the form attached as <u>Exhibit A</u> (the **"Security Instrument"**), which will be properly recorded or filed. You also grant us the right to record public notice of the Option either through (a) a rider or other means of incorporation into the Security Instrument or (b) a separately recorded memorandum evidencing: (i) the provisions of this Agreement that constitute covenants running with the land and (ii) the terms of this Agreement (**"Notice of Option Purchase Agreement"**).

### Section Two:
### Owner Option Repurchase and Option Exercise

2.1 **Owner Option Repurchase or Point Option Exercise Upon a Sale.** In connection with any Property Sale you may elect to terminate and repurchase the Option. If you do not elect to repurchase the Option, then we shall have the right, but not the obligation, to exercise the Option and be paid our Point Proceeds (**"Option Exercise Upon a Sale"**).

2.1.1 **Permitted Sale.** Any Property Sale by you, whether in connection with an Owner Option Repurchase or our Option Exercise, must meet the following conditions (a **"Permitted Sale"**): (a) you must use a licensed real estate agent to market and sell the Property; (b) you must hold at least two open houses; (c) the home must be listed for sale on the Multiple Listing Service for at least 14 days; (d) the sale must be an Arm's Length Transaction; (e) you will be solely responsible for conveying title free and clear of any liens to the satisfaction of the Third Party Buyer, and for satisfying any and all loans and other obligations secured by liens on the Property; (f) the transfer of the title to the Property at the closing of a Property Sale to a Third Party Buyer must convey the Property without being subject to the Option or any of the Option Documents; and (g) the Property Sale and transfer of the title to the Property may not be defeasible by you or the Third Party Buyer after close of Escrow upon the occurrence of some future contractually-specified event. A Permitted Sale includes a Property Sale that is not in accordance with this Section 2.1 but is otherwise expressly consented to in writing by Point. If you do not comply with all requirements, Point may order an Appraisal at your cost and use the Appraised Value of the Property rather than the sale price to calculate Point Proceeds.

2.1.2 **Notices and Documentation Upon Proposed Property Sale.**

(a) Owner Notice of Intention to Sell. You must give us prompt written notification, but no later than when you list the home for sale or, if the Property will be sold off the market, then at the time that you know you intend to sell.

(b) Owner Notice of Acceptance of Offer. If you accept an offer to purchase the Property, you must give us immediate, written notification but in no event more than 5 days after your acceptance of such offer and at least 15 days prior to a closing of any such transaction.

© 2023 Point Digital Finance, Inc.                                                                 DOCSET: IL22.1

**POINT**



(c) Owner Notice Requirements. When you provide your notice of intent to sell or accept an offer, you must (a) indicate whether you elect to make an Owner Option Repurchase, or acknowledge we may make an Option Exercise in connection with the Property Sale; (b) include all related documents and agreements executed, created, obtained or delivered by you in connection with the marketing or sale of the Property; and (c) disclose whether the Property has been a Non-Owner Occupied Property at any time in the six-month period prior to the notice of intent to sell.

(d) Point Notice of Option Exercise Upon a Sale. If your notice of intent to sell or accept an offer does not indicate that you will make an Owner Option Repurchase, within five Business Days of our receipt, we may deliver a written notice to you informing you of our intent to commence our Option Exercise Upon a Sale (**"Notice of Option Exercise Upon a Sale"**). If you do not provide us with a notice of intent to sell or accept an offer, we will not have any obligation to deliver a Notice of Option Exercise Upon a Sale.

(e) Required Documentation. You shall promptly provide us all documents, purchase offers, escrow instructions, preliminary title reports and any other materials relating to the proposed sale or transfer as they become available.

2.1.3 **Ending Agreed Value and Appraisal in Property Sale.** Prior to closing on your Property Sale, we may order an Appraisal at your cost as provided in Section 4.3. You agree to comply with such process. In any Property Sale in connection with an Owner Option Repurchase or an Option Exercise Upon a Sale, the Ending Agreed Value is determined according to Schedule 2 Paragraph C.1.

2.1.4 **Closing of Sale and Owner Option Repurchase or Option Exercise Upon a Sale.**

(a) Escrow. Any Property Sale must be consummated through a licensed real property Escrow using the services of an Escrow Agent. Any instructions to the Escrow Agent regarding the disbursement of sales proceeds, the payment of our Point Proceeds and the release of the Security Instrument and, if applicable, the Notice of Option Purchase Agreement must have our prior written consent. Our consent will be given and conditioned upon our determination of your compliance with the terms and conditions of this Agreement.

(b) Concurrent Closings. The closing of an Owner Option Repurchase may occur prior to or concurrently with the Property Sale through the same Escrow as the Property Sale.

(c) Escrow Deliveries. On or prior to the close of Escrow upon any Property Sale where there will be an Owner Option Repurchase or Option Exercise Upon a Sale, (i) you agree to deliver or cause to be delivered to the Escrow Agent the appropriate deeds, affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to us, to effect your Owner Option Repurchase or our Option Exercise; and (ii) we agree to deliver or cause to be delivered the Exercise Payment to the Escrow Agent, or, at our election, the amount of the Exercise Payment may be debited against the Point Proceeds.

(d) Payment Allocations. At close of and through Escrow for a Property Sale, we shall be paid an amount equal to the Point Proceeds. You will be solely responsible for paying Closing Costs and Sales Commissions and satisfying and removing any and all loans and other obligations secured by liens on the Property.

2.2 **Owner Option Repurchase or Point Option Exercise as of Expiration Date.** Prior to the Expiration Date, (a) you may elect to terminate and repurchase the Option by paying us the Point

© 2023 Point Digital Finance, Inc.



**POINT**



Proceeds through an Owner Option Repurchase in accordance with Section 2.2.1, or (b) if you do not consummate your Owner Option Repurchase, then we shall have the right, but not the obligation, to exercise the Option as of the Expiration Date, subject to the terms and conditions of Section 2.2.2 (**"Option Exercise as of Expiration Date"**).

2.2.1 **Owner Option Repurchase as of Expiration Date.** To initiate an Owner Option Repurchase in connection with the expiration of the Option Term, you must deliver written notice to us of your election to make an Owner Option Repurchase at least 50 days prior to the Expiration Date. The closing of the Owner Option Repurchase must occur prior to the Expiration Date and should be scheduled so as to allow us to conduct the Appraisal to determine the Ending Agreed Value for purposes of calculating the Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated prior to the Expiration Date, then (a) in Point's sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated, and (b) the Option Term shall automatically be extended by 90 days after the original Expiration Date to permit us the opportunity to make an Option Exercise as of Expiration Date.

2.2.2 **Option Exercise as of Expiration Date and Property Sale.** In the event of an Option Exercise as of Expiration Date, you will first be required to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. We will then purchase the Option Percentage of the Property by paying you the Exercise Payment, which will be held in an interest-bearing escrow account (the **"Exercise Payment Escrow Account"**). Upon closing of Escrow on the exercise of the Option, we will thereby take joint ownership of the Property with you and have the right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale subject to the procedures set forth in Section 2.2.2(d). The Exercise Payment will not be released until the closing of a subsequent Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise as of Expiration Date. You shall retain physical possession and the exclusive right to occupy the Property prior to a Property Sale (except if we determine, in our sole discretion, that there are extreme circumstances affecting the condition of the Property, such as abandonment, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(a) Notice of Option Exercise as of Expiration Date. To commence our Option Exercise as of Expiration Date, we will deliver written notice to you of our intention to exercise the Option (**"Notice of Option Exercise as of Expiration Date"**) at least 30 days prior to the Expiration Date.

(b) Documentation; Appraisals; Inspections; Confirmation of Title. Within 15 days following delivery of the Notice of Option Exercise as of Expiration Date, you agree to allow us to conduct both a home inspection and an Appraisal of the Property, at your cost, for the purpose of ascertaining the market value and the condition of the Property. Upon our request, you will also provide us with Confirmation of Title to our satisfaction, effective as of the date of closing of the Option Exercise as of Expiration Date. You will deliver to us any documents necessary to grant us the exclusive right to market and sell the Property. If we are not satisfied, in our sole discretion, with the value of the Property following the Appraisal or with the Confirmation of Title, we may withdraw our intention to exercise the Option and cancel our Notice of Option Exercise as of Expiration Date in writing, without any penalty to us or any further obligation to exercise the Option.

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

**POINT**

(c) Closing on Option Exercise as of Expiration Date.

(i) **Escrow for Option Exercise as of Expiration Date.** To effect the Option Exercise as of Expiration Date and purchase our Option Percentage of the Property, we shall open an Escrow, separate from the Exercise Payment Escrow Account. The parties shall use best efforts to close Escrow by the Expiration Date, with the Exercise Payment to be held in the Exercise Payment Escrow Account until the closing of a subsequent Property Sale.

(ii) **Closing Deliveries for Option Exercise as of Expiration Date.** On or prior to the close of Escrow upon our Option Exercise as of Expiration Date, you agree to deliver or cause to be delivered to the Escrow Agent the following: (i) a Grant Deed; (ii) Closing Costs, if any; (iii) any documents or other instruments that may be required by the Escrow Agent in connection with Confirmation of Title; (iv) the appropriate affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to Point; (v) any documents necessary for Point to conduct a Property Sale following Option Exercise; and (vi) instructions to the Escrow Agent that the Exercise Payment be deposited and held in an interest bearing Exercise Payment Escrow Account pending the closing of a Property Sale. We agree to deliver or cause to be delivered to the Escrow Agent (a) a preliminary change of ownership report (or similar document) required under applicable state or local law, and (b) the Exercise Payment which will be deposited in the Exercise Payment Escrow Account, less all monetary amounts owed to Point in the form of unpaid Service Fees and unreimbursed Preservation Payments.

(d) Property Sale in Connection with Option Exercise as of Expiration Date.

(i) **Initiation of Property Sale by Owner.** If you intend to initiate a Property Sale following our initiation of Option Exercise as of Expiration Date, you must meet the Owner obligations upon a Property Sale, and the sale must meet the conditions for a Permitted Sale, as described in Section 2.1.

(ii) **Initiation of Property Sale by Point.** If we choose to initiate a Property Sale after or in conjunction with our Option Exercise as of Expiration Date, we shall provide you with 10 Business Days advance notice of our intention to solicit buyers and sell the Property to one or more third parties in a Property Sale. You shall cooperate by allowing access to the Property and promptly executing all documents reasonably presented to you by us to effect a transfer of your interest in the Property to the Third Party Buyer.

(iii) **Ending Agreed Value and Payment of Proceeds.** In any Property Sale following our Option Exercise as of Expiration Date, the Ending Agreed Value shall be as determined by Schedule 2 Paragraph C.1. At close of and through the Escrow for the Property Sale by us under this Section 2.2.2(d), the Escrow shall be conducted and sale proceeds shall be allocated and paid in the manner described in Section 2.1, except that the amount in the Exercise Payment Escrow Account shall be released to you and we shall also be paid (i) any Closing Costs that we pre-paid; and (ii) any other commercially reasonable sums expended by us in good faith in the preparation and marketing of the Property for sale.

2.3 **Option Exercise After Default and Property Sale.** At any time during the term of this Agreement, upon the occurrence of any Event(s) of Default described in Section 6.1 below, we shall have the

Page **6** of **26**

© 2023 Point Digital Finance, Inc.                                    DOCSET: IL22.1

**POINT**



right, but not the obligation, to exercise the Option (an **"Option Exercise After Default"**) pursuant to the terms of this Section 2.3 and purchase the Option Percentage of the Property by paying you the Exercise Payment which will be held in a separate Exercise Payment Escrow Account. We may then require you to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. Following the closing of escrow on Option Exercise After Default, we will thereby take joint ownership of the Property with you and have the exclusive right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise After Default. Prior to a Property Sale, you shall retain physical possession and the exclusive right to occupy the Property (except if we determine, in our sole discretion, that the Property is at risk of waste or gross neglect, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property). At any time from an occurrence of any Event of Default until the cure of such default to our sole satisfaction, we may order one or more Appraisals.

2.3.1 **Notice of Option Exercise After Default.** Upon the occurrence of any Event(s) of Default giving rise to our right to exercise the Option, we shall provide written notice to you of the default and your right to cure (the **"Notice of Right to Cure Default"**). In the event that you fail to cure the default, as determined in our sole discretion, within 30 days following delivery of Notice of Right to Cure Default, we may, but are not obligated to, declare a default and our election to exercise the Option by delivering to you a written Notice of Option Exercise After Default (the **"Notice of Option Exercise After Default"**). Upon delivery of the Notice of Option Exercise After Default, we shall automatically be permitted to commence the process to exercise the Option and close on the Option Exercise, without further notice to you, pursuant to those terms and conditions set forth for Option Exercise as of Expiration Date in Sections 2.2.2(b) - (d) above; except that we shall additionally deliver instructions to the Escrow Agent, in form and content acceptable to us, concerning disbursement of the funds in the Exercise Payment Escrow Account to remedy the Events of Default in accordance with Section 2.3.3 below. We may, but are not obligated to, record the Notice of Option Exercise After Default in the county where the Property is located.

2.3.2 **Owner Cure or Failure to Cure After Notice.** In the event we deliver you a Notice of Option Exercise After Default, you shall retain the right to cure such default, with Point to determine the sufficiency of such cure in its sole discretion, on or before the 90th day following delivery of such Notice. In the event you fail to timely or sufficiently cure the default, as determined in our sole discretion, we shall notify you of the date we have selected for close of Escrow on our Option Exercise After Default; provided, however, that close of Escrow may not occur until the 120th day following delivery of the Notice of Option Exercise After Default, at the earliest.

2.3.3 **Amounts Chargeable to Owner After Default.** You authorize us to pay all amounts necessary to any third parties to enable us to cure and remedy your Event of Default by either (a) prior to Option Exercise, reducing the Exercise Payment that is owed to you through the Escrow for our Option Exercise After Default or (b) following Option Exercise, making disbursements from the Exercise Payment Escrow Account as described in Section 2.3.1. To cure and remedy the default, we may make payments to cover your delinquent payments, accrued interest, late fees, reinstatement fees, taxes and other penalties, together with any and all amounts which we deem necessary, in our discretion, to repair, protect and maintain the Property. Additionally, Point may charge you reasonable administrative fees for our oversight of the default process.

Page **7** of **26**

© 2023 Point Digital Finance, Inc.                                         DOCSET: IL22.1

POINT

2.3.4 **Property Sale Following Option Exercise After Default.** Any Property Sale initiated by you or Point following Point's Option Exercise After Default must be conducted in accordance with the terms and conditions of Section 2.2.2(d), provided that, the Ending Agreed Value shall be determined according to <u>Schedule 2</u> Paragraph C.2.

2.3.5 **Concurrent Remedies.** Our right of Option Exercise After Default under this Section 2.3 shall be, to the extent permissible under law, concurrent with our other rights and remedies at law and in equity, including, without limitation, remedies specified in Section 6 below. We retain full discretion to select the appropriate remedy following default, and are not obligated to initiate Option Exercise prior to initiating foreclosure proceedings.

2.3.6 **Owner Option Repurchase After Default.** At any time following our delivery of a Notice of Right to Cure Default but prior to the consummation of our Option Exercise After Default, you may elect to terminate and repurchase the Option by paying us our Point Proceeds in an Owner Option Repurchase as provided in Section 1.4.1; provided that the closing of such Owner Option Repurchase must (a) occur (i) within 20 days of you providing us notice of your election to make the Owner Option Repurchase, and (ii) prior to any scheduled closing of an Option Exercise After Default; and (b) use an Ending Agreed Value determined according to <u>Schedule 2</u> Paragraph C.2 to determine the amount of Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated within the prescribed periods in this Section 2.3.6, then (a) in our sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated; (b) any waiting periods for us to be allowed to exercise of our remedies shall not be impacted; and (c) if we had delayed any exercise of our remedies because of your election, such delay shall not limit any of our rights to such remedies.

**Section Three:**
**Terminations**

3.1 **Non-Exercise; Other Terminations of Option.** Subject to the continuing duties, rights and obligations of the parties under Section 5 (Representations and Warranties) and Section 6 (Default and Remedies for Default), the Option shall terminate under the following conditions if there has not been a prior Owner Option Repurchase or Option Exercise:

    (a) upon a Property Sale for which Point receives notice of intention to sell or acceptance of an offer, as provided in Section 2.1.2, and Point elects not to exercise the Option, provided such Property Sale would have otherwise met the conditions for a Permitted Sale;

    (b) Point elects not to exercise the Option, and allows it to lapse, as of the Expiration Date;

    (c) the Property is destroyed and the insurance proceeds and proceeds of the sale of the Property are paid to Point in the full amount specified in Section 4.4.2;

    (d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to Point in the full amount specified in Section 4.5; or

    (e) Point voluntarily terminates the Option Documents in writing.

3.2 **Effect of Non-Exercise and Termination.** If the Option is terminated as provided in Section 3.1 above, then (a) the Option and our rights to exercise the Option shall immediately terminate without notice; (b) the Option Investment Payment paid to you by us shall be retained by you in

© 2023 Point Digital Finance, Inc.                                                  DOCSET: IL22.1

**POINT**



consideration of the granting of the Option; and (c) subject to any survival provisions, this Agreement and the other Option Documents shall terminate.

3.3 **Termination Following Exercise.** In the event of an Option Exercise, this Agreement shall continue in full force and effect, as provided in Section 1.2, and terminate following the consummation of a Property Sale, or other event, where we receive the full amount of our Point Proceeds; provided, however, that certain obligations and provisions of this Agreement shall survive such termination as provided in Section 7.8.

3.4 **Release after Termination.** Point will file or will cause to be filed a termination and release of the Notice of Option Purchase Agreement, if applicable, and a reconveyance or satisfaction of the Security Instrument after the Option terminates.

### Section Four:
### Additional Covenants of Owner and Point

4.1 **Covenants and Rights of Owner.**

4.1.1 **Insurance.** You shall maintain at your own expense, and at a level that will cover the cost of replacement of the Property plus improvements, insurance on the Property against fire and other hazards with only those exclusions customarily associated with special form policies, and exceptions to those exclusions for ensuing loss. In addition, Point may from time to time reasonably require by written notice that you obtain and maintain (a) insurance against any other hazards, such as flood hazards or earthquakes, which insurance is common for similar properties in similar locations, and (b) liability insurance on the Property against such risks and in such amounts as are reasonable for similar properties in similar locations. Any such required insurance shall be obtained from a nationally recognized provider. We shall be named as an additional named insured and/or loss payee (or as we otherwise direct) under all hazard and liability insurance policies obtained by you, whether or not such insurance is required under this Agreement. You expressly authorize us to communicate directly with all such insurance companies for the purposes of ensuring the maintenance of such insurance policies and the coverage and reimbursement of losses thereunder. If you fail to maintain or obtain the insurance coverage required by this Section 4.1.1, we may obtain coverage on the Property that we, in our sole discretion, deem necessary and appropriate to protect our Point Proceeds as a Preservation Payment.

4.1.2 **No Receiver.** You shall not permit the appointment of a receiver for the Property. If a receiver for the Property is appointed, we may, but are not obligated to, take such action as we in our sole discretion may deem necessary or appropriate to remove such receiver, at your expense.

4.1.3 **Rental Premium.** You shall provide us with prompt written Notice in the event the Property becomes a Non-Owner Occupied Property at any time after the Effective Date. If the Property becomes a Non-Owner Occupied Property at any time within the six-month period prior to a Property Sale or prior to an Appraisal of the Property done for purposes of calculating the Point Proceeds, then you shall pay us the Rental Premium, which will be added to the Point Proceeds. The Rental Premium will not be assessed if (i) the Property is identified as a Non-Owner Occupied Property as of the Effective Date and as indicated in Section 1.1 or (ii) in the event the Ending Agreed Value is less than the Original Agreed Value. Without limiting the foregoing, a Property may not be subject to a rental or lease period that extends beyond

© 2023 Point Digital Finance, Inc.                                                     DOCSET: IL22.1

POINT

the Expiration Date without Point's prior written consent.

4.1.4 **Service Fees.** You shall pay all Service Fees imposed by us from time to time in accordance with this Agreement. Service Fees shall include, without limitation: (a) reasonable fees for processing your requests for subordination; (b) reasonable fees for processing your requests for Property title or ownership changes; (c) reasonable fees for processing any reconveyance or renewal recordings of our Option Documents; (d) reasonable fees for processing Preservation Payments; (e) reasonable fees relating to a default by you, including administrative fees for our oversight of the default process; and (f) charges to cover any third party or other out-of-pocket costs relating to any of the foregoing categories (including, for example, charges imposed by title companies and Escrow companies, recording of documents, and reasonable attorneys' fees).

4.1.5 **Existing Loans.** Without our express written approval, you shall not increase, or permit the increase of (whether through negative amortization or otherwise), any existing loans secured by liens on the Property.

4.1.6 **Liens and Secured Obligations.** You shall at all times pay and keep current any and all loans and obligations secured by liens on the Property. You shall not encumber the Property with any secured obligation that is either senior to or could have the effect of impairing Point's lien position.

4.1.7 **Occupancy.** You shall enjoy sole right of occupancy of the Property as an owner and not as a tenant or lessee, whether or not we have exercised the Option, subject to the rights of you and Point to sell the Property pursuant to the terms of this Agreement. The foregoing sole right of occupancy shall be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your right of sole occupancy is not transferable by you except as part of a Property Sale or Exempted Owner Property Transfer, or as otherwise permitted by us in our sole discretion.

4.1.8 **Tax Benefits.** You shall be entitled to the full benefit of any and all tax advantages arising in relation to the Property, including, without limitation, all available deductions for taxes paid by you; provided, however, that you shall not be entitled to any tax benefits arising out of or attributable to any unreimbursed Preservation Payment.

4.1.9 **Obligation to Provide Information to Point.** Upon our reasonable request, you shall answer questions regarding the status of the Property and provide to us such reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage and information available to you concerning the Property and any modifications to the Property. You or your representative shall immediately provide Point with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, or Point's ability to exercise any right conferred by any of the Option Documents, including, without limitation, (a) the death or divorce of any Owner, (b) the death of any Trustee or Trustor (where Owner is/are the Trustee(s) of a Revocable Trust), or (c) the occurrence of an Event of Default.

4.1.10 **Debt Payoff.** A portion of the Option Investment Payment may be paid to settle and discharge your debts and outstanding amounts owed to third party creditors (the "Debt Payoff"). Point and Owner will instruct the Escrow Agent handling the Option Grant Closing to make disbursements for the Debt Payoff. Point and Owner agree that the Debt Payoff Amount represents the amounts due to the creditors and the Debt Payoff Amounts specified in the Option Agreement Estimate and Closing Disclosure are estimates based on the best

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

**POINT**

information we have prior to the Option Grant Closing. You agree that the daily amounts of each debt may fluctuate and that Point may change the final amounts paid to each creditor to best accomplish the parties' intent. These amounts may increase due to accrual of interest between the Effective Date and the date funds are disbursed through escrow. These amounts may also decrease due to payments that You made prior to the Option Grant Closing. Point and Owner agree that the actual amount to be paid through escrow to Owner's creditors will include all interest accrued and due as of the date of the Option Grant Closing and may be an amount greater or lesser than the estimated Debt Payoff Amount indicated on the Closing Disclosure. Any amounts due to creditors in excess of the estimated Debt Payoff Amount will be deducted from the remaining Option Investment Payment due to Owner. Any changes made to the Debt Payoff will not affect the amount of the Option Investment Payment.

Owner is responsible for paying off any existing debts and outstanding amounts owed to third party creditors that are not part of the Debt Payoff.

We will send you written confirmation of the exact amounts paid pursuant to the Debt Payoff following the Option Grant Closing. Within ten days of receiving payment of the Option Investment Payment following the Option Grant Closing, you will initiate payments in accordance with the terms of this Agreement to those third party creditors who were not paid through Escrow in connection with the Option Grant Closing; within 45 days of the Option Grant Closing, you will provide Point with written evidence from your bank or the third party creditors of payments made pursuant to this Section 4.1.10.

## 4.2 Covenants and Rights of Point.

4.2.1 **Point's Interest in the Property.** Until the time you consummate an Owner Option Repurchase or Point closes on the Option Exercise, Point has a contingent ownership interest in the Property. Following the closing of the Option Exercise, Point will have joint ownership rights in the Property.

4.2.2 **Preservation Payments.** To the extent that you fail to take action to protect the Property and Point's Rights as required under this Agreement, we shall have the right in our sole discretion to take such action and pay such money as we deem appropriate to correct your failure to take such required action (**"Preservation Payments"**). We shall give you five Business Days written notice of your failure prior to our taking corrective action. You shall promptly, upon demand for payment, but not later than 10 Business Days after demand, pay or reimburse us for any and all Preservation Payments, including, without limitation, those related to: the placement of insurance, the payment of taxes, expenses to remove or prevent a receiver for Property or the cure of defaulted loans. Point shall be entitled to charge you an interest rate of 8% per annum (or less if limited by applicable law) on any Preservation Payments it makes. Interest will begin to accrue on the date Point makes the Preservation Payment and will continue to accrue until Point is repaid or receives its Point Proceeds.

4.2.3 **Waiver of Right to Partition.** Owner and Point each hereby waive and relinquish all rights either of them may now or hereafter have to seek partition of the Property, whether in kind or by sale; provided, however, that Point shall retain the right to seek a partition: (a) in the event of, and as part of any action arising out of an Event of Default which is not timely cured pursuant to Section 2.3 above; or (b) in connection with any claim or action by Owner which asserts in whole or in part that this Agreement or any portion hereof is against the law or otherwise unenforceable.

© 2023 Point Digital Finance, Inc.　　　　　　　　　　　　　　　　DOCSET: IL22.1

**POINT**



4.2.4 **Right to Disclose Certain Information.** We may share certain personal and financial information with regard to this Agreement with our affiliates, subsidiaries, assignees and persons with which we intend to conduct business, including, without limitation, the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement.

4.2.5 **No Point Liability and No Point Loans.** Point shall not be liable for (including liability to repay) any loans created or obtained by you whether before or after any exercise of the Option and whether or not consented to, approved of, or subordinated to by Point. Further, we shall have no liability for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

4.3 **Appraisals.**

4.3.1 **Appraisal Order.** In the event of (a) a proposed Property Sale; (b) a proposed Owner Option Repurchase; (c) a determination of Ending Agreed Value as of the Expiration Date; (d) any allocation of insurance proceeds; (e) an Event of Default (at any time and on more than one occasion until the cure of such default or until an Owner Option Repurchase or a Property Sale following an Option Exercise After Default); or (f) any determination of Liquidated Damages pursuant to Section 8 of the Security Instrument, we may, in our sole discretion, (i) order an appraisal; (ii) order a broker's price opinion; (iii) order an underwriting-grade automated valuation model; or (iv) conduct any other reasonable valuation method to determine the value of the Property (collectively, an **"Appraisal"**). Subject to this Section 4.3, the value reflected on the Appraisal shall be the **"Appraised Value"** of the Property.

4.3.2 **Owner Cooperation.** You will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any and all relevant documentation in your possession pertaining to conditions that may affect the value of the Property. In addition, upon any Appraisal, you will inform us if the Property has been a Non-Owner Occupied Property in the six-month period prior to the Appraisal and, if currently a Non-Owner Occupied Property or anticipated to be a Non-Owner Occupied Property, the current rental or lease term, and any renewal rights, for the tenant.

4.3.3 **Additional Appraisals.** Subject to this Section 4.3.3, either Owner or Point may elect to order second and third Appraisals when an Appraised Value is needed under this Agreement. If either party desires to have a second Appraisal, then (a) the second Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the first Appraisal, and (b) the Appraised Value will then be the average value of the two Appraisals. If either party desires to have a third Appraisal, then (i) the third Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the second Appraisal, and (ii) the Appraised Value will then be the median value of the three Appraisals.

4.3.4 **Cost of Appraisal.** You shall pay all expenses associated with the first Appraisal on the Property ordered in connection with any event described in Section 4.3.1. The party that orders an additional Appraisal in connection with Section 4.3.3, if any, shall pay all expenses associated with such additional Appraisal. If you fail to pay the expenses associated with the first Appraisal or any additional Appraisal you request, we may subtract such expenses, or direct the payment of such expenses, out of Escrow.

4.4 **Property Destruction or Damage; Insurance.**

© 2023 Point Digital Finance, Inc.                                                                                                  DOCSET: IL22.1

**POINT**

4.4.1 **Repair and Restoration.** If the Property is destroyed or damaged in any material manner, you shall restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with Senior Liens on the Property, you shall apply any and all insurance proceeds (whether or not the underlying insurance was required by us) to such restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you shall be responsible for any shortfall and we shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

4.4.2 **Allocation Where Repair Not Feasible.** If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you shall obtain an Appraisal, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any and all insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (a) to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by us) reasonably incurred by you, a senior lender and/or Point in collecting and contesting with the insurers the payments under the relevant insurance policies; (b) to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens; (c) to us, an amount calculated according to the Calculation of Point Proceeds; and (d) to you, the balance of the proceeds.

4.4.3 **Failure to Maintain Adequate Insurance.** If (a) you fail to maintain insurance in amounts required by Section 4.1.1 above or any insurance claim is denied due to your action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to us the entire amount owed as set forth in Section 4.4.2 above, then there shall be an Exercise Payment Insurance Reduction proportional to the decrease in the Property's value as compared to the Appraised Value of the Property immediately prior to the destruction or damage. In this case, we may exercise the Option (if we have not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 2.3 above, except that the Exercise Payment shall be reduced because of the added economic burden and risk imposed on Point by virtue of your failure. The Exercise Payment Insurance Reduction shall be taken into account in the calculation of the amount due to us according to the Calculation of Point Proceeds. The proceeds of any sale pursuant to this Section 4.4.3, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by us), will be allocated as described in Section 4.4.2 above.

4.5 **Condemnation.** If the Property is condemned in whole or in part and the Option has been exercised, then all condemnation proceeds net of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by Point) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds (**"Net Condemnation Proceeds"**) shall be allocated as provided in Section 4.4.2(b) – (d) above. If the Property is condemned in part, and if the Option has not been exercised, then we will have the right to exercise the Option, calculating our Point Proceeds using the Net Condemnation Proceeds as the Ending Agreed Value. The proceeds shall be allocated as provided in Section 4.4.2(b) – (d) above. In the case of a partial condemnation, Point's Rights shall be retained with respect to any portion of the Property that has not been condemned.

© 2023 Point Digital Finance, Inc.                                                      DOCSET: IL22.1

**POINT**

## Section Five:
## Representations And Warranties

5.1 **In General.** The Owner makes the representations and warranties in this Section 5 to, and for the benefit of, Point. The representations and warranties of Owner in this Section 5 shall be deemed made and renewed on and as of: (a) the Effective Date; (b) if you effect an Owner Option Repurchase, the date the repurchase is consummated; (c) if the Option is exercised, the date the exercise is consummated; and (d) upon any permitted assignment by you. The truth, accuracy and completeness of the representations, warranties and covenants set forth in this Section 5 at and as of each date in (a) – (d) above are a condition precedent to any and all of our obligations under each of the Option Documents.

5.2 **Capacity; Authority.** You represent and warrant that you, as the Owner(s) identified above, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. Your fee simple title to the Property is marketable and insurable, free of restrictions, leases, liens and other encumbrances or interests, and except as specifically identified in the Confirmation of Title delivered to Point, except with respect to Acknowledged Pre-Existing Liens. You represent and warrant that you have the full capacity and the legal power, right and authority to grant the Option, to enter into this Agreement and the other Option Documents, and to consummate the transactions contemplated by those documents. If you are the Trustee(s) of a Revocable Trust: (a) such trust has been duly formed; (b) the Trustee(s) of such trust have the capacity and authority to enter into the Agreement and the other Option Documents; and (c) copies of all trust documents (and all amendments and supplements) have been delivered to Point.

5.3 **No Lawsuits, Claims, or Foreclosures.** There is no litigation or arbitration pending or, after your due and diligent inquiry, to the best of your knowledge, threatened against you that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or your ability to perform your obligations under this Agreement. You have not received or are not aware of notice of any special assessment or other proceedings affecting the Property nor of any: (a) default or notice of default with respect to any loan or other obligation secured by the Property; (b) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (c) information or notice that the Property is to be sold or foreclosed upon by a party holding a lien on the Property.

5.4 **No Violations.** You have no knowledge of or information concerning any violations of any laws, regulations, zoning ordinances or other land-use regulation proceedings relating to the Property and no knowledge that any operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by you or others are not, have not been or will not be in all material respects in compliance with all state, federal and local laws, zoning ordinances, and regulations.

5.5 **Environmental Matters.** You have no knowledge of or information concerning any violation of, or claim of violation of any state, federal or local environmental law or regulation, including, without limitation, those relating to hazardous materials (**"Environmental Laws"**). In addition, you have no knowledge of the presence of any hazardous materials on, in, or about the Property or property in the vicinity of the Property. You shall not, and shall not allow others to, violate any laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

5.6 **Documentation and Information Supplied by Owner; Financial Condition of Owner.** Your application to Point and all financial and other documentation and other information (including

© 2023 Point Digital Finance, Inc.                                      DOCSET: IL22.1





**POINT**

documentation and information about the Property) supplied or made available by you or your spouse, if applicable, as part of applying for, or in connection with entering into, the Option and the Option Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's) financial condition as of (a) the date supplied, and (b) the Effective Date of this Agreement. There has been no material change in your financial condition as of the Effective Date since your application to Point.

5.7 **Conflict; Enforceability.** You represent and warrant that: (a) the execution and delivery of the Option Documents, the incurrence of the obligations set forth in those documents, the consummation of the transactions contemplated by, or compliance with the terms of, those documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which you are a party or by which any portion of the Property may be bound; and (b) the Option Documents and all other documents required to be executed by you in connection with those documents shall be valid, legally binding obligations of, and enforceable against, you and, if applicable, Trustor(s) and any successors or assignees in accordance with their terms.

**Section Six:**
**Defaults and Remedies For Default**

6.1 **Events of Default.** The occurrence of any of the following shall constitute an Event of Default ("**Event of Default**") under the Option Documents, in Point's sole discretion:

(a) you breach or fail to perform any obligation or covenant under any of the Option Documents (including but not limited to any failure or refusal to honor Point's Rights), or reject or take any action to terminate the Option or this Agreement, except as expressly permitted under this Agreement;

(b) you fail to timely provide to us any Notice(s) required under this Agreement;

(c) you make any representation or warranty, whether oral or written, to us that is false or misleading as of the time given, including, without limitation, any misrepresentation or suppression of material fact in connection with the amount or kind of consideration given to you in any Property Sale and the representations and warranties in Section 5;

(d) any event of your insolvency, including but not limited to the commencement of any voluntary or involuntary bankruptcy proceeding by or against you or the appointment of a receiver for the Property or you or a conservator of your affairs;

(e) any taxes or assessments on the Property become delinquent;

(f) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with the provisions of this Agreement;

(g) any senior lien that does not have our prior written approval attaches to the Property;

(h) any loans that are secured by liens on the Property, whether recorded or unrecorded, become delinquent (whether or not such loans or liens have been approved or subordinated to by Point);

Page **15** of **26**

© 2023 Point Digital Finance, Inc.                                                  DOCSET: IL22.1



(i)  you fail to maintain, preserve or repair the Property in good repair and in a condition substantially similar to its condition on the date of this Agreement, except for normal wear and tear;

(j)  insurance on the Property is not maintained as prescribed in this Agreement;

(k)  any assignment, attempted assignment, or other transfer of the Option or Option Documents in violation of Section 7.7.2 below;

(l)  if no Owner or no renter authorized by the Owner uses the Property as regular living and sleeping quarters for more than 730 consecutive days; provided that any non-occupancy due to renovation on the Property will not be counted against such two-year period;

(m)  the Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date;

(n)  you fail to cooperate with us, which we will determine in our sole discretion, to effect a Property Sale before or after Option Exercise as of Expiration Date or Option Exercise After Default; or

(o)  any other action or event occurs which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, Point's right to exercise the Option or Point's Rights.

6.2  **Remedies Following Event of Default.**  In an Event of Default, Point may exercise any of the following remedies and any other rights and remedies available to us in law, equity or otherwise:

6.2.1  **Exercise Option and Receive Point Proceeds.**  As provided in Section 2.3, upon the occurrence of any Event(s) of Default, we shall have the right, but not the obligation, (a) to exercise the Option and take joint ownership of the Property with you and (b) then solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale, and receive our Point Proceeds in connection with such Property Sale.

6.2.2  **Foreclosure/Power of Sale Under State Laws.**  Point shall be entitled, in its sole discretion, to exercise Point's power of sale under the Security Instrument, and to foreclose upon the Property to the extent permissible under applicable law. Point shall follow and be bound by those procedures prescribed under law for foreclosure of residential real property established in the jurisdiction where the Property is located. In the event Point elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 6.2.2, Point may declare any and all of the sums specified as Liquidated Damages immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

6.2.3  **Damages for Breach.**  We shall be entitled, in our sole discretion, but are not obligated to, demand damages for any Event(s) of Default, calculated according to the Calculation of Point Proceeds set forth in Schedule 2.

6.2.4  **Specific Performance, Rescission and Injunctive Relief.**  You and we agree that if we are not allowed to exercise our rights under any of the Option Documents, or if you fail to comply with your obligations thereunder, the damages to us would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity or otherwise, we shall be entitled to seek specific performance of the covenants, agreements and rights contained in each of the Option Documents, or, as permitted by applicable law, to seek full

© 2023 Point Digital Finance, Inc.                                                                 DOCSET: IL22.1

**POINT**



rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity or otherwise, we shall thereafter be entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

6.3 **Repayment in Bankruptcy.** In the event we are required to and do remit or disgorge one or more dollars paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then Point shall be entitled to assert a claim against you for each such dollar remitted (and permitted costs herein) under the terms and conditions of this Agreement, and such claim by us shall begin to accrue on the date such dollar is actually remitted and shall automatically survive the term of this Agreement.

6.4 **Calculation of Liquidated Damages.** To the extent that enforcement of the Security Instrument and any power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount, Owner and Point agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) default(s) as specified in this Section 6 may be uncertain, depend on many factors, and be extremely difficult to ascertain, and that a good faith effort to determine a method for reasonably estimating and liquidating such damages is the calculation of Liquidated Damages according to the Calculation of Point Proceeds set forth in Schedule 2. The amount in default or liquidated bid amount under any remedy may also include all, or any, of the following: (i) the sum of all monetary obligations owed to us by you under this Agreement; and (ii) any and all amounts, properly chargeable to you as necessary to satisfy your obligations with respect to your mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

6.5 **Remedies Concurrent and Not Exclusive.** The remedies set forth in this Section 6 shall be concurrent, cumulative and not exclusive, to the extent permitted by law. Every right, power and remedy granted to Point in the Option Documents shall be in addition to all those rights, powers and remedies granted to Point at law or in equity or by statute, and each such right, power and remedy may be exercised from time to time and as often and in such order as may be deemed expedient by Point to the extent permitted by law, and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.

**Section Seven:**
**Miscellaneous**

7.1 **Indemnification by Owner and Maximum Liability.** You hereby agree to defend, indemnify and hold Point harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees, to the extent permissible) of every kind arising out of or relating to: (a) a breach of any of your representations or warranties under this Agreement or the other Option Documents; (b) any act or omission by you or your agents; or (c) the Property. Notwithstanding your indemnification obligation under this Section 7.1, at our election, we may defend any third party claim subject to your indemnification obligation with counsel of our own choosing and without your participation. You shall not, without our prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING OWNER'S INDEMNIFICATION OBLIGATION, IN NO EVENT SHALL POINT'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO

© 2023 Point Digital Finance, Inc.                                                      DOCSET: IL22.1

POINT



THIS AGREEMENT OR THE PROPERTY EXCEED THE AMOUNT OF THE OPTION INVESTMENT PAYMENT.

7.2 **Asset Administration.** You acknowledge and consent to any assignment whereby the Asset Administrator's responsibilities, including, but not limited to, the right to enforce the Option Documents, are transferred from us to a third party. You will be notified of any change in the Asset Administrator within 30 days of such change.

7.3 **Covenants to Run With Land.** The provisions of this Agreement shall be deemed to be covenants running with the land so long as this Agreement remains in effect. We shall record a Notice of Option Purchase Agreement reflecting this fact in the public records. Upon valid termination of this Agreement, the Notice of Option Purchase Agreement shall automatically terminate, and we shall cause to be recorded such documents as are required to reflect such termination.

7.4 **Relationship.** Point shall not be deemed a partner, joint venturer, trustee, or fiduciary with, or of, Owner. Owner shall not be permitted to execute any document or enter into any agreement on behalf of Point. The Option is intended to be and shall be treated for all purposes (including, without limitation, tax purposes) as an option to purchase real property and not as a purchase, or joint venture.

7.5 **Multiple Owners and Revocable Trusts.**

    7.5.1 **Multiple Owners.** If Owner is more than one person or entity: (i) the Option Documents must be signed by each such Owner; (ii) all rights and powers specified for Owner in the Option Documents must be approved and exercised unanimously by all such multiple Owners; (iii) all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under the Option Documents; (iv) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 7.13; and (v) Point may treat any notice received from any one Owner as notice from all Owners.

    7.5.2 **Revocable Trusts.** If any Owner is/are the Trustor(s) or Trustee(s) of a Revocable Trust: (i) all Trustors must sign the Option Documents in their capacities as individuals and as Trustors; (ii) all Trustees must sign the Option Documents in their capacities as Trustees; (iii) each Trustee and Trustor who signs this Agreement hereby represents and warrants that all Trustees and Trustors have been disclosed to Point; (iv) all rights and powers specified for, and all actions required of, Owner in the Option Documents must be approved and exercised by all Trustees unanimously; (v) all Trustors, in their capacities as individuals, shall be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under the Option Documents; (vi) all representations and warranties by Owner in the Option Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (vii) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of the Trustees using the contact information set forth in Section 7.13 of this Agreement; and (viii) Point may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

7.6 **Delegation of Duties.** We may execute any of our duties under this Agreement or any other Option Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel shall be deemed to have been taken in good faith. We shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

© 2023 Point Digital Finance, Inc.                                        DOCSET: IL22.1

**POINT**



7.7 **Successors and Assignees; Owner's Estate.** The Option Documents shall be binding upon and insure to the benefit of Owner and Point and their respective heirs, successors and assignees. If the Owner dies, then the Option Documents shall be binding on the Owner's Estate. The death of the Owner shall not terminate any of the Option Documents. However, nothing in this provision shall permit assignment of any of the Option Documents contrary to the express provisions of this Agreement.

    7.7.1 **Assignment by Point.** Point may assign, participate, hypothecate or sell, in whole or in part, Point's right and title to, and interest in, any of the Option Documents at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any assignment, Point may in its sole discretion disclose any and all documents and information in its possession relating to Owner and the Property, subject to its assignee's agreement to continue to observe Point's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Point's assignee shall automatically have all the rights and remedies of Point under the Option Documents. Point and Owner shall execute and deliver in recordable form, if requested, at Point's expense, such other documents as are appropriate to reflect the assignment of the Option and the other Option Documents. Point and Owner agree to cooperate with such assignee and execute such additional documents as may be necessary to insure assignee's interest in the Property. Point shall notify Owner no later than 60 Business Days after the effective date of any such assignment.

    7.7.2 **Assignment of Agreement by Owner.** Absent Point's prior written consent, which consent may be withheld in Point's sole discretion, Owner may not assign or otherwise transfer any of the Option Documents. Notwithstanding the foregoing, Point will generally not unreasonably withhold consent to such assignment to: (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse who acquires an undivided interest in the Property; provided that in each case the assignee (including, in the case of a Revocable Trust, any Trustor): (A) was alive as of the Effective Date, (B) executes this Agreement and, if applicable, the Notice of Option Purchase Agreement, and (C) executes such assignment with the assignor (hereinafter, **"Exempted Owner Assignment(s)"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, shall continue to remain liable under the Option Documents.

    7.7.3 **Exempted Owner Property Transfer.** If Owner obtains Point's prior written consent, the Owner may Transfer the Property into the name of (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse; provided that the requirements for an Exempted Owner Assignment under Section 7.7.2(A) – (D) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer will not be considered a Property Sale and will not trigger Point's right to exercise the Option.

7.8 **Survival.** The following provisions shall survive any termination of this Agreement: (a) the indemnification and liability cap provisions of Section 7.1; (b) the obligations to repay any and all Preservation Payments and Service Fees; (c) the obligation to remove any liens on the Property and pay any Sales Commissions, Closing Costs and or other expenses properly chargeable to Owner under Section 2; (d) any and all provisions which entitle Point to monetary remedies, fees, costs and expenses in connection with any Event of Default under Section 6; and (e) Sections 7.6 through 7.22 of this Agreement.

© 2023 Point Digital Finance, Inc.      DOCSET: IL22.1

**POINT**



7.9 **Injunction.** If we are stayed or enjoined from exercising the Option, commencing or initiating Option notice and exercise procedures hereunder (whether as a result of Owner's bankruptcy or otherwise), or enforcing any right of Point under this Agreement, the Option shall not expire until 90 Business Days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period prescribed in the Option Documents which we are prevented or prohibited from observing by operation of law or by court order, shall automatically be stayed for the duration of such stay, injunction or legal prohibition until such stay, injunction, or legal prohibition is no longer applicable or is lifted by final order of the appropriate court.

7.10 **Choice of Law; Venue.** The Option, this Agreement and the other Option Documents shall be determined under, governed by, and construed in accordance with California law, without regard to its conflict of law principles; provided, however, that to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws shall be deemed to govern and control. Subject to Section 7.20, the parties agree that all actions or proceedings arising in connection with this Agreement shall be arbitrated at a JAMS arbitration location, or injunctive relief sought only in the state and federal courts located in or having jurisdiction in the city or county in which the Property is located.

7.11 **Further Assurances.** The parties agree, from time to time, as and when requested by any other party to this Agreement and the other Option Documents or by its successors or assignees to: (a) execute and deliver, or cause to be executed and delivered, all such instruments; and (b) take, or cause to be taken, all such further or other actions as may be reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Option Documents.

7.12 **Severability; Waivers.** Each provision of this Agreement, and of the other Option Documents, shall be severable from every other provision for the purpose of determining the legal enforceability of any provision, which shall be construed separately and as separately enforceable from every other provision hereunder. No waiver by Point of any of its rights or remedies in connection with this Agreement or the other Option Documents shall be effective unless such waiver is in writing and signed by Point and Owner, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No delay or waiver by Point in exercising any right shall be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse. To the extent that enforcement of any provision, or exercise of any right, under this Agreement or the other Option Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then such provision shall be considered separately and apart from the remaining provisions, and any and all other remaining provisions shall continue to be fully enforceable under law.

7.13 **Notice.** Each party shall deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a **"Notice"**) in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address. Owner shall promptly notify Point of Owner's change of address. Notice to any one Owner shall constitute notice to all Owners unless applicable law expressly requires otherwise. Notice from any one Owner shall constitute notice from all Owners unless applicable law expressly requires otherwise. Each party shall deliver all Notices by first class mail, personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission). Except as otherwise provided in this Agreement, a notice to Owner

© 2023 Point Digital Finance, Inc.                    DOCSET: IL22.1

**POINT**



in connection with this Agreement shall be deemed to have been given to Owner when mailed by first class mail or when actually delivered to Owner's notice address if sent by other means. Any notice in connection with this Agreement shall not be deemed to have been given to Point until actually received by Point. If any notice required by the Security Instrument is also required under applicable law, such requirement of the applicable law will satisfy the corresponding requirement under this Agreement.

| POINT: | OWNER: |
| --- | --- |
| Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>**Personal or Overnight Delivery:**<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, CA 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | James B. Muskal<br>1312 N ASTOR ST<br>CHICAGO, IL 60610<br>Phone: (312) 616-5630<br>Email: jmuskal@leydig.com |

7.14 **Entire Agreement; Amendment.** The Schedules and Exhibits below, and any riders to this Agreement, are incorporated herein by this reference. This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the other written agreements made by and between Owner and Point as of the Effective Date together constitute the entire agreement between the parties pertaining to the subject matter contained in them. Except as expressly agreed in writing, all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Option Documents, and the transaction which is the subject matter thereof, including but not limited to any and all offer letters, terms sheets and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the party against whom enforcement is sought.

7.15 **No Third-Party Beneficiaries.** This Agreement and the other Option Documents are entered into for the protection and benefit of Point and Owner and their respective heirs, permitted successors, affiliates and assignees with regard to their respective present and contingent ownership interests in the Property. No other Person shall have any rights or causes of action under this Agreement or the other Option Documents.

7.16 **Counterparts; Electronic Signatures.** This Agreement and the other Option Documents may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law,

© 2023 Point Digital Finance, Inc.                                                                 DOCSET: IL22.1

**POINT**



including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.17 **Registered Domestic Partnerships and Civil Unions.** An Owner shall have the same rights and obligations with respect to Owner's Civil Union Partner or Registered Domestic Partner as the Owner shall have with respect to its spouse for all purposes under the Option Documents, including Sections 7.7.2, 7.7.3 and 7.18 of this Agreement, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

7.18 **Consent of Spouse.** If you are married on the date of this Agreement and your spouse is not listed on the title to the Property, your spouse must execute and deliver to us a notarized Consent of Spouse in the form of Exhibit B attached to this Agreement (**"Consent of Spouse"**). If you should marry or remarry after the Effective Date, within 30 days after the marriage, you and your spouse shall execute and deliver to us a notarized Consent of Spouse. The Consent of Spouse will not be deemed to confer or convey to your spouse any rights in the Property that do not otherwise exist by operation of law.

7.19 **WAIVER OF JURY TRIAL.** TO THE FULLEST EXTENT PERMITTED BY LAW, POINT AND OWNER HEREBY VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE OPTION DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE OPTION DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN POINT AND OWNER.

7.20 **ARBITRATION.**

7.20.1 *Arbitration.* OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE **"RULES"**) OF, AND PURSUANT TO THE STATE LAW OF, THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2.

7.20.2 *Procedure.* OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS (**"JAMS"**), AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. THE PARTIES SHALL BE ENTITLED TO PRE-HEARING DISCOVERY AND THE EXCHANGE OF NON-PRIVILEGED INFORMATION RELEVANT TO THE DISPUTE, CONSISTENT WITH JAMS' RULES AND CALIFORNIA LAW, AND AS OVERSEEN BY THE ARBITRATOR. OWNER AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. OWNER ALSO

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

POINT



AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. OWNER UNDERSTANDS THAT POINT WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

7.20.3 *Remedy.* EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND POINT. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR POINT WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

7.20.4 *Availability of Injunctive Relief.* BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF POINT ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE POINT PROCEEDS IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

7.20.5 *Small Claims Court.* BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION.

7.20.6 *Class Action Waiver.* ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR WE MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

7.21 **TAX MATTERS**. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN OPTION TO PURCHASE AN INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT POINT HAS REQUESTED THAT OWNER DISCUSS THIS

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

POINT

AGREEMENT WITH TAX, LEGAL AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

7.22 **NO ADVICE.** IN ENTERING INTO THE OPTION DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND SHALL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY POINT, ITS AGENTS, ITS AFFILIATES, OR ANY OF THEIR OFFICERS, EMPLOYEES OR AGENTS, REGARDING: (A) THE VALUE OF THE PROPERTY OR THAT THE ORIGINAL AGREED VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE OR FAIR MARKET VALUE OF THE PROPERTY; (B) THE ADVISABILITY OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE; OR (C) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY POINT TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

7.23 **Cancellation.** You may cancel this Agreement at any time within three Business Days from the date you sign this Agreement. If you wish to cancel this Agreement, you must send written notice to us in accordance with Section 7.13 within three Business Days from the date you sign this Agreement. If you cancel this Agreement and have already received the Option Investment Payment, you agree to immediately repay the amount of the Option Investment Payment to us.

7.24 **Consent to be Contacted.** You expressly authorize us, our agents, representatives, affiliates, successors, and assigns to contact you for any purpose arising out of or relating to the Option or Option Documents at any phone number that you have provided us or will provide us in the future, including but not limited to autodialed or prerecorded phone calls or text messages, regardless of whether the phone number is a cellular telephone number or landline. You represent and warrant that you are the owner or regular user of any phone numbers that you provide us and acknowledge that your carrier's telephone minute and text charges may apply. You also agree to notify us immediately whenever you stop using any mobile numbers that you have provided us.

**[Signatures on Following Pages]**

© 2023 Point Digital Finance, Inc.                                                    DOCSET: IL22.1

**POINT**

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**POINT:**

POINT DIGITAL FINANCE, INC., a Delaware corporation

By:

Name:    Jordan D. Fox

Title:    Assistant Secretary

© 2023 Point Digital Finance, Inc.        DOCSET: IL22.1

POINT

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.


**OWNER:**

James B. Muskal

© 2023 Point Digital Finance, Inc.                                        DOCSET: IL22.1

**POINT**

## APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below:

**Acknowledged Pre-Existing Lien.** A perfected lien upon the Property securing an Acknowledged Pre-Existing Loan that is senior to (a) the lien of the Security Instrument, (b) the covenants running with the land under this Agreement, and (c) the Option; (i) of which Point had actual written notice under a title report, title search or title commitment obtained in connection with this Option transaction; and (ii) that is acknowledged in writing by Point before or upon Point's execution of this Agreement.

**Acknowledged Pre-Existing Loan.** An obligation secured by an Acknowledged Pre-Existing Lien, including, without limitation, any and all principal, interest, and expenses.

**Agreement.** This Point Digital Finance Option Purchase Agreement between Owner and Point and all exhibits, schedules, attachments, riders, and all amendments, supplements, and addenda now or hereafter executed by the parties.

**Aggregate Principal Balance of Indebtedness.** The amount of the total principal balance of the loans or any other indebtedness secured by liens on the Property plus the amount of the Point Proceeds as it is calculated at the time of determining the Aggregate Principal Balance of Indebtedness. In the case of an open-end line of credit, the unused portion of any line of credit shall be considered principal indebtedness.

**Appraisal.** Is defined in Section 4.3.1.

**Appraised Value.** Is defined in Section 4.3.1.

**Appreciation.** Is calculated as the Ending Agreed Value minus the Original Agreed Value.

**Arm's Length Transaction.** A transaction in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, as by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property. An Arm's Length Transaction would presumptively not include a transaction between family members or business associates, or where there are hidden terms or agreements or special understandings between the parties, whether written or oral, for the seller to regain ownership of the Property or the buyer to immediately resell the Property within 90 Business Days and the seller to receive any proceeds from such resell transaction.

**Asset Administrator.** The entity responsible for monitoring Owner's compliance with, and discharging Point's responsibilities and maintaining Point's rights under, this Agreement and the other Option Documents. Initially, the Asset Administrator will be Point Digital Finance, Inc.

**Business Days.** Any day other than a Saturday, a Sunday, Good Friday, the day after Thanksgiving, or a day on which commercial banks in New York or California are required or authorized to be closed.

**Calculation of Point Proceeds.** Is defined in Schedule 2.

**Civil Union Partner and Registered Domestic Partner.** The natural person having such status under the California Family Code Section 299 or applicable state law.

© 2023 Point Digital Finance, Inc.    DOCSET: IL22.1

**POINT**



**Closing Costs.** All (a) ordinary and customary costs in connection with any sale or other Transfer of the Property or any assignment or exercise of the Option related to such Transfer, including, without limitation, recording fees and costs, reconveyance fees, Escrow fees, title insurance fees or fees incurred in obtaining the Confirmation of Title elected by Point, transfer taxes and documentary transfer taxes, and (b) federal, state or local taxes (excluding income taxes) arising, incurred or owed in connection with (i) Point's exercise or sale of the Option, (ii) a Property Sale, (iii) any related closing of that sale, or (iv) any related Escrow. However, the term "Closing Costs" shall not include costs that are owed or incurred by a third party other than Point in connection with a sale of the Property to that third party.

**Confirmation of Title.** Confirmation of good and marketable title in and to the Property in fee simple and free of any liens or encumbrances of whatever character, subject only to the Permitted Encumbrances, to be provided, in Point's sole discretion, in the form either of a policy of title insurance issued to, or for the benefit of, Point or Point's assignee at the time that this Agreement is entered into (or at such other times as may be required by Point under this Agreement) and insuring Point's or Point's assignee's rights under the Option Documents; or of a written title report, abstract of title or other title search documentation reflecting, to Point's satisfaction, confirmation of its good and marketable title to Point's ownership interest in the Property.

**Consent of Spouse.** Is defined in Section 7.18.

**Debt Payoff.** Is defined in Section 4.1.10.

**Debt Payoff Amount.** The amount of the Option Investment Payment that Point and Owner agree will be paid, either through Escrow in connection with the Option Grant Closing or by Owner pursuant to Section 4.1.10, to settle existing debts and obligations of the Owner. An estimate of the Debt Payoff Amount is set forth in the Option Agreement Estimate and Closing Disclosure, and the exact amounts paid pursuant to the Debt Payoff will be set forth in a written confirmation from Point following the Option Grant Closing.

**Effective Date.** Is defined in the first paragraph of this Agreement.

**Effective Sale Price.** The monetary amount for which the Property is to be sold or transferred by Owner or Point, as applicable, to a Third Party Buyer, as adjusted, as set forth below. The Effective Sale Price shall be the sum of all amounts set forth or that would otherwise be set forth in the Closing Disclosure promulgated under TILA-RESPA rules (or any successor form) prepared by an Escrow Agent (which shall include the fair market value of any non-cash consideration received by, or for the benefit of, Owner and/or Point in connection with the sale of the Property). The Effective Sale Price will also be increased to capture agreements that benefit the Owner and decrease the sale price of the Property, including but not limited to below-market or free rent-back periods or assumptions of debt by the Third Party Buyer (such as a PACE or solar loans). The calculation of the Effective Sale Price shall not include any deduction for any: (a) Closing Costs; (b) liens on the Property; (c) outstanding taxes; (d) Sales Commissions; (e) appraisal expenses; (f) loans secured by the Property; (g) credits made by Seller to closing costs; and/or (h) amounts payable to Point hereunder.

**Ending Agreed Value.** The value of the Property as used in the Calculation of Point Proceeds and the determination of which is set forth in Schedule 2.

**Environmental Laws.** Is defined in Section 5.5.

**Escrow.** A transaction settlement, typically consisting of an exchange and disbursement of consideration, costs, and proceeds, and documentation of clear title to the Property, using the services of an Escrow

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

**POINT**



Agent.

**Escrow Agent**. A title company reasonably acceptable to Point as contemplated by Section 2 or any neutral third party Escrow agent, settlement agent, title agent or attorney closing firm that closes or settles any transaction contemplated hereunder.

**Event of Default**. Is defined in Section 6.1.

**Exempted Owner Assignment**. Is defined in Section 7.7.2.

**Exempted Owner Property Transfer**. Is defined in Section 7.7.3.

**Exercise Payment**. The amount of the Option Consideration minus the Option Investment Payment, as such amount may be reduced pursuant to Section 4.4.3. The purchase by Point of its Option Percentage in the Property occurs by payment or debit of the Exercise Payment. The Exercise Payment is a defined term used in various calculations made under this Agreement, and when so used shall refer to the applicable dollar amount employed whether or not the Option is, in fact, exercised.

**Exercise Payment Escrow Account**. Is defined in Section 2.2.2.

**Exercise Payment Insurance Reduction**. Is defined in Section 4.4.3.

**Expiration Date**. The day described in Section 1.1.

**Grant Deed**. A grant deed, executed by Owner and notarized, in form and substance acceptable to the Escrow Agent, that, when recorded, will deliver to Point, or its assignee (or to a Third Party Buyer, where applicable), good and marketable fee simple title to Point's undivided percentage interest in the Property, subject to (a) the standard printed exceptions described in the policy of title insurance covering the Property, or, where applicable, any written exceptions disclosed in the Option Confirmation of Title; (b) the standard printed exceptions of the Escrow Agent, if any; and (c) the Permitted Encumbrances, provided that all outstanding obligations under the Permitted Encumbrances are current.

**JAMS**. Is defined in Section 7.20.2.

**Net Condemnation Proceeds**. Is defined in Section 4.5.

**Non-Owner Occupied Property**. Property that is rented or leased by the Owner to third parties while there is not at least one Owner regularly occupying the Property as a residence for living and sleeping quarters, provided that a Property will not be deemed a Non-Owner Occupied Property if it has short term rentals (with rental periods less than 30 days) where such short term rentals occur an aggregate of less than three months out of a six month period. A Non-Owner Occupied Property may not be subject to any lease or rent agreement that extends beyond the Expiration Date.

**Notice**. Is defined in Section 7.13.

**Notice of Option Exercise After Default**. Is defined in Section 2.3.1.

**Notice of Option Exercise as of Expiration Date**. Is defined in Section 2.2.2(a).

**Notice of Option Exercise Upon a Sale**. Is defined in Section 2.1.2.

© 2023 Point Digital Finance, Inc.                    DOCSET: IL22.1

**POINT**



**Notice of Option Purchase Agreement.** Is defined in Section 1.5.

**Notice of Right to Cure Default.** Is defined in Section 2.3.1.

**Option.** Is defined in Section 1.1.

**Option Consideration.** Is defined in Section 1.1.

**Option Documents.** This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the Consent of Spouse, and any riders, amendments or supplements to any of these documents.

**Option Exercise.** Is defined as Point's election to purchase the Option Percentage.

**Option Exercise After Default.** Is defined in Section 2.3.

**Option Exercise as of Expiration Date.** Is defined in Section 2.2.

**Option Exercise Upon a Sale.** Is defined in Section 2.1.

**Option Grant Closing.** Is defined in Section 1.3.1.

**Option Investment Payment.** Is defined in Section 1.1.

**Option Percentage.** Is defined in Section 1.1.

**Option Term.** Is defined in Section 1.2.

**Original Agreed Value.** The starting value of the Property, for purposes of this Agreement only, determined by Point in reliance on various factors, such as independent appraisals, automated valuation models, and Point's proprietary valuation and risk assessment methods, and agreed to by the Owner at the time of the origination of the Option, as specified in Section 1.1. In some cases, the Original Agreed Value may be less than the Appraised Value of the Property as of the Effective Date as a reflection of certain risk adjustments.

**Owner.** All of the persons or entities, individually and collectively, who appear on the record title to the Property as holding fee simple title to 100% of the Property as of the Effective Date.

**Owner's Estate.** Collectively the executor, personal representative and other persons charged with the administration and distribution of the Property following the death of the Owner, and the heirs, beneficiaries, persons and trusts who are entitled to receive the Property when it is distributed following the death of the Owner, whether pursuant to form of title on the Property, the deceased Owner's will or Revocable Trust, the laws of intestacy, or any other means.

**Owner Occupied Property.** Property that is not rented or leased and that at least one Owner (or if the Property is held in a Revocable Trust, one Owner or one Trustor) regularly occupies as a residence for living and sleeping quarters.

**Owner Option Repurchase.** Is defined in Section 1.4.

© 2023 Point Digital Finance, Inc.                    DOCSET: IL22.1

**POINT**



**Permitted Encumbrances**. All licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject at the time the Option Documents become effective: (a) that are stated as exceptions on the Confirmation of Title, or (b) to which Point has expressly agreed in writing that the Property will remain subject following any exercise of the Option by Point. In no event will "Permitted Encumbrances" include any Senior Loans, Senior Liens, or any other liens that secure the payment of any loans or the performance of any obligations owed to any creditor.

**Permitted Sale**. Is defined in Section 2.1.1.

**Person**. An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing.

**Point Proceeds**. The amount calculated as the monetary interest of Point under the Agreement and Option Documents, as further defined and calculated under Schedule 2.

**Point Proceeds Cap**. Is defined in Section 1.4.

**Point's Rights**. The Point Proceeds due to Point, together with all interests and rights that Point has with regard to the Property (matured or unmatured, contingent or non-contingent, present or prospective), whether the Option has or has not been exercised, and all other rights that Point may have under the Option Documents.

**Preservation Payments**. Is defined in Section 4.2.2.

**Property**. The residential real property owned by Owner that is the subject of the Option Documents. The legal description of the Property is set forth in Schedule 1 to this Agreement. The Property shall include only the real property described in that Schedule 1 and the fixtures appurtenant to that real property, and shall not include any other personal property of Owner.

**Property Sale**. A sale or Transfer by Owner (or by Point following exercise of Option) of all, or an interest in, the Property. This term excludes the sale of Point's ownership interest pursuant to the Option. A Property Sale by the Owner must also be a Permitted Sale. An Exempted Owner Property Transfer is not considered a Property Sale.

**Registered Domestic Partner**. See "Civil Union Partner and Registered Domestic Partner" above.

**Rental Premium**. A premium added to the Point Proceeds to account for potential loss of value of the Property resulting from use of the Property as a rental property. The Rental Premium shall equal 10% of the Appreciation multiplied by the Option Percentage, where Appreciation is calculated as the Ending Agreed Value minus the Original Agreed Value [Rental Premium = 10% × (Ending Agreed Value - Original Agreed Value) × Option Percentage]. If the Ending Agreed Value is less than the Original Agreed Value, no Rental Premium will apply. An example follows:
- Original Agreed Value of Home at $500,000, and Ending Agreed Value at $1,000,000. Point has 20% Option Percentage.
- Appreciation is $500,000 = $1,000,000 (Ending Agreed Value) – $500,000 (Original Agreed Value).
- Rental Premium is $10,000 = 10% × $500,000 (Appreciation) × 20% (Option Percentage).

© 2023 Point Digital Finance, Inc.                    DOCSET: IL22.1

POINT



**Revocable Trust.** A revocable trust, revocable living trust, *inter vivos* trust, revocable family trust or similar trust established in accordance with the laws of any state.

**Rules.** Is defined in Section 7.20.1.

**Sales Commissions.** All broker fees, sales commissions, finder fees and all other fees and costs owed to any broker, real estate agent or finder and incurred in connection with a sale or Transfer of the Property or any interest in the Property.

**Security Instrument.** Is defined in Section 1.5.

**Senior Liens.** Liens on the Property that are perfected prior to or are otherwise senior to Point's Point Proceeds.

**Senior Loans.** Loans or other obligations that are secured by Senior Liens.

**Service Fees.** Fees, costs and charges of the type further described in Section 4.1.4, which Service Fees are designed to compensate the Asset Administrator for the time, effort, costs and expenses incurred by the Asset Administrator in responding to requests from Owner or defaults by Owner under the Option Documents or in performing other necessary and reasonable acts pursuant to the Option Documents.

**Transfer.** A sale, exchange, transfer, conveyance or assignment of all or any part of the Property or any legal or beneficial interest in the Property, unless the sale, exchange, transfer, conveyance or assignment is to a surviving Owner or estate of an Owner in the event of a death of an Owner.

**Third Party Buyer.** The Person that purchases, or proposes to purchase, the Property in a Property Sale or Transfer of the Property.

**Trustee(s).** The Person or Persons designated as the "trustee" of a Revocable Trust in its formation documents and any subsequent amendments, and any successor trustees under such Revocable Trust.

**Trustor(s).** The Person or Persons designated as the "trustor", "settlor" or "grantor" of a Revocable Trust in its formation documents and any subsequent amendments.

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

POINT



**Schedule 1**

**LEGAL DESCRIPTION**

The following described real estate in the County of Cook, State of Illinois, to-wit:
The North 18.33 feet of Subdivision Lot 1 (measured on a right angle from the North Line of said Lot) in the
Subdivision of Lots 9, 10 and 11 in Block 4 in Stone's Resubdivision of part of Astor's Addition to Chicago in
Section 3, Township 39 North Range 14 East of the Third Principal Meridian, in Cook County, Illinois.
Subject to: Covenants, conditions and restrictions of record; private, public and utility easements and roads and
highways, if any; party wall rights and agreements, if any; special taxes or assessments for improvements not yet
completed; any unconfirmed special tax or assessment; general taxes for the year 1978 and subsequent years
including taxes which may accrue by reason of now and additional improvements during the years 1977 and
1978.
Commonly Known As: 1312 North Astor Street, Chicago, IL 60610
Parcel ID: 17-03-106-017-0000


PARCEL NUMBER: 17-03-106-017-0000


[end of legal description]

© 2023 Point Digital Finance, Inc.     DOCSET: IL22.1

POINT



**Schedule 2**

**CALCULATION OF POINT PROCEEDS**

A. **Formula for Calculation of Point Proceeds.** Except as otherwise provided in this Agreement, any calculation of the value of the Point Proceeds under this Agreement, the other Option Documents, or otherwise shall be calculated as the total of the following (**"Calculation of Point Proceeds"**):

> **Point Proceeds** = Lesser of {**Point Proceeds Cap** and [(**Ending Agreed Value** ×
> **Option Percentage**) – **Exercise Payment** + **Rental Premium**[†]]}
> + **Service Fees**[†] + **Preservation Payments**[†]
>
> [†] if applicable

- the *lesser* of the following:
  › the **Point Proceeds Cap**, as calculated in Section B below, and
  › the *sum* of the following:
    » the **Ending Agreed Value** as specified in Section C below *multiplied* by the **Option Percentage**;
    » *minus* the **Exercise Payment**, subject to reductions[(1)] and adjustments[(2)] below;
    » *plus* the **Rental Premium** if a designated **Owner-Occupied Property** has been rented or leased in the previous six month period and Ending Agreed Value exceeds Original Agreed Value;
- *plus* all monetary amounts owed to Point in the form of unpaid **Service Fees** and unreimbursed **Preservation Payments** (including any unpaid interest and other fees and charges associated with such Preservation Payments), provided that Owner has not already delivered any such amounts

---

[(1)] The Exercise Payment amount will be reduced if an Exercise Payment Insurance Reduction is deemed to be applicable under Section 4.4.3.

[(2)] If Point has previously delivered the Exercise Payment to Owner at an Option Exercise pursuant to Sections 2.2 or 2.3, then the value of the Exercise Payment shall not be deducted from the Point Proceeds to be paid to Point.

B. **Calculating the Point Proceeds Cap.** The Calculation of the Point Proceeds takes into account the Point Proceeds Cap, which may limit the amount an Owner is obligated to pay to Point. The Point Proceeds Cap is calculated as follows:

> **Point Proceeds Cap** = **Option Investment Payment** × [1 + (**Point Proceeds Cap Factor** / 12)]$^M$

> where **M**, used as an exponent, represents the number of months (including partial months) that have fully elapsed since the Effective Date.

C. **Determining Ending Agreed Value.** The following Ending Agreed Values shall apply to the Calculation of Point Proceeds:

(1) **Property Sale.** Except as provided in C.2. below, in any Property Sale, the Ending Agreed Value shall be the greater of (a) the Effective Sale Price and (b) the Appraised Value, if available.

(2) **Property Sale or Owner Option Repurchase After Event of Default.** In the event of a Property Sale initiated by us following an Option Exercise After Default in accordance with Section 2.3.4 or an Owner Option Repurchase in accordance with Section 2.3.6, the Ending Agreed Value shall

© 2023 Point Digital Finance, Inc.                                            DOCSET: IL22.1

**POINT**



be the greater of (a) the Effective Sale Price, if any, (b) the highest Appraised Value of the Property calculated between the date of an Event of Default through the date of closing of such Property Sale or Owner Option Repurchase, and (c) the Original Agreed Value.

(3) **Owner Option Repurchase.** Except as otherwise provided in Section 1.4.1, in any Owner Option Repurchase during the Option Term not involving a Property Sale or Event of Default, the Ending Agreed Value shall be the Appraised Value of the Property at the time of the Owner Option Repurchase.

(4) **Insurance Allocation.** In any insurance allocation under Section 4.4, the Ending Agreed Value shall be the Appraised Value of the Property immediately prior to the destruction or damage.

(5) **Condemnation.** In any total condemnation or partial condemnation of the Property, the Ending Agreed Value shall be the Net Condemnation Proceeds under Section 4.5.

D. **Damage Calculations.** In any calculation of damages due to Point following an Event of Default, or any calculation of Liquidated Damages under this Agreement, the Ending Agreed Value for determining the Point Proceeds shall be the highest Appraised Value of the Property calculated between the date of any Event of Default through the date Point accepts payment from Owner in discharge of Point's Rights hereunder; and provided, further, that in the event of any calculation of damages or Liquidated Damages following any Event of Default under Section 6.4 of the Agreement, the Ending Agreed Value shall be the higher of (a) the highest Appraised Value of the Property calculated between the date of any Event of Default hereunder through the date Point accepts payment from Owner in full discharge of Point's Rights hereunder; and (b) the Original Agreed Value.

© 2023 Point Digital Finance, Inc.

DOCSET: IL22.1

POINT

**EXHIBIT A**

**SECURITY INSTRUMENT**

© 2023 Point Digital Finance, Inc.                                      DOCSET: IL22.1

POINT



**EXHIBIT B**

**CONSENT OF SPOUSE**

© 2023 Point Digital Finance, Inc.                                                                            DOCSET: IL22.1

POINT



**Prepared by, recording requested by,
and when recorded mail to:**

Point Digital Finance, Inc.
PO Box 192
Palo Alto, CA 94302

point.com

Option Agreement ID:
2022155-ESOLO

Parcel Number:
17-03-106-017-0000

_____

*C-IL849467*                                              (Space Above for Recorder's Use)

## MORTGAGE

**NOTICE: THIS MORTGAGE CONTAINS A SUBORDINATION CLAUSE WHICH MAY RESULT IN MORTGAGEE'S SECURITY OR OTHER INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

This **MORTGAGE**, together with any riders hereto (**"Security Instrument"**), is made as of January 20, 2023 (**"Effective Date"**), among James B. Muskal and Cheryll Collins-Muskal (individually or collectively, **"Mortgagor"**) and Point Digital Finance, Inc., a Delaware corporation, and its successors and assignees (**"Mortgagee"**).

The following riders are to be executed by Mortgagor [check box as applicable]:
☐  Condominium Rider
☐  Planned Unit Development Rider

### RECITALS

A.      This Security Instrument is given in connection with the execution of that certain Point Digital Finance Option Purchase Agreement (**"Option Agreement"**), entered into by and between Mortgagor and Mortgagee, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase (**"Option"**) an undivided percentage interest (the **"Option Percentage"**) in that certain real property and improvements thereon in County of Cook, State of Illinois, as more particularly described in Schedule A attached hereto and incorporated herein by this reference, and commonly known as 1312 N ASTOR ST, CHICAGO, IL 60610 (**"Real Property"**). The initial term of the Option shall commence on the Effective Date and shall expire

© 2023 Point Digital Finance, Inc              Page 1 of 16                      DOCSET: IL22.1

on January 20, 2053. In exchange for granting the Option to Mortgagee, Mortgagee paid to Mortgagor an Option Investment Payment amount equal to $350,000.00.

B.      Mortgagee desires to secure the rights granted to it in the Option Agreement and the performance of Obligations (hereinafter defined).

C.      This Security Instrument is given pursuant to the Option Agreement, and payment, fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument in accordance with the terms set forth herein.

D.      Capitalized terms used in this Security Instrument shall have the meanings specified herein, or if not defined herein, in the Option Agreement. The Option Agreement and certain other ancillary documents (which documents, together with the Security Instrument, are collectively termed the **"Option Documents"**) are executed by Mortgagor and Mortgagee concurrently herewith.

1.      **Grant**. MORTGAGOR HEREBY IRREVOCABLY mortgages, grants, transfers and assigns to Mortgagee, and its successors and assignees, a security interest, with power of sale, for the benefit of Mortgagee and its successors and assigns in and to the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the **"Property"**):

a.      Real Property. The Real Property together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property.

b.      Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Real Property, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the **"Leases"**) and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees

from any and all sources arising from or attributable to the Real Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Mortgagor and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the **"Rents"**) and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Point Proceeds. As used herein, **"Creditors Rights Laws"** shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

      **c.**     Insurance Proceeds. All insurance proceeds in respect of the Real Property under any insurance policies covering the Real Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Real Property (collectively, the **"Insurance Proceeds"**).

      **d.**     Condemnation Awards. All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Real Property (collectively, the **"Awards"**).

      **CONDITIONS TO GRANT**: TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever, WITH THE POWER OF SALE, to secure Mortgagor's payment to Mortgagee of the Point Proceeds and the performance of the Obligations at the time and in the manner provided in the Option Documents and this Security Instrument;

      PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly (a) pay to Mortgagee the Point Proceeds at the time and in the manner provided in the Option Agreement, this Security Instrument and the other Option Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument and the other Option Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument and the other Option Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Mortgagor's obligation to indemnify and hold harmless Mortgagee pursuant to the provisions hereof shall survive any such payment and release.

   **2.**     **Secured Obligations.**

a.      Obligations. Mortgagor makes the mortgage, grant, transfer and assignment set forth in Section 1 above for the purpose of securing the following **"Obligations"**:

**(1)**      the payment of the Point Proceeds;

**(2)**      all other obligations of Mortgagor contained herein;

**(3)**      each obligation of Mortgagor contained in the Option Agreement and any ancillary document;

**(4)**      each obligation of Mortgagor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Option Agreement;

**(5)**      any expenditures made by Mortgagee pursuant to, or under, this Security Instrument; and

**(6)**      payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively **"Attorneys' Fees"**)) incurred by Mortgagee in the enforcement and collection of the obligations listed above and the protection of Mortgagee's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

b.      Option Investment Payment. Mortgagor shall not be obligated to repay any part of the Option Investment Payment (as such term is defined in the Option Agreement); and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Mortgagor to be paid pursuant to the Option Agreement.

**3.      Uniform Commercial Code Security Agreement and Fixture Filing**. This Security Instrument also is intended to be and shall constitute a security agreement under the Illinois Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Illinois Uniform Commercial Code. Mortgagor hereby grants to Mortgagee a security interest in those items to secure the performance and payment of the Obligations.

a.      Mortgagor agrees that Mortgagee may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index

© 2023 Point Digital Finance, Inc          Page 4 of 16          DOCSET: IL22.1

and/or in the Office of the Illinois Secretary of State, as a financing statement for any of the items specified above as part of the Property.

       **b.**     This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the Illinois Uniform Commercial Code, and any similar or successor provisions.

       **c.**     Mortgagee may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

       **d.**     Mortgagor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Mortgagee may reasonably require.

       **e.**     On any default hereunder, Mortgagee shall have the remedies of a secured party under the Illinois Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Mortgagee may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Mortgagee's remedies under the Illinois Uniform Commercial Code or the remedies in Section 7 below.

    **4.**    **<u>Assignment of Leases and Rents</u>**. Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

       **a.**     Mortgagor hereby gives to, and confers upon, Mortgagee the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving unto Mortgagor the right, prior to any default by Mortgagor in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

       **b.**     Upon any such default, Mortgagee may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Mortgagee may determine.

       **c.**     The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this

Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Mortgagor to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

**5.** <u>**Covenants of Mortgagor Regarding the Property**</u>. Mortgagor hereby agrees as follows:

**a.** To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Mortgagee; and to pay all costs and expenses of Mortgagee (including cost of evidence of title and Attorneys' Fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Mortgagee may appear, and in any suit brought by Mortgagee to foreclose this Security Instrument or to collect the Obligations or to protect Mortgagee's rights under this Security Instrument; and/or (ii) in connection with the enforcement of any provisions of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

**b.** To pay at least ten days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

**(1)** If Mortgagor fails to make any payment or to do any act as provided in this Security Instrument, Mortgagee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Mortgagee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Security Instrument.

**(2)** Such performance by Mortgagee shall not require notice to, or demand on, Mortgagor and shall not release Mortgagor from any obligation under this Security Instrument.

**(3)** Mortgagee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Mortgagee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Mortgagee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

c. To pay immediately upon demand all sums expended by Mortgagee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Mortgagee at the rate specified in the Option Agreement from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6. **Power of Attorney**. Mortgagor hereby irrevocably appoints Mortgagee as Mortgagor's attorney-in-fact (such agency being coupled with an interest). As such attorney-in-fact Mortgagee may, after providing notice to Mortgagor pursuant to the Option Agreement (without the obligation to do so) in Mortgagee's name, or in the name of Mortgagor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Mortgagee's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Mortgagor; provided, however, that Mortgagee as such attorney-in-fact shall be accountable only for such funds as are actually received by Mortgagee.

7. **Default and Foreclosure and Power of Sale**. Upon Mortgagor's default under or breach of any of the rights and Obligations that are secured by this Security Instrument as specified above, Mortgagee may declare all performance and sums secured by this Security Instrument immediately due by delivery to Mortgagor of written declaration of default. Mortgagee shall give notice of default to Mortgagor prior to acceleration following Mortgagor's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Mortgagor, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the performance secured by this Security Instrument and sale of the Property. The notice shall further inform Mortgagor of the right to cure after acceleration and the right to bring an action to assert the non-existence of a default or any other defense of Mortgagor to acceleration and sale. If the default is not cured on or before the date specified in the notice, Mortgagee at its option may require immediate performance in full of all obligations secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Mortgagee shall be entitled to collect all expenses incurred in pursuing the remedies provided herein, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Mortgagee invokes the power of sale, Mortgagee shall execute a written notice of Mortgagee's election to cause the Property to be sold as prescribed by applicable law. Mortgagee shall mail copies of the notice as prescribed by applicable law to Mortgagor and to the other persons prescribed by applicable law. Mortgagee shall give public notice of sale to the persons and in the manner prescribed by applicable law.

After the time required by applicable law, Mortgagee, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of

sale in one or more parcels. Mortgagee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

Mortgagee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Mortgagor or Mortgagee as defined in this Security Instrument, may purchase at such sale.

a.    After deducting all costs, fees and expenses (including Attorneys' Fees) Mortgagee shall apply the proceeds of sale to payment: (i) to Mortgagee, all sums expended and performance due under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by law in effect on the Effective Date of this Security Instrument; (ii) to Mortgagee, all other sums then secured hereby; and (iii) the remainder, if any, to the person or persons legally entitled thereto.

b.    Notice provided to Mortgagor under this Security Instrument shall be delivered to the address specified in Section 19 of this Security Instrument in accordance with the applicable terms and conditions of the Option Agreement unless otherwise required by applicable law.

c.    Exercise of Mortgagee's remedies under this Security Instrument shall be in compliance with applicable law.

8.    **Liquidated Damages**. Liquidated Damages means an amount equal to the sum of

a.    the Point Proceeds as calculated pursuant to the Option Agreement;

b.    in connection with Mortgagor's failure to make any monetary payment, the sum of all monetary obligations (including, without limitation, all Preservation Payments) owed to Mortgagee by Mortgagor under the Option Agreement; and

c.    any and all amounts, properly chargeable to Mortgagor as necessary to satisfy Mortgagor's obligations under the Option Agreement with respect to Mortgagor's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

9.    **Late Performance**. By accepting performance of any obligation after its due date, Mortgagee does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.

10.    **Defeasance**. If Mortgagor shall well and truly satisfy all Obligations secured hereby at the time and in the manner provided in this Security Instrument and in the Option Agreement, and Mortgagor shall well and truly abide by and comply with each and every covenant and

condition set forth in this Security Instrument and in the Option Agreement, then these presents and the lien and interest hereby transferred and assigned shall cease, terminate and be void. Mortgagee shall release the Property and renounce any other rights granted to it herein and shall execute, at the request of the Mortgagor, a release of this Security Instrument and any other instrument to that effect deemed necessary or desirable, upon performance being made on the Obligations secured hereby.

11.     <u>Successors</u>. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "Mortgagee" shall include any successor or assignee of Mortgagee's rights in the Option Agreement and in this Security Instrument, whether or not named as Mortgagee in this Security Instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

12.     <u>Joint and Several Liability</u>. If more than one person signs this Security Instrument as Mortgagor, the obligations of each signatory shall be joint and several.

13.     <u>Multiple Mortgagors</u>. If there are multiple Mortgagors of the Property:

a.     this Security Instrument must be signed by each such Mortgagor;

b.     all rights and powers specified for Mortgagor in this Security Instrument must be approved and exercised unanimously by all such multiple Mortgagors;

c.     all such multiple Mortgagors shall be jointly and severally liable for all liabilities and obligations specified for Mortgagor under this Security Instrument;

d.     notice required to be given by, or to, Mortgagor will be deemed adequately given if given by, or to, any of Mortgagors using the contact information set forth in Section 19 of this Security Instrument; and

e.     Mortgagee may treat any notice received from any one Mortgagor as notice from all Mortgagors.

14.     <u>Revocable Trust</u>. If any Mortgagor is/are the trustee(s) of a Revocable Trust (as defined in the Option Agreement):

a.     all trustees of the Revocable Trust and all individuals having the power to revoke the Revocable Trust (referred to herein as "owners of the Revocable Trust") must sign this Security Instrument in their respective capacities as trustees and/or owners of the Revocable Trust, and each trustee and owner of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and owners of the Revocable Trust have been

disclosed to Mortgagee;

     **b.**     any trustee of the Revocable Trust who is also an owner of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as owner of the Revocable Trust;

     **c.**     all rights and powers specified for, and all actions required of, Mortgagor in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

     **d.**     all trustees and all owners of the Revocable Trust shall be jointly and severally liable for all liabilities and obligations specified for Mortgagor under this Security Instrument;

     **e.**     all representations and warranties by Mortgagor in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all owners of the Revocable Trust;

     **f.**     notice required to be given by, or to, any Mortgagor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in Section 19 of this Security Instrument; and

     **g.**     Mortgagee may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Mortgagor.

     **15.**     **Extent of Lien**. The lien granted under this Security Instrument shall encumber Mortgagor's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

     **16.**     **No Merger**. So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Mortgagee otherwise consents in writing, the fee estate of Mortgagor in the Property or any part thereof (including the estate of Mortgagee after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Mortgagee or in any other Person.

     **17.**     **Subordination of Homestead and Waivers**. If Mortgagor heretofore has acquired or hereafter acquires an estate of homestead in the Property, Mortgagor hereby agrees, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount due under the Option Agreement and to all renewals, extensions and modifications of this Security Instrument or the Option Agreement, and that said homestead estate is subject to all of the rights of Mortgagee under this Security Instrument and the Option Agreement and all renewals, extensions and modifications of this Security Instrument and the Option Agreement, and is subordinate to the lien evidenced by this

Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Mortgagor waives and relinquishes all rights of curtesy and dower in the Property.

18. **Notice of Option Purchase Agreement**. Mortgagor hereby provides notice that Mortgagor and Mortgagee have entered into the Option Agreement, as more particularly described in Schedule B attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Mortgagee. The Option Agreement is irrevocable by Mortgagor and expires on January 20, 2053. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

19. **Notices**. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| **POINT:** | **MORTGAGOR:** |
|---|---|
| Point Digital Finance, Inc. | James B. Muskal |
| PO Box 192 | 1312 N ASTOR ST |
| Palo Alto, CA 94302 | CHICAGO, IL 60610 |
| | |
| **Personal or Overnight Delivery:** | |
| Point Digital Finance, Inc. | |
| Attn: Chief Executive Officer - NOTICES | |
| 444 High Street, 4th Floor | |
| Palo Alto, California 94301 | |
| | |
| Fax: 650-434-3778 | |
| Email: notices@point.com | |

**Do not lose or destroy this Security Instrument or the Option Agreement that it secures. All must be delivered to Mortgagee for cancellation before discharge will be made.**

**[Signatures on Following Page]**

© 2023 Point Digital Finance, Inc DOCSET: IL22.1

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH MORTGAGEE, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT AND OPTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN MORTGAGOR AND MORTGAGEE AS OF THE EFFECTIVE DATE.

**MORTGAGOR HEREBY DECLARES THAT MORTGAGOR HAS READ THIS SECURITY INSTRUMENT, HAS RECEIVED A COMPLETELY FILLED IN COPY OF IT WITHOUT CHARGE THEREFOR AND HAS SIGNED THIS SECURITY INSTRUMENT AS OF THE EFFECTIVE DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Security Instrument as of the date set forth above.

**MORTGAGOR(S):**

_____   Date: ___1/20/23._____
James B. Muskal

_____   Date: ___1/20/23_____
Cheryll Collins-Muskal

## ACKNOWLEDGMENT

State of ~~Illinois~~ *AZ*                          )
                                                   ) §
County of ___*MARICOPA*___                          )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT *Samuel Bruska  Cheryll Collins – Mickel* _____ , personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person, and acknowledged that [he/she] signed, sealed and delivered the said instrument as [his/her] free and voluntary act for the uses and purposes therein set forth.

Given under my hand and official seal, this *20* day of *Jan* , *2023* .

_____
(Signature of Notary)

KENNETH L. DEAN
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 640215
Expires January 14, 2027

_____
(Seal of Notary)

© 2023 Point Digital Finance, Inc          Page 13 of 16          DOCSET: IL22.1

## SCHEDULE A

## LEGAL DESCRIPTION

The following described real estate in the County of Cook, State of Illinois, to-wit:

The North 18.33 feet of Subdivision Lot 1 (measured on a right angle from the North Line of said Lot) in the

Subdivision of Lots 9, 10 and 11 in Block 4 in Stone's Resubdivision of part of Astor's Addition to Chicago in

Section 3, Township 39 North Range 14 East of the Third Principal Meridian, in Cook County, Illinois.

Subject to: Covenants, conditions and restrictions of record; private, public and utility easements and roads and

highways, if any; party wall rights and agreements, if any; special taxes or assessments for improvements not yet

completed; any unconfirmed special tax or assessment; general taxes for the year 1978 and subsequent years

including taxes which may accrue by reason of now and additional improvements during the years 1977 and

1978.

Commonly Known As: 1312 North Astor Street, Chicago, IL 60610

Parcel ID: 17-03-106-017-0000

PARCEL NUMBER: 17-03-106-017-0000

[end of legal description]

## SCHEDULE B

## NOTICE OF OPTION

This Notice of Option ("**Option Notice**") provides notice of that certain Option Agreement entered into as of January 20, 2023 ("**Effective Date**"), by and between James B. Muskal and Mortgagee, and supplements the Security Instrument of the same date between the same parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

### RECITALS

1.     Mortgagor hereby declares that as of the Effective Date, Mortgagor and Mortgagee have entered into that certain unrecorded Point Digital Finance Option Purchase Agreement ("**Option Agreement**"), which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase ("**Option**") an undivided percentage interest (the "**Option Percentage**") of fee simple title ownership in the Property. In exchange for granting the Option to Mortgagee, Mortgagee paid to Mortgagor an Option Investment Payment equal to **$350,000.00**. The Option is irrevocable by Mortgagor and expires on **January 20, 2053**.

2.     Pursuant to the Option Agreement, Mortgagor has made certain covenants and promises to, or for the benefit of, Mortgagee in connection with the Property, all as more particularly described, and on the terms and conditions stated in the Option Agreement.

3.     Mortgagor has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Mortgagor as to the Mortgagee, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Mortgagor's interest in the Property so long as the Option Agreement has not expired or been terminated.

### TERMS

A.     Notice.   Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

B.     Covenants.   The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

1. restrictions on Mortgagor's right to transfer the Property without giving prior written notice to the Mortgagee and requirements that Mortgagor comply with

specific sale procedures set forth in the Option Agreement;

2. requirements that Mortgagor maintain insurance on the Property against certain hazards and risks;

3. restrictions on Mortgagor's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;

4. requirements that Mortgagor keep the Property free of liens not approved by Mortgagee; and

5. requirements that Mortgagor protect and maintain the Property.

2022155-ESOLO                                                    James B. Muskal

**POINT**

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**


Initials — I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.


Initials — I am responsible for paying off any of my debts that are not paid off with the funds received from Point.


Initials — I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.


Initials — Point is **not** buying part of my home today. Instead, Point is buying the right to 44.2000% of my home's future change in value. This right is called the "option."


Initials — When I am ready to repay Point, Point will determine my home's change in value by subtracting the Original Agreed Value from the Ending Agreed Value. To determine the Original Agreed Value, Point lowered the assessed value of my home by 28.00%. This is called the risk adjustment. The Original Agreed Value for my home is $1,584,000.00. To determine my home's Ending Agreed Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).


Initials — My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount is the result of applying an annual rate to the funds I receive from Point. This rate is called the Point Proceeds Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.


Initials — If my home value increases, my repayment amount will also increase. Even if my home value does not increase, my repayment amount may increase over time. This is because the Original Agreed Value is less than my home's current assessed value.


Initials — I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.


Initials — If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.


Initials — Lenders may not be willing to refinance my mortgage unless I also repay Point.

EXHIBIT 2



# POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

## Closing Disclosure

*This form is a statement of final option terms and closing costs.*
*Compare this document with your Option Agreement Estimate.*

| Closing Information | | Transaction Information | |
|---|---|---|---|
| **Date Issued** | 07/15/2024 | **Homeowners** | Cheryl C. Collins-Muskal |
| | | | James B. Muskal |
| **Effective Date** | 07/18/2024 (projected) | **Homeowner Address** | 1312 N Astor St |
| **Disbursement Date** | 07/24/2024 (projected) | | Chicago, IL 60610 |
| **Settlement Agent** | Vantage Point Title | **Investor** | Point Digital Finance, Inc |
| **Escrow Account #** | C-AZ892254 | **Option Agreement #** | 2024252-TEDOG |
| **Property** | 6023 E TURQUOISE AVE | **Occupancy Type** | Non-Owner Occupied Property |
| | PARADISE VALLEY, AZ 85253 | | |

## Option Terms — *Except for the Estimated Debt Payoff Amount, the Option Terms below will not change after closing.*

### *There are no monthly payments and no interest accrues.*

| | | |
|---|---|---|
| **Investment Amount** | $210,000.00 | *This is the amount Point will invest in your Property in exchange for an Option in your Property.* |
| **Appraised Value** | $2,800,000.00 | *This is the value determined by Point in reliance on various methods, such as traditional appraisals or automated valuation models.* |
| **Homeowner Protection Cap** | 19.0% | *An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 of your Option Agreement.* |
| **Appreciation Starting Value** | $2,044,000.00 | *This is the beginning value of your Property used to calculate Point's share of the Property's appreciation and the Point Proceeds. The Property's appreciation value can be positive or negative depending on the Final Home Value. The Point Proceeds is the amount you pay Point upon your repurchase, a sale of the Property, or at the end of the term. In all cases, the Point Proceeds will be subject to the Homeowner Protection Cap.* |
| **Investment Term** | 30 Years | |
| **HEI Percentage** | 34.5000% | *This is the percentage of appreciation you will pay Point upon repayment, unless the result is more than the Capped Repayment Amount.* |
| **Estimated Debt Payoff Amount** | $42,217.80 | *The estimated amount of the Investment Amount that will be paid to settle existing debts and obligations.* |
| **Acknowledged Pre-Existing Loans** | $1,469,203.95 | *This is the current sum of debt obligations on your Property.* **Contact Point immediately if this is not correct.** |

## Closing Summary — *See Calculating Cash to Homeowner on page 3 for details.*

| | | |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $625.00 | Includes $1,901.55 in Option Agreement Costs + $30.00 in Other Costs - $1,306.55 Paid by Point |
| **Cash to Homeowner** | $167,157.20 | After deducting Closing Costs Paid by Homeowner and Payoffs Made at Closing Through Escrow. |



EXHIBIT 3



PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Option Agreement Estimate

*Save this Estimate to compare with your Closing Disclosure.*

| | | | |
|---|---|---|---|
| **Option Agreement #** | 2024252-TEDOG | **Estimate Revision** | 1 |
| **Date Issued** | 06/18/2024 | **Homeowners** | James B Muskal |
| | | | Cheryll C Collins-Muskal |
| **Property** | 6023 E TURQUOISE AVE | **Homeowner Address** | 1312 N Astor St |
| | PARADISE VALLEY, AZ 85253 | | Chicago, IL 60610 |
| **Occupancy Type** | Non-Owner Occupied Property | **Investor** | Point Digital Finance, Inc |

## Option Terms

*There are no monthly payments and no interest accrues. The terms below are estimates based on information in your application and are subject to change until final pricing. After closing, these terms will not change.*

| | | |
|---|---|---|
| **Investment Amount** | $300,000.00 | This is the amount Point will invest in your Property in exchange for an Option in your Property. |
| **Appraised Value** | $2,800,000.00 | This is the value determined by Point in reliance on various methods, such as traditional appraisals or automated valuation models. At initial application, it is based on your stated home value. |
| **Homeowner Protection Cap** | 19.0% | An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 of your Option Agreement. |
| **Appreciation Starting Value** | $2,044,000.00 | This is the beginning value of your Property used to calculate Point's share of the Property's appreciation and the Point Proceeds. The Property's appreciation value can be positive or negative depending on the Final Home Value. The Point Proceeds is the amount you pay Point upon your repurchase, a sale of the Property, or at the end of the term. In all cases, the Point Proceeds will be subject to the Homeowner Protection Cap. |
| **Investment Term** | 30 Years | |
| **HEI Percentage** | 45.8000% | This is the percentage of appreciation you will pay Point upon repayment, unless the result is more than the Capped Repayment Amount. |
| **Estimated Debt Payoff Amount** | $40,000.00 | The estimated amount of the Investment Amount that will be paid to settle existing debts and obligations. |
| **Acknowledged Pre-Existing Loans** | $670,000.00 | This is the current sum of debt obligations on your Property. **Contact Point immediately if this is not correct**. |

## Closing Summary

*See Calculating Cash to Homeowner on page 3 for details.*

| | | |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $13,267.60 | Includes $14,702.15 in Option Agreement Costs + $60.00 in Other Costs - $1,494.55 Paid by Point |
| **Cash to Homeowner** | $246,732.40 | After deducting Closing Costs Paid by Homeowner and Payoffs Made at Closing. |