**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>v. POINT DIGITAL FINANCE, INC., a Delaware Corporation, and DEER PARK 1850 FUND, L.P.<br><br>Defendants. | 1:26-cv-00646<br><br>Hon. John F. Kness<br>Presiding |

**PLAINTIFF RESPONSE IN OPPOSITION
TO THE MOTION TO COMPEL ARBITRATION**

Defendant Point has designed a very complex mortgage product called a Home Equity Investment (HEI) loan that poses greater risks than traditional mortgages. The Complaint asserts that Point's $350,000 HEI mortgage loan with Muskal violates the federal law protecting home owners -- the Truth in Lending Act (TILA). Because TILA has a prohibition of arbitration clauses, the Motion to Compel Arbitration must be denied. Point's assertion that its HEI loan is not subject to TILA is baseless, as the HEI loan meets TILA's definition of a consumer credit transaction: it extended credit "to incur debt and defer its payment."

Moreover, Point cannot even attempt to relitigate this issue under collateral estoppel, where Point has already lost a Motion to Compel Arbitration on this same issue in its Arizona state court case with plaintiff. In that Complaint, plaintiff alleged a TILA violation from the same type of Point HEI loan on an Arizona residence. Point moved to compel arbitration. After briefing and argument, the Arizona court held that Point's HEI contract is a mortgage loan such that TILA applies – and thus held the TILA prohibition against arbitration applied. That holding on the identical issue as the Motion here is binding under collateral estoppel.

## PROCEDURAL BACKGROUND

### A. The Arizona Complaint by Muskal against Point for the Arizona HEI contract

Plaintiff (the James Muskal Estate) and Point are litigating another HEI contract case in Arizona involving the same borrower -- James B. Muskal -- in Arizona state court. The Complaint was filed on July 15, 2025, and is attached as Exhibit A. Its third cause of action alleges that its attached Muskal-Point HEI contract is a residential mortgage loan under TILA, and that Point violated TILA disclosure requirements. Ex. A.

In the Arizona court case, Point filed a Motion to Compel Arbitration pursuant to sections 7.10 and 7.20 of the Arizona HEI agreement. The Motion is attached as Exhibit B.

In an 11-page Response brief attached as Exhibit C, plaintiff asserted that the TILA prohibition of arbitration for residential mortgage loans under 15 U.S.C. § 1639c(e)(1) barred application of the arbitration provision. Plaintiff's brief noted that TILA defines a "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage" (§ 1602(dd)(5)), and "credit" is defined by TILA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." Id. § 1602(f). Plaintiff explained that the HEI loan at issue constituted "debt" under the standard dictionary definitions such as "liability on a claim" or "something owed" (Ex. C at 3-4), and that numerous court cases examining very similar HEI agreements had concluded likewise.

Point filed a 13-page Reply brief (Ex. D). Point argued that TILA was not applicable because Point's products are "excluded from the definition of 'credit.' "(Ex. D at 4). Point argued: "Here the Option does not create a 'debt,' as Owners are not liable for a specific sum of money and have no obligation to repay the $210,000 Investment Amount." (p. 5).

On December 17, 2025, the Arizona court held a lengthy oral argument on the merits,

and the transcript is attached as Exhibit E. After almost an hour of argument, the court held:

> TILA is a remedial statute and the Court interprets it liberally, but also a party opposing an arbitration, essentially an arbitration clause or application of a clause does have a burden as well. But when I put it all together from my perspective, I come back to my best reading of a complicated, complicated contractual agreement. And that for me, my reading is such that it did create a debt, a functional debt, and therefore fits in the TILA definition of a consumer credit transaction, which makes the agreement subject to TILA.
>
> And therefore, I'm going to deny the motion to dismiss because the Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when I apply the language of the Act. I have no doubt that other courts are going to consider this and may go in other directions. But I have to do the best I can with the plain language and applying the economic reality of what I see the agreement to be and the effect of the agreement.
>
> I ultimately agree that the option held by Point here is ultimately a distinction without a true meaning with respect to the responsibilities of the parties and the nature of this relationship. And so under those circumstances, I don't believe that the arbitration clause in the contract is enforceable because it is not enforceable under TILA, so I'm going to deny the motion to dismiss for those reasons.

Ex. E at 30-31

The Arizona court then issued its order attached as Exhibit F, dated December 17, 2025, denying arbitration because "the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act." Ex. F. The order was electronically filed on December 19, 2025, but was not signed by the judge. Ex. F.

On January 20, 2026, Point appealed this Order to the Arizona Appellate Court. On March 16, 2026, the Appellate Court issued the Order attached as Exhibit G, holding that Point had improperly appealed without obtaining a signed copy of the trial court's order. The Order held: "Appellant appeals from an unsigned ruling dated December 17, 2025, and filed

December 19, 2025. Unsigned rulings are not appealable. [Cite]. For this appeal to proceed, appellant must obtain a signed order corresponding to the minute entry dated December 17, 2025, and filed December 19, 2025." Ex. G. The Order stayed the appeal, and ordered: "appellant must file a motion asking the superior court to enter a signed order." Ex. G at 2.

After Point complied with the Appellate Court and moved for entry of the signed order, on April 2, 2026, the trial court in Exhibit H signed its order denying the Motion to Compel Arbitration for the reasons set out in the prior order. The trial court also attached its prior minute order to the signed order. Ex. H. On April 15, 2026, Point filed the signed trial court order with the Arizona appellate court in order to continue its appeal.

**B. The Complaint here by Muskal against Point for the Illinois HEI contract**

On January 20, 2026, plaintiff filed its Complaint here attached as Exhibit I. Count I alleges that its attached Muskal-Point HEI contract on an Illinois property is a residential mortgage loan under TILA, and that Point violated TILA disclosure requirements. The Complaint also names Deer Park as a defendant as an interested party after Point transferred its mortgage to Deer Park.

The defendants have now filed a joint Motion to Compel Arbitration pursuant to the arbitration provisions in sections 7.10 and 7.20 of the Illinois HEI agreement, which is identical to sections 7.10 and 7.20 of the Arizona HEI agreement. Point's Memorandum argues that TILA does not apply because the "Agreement did not extend credit, did not create a debt, and is not a loan within the meaning of TILA." Memo. at 9-10.

## ARGUMENT

**I. Collateral estoppel bars the Motion to Compel Arbitration when Point has already lost in the Arizona litigation on precisely the same motion and issue**

Collateral estoppel -- also called issue preclusion -- seeks to conserve judicial resources

and foster reliance on judicial action by minimizing the possibility of inconsistent decisions. *Silva v. Wisconsin*, 917 F.3d 546, 562, (7th Cir. 2019). It prohibits parties from relitigating an issue after a court considered the parties' arguments on that issue and resolved it in a manner that was essential to the court's judgment. *Id.* Federal courts apply the preclusion law of the state where the judgment was rendered, Arizona in this matter. *Id.*

Under Arizona law, issue preclusion applies if: (1) the issue at stake is the same in both proceedings; (2) the issue was actually litigated and determined in a valid and final judgment issued by a tribunal with competent jurisdiction; (3) the opposing party had a full and fair opportunity to litigate the issue and actually did so; and (4) the issue was essential to the judgment. *Legacy Found. Action Fund v. Citizens Clean Election Comm'n*, 524 P.3d 1141, 1148 (Ariz. 2023). Arizona courts apply the same issue preclusion test as federal courts. *Quinn v. Cardenas*, 535 P.3d 921, 928 (Az. App. 2023).

**A. The four factors for issue preclusion are all met here to bar Point from relitigating its Motion to Compel Arbitration.**

**1. The issue at stake is the same in both proceedings here.**

The issue at stake is the exact same in both matters here – whether Point's HEI agreements with Muskal are subject to TILA, under which the TILA bar on arbitration applies. As in the Arizona case, Point argues here that its $350,000 HEI loan does not create a debt under the TILA definition -- "In sum, the lack of required repayment means that the Option Agreement did not extend credit, did not create a debt, and is not a loan within the meaning of TILA." Memo at 9-10. As shown above in the procedural background, this was Point's same argument in Arizona that was rejected by the trial court – for instance: "Here the Option does not create a "debt," as Owners are not liable for a specific sum of money and have no obligation to repay the $210,000 Investment Amount." Ex. D at 5.

While Point argues the same issue is not at stake in both cases because the Arizona loan involved "different terms" with a different property (Memo at 13), Point does not explain why any such "different terms" make a difference to the analysis at issue of whether Point's HEI agreements in Arizona and Illinois are subject to TILA. In fact, with the Arizona court finding that its $210,000 HEI loan constituted a debt subject to TILA, the greater $350,000 HEI loan at issue here is even more of a "debt" under TILA that must be repaid.

**2. The issue was actually litigated and determined in a valid final judgment.**

Point does not dispute that once the Arizona Court's Order is signed – which has now occurred – that the Order is a valid final judgment for issue preclusion purposes under Arizona law. In addition, the Arizona Appellate Court's Order put the blame entirely on Point for filing its improper appeal of an unsigned order (Ex. G) instead of first moving the trial court to sign its Order before the appeal, and the Appellate Court's Order directed Point to correct its mistake and move the trial court to sign the order. Ex. G. As the Appellate Court held, "Unsigned rulings are not appealable. Ariz. R. Civ. P. 54(a), 58(b)(1)" (Ex. G), and Point only has itself to blame for filing an improper appeal under the rules without first seeking to correct the matter with the trial court in the 30 days before it filed its appeal. Moreover, exhaustion of appellate remedies is not a requirement of issue preclusion, and a final judgment has preclusive effect even though it is pending on appeal. *See Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 160 (7th Cir. 1995).

**3. Point had a full and fair opportunity to litigate the issue and actually did so**

As shown above and in Exhibits B, C, D and E, this issue of whether Point's HEI contracts are subject to TILA was extensively litigated in Arizona with lengthy briefing and argument at a full hearing. The trial court also extensively explained its ruling at the

hearing. Ex. E at 30-31. Point does not explain why there is any reason to doubt "the fairness of the procedures followed" in this extensive briefing and hearing -- its argument is frivolous.

**4. The issue was essential to the judgment.**

Point does not dispute that this factor is present. Accordingly, with all the factors present, issue preclusion is mandated here. See, e.g., *Garcia v. Vallon*, 583 P.3d 421, 424, (Ariz. App 2025) (domestic violence finding in a protective order judgment requires issue preclusion in a parenting matter).

**B. Deer Park has no independent right to arbitration separate from Point's right to it, and thus Deer Park's Motion to Compel fails with Point's Motion.**

While Point argues: "If estoppel applied, Deer Park would have to either proceed with arbitration without Point or forgo its right to arbitration" (Memo at 15), this falsely presumes Deer Park has an independent right to arbitrate. However, Deer Park's rights are entirely dependent on any arbitration rights Point has under the note. Point cannot assign Deer Park any rights Point itself does not have -- all Deer Park possesses is an assigned mortgage, which is a mere incident to the debt. *Moore v. Lewis*, 366 N.E.2d 594, 599 (Ill. App. 1977). There is no contract between Muskal and Deer Park, and any rights that Deer Park has under the assigned mortgage are entirely dependent on the rights Point has under the note, including Point's right to arbitrate. *United Central Bank v. KMWC 845, LLC*, 800 F.3d 307, 311 (7th Cir. 2015) (action on a mortgage is precluded "when an action on the underlying note is barred by the statute of limitations or another procedural rule"). Thus, Deer Park has no right to arbitrate here where Point does not, whether by estoppel or on the merits in Part II below.

Point's Memorandum also argues that it would be "unfair" if Deer Park has lost the opportunity to "effectively contest" Point's liability under TILA, but this argument fails for several reasons. First, Point itself was the far more motivated and sophisticated party to

"effectively contest" in the initial Arizona instance whether TILA applied to Point's own HEI loans at issue. Point has issued hundreds of these HEI loans across the country, and this is a life-or-death issue for the company; Deer Park is merely a third-party debt purchaser.

In addition, Deer Park knew that any rights it had under the assigned mortgage were entirely dependent on Point's own rights under the mortgage, and thus Deer Park had the full opportunity in its own purchase agreement with Point to protect itself from any Point failures to properly establish the purchased mortgage debt. *See Cogswell v. CitiFinancial Mortg. Co*., 624 F.3d 395, 397 (7th Cir. 2010) (analyzing contract dispute between seller and buyer of assigned failed mortgage debt). Perhaps the Point-Deer Park purchase/assignment agreement promised Deer Park a full refund if the purchased mortgage was invalid; or perhaps Deer Park chose to purchase the mortgage at a discount and assume the legal risks herein with its eyes wide open. But either way, there is no basis for this Court to extensively relitigate a prior court finding to "protect" this sophisticated third-party debt purchaser who already had the full means to protect itself in its contract with Point and then chose accordingly.

For all the reasons above, there are no "special circumstances" of "overriding consideration of fairness to a litigant" that apply to Deer Park (or Point) here, and thus the defendants' citations to the Restatement and cases such as *Hullett v. Cousin*, 63 P.3d 1029 (Ariz. 2003) mentioning such "overriding consideration of fairness" are inapposite.

**C. This Court has no discretion to refuse to apply issue preclusion here where its required foundations are established.**

Finally, Point also cites *Hullett* to claim, "This Court also retains discretion not to apply collateral estoppel, even if Muskal establishes all the necessary elements." (Memo at 13). But Point's assertion is false – the word "discretion" appears nowhere in *Hullett* or any cited law, and issue preclusion is mandated when the necessary elements are present unless

exceptional special circumstances exist that are not present here. As the Seventh Circuit held just last year in denying a Motion to Compel Arbitration due to issue preclusion:

> "issue preclusion promotes important goals. It 'protects litigants from the burden of relitigating an identical issue with the same party' and 'promotes judicial economy by preventing needless litigation.' [cite]. Uber had an opportunity to litigate this issue before the state court; it lost. It does not get another bite at the apple."

*Agha v. Uber Techs., Inc.*, 148 F.4th 910, 915-916 (7th Cir. 2025) (arbitration denied).

Moreover, the value and fairness of issue preclusion to prevent "needless litigation" is especially strong here where Point already has an appeal pending in Arizona state court on the same issue, yet still requests parallel litigation both in this Court and thus also in a subsequent appeal to the Seventh Circuit, regardless of which party wins initially here. Issue preclusion is important to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). There is no reason whatsoever to have the cost and vexation of multiple lawsuits on the exact same issue occurring in both the Arizona Court of Appeals as well as in this Court and then the Seventh Circuit. Quite the contrary -- any resulting inconsistent decisions in Arizona and the Seventh Circuit on the same issue would be bad for both the parties and the public. Under the law and for all the reasons above, issue preclusion requires denial of the Motion to Compel Arbitration.

## II. TILA applies to Point's HEI Loan and bars arbitration

Even if issue preclusion did not bar the Motion, the Arizona court made the correct decision that TILA applies to Point's HEI loans and bars arbitration. Defendants acknowledge that if TILA applies here, then the TILA prohibition on arbitration applies.

### A. Defendant's product is a residential mortgage loan under the TILA.

As a remedial statute, TILA is to be construed liberally in favor of consumers. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 465 (7th Cir. 2010). TILA defines a "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage, deed of trust, ... or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602(dd)(5). "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f). Thus, the relevant issue here is whether the HEI loan was a right "to defer payment of debt or to incur debt and defer its payment" – and the answer is ***yes***. Under the plain meaning of "debt", the structure of the loan, and the relevant case law – TILA applies to the HEI loan debt here.

"Debt" is not defined in the TILA, and this Court should use the "natural reading" for such a TILA term. *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 755 (7th Cir. 2000). Black's Law Dictionary defines "debt" as "liability on a claim; a specific sum of money due by agreement or otherwise." Debt, *Black's Law Dictionary* (12th ed. 2024). Other dictionaries have similar definitions: "Something owed." Debt, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/debt. "Something, especially money, that is owed to someone else, or the state of owing something." Cambridge Dictionary, Debt, https://dictionary.cambridge.org/us/dictionary/english/debt. Black's also defines "contingent debt," which is "a debt that is not presently fixed but that may become fixed in the future with the occurrence of some event." Contingent Debt, Black's Law Dictionary (12th ed. 2024).

Here, the Point product involves incurring debt under these definitions, with Point deferring payment of that debt until a later date. As a functional matter, at least some of the initial payment will always be paid back to Point, as detailed in the Complaint ¶¶ 14-43.

Point provided Muskal with an advance of $350,000. Point contracted to receive (1) a 44.2% interest in the future price changes of the home (positive or negative) from the assessed value of $2.2 million; plus (2) a repayment of $622,272 – $272,272 more than the $350,000 amount borrowed. The additional $272,272 is owed because the agreed-upon "starting value" utilized in Point's contract -- $1,584,000 -- is already discounted substantially from the assessed fair market value of the home of 2.2 million that Point assessed at the time of the contract. This 28% discount essentially insulated Point from any market risk not to get its money back: the price would have to drop by $1,407,855 from the assessed value of 2.2 million – a drop of 64% -- to less than $800,000 for Point not to recover any of its $350,000 loan.

While Point's annual profits on the loan are "capped" at 21.94% APR, in just a few years decedent would owe $622,272 on his $350,000 loan if the assessed value of the home had not changed. Such extravagant profits are precisely why Point wishes to dodge TILA disclosure requirements – but this loan functions as debt if you owe $622,272 in three years while your home price stays the same. For Point not to recover any money, the home would have to endure an historically unprecedented price drop of 64%. Because at least some of the initial cash advance will essentially always be returned to Point upon a payment event, the HEI product satisfies the definition of a "debt," and is therefore "credit" under the TILA.

A comparison to second mortgages further confirms that this HEI loan is debt under the statute. In a non-recourse second mortgage for 10% of the home's equity, where there is a first mortgage for 80% of the home's equity, the non-recourse second mortgage will be worthless if the home's price drops by 20% and is sold. But that second mortgage *is still considered debt subject to TILA*, even though it could be worthless with such a 20% price drop. For the HEI loan at issue here, decedent would still owe money even if the house value

dropped by 64% -- and thus like a nonrecourse second mortgage it must be considered a debt. Under the natural reading of "debt" – especially under the liberal reading of TILA as required – where a second mortgage is considered debt under TILA, the HEI loan is "debt" as well.

**B. Point is incorrect that its HEI Loan is an option agreement and not a debt merely because there is an absurdly small mathematical possibility it will not have value.**

Point argues that its HEI loan is actually an "option" and not a debt if there is the slightest mathematical possibility that its loan could ever become worthless, and it is irrelevant that such circumstances would require a home price drop by the unprecedented amount of over 64% of its assessed value. Point argues that: "circumstances exist where it would be rational for Point to forgo the option; namely, where the home's value so depreciated that Point would "receive nothing at all" by exercising the option. Id. ¶ 33(a). Even if those circumstances were rare, they existed. The Option Agreement is therefore an option contract." Memo at 11.

Point is mistaken under TILA and Seventh Circuit law – because this HEI loan is extraordinarily unlikely to become worthless, its economic substance functions as a standard debt between the parties under TILA in substance, natural reading, and practical application. The leading Seventh Circuit case examining TILA is *Williams v. Chartwell*, which reversed a district court's overly narrow TILA findings. The Court held: "an examination of the economic substance of the transactions reveals that the cash collateral required by Chartwell does not constitute a deposit account *** Chartwell's failure to disclose the impact of that collateral on the APRs constitutes a violation of TILA. In making this conclusion, we again emphasize the importance of substance over form in TILA litigation." 204 F.3d 748, 755-6 (7th Cir. 2000) (emphasis added). *Williams* further castigated the trial court's narrow finding: "Such an approach elevates form over substance, and fails to account for this Court's consistent assertion that courts are to focus on the economic substance of the transaction in

determining whether TILA has been violated." Where the economic substance of the HEI loan here functioned as standard debt unless the price dropped by an unprecedented (and unfathomable) amount of 64%, *Williams* mandates application of TILA here as well.

Moreover, when *Williams* held that "we again emphasize the importance of substance over form in TILA litigation" (*id.)*, it cited two other Seventh Circuit cases applicable here. In *Smith v. Cash Store Mgmt., Inc*., the Court held: "It is the economic substance of the transaction that determines whether the check serves as collateral." 195 F.3d 325, 329 (7th Cir. 1999). In *Adams v. Plaza Fin. Co.,* the Seventh Circuit discussed "penetrating the outer form to find the inner substance [TILA requires] truthful and (it is hoped) informative disclosure of the interest rate and the other terms of credit." 168 F.3d 932, 936 (7th Cir. 1999).

Under *Williams, Smith*, and *Adams*, the HEI loan substantively functions as debt under TILA where there is only an absurdly *de minimis* possibility that the loan will not have value as debt. While Point also argues that an option holder does not have to collect the option on the loan even if it has value – if the option holder wishes to act irrationally – this does not affect the substance of the transaction and how it functions as debt with rational actors. Nor can Point adequately explain why its HEI loan is not debt while a non-recourse mortgage is "debt" under TILA, even though its value could also be zero as a "practical matter" (Memo at 9) under circumstances far likelier than a 64% price drop for the HEI loan at issue. Point's explanation for the different treatment of HEI loans than non-recourse mortgages is formalistic indecipherable emptiness, and TILA values substance over form under *Williams.*

In fact, Point does not explain at all why the natural reading of "debt" – a "liability on a claim" -- does not include liabilities (such as nonrecourse second mortgages) even when

there is a small chance such liabilities will have no value in the future. What Point has done is taken an "option" exception that is not in the statute itself -- an exception found by an agency under the rationale that a real-world valid option contract may well not have value – and attempted to silently amend the TILA statute, such that now any mortgage loan need not satisfy TILA requirements if there is the tiniest chance the loan holds no value in the future. It is a ridiculous interpretation that is entirely contrary to both the actual TILA language as well as the remedial functions of TILA to inform and protect mortgage borrowers. Even if there is a .01% chance that the HEI loan will have no value in the future, mortgage borrowers need TILA's protections the other 99.99% of the time as required by the statute. Moreover, agency commentary about a silent "option" exception cannot trump the actual TILA language, as the Supreme Court recently held in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

**C. Courts have rejected arguments that similar products are "options" and therefore excluded from the TILA.**

Other courts are likewise finding that HEI loan products are indeed "debt." The Ninth Circuit in *Olson v. Unison Agreement Corporation*, held in an unpublished opinion that the practical effect of a very similar product to Defendant's here was that of a mortgage under Washington law. 2025 WL 2254522 (9th Cir. 2025). While no TILA claim was brought, it addressed the very same definitions of "credit" and "debt" applicable to analysis under the TILA. *Id*. Likewise, it noted that regardless of the nominal presence of an "option" within the product at issue, the structure of the obligation rendered it such that the option will essentially always have marginal value even in the case of a severe market crash, rendering the product no different than a non-recourse mortgage. *Id.* While Point tries to distinguish the statutory language in Washington law in *Olson* (Memo at 10), as *Olson* noted, the relevant language in

that law is similar to the language from TILA and Regulation Z about reverse mortgages.[1]

And of course, the Arizona court in this matter held that TILA applies to these HEI loans as debt under the statute – and Point has not cited any error in the court's detailed oral ruling. *See also In re Stone*, 671 B.R. 752, 2025 WL 2222829 (Bankr. D. Colo.) (product violated Colorado mortgage statutes); *Commonwealth v. Hometap Equity Partners, LLC*, No. 2584-cv-00469-BLS2, 2025 WL 2468564, at *7 (Mass. Super. Aug. 21, 2025) attached as Exhibit J..

Unlike these cases directly on point, Point has not cited any relevant support from case precedents for its TILA interpretation that a mortgage contract is not covered by TILA if there is the tiniest chance it will not have value in the future. Its cite to *Foster v. Equitykey Real Est. Invs. L.P.*, was distinguished by *Hometap* on grounds also relevant here: "In *Foster*, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation." *Hometap,* Ex. J at 15, Westlaw at *7. *Foster* was also an unpublished decision from a lower court in the Ninth Circuit, which analyzed these products more recently in *Olson* with a different result. None of Point's other citations actually support its TILA interpretation here.

**CONCLUSION**

Defendants' Motion should be denied. It is barred by collateral estoppel where the Arizona court ruled against Point on precisely the same issues in its Motion to Compel Arbitration. And on the merits, Point's product squarely meets the definition of a residential mortgage as in economic substance it constitutes a debt under TILA.

---

[1] *Olson* also explained the option exception: "[W]e agree that option contracts generally do not constitute credit obligations, but that does not mean that the mere embedding of a formal option in a highly complex overall arrangement automatically exempts that arrangement from being classified as a 'credit obligation.'" Olson at *5.

By:____/s/ Michael Steigmann_____

Attorney for Plaintiff

Michael Steigmann
150 S. Wacker Dr. #2400
Chicago, Illinois 60601
(312) 833-5945
ARDC 6226169
Michael@Steigmann.com

Andrew Rahtz, Bar No. 026151
Blake A. Bracht, Bar No. 037886
**PLATT & WESTBY, P.C.**
2916 N. Seventh Avenue, Suite 100
Phoenix, Arizona 85013
Telephone: 602-277-4441
courtemails@plattwestby.com
*Attorneys for Plaintiff*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>vs.<br><br>POINT DIGITAL FINANCE, INC.,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT** |

Plaintiff Steven Muskal, in his capacity as Independent Administrator of the Estate of James B. Muskal, and for his Complaint against Defendant Point Digital Finance, Inc. (hereinafter "Defendant"), states as follows:

**<u>Parties, Jurisdiction, and Venue</u>**

1. Plaintiff Steven Muskal is the duly appointed Independent Administrator of the Estate of James B. Muskal and has legal authority to bring this action on behalf of the Estate. Plaintiff brings this action solely in his capacity as Independent Administrator for the benefit of the Estate, and not in his personal capacity.

2. James B. Muskal was born on July 28, 1938, and passed away in Chicago,


EXHIBIT A

Illinois, on March 13, 2025.

3. Upon information and belief, Defendant Point Digital Finance, Inc. ("Point"), is a Delaware corporation with its principal place of business in the State of California.

4. The Court has subject matter jurisdiction pursuant to A.R.S. § 12-123 because the amount in controversy exceeds the jurisdictional minimum of the Court.

5. The Court has personal jurisdiction because the subject matter of this action concerns a mortgage loan secured by real property located within the State of Arizona.

6. Venue is proper pursuant to A.R.S. § 12-401(12) because the subject matter of this action concerns a mortgage loan secured by real property located within Maricopa County.

**General Allegations**

7. On July 15, 2025, Defendant Point Digital Finance entered into a contract with James B. Muskal and Cheryl Muskal (aka Cheryl Collins), a copy of which is attached hereto as **Exhibit 1** (the "Contract").

8. The Contract, which Point refers to as a "Point Digital Finance Option Purchase Agreement," is, in essence, a reverse mortgage.

9. At the time, James and Cheryl owned real property located at 6023 E Turquoise Ave, Paradise Valley, AZ 85253 (the "Property") as joint tenants with rights of survivorship.

10. On February 15, 2025, Cheryl died, leaving James as the sole owner of the Property until his own death on March 13, 2025.

11. Pursuant to the Contract, Point paid James and Cheryl an up-front sum of $210,000, less closing costs, which Point refers to as their "investment amount."

12. Point then recorded a deed of trust against the Property.

13. Instead of a traditional interest rate based upon the principal amount of the loan, Point instead contracted to receive a 34.5% interest in the future appreciation of the home.

14. However, the agreed-upon starting value utilized in Point's contract is already discounted substantially from the current fair market value of the home, in this case by 27%, essentially insulating Point from any market risk.

15. In effect, in order for Point to lose money on the transaction, the value of the Property would have to plummet 27% from its true starting fair market value.

16. Based upon available data, the only time in history when housing prices declined to that extend year over year was during the Great Recession housing crisis.

17. Alternatively, Point includes a maximum rate of return on their "investment," here at a 19% annual rate, compounded monthly, which Point misleadingly refers to as the "Homeowner Protection Cap."

18. Past a short period of time, however, the "Homeowner Protection Cap" becomes mathematically meaningless – after only five years, the "cap" on Point's proceeds has grown to $538,972.83. In other words, after only five years, for the "cap" to come into play to limit Point's profit on a sale and repurchase of the Option, the sale price for the Property would need to exceed $3,606,240.09. At the expiration of the 30-year option period, the "cap" on Point's profit is $60,021,209.15.

19. Upon information and belief, the typical market rate for home equity lines of credit in July 2024 was approximately 9.17% simple interest.

20. Point provides no mechanism by which a borrower can pay down accumulated interest to prevent compounding or pay down the "investment" balance without a full refinance.

21. Point misleadingly states that no interest accrues on the initial "investment."

22. The term of Point's "option" is 30 years; essentially, by paying a strike price of $495,180.00, Point has the right to force a sale of the Property either at the expiration of the 30-year term or the occurrence of certain triggering events, at which time Point acquires a 34.5% interest in the *entire* value of the Property.

23. Point deliberately backloads the remaining option consideration to disguise the nature of the transaction; functionally, it acquired a 34.5% interest in all future appreciation of the Property by paying only 10% of the already-discounted starting value; the "exercise price" becomes mathematically meaningless to the borrower except to all but guarantee that Point's initial investment must be paid back in the future and create the illusion of sufficient consideration.

24. However, Point profits based on the rarity of anyone staying in one home for 30 years.

25. The median period of time that Americans live in one home is approximately 11.9 years.

26. Functionally, there are only three ways to exit Point's product:

a. First, hold the Property for the full 30-year term, and Point does not elect to exercise the option. The likelihood of this scenario is statistically extremely

remote; in the case of the Subject Property, the Property's fair market value in 2054 would need to be less that the already-discounted initial agreed-upon value of $2,044,000 before Point fails to cover its initial investment of $210,000 and less than $1,435,304.35 for Point to receive nothing at all.

b. Second, hold the Property for the full 30-year term, and Point exercises its option and forces a sale. For the reasons stated in *a.* above, the statistical likelihood of Point not exercising the option after 30 years is functionally zero.

c. Third, pay off Point's initial $210,000 back, plus its 34.5% share of appreciation (limited to no more than 19% interest, compounded monthly), either by refinancing, selling the Property, or otherwise paying Point in full. As stated in *a.* above, there is essentially no statistically plausible scenario where Point declines to exercise its option on its own in the event of a sale of the Property.

27. Point's product is deliberately designed to minimize risk to Point at the expense of the homeowner – if the homeowner buys Point out within a relatively short period of time, Point's substantial discount on the agreed-upon initial value of the Property nearly guarantees that Point's return on its initial investment will be calculated using the exorbitant compounding-interest "cap," substantially outpacing the expected return of nearly any relatively stable investment product available on the market. If Point's option remains for more than a few years, Point has functionally bought into the housing market by diverting a

substantial fraction of the homeowner's accumulated real estate wealth from the individual to Point's shareholders, while taking on no responsibility for rent payments, maintenance, or any of those other pesky costs associated with owning real property, all while also charging equally exorbitant application, processing, and other fees to further strip equity from homeowners.[1]

28. Upon information and belief, Point deliberately targets so-called "house rich, cash poor" individuals for its products, especially the elderly and those in financial distress.

29. On its face, the Contract fails to identify the initial investment amount of $210,000 as a loan.

30. On its face, the Contract fails to identify the Point Proceeds accurately as a balloon payment.

31. On its face, the Contract falsely identifies the Exercise Payment as part of consideration for the Contract.

32. The Contract misleadingly states that no interest accrues on the balance of the loan.

33. The Contract misleadingly describes a 19% monthly compounding interest rate as "protecting" the homeowner.

34. James Muskal relied upon the misrepresentations and misleading language in the

---

[1] Though no application or service fees were charged to James and Cheryl in this particular transaction, Point had already stripped tens of thousands of dollars of equity from them through fees associated with other transactions both on the subject Property and other real property owned by James and Cheryl.

Contract in agreeing to enter the Contract, ultimately unknowingly agreeing to pay far more to Point than any conventional loan or HELOC would have charged.

35. Upon information and belief, Point made no inquiry into James and Cheryl's ability to repay the loan beyond purely the value of the collateral.

36. Upon information and belief, Point deliberately targeted James and Cheryl via advertising, email lists, phone calls, or other means of targeted communication over the preceding several years in order to induce them to enter into numerous contracts with Point, deliberately siphoning tens of thousands of dollars of James and Cheryl's personal wealth to itself based on inadequate and deliberately misleading descriptions of its product.

**FIRST CAUSE OF ACTION: RECISSION OF UNCONSCIONABLE CONTRACT**

37. Plaintiff incorporates all prior allegations as though fully set forth herein.

38. The Contract is procedurally unconscionable because it is deliberately written in a way that is misleading and confusing to the average person.

39. The Contract is procedurally unconscionable because it misleadingly describes the Contract as bearing no interest.

40. The Contract is further procedurally unconscionable because failed to adequately disclose the future cost of the Contract to James and Cheryl.

41. The Contract is further procedurally unconscionable because it used misleading terms like Homeowner Protection Cap to describe a compounding rate of interest that was substantially greater than prevailing rates of interest for second-priority home equity loans at the time.

42. The Contract is further procedurally unconscionable because it falsely states that the Exercise Payment is part of the consideration for the Contract while using a payout formula whereby the Exercise Payment is never actually realized by the borrower.

43. The Contract is substantively unfair because it conveys more than triple the share of future appreciation in the Property as the proportional value provided at the time of contracting.

44. The Contract is substantively unfair because it utilizes a significant initial discount rate to nearly guarantee a rate of return that doubles or even triples the cost of prevailing mortgage products.

45. The Contract is substantively unfair because there is no ability of the borrower to pay down the amount owed over time.

46. The Contract is substantively unfair because it deliberately targets the primary source of wealth for most Americans with the goal of diverting that wealth from individuals.

47. The Contract is substantively unfair because the circumstances where James and Cheryl's cost of obtaining credit is even comparable to prevailing market rates, let alone to where James and Cheryl can arguably have a net economic benefit, are so statistically remote that the transaction is inherently one-sided in favor of Point.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION: A.R.S. § 44-1522 CONSUMER FRAUD

48. Plaintiff incorporates all prior allegations as though fully set forth herein.

49. The transaction described in the Contract is "Merchandise" as defined by A.R.S.

§ 44-1521(5).

50. Defendant Point is a "person" as defined by A.R.S. § 44-1521(6).

51. The Contract is a "sale" as defined by A.R.S. § 44-1521(7).

52. The terms of the Contract are misleading or false, including, but not limited to, in the following ways:

a. By falsely stating that the Exercise Payment is part of the consideration for the bargain, thereby inflating the perceived value of the transaction.

b. By misleadingly describing the 19% monthly compounding interest maximum, which was more than double the prevailing interest rate on home equity loans, as a "Homeowner Protection Cap."

c. By deliberately omitting estimates of the cost of the Contract from the face of the Contract.

d. By failing to adequately explain that the agreed-upon starting value was substantially discounted from the true fair market value of the Property.

e. By misleadingly stating that the Contract does not accrue interest.

f. By failing to accurately describe the Contract as a mortgage loan.

g. By misleadingly stating that the future amount due to Point may be less than the initial investment amount without disclosing that the circumstances giving rise to that result are extremely improbable.

53. Plaintiff has sustained damages as a result of Point's false and misleading practices in the form of being responsible to pay a buyout price including a finance charge

several times in excess of market rates.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION: VIOLATION OF THE TRUTH IN LENDING ACT

54. Plaintiff incorporates all prior allegations as though fully set forth herein.

55. The Contract is a residential mortgage loan as defined by 15 U.S.C. § 1602(dd)(5).

56. James Muskal was a natural person.

57. The transaction was entered into primarily for personal, family, and household purposes.

58. Point is a creditor.

59. The Contract fails to comply with the disclosure requirements of the Truth in Lending Act in that it, among other things:

a. Fails to adequately disclose the annual percentage rate associated with the Contract.

b. Fails to adequately disclose the finance charge associated with the Contract.

c. Fails to identify the initial payment of $210,000 as the "amount financed."

d. Fails to provide a statement of the consumer's right to obtain, upon written request, a written itemization of the amount financed.

e. Fails to disclose in conspicuous type a good faith estimate of the total cost of the mortgage to the consumer expressed as a table of annual rates.

f. Fails to disclose the projected total cost of the Contract.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

## Prayer for Relief

Plaintiff, therefore, based on the above-stated causes of action, hereby prays for relief as follows:

1. For recission of the Contract;
2. For statutory damages under the Truth in Lending Act, 15 U.S.C. § 1640(a)(1)(2)(A)(iv) in the maximum amount of $4,000;
3. For punitive damages for Point's violations of the Consumer Fraud Act;
4. For Plaintiff's reasonable attorney's fees incurred in bringing this action pursuant to 15 U.S.C. § 1640(a)(3), A.R.S. § 12-341.01, the terms of the Contract, or as otherwise provided by law;
5. For Plaintiff's costs pursuant to A.R.S. § 12-341 or as otherwise provided by law;
6. For such other relief as the Court deems just and proper.

**DATED** this 15 day of July, 2025.

**PLATT & WESTBY, P.C.**

*/s/ Blake A. Bracht*
Blake A. Bracht
*Attorney for Plaintiff*

# Exhibit 1

Option Agreement ID: 2024252-TEDOG

# POINT DIGITAL FINANCE OPTION PURCHASE AGREEMENT

This Point Digital Finance Option Purchase Agreement is entered into as of July 15, 2024 (**"Effective Date"**), by and between James B. Muskal and Cheryl C. Collins-Muskal and Point Digital Finance, Inc., a Delaware corporation. **"We"**, **"us"**, **"our"** and **"Point"** refer to Point Digital Finance, Inc. and its successors and assigns. **"You"**, **"your"** and **"Owner"** refer to James B. Muskal and Cheryl C. Collins-Muskal and Owner's permitted assigns under this Agreement. Capitalized terms used but not defined in the text of this Agreement have the meanings set forth in the attached Appendix A.

*To be completed by Point only:*

☒ If this box is checked, Point Digital Finance, Inc. will assign all rights, title, and interest in and to this Agreement to Point Titling Trust.

## Section One:
## Option Terms

1.1 **Grant of Option and Consideration**. You agree to sell to us an exclusive and irrevocable option (the **"Option"**) to purchase an undivided percentage interest of fee simple title ownership (the **"HEI Percentage"**) in and to the Property in exchange for our agreement to pay you the Investment Amount. Point may exercise the Option and purchase the HEI Percentage by paying you the Exercise Payment. The Property is commonly known as 6023 E TURQUOISE AVE, PARADISE VALLEY, AZ 85253 and is more specifically described on Schedule 1 (the **"Property"**).

You hereby agree to the specific terms of our Option as set forth below in the column entitled "Owner's Information":

| | **Definition** | **Owner's Information** |
|---|---|---|
| **Investment Amount** | the first payment of the Option Consideration, to be paid shortly after execution of this Agreement | $210,000.00 |
| **HEI Percentage** | short for Home Equity Investment Percentage and is the percentage interest of Appreciation that Point shares in; also the percentage interest of the Property that we would acquire upon Option Exercise | 34.5000% |
| **Appreciation Starting Value** | the starting value of the Property for calculating Appreciation and Point Proceeds | $2,044,000.00 |
| **Homeowner Protection Cap** | An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 | 19.00% |
| **Exercise Payment** | the payment Point will make to you if Point exercises the Option | $495,180.00 |
| **Option Consideration** | the total purchase price for the HEI Percentage, which is the sum of the Investment Amount and the Exercise Payment | $705,180.00 |



© 2024 Point Digital Finance, Inc.

| | | |
|---|---|---|
| **Amount of Acknowledged Pre-Existing Loans** | Acknowledged Pre-Existing Loan is defined in Appendix A | $1,469,203.95 |
| **Expiration Date** | the date on which the Investment Term expires | July 15, 2054 |
| **Legal Form of Ownership of Property** | -- | husband and wife |
| **Owner Occupied Property vs. Non-Owner Occupied Property** | both terms are defined in Appendix A | Non-Owner Occupied Property |
| **Property Type** | -- | Single Family Home |

1.2 **Term of Option and Term of Agreement.** The term of the Option you grant to us (the **"Investment Term"**) will commence on the Effective Date and will expire at 11:59 p.m., Pacific Time, on the Expiration Date, unless otherwise extended pursuant to Sections 2.2.1 or 7.9. The term of this Agreement will continue until the receipt of the full amount of our Point Proceeds following (i) an Owner Option Repurchase or (ii) an Option Exercise. Certain obligations and provisions of this Agreement shall survive termination as provided in Section 7.8.

1.3 **Payment of Option Consideration.** We will pay you the total Option Consideration in two parts as set forth below.

1.3.1 **Payment of the Investment Amount and Option Grant Closing.** We shall pay you the Investment Amount within five Business Days of confirmation by an Escrow Agent that the escrow for the granting of the Option has closed including, but not limited to, confirmation of the following (the **"Option Grant Closing"**):

(a) You have executed and delivered to the Escrow Agent each of the following Option Documents: (i) a signed original of this Agreement; (ii) a signed and notarized original of the Security Instrument; and (iii) any other required documents;

(b) the Security Instrument and any other required documents are properly recorded in the appropriate state or county recorder's office; and

(c) Point has been added as an additional named insured under your insurance policies in compliance with Section 4.1.1.

1.3.2 **Payment of the Exercise Payment.** If you choose to repurchase the Option, Point will calculate the Point Proceeds and account for the Exercise Payment according to Schedule 2. If Point exercises the Option, Point will credit the Exercise Payment against its share of proceeds from a Property Sale except as indicated in Section 2.3.

1.4 **Payment of Point Proceeds.** Except as otherwise noted, your obligations under this Agreement will cease once you pay us our Point Proceeds, which will always be calculated per Schedule 2. This will typically occur by (a) your election to terminate and repurchase the Option by paying us the Point Proceeds (an **"Owner Option Repurchase"**), or (b) our election to exercise the Option upon the events specified in Section 1.4.2 event and be paid the Point Proceeds in a Property Sale. The Calculation of the Point Proceeds takes into account a cap (the **"Capped Repayment Amount"**) that may limit the amount of Point Proceeds you are obligated to pay to Point. The Capped Repayment Amount is based, in part, on the length of time that has elapsed between the Effective Date and the date Point receives the Point Proceeds.



© 2024 Point Digital Finance, Inc.

1.4.1 **Owner Option Repurchase.** At any time during the Investment Term, you may elect to repurchase and thereby terminate the Option by paying us the Point Proceeds. To initiate an Owner Option Repurchase, you must deliver written notice to us at least 15 days prior to the proposed closing date. You may be required to provide additional notice if you are repurchasing the Option in connection with a Property Sale or at the Expiration Date. The closing of the Owner Option Repurchase will be scheduled to allow us to conduct an Appraisal, at your cost, to determine the Final Home Value.

We shall retain the right to reject any tender by you of the Point Proceeds that is less than the full amount of the Point Proceeds, is less than $0, is not actually received by Point or is not tendered within the time frame agreed to by you and Point, or is in violation of applicable law. Upon our acceptance of the Point Proceeds, the Option shall terminate.

1.4.2 **Option Exercise Triggers.** At any time prior to you consummating an Owner Option Repurchase, we have the right to exercise the Option upon the following events: (a) any Transfer of the Property or any portion of the Property as provided in Section 2.1; (b) at the Expiration Date, as provided in Section 2.2; (c) upon an Event of Default as provided in Section 2.3; or (d) upon special circumstances as provided in Sections 4.4 and 4.5.

1.5 **Recording and Securing the Option.** You grant us the right to secure your performance under the Agreement and our right to our HEI Percentage through a Security Instrument (a Deed of Trust or Mortgage), substantially in the form attached as Exhibit A (the **"Security Instrument"**), which will be properly recorded or filed. You also grant us the right to record public notice of the Option either through (a) a rider or other means of incorporation into the Security Instrument or (b) a separately recorded memorandum evidencing: (i) the provisions of this Agreement that constitute covenants running with the land and (ii) the terms of this Agreement (**"Notice of Option Purchase Agreement"**).

## Section Two:
## Owner Option Repurchase and Option Exercise

2.1 **Owner Option Repurchase or Point Option Exercise Upon a Sale.** In connection with any Property Sale you may elect to terminate and repurchase the Option. If you do not elect to repurchase the Option, then we shall have the right, but not the obligation, to exercise the Option and be paid our Point Proceeds (**"Option Exercise Upon a Sale"**).

2.1.1 **Permitted Sale.** Any Property Sale by you, whether in connection with an Owner Option Repurchase or our Option Exercise, must meet the following conditions (a **"Permitted Sale"**): (a) you must use a licensed real estate agent to market and sell the Property; (b) you must hold at least two open houses; (c) the home must be listed for sale on the Multiple Listing Service for at least 14 days; (d) the sale must be an Arm's Length Transaction; (e) you will be solely responsible for conveying title free and clear of any liens to the satisfaction of the Third Party Buyer, and for satisfying any and all loans and other obligations secured by liens on the Property; (f) the transfer of the title to the Property at the closing of a Property Sale to a Third Party Buyer must convey the Property without being subject to the Option or any of the Option Documents; and (g) the Property Sale and transfer of the title to the Property may not be defeasible by you or the Third Party Buyer after close of Escrow upon the occurrence of some future contractually-specified event. A Permitted Sale includes a Property Sale that is not in accordance with this Section 2.1 but is otherwise expressly consented to in writing by Point. If you do not comply with all requirements, Point may order



© 2024 Point Digital Finance, Inc. 

an Appraisal at your cost and use the Appraised Value of the Property rather than the sale price to calculate Point Proceeds.

2.1.2 **Notices and Documentation Upon Proposed Property Sale.**

(a) Owner Notice of Intention to Sell. You must give us prompt written notification, but no later than when you list the home for sale or, if the Property will be sold off the market, then at the time that you know you intend to sell.

(b) Owner Notice of Acceptance of Offer. If you accept an offer to purchase the Property, you must give us immediate, written notification but in no event more than 5 days after your acceptance of such offer and at least 15 days prior to a closing of any such transaction.

(c) Owner Notice Requirements. When you provide your notice of intent to sell or accept an offer, you must (a) indicate whether you elect to make an Owner Option Repurchase, or acknowledge we may make an Option Exercise in connection with the Property Sale; (b) include all related documents and agreements executed, created, obtained or delivered by you in connection with the marketing or sale of the Property; and (c) disclose whether the Property has been a Non-Owner Occupied Property at any time in the six-month period prior to the notice of intent to sell.

(d) Point Notice of Option Exercise Upon a Sale. If your notice of intent to sell or accept an offer does not indicate that you will make an Owner Option Repurchase, within five Business Days of our receipt, we may deliver a written notice to you informing you of our intent to commence our Option Exercise Upon a Sale (**"Notice of Option Exercise Upon a Sale"**). If you do not provide us with a notice of intent to sell or accept an offer, we will not have any obligation to deliver a Notice of Option Exercise Upon a Sale.

(e) Required Documentation. You shall promptly provide us all documents, purchase offers, escrow instructions, preliminary title reports and any other materials relating to the proposed sale or transfer as they become available.

2.1.3 **Final Home Value and Appraisal in Property Sale.** Prior to closing on your Property Sale, we may order an Appraisal at your cost as provided in Section 4.3. You agree to comply with such process. In any Property Sale in connection with an Owner Option Repurchase or an Option Exercise Upon a Sale, the Final Home Value is determined according to Schedule 2 Paragraph C.1.

2.1.4 **Closing of Sale and Owner Option Repurchase or Option Exercise Upon a Sale.**

(a) Escrow. Any Property Sale must be consummated through a licensed real property Escrow using the services of an Escrow Agent. Any instructions to the Escrow Agent regarding the disbursement of sales proceeds, the payment of our Point Proceeds and the release of the Security Instrument and, if applicable, the Notice of Option Purchase Agreement must have our prior written consent. Our consent will be given and conditioned upon our determination of your compliance with the terms and conditions of this Agreement.

(b) Concurrent Closings. The closing of an Owner Option Repurchase may occur prior to or concurrently with the Property Sale through the same Escrow as the Property Sale.

(c) Escrow Deliveries. On or prior to the close of Escrow upon any Property Sale where there will be an Owner Option Repurchase or Option Exercise Upon a Sale, (i) you agree to



© 2024 Point Digital Finance, Inc.

deliver or cause to be delivered to the Escrow Agent the appropriate deeds, affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to us, to effect your Owner Option Repurchase or our Option Exercise; and (ii) we agree to deliver or cause to be delivered the Exercise Payment to the Escrow Agent, or, at our election, the amount of the Exercise Payment may be debited against the Point Proceeds.

(d) Payment Allocations. At close of and through Escrow for a Property Sale, we shall be paid an amount equal to the Point Proceeds. You will be solely responsible for paying Closing Costs and Sales Commissions and satisfying and removing any and all loans and other obligations secured by liens on the Property.

2.2 **Owner Option Repurchase or Point Option Exercise as of Expiration Date.** Prior to the Expiration Date, (a) you may elect to terminate and repurchase the Option by paying us the Point Proceeds through an Owner Option Repurchase in accordance with Section 2.2.1, or (b) if you do not consummate your Owner Option Repurchase, then we shall have the right, but not the obligation, to exercise the Option as of the Expiration Date, subject to the terms and conditions of Section 2.2.2 (**"Option Exercise as of Expiration Date"**).

2.2.1 **Owner Option Repurchase as of Expiration Date.** To initiate an Owner Option Repurchase in connection with the expiration of the Investment Term, you must deliver written notice to us of your election to make an Owner Option Repurchase at least 50 days prior to the Expiration Date. The closing of the Owner Option Repurchase must occur prior to the Expiration Date and should be scheduled so as to allow us to conduct the Appraisal to determine the Final Home Value for purposes of calculating the Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated prior to the Expiration Date, then (a) in Point's sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated, and (b) the Investment Term shall automatically be extended by 90 days after the original Expiration Date to permit us the opportunity to make an Option Exercise as of Expiration Date.

2.2.2 **Option Exercise as of Expiration Date and Property Sale.** In the event of an Option Exercise as of Expiration Date, you will first be required to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. We will then purchase the HEI Percentage of the Property by paying you the Exercise Payment, which will be held in an interest-bearing escrow account (the **"Exercise Payment Escrow Account"**). Upon closing of Escrow on the exercise of the Option, we will thereby take joint ownership of the Property with you and have the right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale subject to the procedures set forth in Section 2.2.2(d). The Exercise Payment will not be released until the closing of a subsequent Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise as of Expiration Date. You shall retain physical possession and the exclusive right to occupy the Property prior to a Property Sale (except if we determine, in our sole discretion, that there are extreme circumstances affecting the condition of the Property, such as abandonment, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(a) Notice of Option Exercise as of Expiration Date. To commence our Option Exercise as of Expiration Date, we will deliver written notice to you of our intention to exercise the Option (**"Notice of Option Exercise as of Expiration Date"**) at least 30 days prior to the Expiration Date.



© 2024 Point Digital Finance, Inc.



POINT

(b) Documentation; Appraisals; Inspections; Confirmation of Title. Within 15 days following delivery of the Notice of Option Exercise as of Expiration Date, you agree to allow us to conduct both a home inspection and an Appraisal of the Property, at your cost, for the purpose of ascertaining the market value and the condition of the Property. Upon our request, you will also provide us with Confirmation of Title to our satisfaction, effective as of the date of closing of the Option Exercise as of Expiration Date. You will deliver to us any documents necessary to grant us the exclusive right to market and sell the Property. If we are not satisfied, in our sole discretion, with the value of the Property following the Appraisal or with the Confirmation of Title, we may withdraw our intention to exercise the Option and cancel our Notice of Option Exercise as of Expiration Date in writing, without any penalty to us or any further obligation to exercise the Option.

(c) Closing on Option Exercise as of Expiration Date.

(i) **Escrow for Option Exercise as of Expiration Date.** To effect the Option Exercise as of Expiration Date and purchase our HEI Percentage of the Property, we shall open an Escrow, separate from the Exercise Payment Escrow Account. The parties shall use best efforts to close Escrow by the Expiration Date, with the Exercise Payment to be held in the Exercise Payment Escrow Account until the closing of a subsequent Property Sale.

(ii) **Closing Deliveries for Option Exercise as of Expiration Date.** On or prior to the close of Escrow upon our Option Exercise as of Expiration Date, you agree to deliver or cause to be delivered to the Escrow Agent the following: (i) a Grant Deed; (ii) Closing Costs, if any; (iii) any documents or other instruments that may be required by the Escrow Agent in connection with Confirmation of Title; (iv) the appropriate affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to Point; (v) any documents necessary for Point to conduct a Property Sale following Option Exercise; and (vi) instructions to the Escrow Agent that the Exercise Payment be deposited and held in an interest bearing Exercise Payment Escrow Account pending the closing of a Property Sale. We agree to deliver or cause to be delivered to the Escrow Agent (a) a preliminary change of ownership report (or similar document) required under applicable state or local law, and (b) the Exercise Payment which will be deposited in the Exercise Payment Escrow Account, less all monetary amounts owed to Point in the form of unpaid Service Fees and unreimbursed Preservation Payments.

(d) Property Sale in Connection with Option Exercise as of Expiration Date.

(i) **Initiation of Property Sale by Owner.** If you intend to initiate a Property Sale following our initiation of Option Exercise as of Expiration Date, you must meet the Owner obligations upon a Property Sale, and the sale must meet the conditions for a Permitted Sale, as described in Section 2.1.

(ii) **Initiation of Property Sale by Point.** If we choose to initiate a Property Sale after or in conjunction with our Option Exercise as of Expiration Date, we shall provide you with 10 Business Days advance notice of our intention to solicit buyers and sell the Property to one or more third parties in a Property Sale. You shall cooperate by allowing access to the Property and promptly executing all documents reasonably presented to you by us to effect a transfer of your interest in the Property to the Third Party Buyer.



© 2024 Point Digital Finance, Inc.

(iii) **Final Home Value and Payment of Proceeds.** In any Property Sale following our Option Exercise as of Expiration Date, the Final Home Value shall be as determined by Schedule 2 Paragraph C.1. At close of and through the Escrow for the Property Sale by us under this Section 2.2.2(d), the Escrow shall be conducted and sale proceeds shall be allocated and paid in the manner described in Section 2.1, except that the amount in the Exercise Payment Escrow Account shall be released to you and we shall also be paid (i) any Closing Costs that we pre-paid; and (ii) any other commercially reasonable sums expended by us in good faith in the preparation and marketing of the Property for sale.

2.3 **Option Exercise After Default and Property Sale.** At any time during the term of this Agreement, upon the occurrence of any Event(s) of Default described in Section 6.1 below, we shall have the right, but not the obligation, to exercise the Option (an **"Option Exercise After Default"**) pursuant to the terms of this Section 2.3 and purchase the HEI Percentage of the Property by paying you the Exercise Payment which will be held in a separate Exercise Payment Escrow Account. We may then require you to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. Following the closing of escrow on Option Exercise After Default, we will thereby take joint ownership of the Property with you and have the exclusive right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise After Default. Prior to a Property Sale, you shall retain physical possession and the exclusive right to occupy the Property (except if we determine, in our sole discretion, that the Property is at risk of waste or gross neglect, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property). At any time from an occurrence of any Event of Default until the cure of such default to our sole satisfaction, we may order one or more Appraisals.

2.3.1 **Notice of Option Exercise After Default.** Upon the occurrence of any Event(s) of Default giving rise to our right to exercise the Option, we shall provide written notice to you of the default and your right to cure (the **"Notice of Right to Cure Default"**). In the event that you fail to cure the default, as determined in our sole discretion, within 30 days following delivery of Notice of Right to Cure Default, we may, but are not obligated to, declare a default and our election to exercise the Option by delivering to you a written Notice of Option Exercise After Default (the **"Notice of Option Exercise After Default"**). Upon delivery of the Notice of Option Exercise After Default, we shall automatically be permitted to commence the process to exercise the Option and close on the Option Exercise, without further notice to you, pursuant to those terms and conditions set forth for Option Exercise as of Expiration Date in Sections 2.2.2(b) - (d) above; except that we shall additionally deliver instructions to the Escrow Agent, in form and content acceptable to us, concerning disbursement of the funds in the Exercise Payment Escrow Account to remedy the Events of Default in accordance with Section 2.3.3 below. We may, but are not obligated to, record the Notice of Option Exercise After Default in the county where the Property is located.

2.3.2 **Owner Cure or Failure to Cure After Notice.** In the event we deliver you a Notice of Option Exercise After Default, you shall retain the right to cure such default, with Point to determine the sufficiency of such cure in its sole discretion, on or before the 90th day following delivery of such Notice. In the event you fail to timely or sufficiently cure the default, as determined in our sole discretion, we shall notify you of the date we have selected for close of Escrow on our Option Exercise After Default; provided, however, that close of Escrow may not occur until the 120th day following delivery of the Notice of Option Exercise After Default, at the earliest.



© 2024 Point Digital Finance, Inc.

2.3.3 **Amounts Chargeable to Owner After Default.** You authorize us to pay all amounts necessary to any third parties to enable us to cure and remedy your Event of Default by either (a) prior to Option Exercise, reducing the Exercise Payment that is owed to you through the Escrow for our Option Exercise After Default or (b) following Option Exercise, making disbursements from the Exercise Payment Escrow Account as described in Section 2.3.1. To cure and remedy the default, we may make payments to cover your delinquent payments, accrued interest, late fees, reinstatement fees, taxes and other penalties, together with any and all amounts which we deem necessary, in our discretion, to repair, protect and maintain the Property. Additionally, Point may charge you reasonable administrative fees for our oversight of the default process.

2.3.4 **Property Sale Following Option Exercise After Default.** Any Property Sale initiated by you or Point following Point's Option Exercise After Default must be conducted in accordance with the terms and conditions of Section 2.2.2(d), provided that, the Final Home Value shall be determined according to Schedule 2 Paragraph C.2.

2.3.5 **Concurrent Remedies.** Our right of Option Exercise After Default under this Section 2.3 shall be, to the extent permissible under law, concurrent with our other rights and remedies at law and in equity, including, without limitation, remedies specified in Section 6 below. We retain full discretion to select the appropriate remedy following default, and are not obligated to initiate Option Exercise prior to initiating foreclosure proceedings.

2.3.6 **Owner Option Repurchase After Default.** At any time following our delivery of a Notice of Right to Cure Default but prior to the consummation of our Option Exercise After Default, you may elect to terminate and repurchase the Option by paying us our Point Proceeds in an Owner Option Repurchase as provided in Section 1.4.1; provided that the closing of such Owner Option Repurchase must (a) occur (i) within 20 days of you providing us notice of your election to make the Owner Option Repurchase, and (ii) prior to any scheduled closing of an Option Exercise After Default; and (b) use an Final Home Value determined according to Schedule 2 Paragraph C.2 to determine the amount of Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated within the prescribed periods in this Section 2.3.6, then (a) in our sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated; (b) any waiting periods for us to be allowed to exercise of our remedies shall not be impacted; and (c) if we had delayed any exercise of our remedies because of your election, such delay shall not limit any of our rights to such remedies.

## Section Three: Terminations

3.1 **Non-Exercise; Other Terminations of Option.** Subject to the continuing duties, rights and obligations of the parties under Section 5 (Representations and Warranties) and Section 6 (Default and Remedies for Default), the Option shall terminate under the following conditions if there has not been a prior Owner Option Repurchase or Option Exercise:

(a) upon a Property Sale for which Point receives notice of intention to sell or acceptance of an offer, as provided in Section 2.1.2, and Point elects not to exercise the Option, provided such Property Sale would have otherwise met the conditions for a Permitted Sale;

(b) Point elects not to exercise the Option, and allows it to lapse, as of the Expiration Date;



© 2024 Point Digital Finance, Inc.



POINT

(c) the Property is destroyed and the insurance proceeds and proceeds of the sale of the Property are paid to Point in the full amount specified in Section 4.4.2;

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to Point in the full amount specified in Section 4.5; or

(e) Point voluntarily terminates the Option Documents in writing.

3.2 **Effect of Non-Exercise and Termination.** If the Option is terminated as provided in Section 3.1 above, then (a) the Option and our rights to exercise the Option shall immediately terminate without notice; (b) the Investment Amount paid to you by us shall be retained by you in consideration of the granting of the Option; and (c) subject to any survival provisions, this Agreement and the other Option Documents shall terminate.

3.3 **Termination Following Exercise.** In the event of an Option Exercise, this Agreement shall continue in full force and effect, as provided in Section 1.2, and terminate following the consummation of a Property Sale, or other event, where we receive the full amount of our Point Proceeds; provided, however, that certain obligations and provisions of this Agreement shall survive such termination as provided in Section 7.8.

3.4 **Release after Termination.** Point will file or will cause to be filed a termination and release of the Notice of Option Purchase Agreement, if applicable, and a reconveyance or satisfaction of the Security Instrument after the Option terminates.

## Section Four:
## Additional Covenants of Owner and Point

4.1 **Covenants and Rights of Owner.**

4.1.1 **Insurance.** You shall maintain at your own expense, and at a level that will cover the cost of replacement of the Property plus improvements, insurance on the Property against fire and other hazards with only those exclusions customarily associated with special form policies, and exceptions to those exclusions for ensuing loss. In addition, Point may from time to time reasonably require by written notice that you obtain and maintain (a) insurance against any other hazards, such as flood hazards or earthquakes, which insurance is common for similar properties in similar locations, and (b) liability insurance on the Property against such risks and in such amounts as are reasonable for similar properties in similar locations. Any such required insurance shall be obtained from a nationally recognized provider. We shall be named as an additional named insured and/or loss payee (or as we otherwise direct) under all hazard and liability insurance policies obtained by you, whether or not such insurance is required under this Agreement. You expressly authorize us to communicate directly with all such insurance companies for the purposes of ensuring the maintenance of such insurance policies and the coverage and reimbursement of losses thereunder. If you fail to maintain or obtain the insurance coverage required by this Section 4.1.1, we may obtain coverage on the Property that we, in our sole discretion, deem necessary and appropriate to protect our Point Proceeds as a Preservation Payment.

4.1.2 **No Receiver.** You shall not permit the appointment of a receiver for the Property. If a receiver for the Property is appointed, we may, but are not obligated to, take such action as we in our sole discretion may deem necessary or appropriate to remove such receiver, at your expense.



© 2024 Point Digital Finance, Inc.



POINT

4.1.3 **Rental Premium.** You shall provide us with prompt written Notice in the event the Property becomes a Non-Owner Occupied Property at any time after the Effective Date. If the Property becomes a Non-Owner Occupied Property at any time within the six-month period prior to a Property Sale or prior to an Appraisal of the Property done for purposes of calculating the Point Proceeds, then you shall pay us the Rental Premium, which will be added to the Point Proceeds. The Rental Premium will not be assessed if (i) the Property is identified as a Non-Owner Occupied Property as of the Effective Date and as indicated in Section 1.1 or (ii) in the event the Final Home Value is less than the Appreciation Starting Value. Without limiting the foregoing, a Property may not be subject to a rental or lease period that extends beyond the Expiration Date without Point's prior written consent.

4.1.4 **Service Fees.** You shall pay all Service Fees imposed by us from time to time in accordance with this Agreement. Service Fees shall include, without limitation: (a) reasonable fees for processing your requests for subordination; (b) reasonable fees for processing your requests for Property title or ownership changes; (c) reasonable fees for processing any reconveyance or renewal recordings of our Option Documents; (d) reasonable fees for processing Preservation Payments; (e) reasonable fees relating to a default by you, including administrative fees for our oversight of the default process; and (f) charges to cover any third party or other out-of-pocket costs relating to any of the foregoing categories (including, for example, charges imposed by title companies and Escrow companies, recording of documents, and reasonable attorneys' fees).

4.1.5 **Existing Loans.** Without our express written approval, you shall not increase, or permit the increase of (whether through negative amortization or otherwise), any existing loans secured by liens on the Property.

4.1.6 **Liens and Secured Obligations.** You shall at all times pay and keep current any and all loans and obligations secured by liens on the Property. You shall not encumber the Property with any secured obligation that is either senior to or could have the effect of impairing Point's lien position.

4.1.7 **Occupancy.** You shall enjoy sole right of occupancy of the Property as an owner and not as a tenant or lessee, whether or not we have exercised the Option, subject to the rights of you and Point to sell the Property pursuant to the terms of this Agreement. The foregoing sole right of occupancy shall be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your right of sole occupancy is not transferable by you except as part of a Property Sale or Exempted Owner Property Transfer, or as otherwise permitted by us in our sole discretion.

4.1.8 **Tax Benefits.** You shall be entitled to the full benefit of any and all tax advantages arising in relation to the Property, including, without limitation, all available deductions for taxes paid by you; provided, however, that you shall not be entitled to any tax benefits arising out of or attributable to any unreimbursed Preservation Payment.

4.1.9 **Obligation to Provide Information to Point.** Upon our reasonable request, you shall answer questions regarding the status of the Property and provide to us such reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage and information available to you concerning the Property and any modifications to the Property. You or your representative shall immediately provide Point with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, or Point's ability to exercise any right conferred by any of the Option Documents, including, without limitation, (a) the death or divorce of any Owner, (b) the death of any Trustee or



© 2024 Point Digital Finance, Inc. 

Trustor (where Owner is/are the Trustee(s) of a Revocable Trust), or (c) the occurrence of an Event of Default.

4.1.10 **Debt Payoff.** A portion of the Investment Amount may be paid to settle and discharge your debts and outstanding amounts owed to third party creditors (the "Debt Payoff"). Point and Owner will instruct the Escrow Agent handling the Option Grant Closing to make disbursements for the Debt Payoff. Point and Owner agree that the Debt Payoff Amount represents the amounts due to the creditors and the Debt Payoff Amounts specified in the Option Agreement Estimate and Closing Disclosure are estimates based on the best information we have prior to the Option Grant Closing. You agree that the daily amounts of each debt may fluctuate and that Point may change the final amounts paid to each creditor to best accomplish the parties' intent. These amounts may increase due to accrual of interest between the Effective Date and the date funds are disbursed through escrow. These amounts may also decrease due to payments that You made prior to the Option Grant Closing. Point and Owner agree that the actual amount to be paid through escrow to Owner's creditors will include all interest accrued and due as of the date of the Option Grant Closing and may be an amount greater or lesser than the estimated Debt Payoff Amount indicated on the Closing Disclosure. Any amounts due to creditors in excess of the estimated Debt Payoff Amount will be deducted from the remaining Investment Amount due to Owner. Any changes made to the Debt Payoff will not affect the amount of the Investment Amount.

Owner is responsible for paying off any existing debts and outstanding amounts owed to third party creditors that are not part of the Debt Payoff.

We will send you written confirmation of the exact amounts paid pursuant to the Debt Payoff following the Option Grant Closing. Within ten days of receiving payment of the Investment Amount following the Option Grant Closing, you will initiate payments in accordance with the terms of this Agreement to those third party creditors who were not paid through Escrow in connection with the Option Grant Closing; within 45 days of the Option Grant Closing, you will provide Point with written evidence from your bank or the third party creditors of payments made pursuant to this Section 4.1.10.

4.2 **Covenants and Rights of Point.**

4.2.1 **Point's Interest in the Property.** Until the time you consummate an Owner Option Repurchase or Point closes on the Option Exercise, Point has a contingent ownership interest in the Property. Following the closing of the Option Exercise, Point will have joint ownership rights in the Property.

4.2.2 **Preservation Payments.** To the extent that you fail to take action to protect the Property and Point's Rights as required under this Agreement, we shall have the right in our sole discretion to take such action and pay such money as we deem appropriate to correct your failure to take such required action (**"Preservation Payments"**). We shall give you five Business Days written notice of your failure prior to our taking corrective action. You shall promptly, upon demand for payment, but not later than 10 Business Days after demand, pay or reimburse us for any and all Preservation Payments, including, without limitation, those related to: the placement of insurance, the payment of taxes, expenses to remove or prevent a receiver for Property or the cure of defaulted loans. Point shall be entitled to charge you an interest rate of 8% per annum (or less if limited by applicable law) on any Preservation Payments it makes. Interest will begin to accrue on the date Point makes the Preservation Payment and will continue to accrue until Point is repaid or receives its Point Proceeds.



© 2024 Point Digital Finance, Inc. 

4.2.3 **Waiver of Right to Partition.** Owner and Point each hereby waive and relinquish all rights either of them may now or hereafter have to seek partition of the Property, whether in kind or by sale; provided, however, that Point shall retain the right to seek a partition: (a) in the event of, and as part of any action arising out of an Event of Default which is not timely cured pursuant to Section 2.3 above; or (b) in connection with any claim or action by Owner which asserts in whole or in part that this Agreement or any portion hereof is against the law or otherwise unenforceable.

4.2.4 **Right to Disclose Certain Information.** We may share certain personal and financial information with regard to this Agreement with our affiliates, subsidiaries, assignees and persons with which we intend to conduct business, including, without limitation, the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement.

4.2.5 **No Point Liability and No Point Loans.** Point shall not be liable for (including liability to repay) any loans created or obtained by you whether before or after any exercise of the Option and whether or not consented to, approved of, or subordinated to by Point. Further, we shall have no liability for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

4.3 **Appraisals.**

4.3.1 **Appraisal Order.** In the event of (a) a proposed Property Sale; (b) a proposed Owner Option Repurchase; (c) a determination of Final Home Value as of the Expiration Date; (d) any allocation of insurance proceeds; (e) an Event of Default (at any time and on more than one occasion until the cure of such default or until an Owner Option Repurchase or a Property Sale following an Option Exercise After Default); or (f) any determination of Liquidated Damages pursuant to Section 8 of the Security Instrument, we may, in our sole discretion, (i) order an appraisal; (ii) order a broker's price opinion; (iii) order an underwriting-grade automated valuation model; or (iv) conduct any other reasonable valuation method to determine the value of the Property (collectively, an **"Appraisal"**). Subject to this Section 4.3, the value reflected on the Appraisal shall be the **"Appraised Value"** of the Property.

4.3.2 **Owner Cooperation.** You will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any and all relevant documentation in your possession pertaining to conditions that may affect the value of the Property. In addition, upon any Appraisal, you will inform us if the Property has been a Non-Owner Occupied Property in the six-month period prior to the Appraisal and, if currently a Non-Owner Occupied Property or anticipated to be a Non-Owner Occupied Property, the current rental or lease term, and any renewal rights, for the tenant.

4.3.3 **Additional Appraisals.** Subject to this Section 4.3.3, either Owner or Point may elect to order second and third Appraisals when an Appraised Value is needed under this Agreement. If either party desires to have a second Appraisal, then (a) the second Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the first Appraisal, and (b) the Appraised Value will then be the average value of the two Appraisals. If either party desires to have a third Appraisal, then (i) the third Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the second Appraisal, and (ii) the Appraised Value will then be the median value of the three Appraisals.



© 2024 Point Digital Finance, Inc.

4.3.4 **Cost of Appraisal.** You shall pay all expenses associated with the first Appraisal on the Property ordered in connection with any event described in Section 4.3.1. The party that orders an additional Appraisal in connection with Section 4.3.3, if any, shall pay all expenses associated with such additional Appraisal. If you fail to pay the expenses associated with the first Appraisal or any additional Appraisal you request, we may subtract such expenses, or direct the payment of such expenses, out of Escrow.

4.4 **Property Destruction or Damage; Insurance.**

4.4.1 **Repair and Restoration.** If the Property is destroyed or damaged in any material manner, you shall restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with Senior Liens on the Property, you shall apply any and all insurance proceeds (whether or not the underlying insurance was required by us) to such restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you shall be responsible for any shortfall and we shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

4.4.2 **Allocation Where Repair Not Feasible.** If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you shall obtain an Appraisal, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any and all insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (a) to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by us) reasonably incurred by you, a senior lender and/or Point in collecting and contesting with the insurers the payments under the relevant insurance policies; (b) to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens; (c) to us, an amount calculated according to the Calculation of Point Proceeds; and (d) to you, the balance of the proceeds.

4.4.3 **Failure to Maintain Adequate Insurance.** If (a) you fail to maintain insurance in amounts required by Section 4.1.1 above or any insurance claim is denied due to your action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to us the entire amount owed as set forth in Section 4.4.2 above, then there shall be an Exercise Payment Insurance Reduction proportional to the decrease in the Property's value as compared to the Appraised Value of the Property immediately prior to the destruction or damage. In this case, we may exercise the Option (if we have not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 2.3 above, except that the Exercise Payment shall be reduced because of the added economic burden and risk imposed on Point by virtue of your failure. The Exercise Payment Insurance Reduction shall be taken into account in the calculation of the amount due to us according to the Calculation of Point Proceeds. The proceeds of any sale pursuant to this Section 4.4.3, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by us), will be allocated as described in Section 4.4.2 above.

4.5 **Condemnation.** If the Property is condemned in whole or in part and the Option has been exercised, then all condemnation proceeds net of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by Point) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds (**"Net Condemnation Proceeds"**) shall be allocated as



© 2024 Point Digital Finance, Inc.

provided in Section 4.4.2(b) – (d) above. If the Property is condemned in part, and if the Option has not been exercised, then we will have the right to exercise the Option, calculating our Point Proceeds using the Net Condemnation Proceeds as the Final Home Value. The proceeds shall be allocated as provided in Section 4.4.2(b) – (d) above. In the case of a partial condemnation, Point's Rights shall be retained with respect to any portion of the Property that has not been condemned.

## Section Five: Representations And Warranties

5.1 **In General.** The Owner makes the representations and warranties in this Section 5 to, and for the benefit of, Point. The representations and warranties of Owner in this Section 5 shall be deemed made and renewed on and as of: (a) the Effective Date; (b) if you effect an Owner Option Repurchase, the date the repurchase is consummated; (c) if the Option is exercised, the date the exercise is consummated; and (d) upon any permitted assignment by you. The truth, accuracy and completeness of the representations, warranties and covenants set forth in this Section 5 at and as of each date in (a) – (d) above are a condition precedent to any and all of our obligations under each of the Option Documents.

5.2 **Capacity; Authority.** You represent and warrant that you, as the Owner(s) identified above, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. Your fee simple title to the Property is marketable and insurable, free of restrictions, leases, liens and other encumbrances or interests, and except as specifically identified in the Confirmation of Title delivered to Point, except with respect to Acknowledged Pre-Existing Liens. You represent and warrant that you have the full capacity and the legal power, right and authority to grant the Option, to enter into this Agreement and the other Option Documents, and to consummate the transactions contemplated by those documents. If you are the Trustee(s) of a Revocable Trust: (a) such trust has been duly formed; (b) the Trustee(s) of such trust have the capacity and authority to enter into the Agreement and the other Option Documents; and (c) copies of all trust documents (and all amendments and supplements) have been delivered to Point.

5.3 **No Lawsuits, Claims, or Foreclosures.** There is no litigation or arbitration pending or, after your due and diligent inquiry, to the best of your knowledge, threatened against you that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or your ability to perform your obligations under this Agreement. You have not received or are not aware of notice of any special assessment or other proceedings affecting the Property nor of any: (a) default or notice of default with respect to any loan or other obligation secured by the Property; (b) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (c) information or notice that the Property is to be sold or foreclosed upon by a party holding a lien on the Property.

5.4 **No Violations.** You have no knowledge of or information concerning any violations of any laws, regulations, zoning ordinances or other land-use regulation proceedings relating to the Property and no knowledge that any operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by you or others are not, have not been or will not be in all material respects in compliance with all state, federal and local laws, zoning ordinances, and regulations.

5.5 **Environmental Matters.** You have no knowledge of or information concerning any violation of, or claim of violation of any state, federal or local environmental law or regulation, including, without limitation, those relating to hazardous materials (**"Environmental Laws"**). In addition, you have no knowledge of the presence of any hazardous materials on, in, or about the Property or property in the



© 2024 Point Digital Finance, Inc.

vicinity of the Property. You shall not, and shall not allow others to, violate any laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

5.6 **Documentation and Information Supplied by Owner; Financial Condition of Owner**. Your application to Point and all financial and other documentation and other information (including documentation and information about the Property) supplied or made available by you or your spouse, if applicable, as part of applying for, or in connection with entering into, the Option and the Option Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's) financial condition as of (a) the date supplied, and (b) the Effective Date of this Agreement. There has been no material change in your financial condition as of the Effective Date since your application to Point.

5.7 **Conflict; Enforceability**. You represent and warrant that: (a) the execution and delivery of the Option Documents, the incurrence of the obligations set forth in those documents, the consummation of the transactions contemplated by, or compliance with the terms of, those documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which you are a party or by which any portion of the Property may be bound; and (b) the Option Documents and all other documents required to be executed by you in connection with those documents shall be valid, legally binding obligations of, and enforceable against, you and, if applicable, Trustor(s) and any successors or assignees in accordance with their terms.

## Section Six:
## Defaults and Remedies For Default

6.1 **Events of Default.** The occurrence of any of the following shall constitute an Event of Default (**"Event of Default"**) under the Option Documents, in Point's sole discretion:

(a) you breach or fail to perform any obligation or covenant under any of the Option Documents (including but not limited to any failure or refusal to honor Point's Rights), or reject or take any action to terminate the Option or this Agreement, except as expressly permitted under this Agreement;

(b) you fail to timely provide to us any Notice(s) required under this Agreement;

(c) you make any representation or warranty, whether oral or written, to us that is false or misleading as of the time given, including, without limitation, any misrepresentation or suppression of material fact in connection with the amount or kind of consideration given to you in any Property Sale and the representations and warranties in Section 5;

(d) any event of your insolvency, including but not limited to the commencement of any voluntary or involuntary bankruptcy proceeding by or against you or the appointment of a receiver for the Property or you or a conservator of your affairs;

(e) any taxes or assessments on the Property become delinquent;

(f) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with the provisions of this Agreement;



© 2024 Point Digital Finance, Inc.

(g) any senior lien that does not have our prior written approval attaches to the Property;

(h) any loans that are secured by liens on the Property, whether recorded or unrecorded, become delinquent (whether or not such loans or liens have been approved or subordinated to by Point);

(i) you fail to maintain, preserve or repair the Property in good repair and in a condition substantially similar to its condition on the date of this Agreement, except for normal wear and tear;

(j) insurance on the Property is not maintained as prescribed in this Agreement;

(k) any assignment, attempted assignment, or other transfer of the Option or Option Documents in violation of Section 7.7.2 below;

(l) if no Owner or no renter authorized by the Owner uses the Property as regular living and sleeping quarters for more than 730 consecutive days; provided that any non-occupancy due to renovation on the Property will not be counted against such two-year period;

(m) the Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date;

(n) you fail to cooperate with us, which we will determine in our sole discretion, to effect a Property Sale before or after Option Exercise as of Expiration Date or Option Exercise After Default; or

(o) any other action or event occurs which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, Point's right to exercise the Option or Point's Rights.

6.2 **Remedies Following Event of Default.** In an Event of Default, Point may exercise any of the following remedies and any other rights and remedies available to us in law, equity or otherwise:

6.2.1 **Exercise Option and Receive Point Proceeds.** As provided in Section 2.3, upon the occurrence of any Event(s) of Default, we shall have the right, but not the obligation, (a) to exercise the Option and take joint ownership of the Property with you and (b) then solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale, and receive our Point Proceeds in connection with such Property Sale.

6.2.2 **Foreclosure/Power of Sale Under State Laws.** Point shall be entitled, in its sole discretion, to exercise Point's power of sale under the Security Instrument, and to foreclose upon the Property to the extent permissible under applicable law. Point shall follow and be bound by those procedures prescribed under law for foreclosure of residential real property established in the jurisdiction where the Property is located. In the event Point elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 6.2.2, Point may declare any and all of the sums specified as Liquidated Damages immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

6.2.3 **Damages for Breach.** We shall be entitled, in our sole discretion, but are not obligated to, demand damages for any Event(s) of Default, calculated according to the Calculation of Point Proceeds set forth in Schedule 2.



© 2024 Point Digital Finance, Inc.

6.2.4 **Specific Performance, Rescission and Injunctive Relief.** You and we agree that if we are not allowed to exercise our rights under any of the Option Documents, or if you fail to comply with your obligations thereunder, the damages to us would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity or otherwise, we shall be entitled to seek specific performance of the covenants, agreements and rights contained in each of the Option Documents, or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity or otherwise, we shall thereafter be entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

6.3 **Repayment in Bankruptcy.** In the event we are required to and do remit or disgorge one or more dollars paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then Point shall be entitled to assert a claim against you for each such dollar remitted (and permitted costs herein) under the terms and conditions of this Agreement, and such claim by us shall begin to accrue on the date such dollar is actually remitted and shall automatically survive the term of this Agreement.

6.4 **Calculation of Liquidated Damages.** To the extent that enforcement of the Security Instrument and any power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount, Owner and Point agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) default(s) as specified in this Section 6 may be uncertain, depend on many factors, and be extremely difficult to ascertain, and that a good faith effort to determine a method for reasonably estimating and liquidating such damages is the calculation of Liquidated Damages according to the Calculation of Point Proceeds set forth in Schedule 2. The amount in default or liquidated bid amount under any remedy may also include all, or any, of the following: (i) the sum of all monetary obligations owed to us by you under this Agreement; and (ii) any and all amounts, properly chargeable to you as necessary to satisfy your obligations with respect to your mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

6.5 **Remedies Concurrent and Not Exclusive.** The remedies set forth in this Section 6 shall be concurrent, cumulative and not exclusive, to the extent permitted by law. Every right, power and remedy granted to Point in the Option Documents shall be in addition to all those rights, powers and remedies granted to Point at law or in equity or by statute, and each such right, power and remedy may be exercised from time to time and as often and in such order as may be deemed expedient by Point to the extent permitted by law, and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.

## Section Seven:
## Miscellaneous

7.1 **Indemnification by Owner and Maximum Liability.** You hereby agree to defend, indemnify and hold Point harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees, to the extent permissible) of every kind arising out of or relating to: (a) a breach of any of your representations or warranties under this Agreement or the



© 2024 Point Digital Finance, Inc.



POINT

other Option Documents; (b) any act or omission by you or your agents; or (c) the Property. Notwithstanding your indemnification obligation under this Section 7.1, at our election, we may defend any third party claim subject to your indemnification obligation with counsel of our own choosing and without your participation. You shall not, without our prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING OWNER'S INDEMNIFICATION OBLIGATION, IN NO EVENT SHALL POINT'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE AMOUNT OF THE INVESTMENT AMOUNT.

7.2 **Asset Administration.** You acknowledge and consent to any assignment whereby the Asset Administrator's responsibilities, including, but not limited to, the right to enforce the Option Documents, are transferred from us to a third party. You will be notified of any change in the Asset Administrator within 30 days of such change.

7.3 **Covenants to Run With Land.** The provisions of this Agreement shall be deemed to be covenants running with the land so long as this Agreement remains in effect. We shall record a Notice of Option Purchase Agreement reflecting this fact in the public records. Upon valid termination of this Agreement, the Notice of Option Purchase Agreement shall automatically terminate, and we shall cause to be recorded such documents as are required to reflect such termination.

7.4 **Relationship.** Point shall not be deemed a partner, joint venturer, trustee, or fiduciary with, or of, Owner. Owner shall not be permitted to execute any document or enter into any agreement on behalf of Point. The Option is intended to be and shall be treated for all purposes (including, without limitation, tax purposes) as an option to purchase real property and not as a purchase, or joint venture.

7.5 **Multiple Owners and Revocable Trusts.**

7.5.1 **Multiple Owners.** If Owner is more than one person or entity: (i) the Option Documents must be signed by each such Owner; (ii) all rights and powers specified for Owner in the Option Documents must be approved and exercised unanimously by all such multiple Owners; (iii) all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under the Option Documents; (iv) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 7.13; and (v) Point may treat any notice received from any one Owner as notice from all Owners.

7.5.2 **Revocable Trusts.** If any Owner is/are the Trustor(s) or Trustee(s) of a Revocable Trust: (i) all Trustors must sign the Option Documents in their capacities as individuals and as Trustors; (ii) all Trustees must sign the Option Documents in their capacities as Trustees; (iii) each Trustee and Trustor who signs this Agreement hereby represents and warrants that all Trustees and Trustors have been disclosed to Point; (iv) all rights and powers specified for, and all actions required of, Owner in the Option Documents must be approved and exercised by all Trustees unanimously; (v) all Trustors, in their capacities as individuals, shall be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under the Option Documents; (vi) all representations and warranties by Owner in the Option Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (vii) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of the Trustees using the contact information set forth in Section 7.13 of this Agreement; and (viii) Point may treat any notice received from any one Trustee as notice from all Trustees and from Owner.



© 2024 Point Digital Finance, Inc.

7.6 **Delegation of Duties.** We may execute any of our duties under this Agreement or any other Option Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel shall be deemed to have been taken in good faith. We shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

7.7 **Successors and Assignees; Owner's Estate.** The Option Documents shall be binding upon and insure to the benefit of Owner and Point and their respective heirs, successors and assignees. If the Owner dies, then the Option Documents shall be binding on the Owner's Estate. The death of the Owner shall not terminate any of the Option Documents. However, nothing in this provision shall permit assignment of any of the Option Documents contrary to the express provisions of this Agreement.

7.7.1 **Assignment by Point.** Point may assign, participate, hypothecate or sell, in whole or in part, Point's right and title to, and interest in, any of the Option Documents at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any assignment, Point may in its sole discretion disclose any and all documents and information in its possession relating to Owner and the Property, subject to its assignee's agreement to continue to observe Point's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Point's assignee shall automatically have all the rights and remedies of Point under the Option Documents. Point and Owner shall execute and deliver in recordable form, if requested, at Point's expense, such other documents as are appropriate to reflect the assignment of the Option and the other Option Documents. Point and Owner agree to cooperate with such assignee and execute such additional documents as may be necessary to insure assignee's interest in the Property. Point shall notify Owner no later than 60 Business Days after the effective date of any such assignment.

7.7.2 **Assignment of Agreement by Owner.** Absent Point's prior written consent, which consent may be withheld in Point's sole discretion, Owner may not assign or otherwise transfer any of the Option Documents. Notwithstanding the foregoing, Point will generally not unreasonably withhold consent to such assignment to: (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse who acquires an undivided interest in the Property; provided that in each case the assignee (including, in the case of a Revocable Trust, any Trustor): (A) was alive as of the Effective Date, (B) executes this Agreement and, if applicable, the Notice of Option Purchase Agreement, and (C) executes such assignment with the assignor (hereinafter, **"Exempted Owner Assignment(s)"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, shall continue to remain liable under the Option Documents.

7.7.3 **Exempted Owner Property Transfer.** If Owner obtains Point's prior written consent, the Owner may Transfer the Property into the name of (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse; provided that the requirements for an Exempted Owner Assignment under Section 7.7.2(A) – (D) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer will not be considered a Property Sale and will not trigger Point's right to exercise the Option.

7.8 **Survival.** The following provisions shall survive any termination of this Agreement: (a) the



© 2024 Point Digital Finance, Inc.

indemnification and liability cap provisions of Section 7.1; (b) the obligations to repay any and all Preservation Payments and Service Fees; (c) the obligation to remove any liens on the Property and pay any Sales Commissions, Closing Costs and or other expenses properly chargeable to Owner under Section 2; (d) any and all provisions which entitle Point to monetary remedies, fees, costs and expenses in connection with any Event of Default under Section 6; and (e) Sections 7.6 through 7.22 of this Agreement.

7.9 **Injunction.** If we are stayed or enjoined from exercising the Option, commencing or initiating Option notice and exercise procedures hereunder (whether as a result of Owner's bankruptcy or otherwise), or enforcing any right of Point under this Agreement, the Option shall not expire until 90 Business Days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period prescribed in the Option Documents which we are prevented or prohibited from observing by operation of law or by court order, shall automatically be stayed for the duration of such stay, injunction or legal prohibition until such stay, injunction, or legal prohibition is no longer applicable or is lifted by final order of the appropriate court.

7.10 **Choice of Law; Venue.** The Option, this Agreement and the other Option Documents shall be determined under, governed by, and construed in accordance with California law, without regard to its conflict of law principles; provided, however, that to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws shall be deemed to govern and control. Subject to Section 7.20, the parties agree that all actions or proceedings arising in connection with this Agreement shall be arbitrated at a JAMS arbitration location, or injunctive relief sought only in the state and federal courts located in or having jurisdiction in the city or county in which the Property is located.

7.11 **Further Assurances.** The parties agree, from time to time, as and when requested by any other party to this Agreement and the other Option Documents or by its successors or assignees to: (a) execute and deliver, or cause to be executed and delivered, all such instruments; and (b) take, or cause to be taken, all such further or other actions as may be reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Option Documents.

7.12 **Severability; Waivers.** Each provision of this Agreement, and of the other Option Documents, shall be severable from every other provision for the purpose of determining the legal enforceability of any provision, which shall be construed separately and as separately enforceable from every other provision hereunder. No waiver by Point of any of its rights or remedies in connection with this Agreement or the other Option Documents shall be effective unless such waiver is in writing and signed by Point and Owner, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No delay or waiver by Point in exercising any right shall be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse. To the extent that enforcement of any provision, or exercise of any right, under this Agreement or the other Option Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then such provision shall be considered separately and apart from the remaining provisions, and any and all other remaining provisions shall continue to be fully enforceable under law.

7.13 **Notice.** Each party shall deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a **"Notice"**) in writing to the address of the other



© 2024 Point Digital Finance, Inc.

party listed below, unless a party has been notified by the other party in writing of a substitute address. Owner shall promptly notify Point of Owner's change of address. Notice to any one Owner shall constitute notice to all Owners unless applicable law expressly requires otherwise. Notice from any one Owner shall constitute notice from all Owners unless applicable law expressly requires otherwise. Each party shall deliver all Notices by first class mail, personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission). Except as otherwise provided in this Agreement, a notice to Owner in connection with this Agreement shall be deemed to have been given to Owner when mailed by first class mail or when actually delivered to Owner's notice address if sent by other means. Any notice in connection with this Agreement shall not be deemed to have been given to Point until actually received by Point. If any notice required by the Security Instrument is also required under applicable law, such requirement of the applicable law will satisfy the corresponding requirement under this Agreement.

| | |
|---|---|
| **POINT:**<br>Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>**Personal or Overnight Delivery:**<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, CA 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | **OWNER:**<br>James B. Muskal and Cheryl C. Collins-Muskal<br>1312 N Astor St<br>Chicago, IL 60610<br>Phone: (312) 515-0037<br>Email: jmuskal@leydig.com |

7.14 **Entire Agreement; Amendment.** The Schedules and Exhibits below, and any riders to this Agreement, are incorporated herein by this reference. This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the other written agreements made by and between Owner and Point as of the Effective Date together constitute the entire agreement between the parties pertaining to the subject matter contained in them. Except as expressly agreed in writing, all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Option Documents, and the transaction which is the subject matter thereof, including but not limited to any and all offer letters, terms sheets and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the party against whom enforcement is sought.

7.15 **No Third-Party Beneficiaries.** This Agreement and the other Option Documents are entered into for the protection and benefit of Point and Owner and their respective heirs, permitted successors, affiliates and assignees with regard to their respective present and contingent ownership interests in the Property. No other Person shall have any rights or causes of action under this Agreement or the other Option Documents.

7.16 **Counterparts; Electronic Signatures.** This Agreement and the other Option Documents may be executed in counterparts, each of which when so executed shall be deemed an original, but all such



© 2024 Point Digital Finance, Inc.

counterparts shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.17 **Registered Domestic Partnerships and Civil Unions**. An Owner shall have the same rights and obligations with respect to Owner's Civil Union Partner or Registered Domestic Partner as the Owner shall have with respect to its spouse for all purposes under the Option Documents, including Sections 7.7.2, 7.7.3 and 7.18 of this Agreement, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

7.18 **Consent of Spouse**. If you are married on the date of this Agreement and your spouse is not listed on the title to the Property, your spouse must execute and deliver to us a notarized Consent of Spouse in the form of Exhibit B attached to this Agreement (**"Consent of Spouse"**). If you should marry or remarry after the Effective Date, within 30 days after the marriage, you and your spouse shall execute and deliver to us a notarized Consent of Spouse. The Consent of Spouse will not be deemed to confer or convey to your spouse any rights in the Property that do not otherwise exist by operation of law.

7.19 **WAIVER OF JURY TRIAL**. TO THE FULLEST EXTENT PERMITTED BY LAW, POINT AND OWNER HEREBY VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE OPTION DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE OPTION DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN POINT AND OWNER.

7.20 **ARBITRATION.**

7.20.1 ***Arbitration***. OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE **"RULES"**) OF, AND PURSUANT TO THE STATE LAW OF, THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2.

7.20.2 ***Procedure***. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS (**"JAMS"**), AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. THE PARTIES SHALL BE ENTITLED TO PRE-HEARING



© 2024 Point Digital Finance, Inc.

DISCOVERY AND THE EXCHANGE OF NON-PRIVILEGED INFORMATION RELEVANT TO THE DISPUTE, CONSISTENT WITH JAMS' RULES AND CALIFORNIA LAW, AND AS OVERSEEN BY THE ARBITRATOR. OWNER AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. OWNER UNDERSTANDS THAT POINT WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

7.20.3 ***Remedy.*** EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND POINT. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR POINT WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

7.20.4 ***Availability of Injunctive Relief.*** BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF POINT ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE POINT PROCEEDS IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

7.20.5 ***Small Claims Court.*** BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION.

7.20.6 ***Class Action Waiver.*** ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR WE MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT



© 2024 Point Digital Finance, Inc.

OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

7.21 **TAX MATTERS.** OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN OPTION TO PURCHASE AN INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT POINT HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

7.22 **NO ADVICE.** IN ENTERING INTO THE OPTION DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND SHALL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY POINT, ITS AGENTS, ITS AFFILIATES, OR ANY OF THEIR OFFICERS, EMPLOYEES OR AGENTS, REGARDING: (A) THE VALUE OF THE PROPERTY OR THAT THE APPRECIATION STARTING VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE OR FAIR MARKET VALUE OF THE PROPERTY; (B) THE ADVISABILITY OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE; OR (C) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY POINT TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

7.23 **Cancellation.** You may cancel this Agreement at any time within three Business Days from the date you sign this Agreement. If you wish to cancel this Agreement, you must send written notice to us in accordance with Section 7.13 within three Business Days from the date you sign this Agreement. If you cancel this Agreement and have already received the Investment Amount, you agree to immediately repay the amount of the Investment Amount to us.

7.24 **Consent to be Contacted.** You expressly authorize us, our agents, representatives, affiliates, successors, and assigns to contact you for any purpose arising out of or relating to the Option or Option Documents at any phone number that you have provided us or will provide us in the future, including but not limited to autodialed or prerecorded phone calls or text messages, regardless of whether the phone number is a cellular telephone number or landline. You represent and warrant that you are the owner or regular user of any phone numbers that you provide us and acknowledge that your carrier's telephone minute and text charges may apply. You also agree to notify us immediately whenever you stop using any mobile numbers that you have provided us.

**[Signatures on Following Pages]**



© 2024 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**POINT:**

POINT DIGITAL FINANCE, INC., a Delaware corporation

By: Jordan Fox

Name: Jordan D. Fox

Title: Assistant Secretary



© 2024 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**OWNERS:**

Cheryl C. Collins-Muskal

James B. Muskal



© 2024 Point Digital Finance, Inc.

STATE OF ~~ARIZONA~~ Illinois )
County of Cook ) §
)

On this 15th day of July, 2024 before me personally appeared Cheryl C. Collins Muskal and James B. Muskal, whose identity was proven to me on the basis of satisfactory evidence to be the person who [he/she] claims to be, and acknowledged that [he/she] signed the [above/attached] document.

[SEAL]

OLGA JOHNSON
Official Seal
Notary Public - State of Illinois
My Commission Expires Jan 28, 2025

Notary Public



© 2024 Point Digital Finance, Inc.

DOCSET: AZ23.1

POINT

**Business Days.** Any day other than a Saturday, a Sunday, Good Friday, the day after Thanksgiving, or a day on which commercial banks in New York or California are required or authorized to be closed.

**Calculation of Point Proceeds.** Is defined in Schedule 2.

**Capped Repayment Amount.** Is defined in Section 1.4.

**Civil Union Partner and Registered Domestic Partner.** The natural person having such status under the California Family Code Section 299 or applicable state law.

**Closing Costs.** All (a) ordinary and customary costs in connection with any sale or other Transfer of the Property or any assignment or exercise of the Option related to such Transfer, including, without limitation, recording fees and costs, reconveyance fees, Escrow fees, title insurance fees or fees incurred in obtaining the Confirmation of Title elected by Point, transfer taxes and documentary transfer taxes, and (b) federal, state or local taxes (excluding income taxes) arising, incurred or owed in connection with (i) Point's exercise or sale of the Option, (ii) a Property Sale, (iii) any related closing of that sale, or (iv) any related Escrow. However, the term "Closing Costs" shall not include costs that are owed or incurred by a third party other than Point in connection with a sale of the Property to that third party.

**Confirmation of Title.** Confirmation of good and marketable title in and to the Property in fee simple and free of any liens or encumbrances of whatever character, subject only to the Permitted Encumbrances, to be provided, in Point's sole discretion, in the form either of a policy of title insurance issued to, or for the benefit of, Point or Point's assignee at the time that this Agreement is entered into (or at such other times as may be required by Point under this Agreement) and insuring Point's or Point's assignee's rights under the Option Documents; or of a written title report, abstract of title or other title search documentation reflecting, to Point's satisfaction, confirmation of its good and marketable title to Point's ownership interest in the Property.

**Consent of Spouse.** Is defined in Section 7.18.

**Debt Payoff.** Is defined in Section 4.1.10.

**Debt Payoff Amount.** The amount of the Investment Amount that Point and Owner agree will be paid, either through Escrow in connection with the Option Grant Closing or by Owner pursuant to Section 4.1.10, to settle existing debts and obligations of the Owner. An estimate of the Debt Payoff Amount is set forth in the Option Agreement Estimate and Closing Disclosure, and the exact amounts paid pursuant to the Debt Payoff will be set forth in a written confirmation from Point following the Option Grant Closing.

**Effective Date.** Is defined in the first paragraph of this Agreement.

**Effective Sale Price.** The monetary amount for which the Property is to be sold or transferred by Owner or Point, as applicable, to a Third Party Buyer, as adjusted, as set forth below. The Effective Sale Price shall be the sum of all amounts set forth or that would otherwise be set forth in the Closing Disclosure promulgated under TILA-RESPA rules (or any successor form) prepared by an Escrow Agent (which shall include the fair market value of any non-cash consideration received by, or for the benefit of, Owner and/or Point in connection with the sale of the Property). The Effective Sale Price will also be increased to capture agreements that benefit the Owner and decrease the sale price of the Property, including but not limited to below-market or free rent-back periods or assumptions of debt by the Third Party Buyer (such as a PACE or solar loans). The calculation of the Effective Sale Price shall not include any deduction for any: (a) Closing Costs; (b) liens on the Property; (c) outstanding taxes; (d) Sales Commissions; (e)


© 2024 Point Digital Finance, Inc.


POINT

appraisal expenses; (f) loans secured by the Property; (g) credits made by Seller to closing costs; and/or (h) amounts payable to Point hereunder.

**Environmental Laws.** Is defined in Section 5.5.

**Escrow.** A transaction settlement, typically consisting of an exchange and disbursement of consideration, costs, and proceeds, and documentation of clear title to the Property, using the services of an Escrow Agent.

**Escrow Agent.** A title company reasonably acceptable to Point as contemplated by Section 2 or any neutral third party Escrow agent, settlement agent, title agent or attorney closing firm that closes or settles any transaction contemplated hereunder.

**Event of Default.** Is defined in Section 6.1.

**Exempted Owner Assignment.** Is defined in Section 7.7.2.

**Exempted Owner Property Transfer.** Is defined in Section 7.7.3.

**Exercise Payment.** The amount of the Option Consideration minus the Investment Amount, as such amount may be reduced pursuant to Section 4.4.3. The purchase by Point of its HEI Percentage in the Property occurs by payment or debit of the Exercise Payment. The Exercise Payment is a defined term used in various calculations made under this Agreement, and when so used shall refer to the applicable dollar amount employed whether or not the Option is, in fact, exercised.

**Exercise Payment Escrow Account.** Is defined in Section 2.2.2.

**Exercise Payment Insurance Reduction.** Is defined in Section 4.4.3.

**Expiration Date.** The day described in Section 1.1.

**Final Home Value.** The value of the Property as used in the Calculation of Point Proceeds and the determination of which is set forth in Schedule 2.

**Grant Deed.** A grant deed, executed by Owner and notarized, in form and substance acceptable to the Escrow Agent, that, when recorded, will deliver to Point, or its assignee (or to a Third Party Buyer, where applicable), good and marketable fee simple title to Point's undivided percentage interest in the Property, subject to (a) the standard printed exceptions described in the policy of title insurance covering the Property, or, where applicable, any written exceptions disclosed in the Option Confirmation of Title; (b) the standard printed exceptions of the Escrow Agent, if any; and (c) the Permitted Encumbrances, provided that all outstanding obligations under the Permitted Encumbrances are current.

**HEI Percentage.** Is defined in Section 1.1.

**Investment Amount.** Is defined in Section 1.1.

**Investment Term.** Is defined in Section 1.2.

**JAMS.** Is defined in Section 7.20.2.

**Net Condemnation Proceeds.** Is defined in Section 4.5.

**Non-Owner Occupied Property.** Property that is rented or leased by the Owner to third parties while there is not at least one Owner regularly occupying the Property as a residence for living and sleeping quarters, provided that a Property will not be deemed a Non-Owner Occupied Property if it has short term rentals (with rental periods less than 30 days) where such short term rentals occur an aggregate of less than three months out of a six month period. A Non-Owner Occupied Property may not be subject to any lease or rent agreement that extends beyond the Expiration Date.

**Notice.** Is defined in Section 7.13.

**Notice of Option Exercise After Default.** Is defined in Section 2.3.1.

**Notice of Option Exercise as of Expiration Date.** Is defined in Section 2.2.2(a).

**Notice of Option Exercise Upon a Sale.** Is defined in Section 2.1.2.

**Notice of Option Purchase Agreement.** Is defined in Section 1.5.

**Notice of Right to Cure Default.** Is defined in Section 2.3.1.

**Option.** Is defined in Section 1.1.

**Option Consideration.** Is defined in Section 1.1.

**Option Documents.** This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the Consent of Spouse, and any riders, amendments or supplements to any of these documents.

**Option Exercise.** Is defined as Point's election to purchase the HEI Percentage.

**Option Exercise After Default.** Is defined in Section 2.3.

**Option Exercise as of Expiration Date.** Is defined in Section 2.2.

**Option Exercise Upon a Sale.** Is defined in Section 2.1.

**Option Grant Closing.** Is defined in Section 1.3.1.

**Owner.** All of the persons or entities, individually and collectively, who appear on the record title to the Property as holding fee simple title to 100% of the Property as of the Effective Date.

**Owner's Estate.** Collectively the executor, personal representative and other persons charged with the administration and distribution of the Property following the death of the Owner, and the heirs, beneficiaries, persons and trusts who are entitled to receive the Property when it is distributed following the death of the Owner, whether pursuant to form of title on the Property, the deceased Owner's will or Revocable Trust, the laws of intestacy, or any other means.

**Owner Occupied Property.** Property that is not rented or leased and that at least one Owner (or if the Property is held in a Revocable Trust, one Owner or one Trustor) regularly occupies as a residence for


© 2024 Point Digital Finance, Inc.

living and sleeping quarters.

**Owner Option Repurchase.** Is defined in Section 1.4.

**Permitted Encumbrances.** All licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject at the time the Option Documents become effective: (a) that are stated as exceptions on the Confirmation of Title, or (b) to which Point has expressly agreed in writing that the Property will remain subject following any exercise of the Option by Point. In no event will "Permitted Encumbrances" include any Senior Loans, Senior Liens, or any other liens that secure the payment of any loans or the performance of any obligations owed to any creditor.

**Permitted Sale.** Is defined in Section 2.1.1.

**Person.** An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing.

**Point Proceeds.** The amount calculated as the monetary interest of Point under the Agreement and Option Documents, as further defined and calculated under Schedule 2.

**Point's Rights.** The Point Proceeds due to Point, together with all interests and rights that Point has with regard to the Property (matured or unmatured, contingent or non-contingent, present or prospective), whether the Option has or has not been exercised, and all other rights that Point may have under the Option Documents.

**Preservation Payments.** Is defined in Section 4.2.2.

**Property.** The residential real property owned by Owner that is the subject of the Option Documents. The legal description of the Property is set forth in Schedule 1 to this Agreement. The Property shall include only the real property described in that Schedule 1 and the fixtures appurtenant to that real property, and shall not include any other personal property of Owner.

**Property Sale.** A sale or Transfer by Owner (or by Point following exercise of Option) of all, or an interest in, the Property. This term excludes the sale of Point's ownership interest pursuant to the Option. A Property Sale by the Owner must also be a Permitted Sale. An Exempted Owner Property Transfer is not considered a Property Sale.

**Registered Domestic Partner.** See "Civil Union Partner and Registered Domestic Partner" above.

**Rental Premium.** A premium added to the Point Proceeds to account for potential loss of value of the Property resulting from use of the Property as a rental property. The Rental Premium shall equal 10% of the Appreciation multiplied by the HEI Percentage, where Appreciation is calculated as the Final Home Value minus the Appreciation Starting Value [Rental Premium = 10% × (Final Home Value - Appreciation Starting Value) × HEI Percentage]. If the Final Home Value is less than the Appreciation Starting Value, no Rental Premium will apply. An example follows:

- Appreciation Starting Value of Home at $500,000, and Final Home Value at $1,000,000. Point has 20% HEI Percentage.
- Appreciation is $500,000 = $1,000,000 (Final Home Value) – $500,000 (Appreciation Starting Value).


© 2024 Point Digital Finance, Inc.

- Rental Premium is $10,000 = 10% × $500,000 (Appreciation) × 20% (HEI Percentage).

**Revocable Trust**. A revocable trust, revocable living trust, *inter vivos* trust, revocable family trust or similar trust established in accordance with the laws of any state.

**Rules**. Is defined in Section 7.20.1.

**Sales Commissions**. All broker fees, sales commissions, finder fees and all other fees and costs owed to any broker, real estate agent or finder and incurred in connection with a sale or Transfer of the Property or any interest in the Property.

**Security Instrument**. Is defined in Section 1.5.

**Senior Liens**. Liens on the Property that are perfected prior to or are otherwise senior to Point's Point Proceeds.

**Senior Loans**. Loans or other obligations that are secured by Senior Liens.

**Service Fees**. Fees, costs and charges of the type further described in Section 4.1.4, which Service Fees are designed to compensate the Asset Administrator for the time, effort, costs and expenses incurred by the Asset Administrator in responding to requests from Owner or defaults by Owner under the Option Documents or in performing other necessary and reasonable acts pursuant to the Option Documents.

**Transfer**. A sale, exchange, transfer, conveyance or assignment of all or any part of the Property or any legal or beneficial interest in the Property, unless the sale, exchange, transfer, conveyance or assignment is to a surviving Owner or estate of an Owner in the event of a death of an Owner.

**Third Party Buyer**. The Person that purchases, or proposes to purchase, the Property in a Property Sale or Transfer of the Property.

**Trustee(s)**. The Person or Persons designated as the "trustee" of a Revocable Trust in its formation documents and any subsequent amendments, and any successor trustees under such Revocable Trust.

**Trustor(s)**. The Person or Persons designated as the "trustor", "settlor" or "grantor" of a Revocable Trust in its formation documents and any subsequent amendments.


© 2024 Point Digital Finance, Inc.

**Schedule 1**

## LEGAL DESCRIPTION

The following described lot, piece or parcel of land, situate, lying and being in Maricopa County, Arizona to-wit:
Lot 153 of Tierra Feliz North Unit Two, according to the plat of record in the Office of the County Recorder of Maricopa County, Arizona, recorded in Book 160 of Maps, Page 20.
Commonly Known As: 6023 East Turquoise Avenue, Paradise Valley, AZ 85253
Parcel ID: 168-02-074

APN: 168-02-074

[end of legal description]



© 2024 Point Digital Finance, Inc.

## Schedule 2

## CALCULATION OF POINT PROCEEDS

A. **Formula for Calculation of Point Proceeds**. Except as otherwise provided in this Agreement, any calculation of the value of the Point Proceeds under this Agreement, the other Option Documents, or otherwise shall be calculated as the total of the following (**"Calculation of Point Proceeds"**):

**Point Proceeds** = Lesser of {**Capped Repayment Amount** and [(**Final Home Value** × **HEI Percentage**) – **Exercise Payment** + **Rental Premium**†]} + **Service Fees**† + **Preservation Payments**†

† if applicable

- the *lesser* of the following:
  - › the **Capped Repayment Amount**, as calculated in Section B below, and
  - › the *sum* of the following:
    - » the **Final Home Value** as specified in Section C below *multiplied* by the **HEI Percentage**;
    - » *minus* the **Exercise Payment**, subject to reductions[(1)] and adjustments[(2)] below;
    - » *plus* the **Rental Premium** if a designated **Owner-Occupied Property** has been rented or leased in the previous six month period and Final Home Value exceeds Appreciation Starting Value;
- *plus* all monetary amounts owed to Point in the form of unpaid **Service Fees** and unreimbursed **Preservation Payments** (including any unpaid interest and other fees and charges associated with such Preservation Payments), provided that Owner has not already delivered any such amounts

---

(1) The Exercise Payment amount will be reduced if an Exercise Payment Insurance Reduction is deemed to be applicable under Section 4.4.3.

(2) If Point has previously delivered the Exercise Payment to Owner at an Option Exercise pursuant to Sections 2.2 or 2.3, then the value of the Exercise Payment shall not be deducted from the Point Proceeds to be paid to Point.

B. **Calculating the Capped Repayment Amount.** The Calculation of the Point Proceeds takes into account the Capped Repayment Amount, which may limit the amount an Owner is obligated to pay to Point. The Capped Repayment Amount is calculated as follows:

$$\textbf{Capped Repayment Amount} = \textbf{Investment Amount} \times [1 + (\textbf{Homeowner Protection Cap} / 12)]^{M}$$

where **M**, used as an exponent, represents the number of months (including partial months) that have fully elapsed since the Effective Date.

C. **Determining Final Home Value**. The following Final Home Values shall apply to the Calculation of Point Proceeds:

(1) **Property Sale**. Except as provided in C.2. below, in any Property Sale, the Final Home Value shall be the greater of (a) the Effective Sale Price and (b) the Appraised Value, if available.

(2) **Property Sale or Owner Option Repurchase After Event of Default**. In the event of a Property Sale initiated by us following an Option Exercise After Default in accordance with Section 2.3.4 or an Owner Option Repurchase in accordance with Section 2.3.6, the Final Home Value shall be



© 2024 Point Digital Finance, Inc.

the greater of (a) the Effective Sale Price, if any, (b) the highest Appraised Value of the Property calculated between the date of an Event of Default through the date of closing of such Property Sale or Owner Option Repurchase, and (c) the Appreciation Starting Value.

(3) **Owner Option Repurchase.** Except as otherwise provided in Section 1.4.1, in any Owner Option Repurchase during the Investment Term not involving a Property Sale or Event of Default, the Final Home Value shall be the Appraised Value of the Property at the time of the Owner Option Repurchase.

(4) **Insurance Allocation.** In any insurance allocation under Section 4.4, the Final Home Value shall be the Appraised Value of the Property immediately prior to the destruction or damage.

(5) **Condemnation.** In any total condemnation or partial condemnation of the Property, the Final Home Value shall be the Net Condemnation Proceeds under Section 4.5.

D. **Damage Calculations.** In any calculation of damages due to Point following an Event of Default, or any calculation of Liquidated Damages under this Agreement, the Final Home Value for determining the Point Proceeds shall be the highest Appraised Value of the Property calculated between the date of any Event of Default through the date Point accepts payment from Owner in discharge of Point's Rights hereunder; and provided, further, that in the event of any calculation of damages or Liquidated Damages following any Event of Default under Section 6.4 of the Agreement, the Final Home Value shall be the higher of (a) the highest Appraised Value of the Property calculated between the date of any Event of Default hereunder through the date Point accepts payment from Owner in full discharge of Point's Rights hereunder; and (b) the Appreciation Starting Value.



© 2024 Point Digital Finance, Inc.

# EXHIBIT A

## SECURITY INSTRUMENT

© 2024 Point Digital Finance, Inc.

**EXHIBIT B**

**CONSENT OF SPOUSE**

© 2024 Point Digital Finance, Inc.

Option Agreement ID: 2024252-TEDOG

**CONSENT OF SPOUSE**

On July 15, 2024, Point Digital Finance, Inc., a Delaware corporation (**"Point"**), and James B. Muskal (individually or collectively, **"Owner"**) entered into the foregoing Point Digital Finance Option Agreement (together with all exhibits, schedules, attachments and riders thereto, the **"Agreement"**) with respect to that certain property located at 6023 E TURQUOISE AVE, PARADISE VALLEY, AZ 85253. Capitalized terms used but not defined in this consent have the meanings set forth in the Option Agreement.

I am the spouse // Civil Union Partner // Registered Domestic Partner ***(circle one)*** of Owner. I hereby acknowledge and certify that I have read and approve of the Agreement and the other Option Documents.

I am aware that the Option Documents contain provisions regarding the Property, including any interest I might have therein, and (a) the Owner's ownership rights in the Property, (b) requirements for use and care of the Property, (c) Point's rights to sell the Property in certain circumstances, and (d) Point's right to a portion of the sale proceeds of the Property. I am also aware that the Agreement obligates the Owner or the Owner's heirs, successors and assignees to pay the Point Proceeds (x) in the event of an Owner Option Repurchase, or (y) in the event of a Property Sale concurrent with or subsequent to Point exercising its Option.

I hereby agree that my interest, if any, in the Property shall be irrevocably bound by the Agreement. I further understand and agree that any community property interest (or similar interest based on the laws relating to marital property in effect in the state of our residence) that I may have in such Property shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am encouraged to seek independent professional guidance or counsel with respect to this consent and the Agreement. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Date: 7/15/24 Cheryl C. Collins-Muskal

Cheryl C. Collins-Muskal



© 2024 Point Digital Finance, Inc

STATE OF ~~ARIZONA~~ Illinois ) §
County of Cook )

On this 15th day of July, 2024 before me personally appeared Cheryl C. Collins Muskal, whose identity was proven to me on the basis of satisfactory evidence to be the person who [he/she] claims to be, and acknowledged that [he/she] signed the [above/attached] document.

[SEAL]

OLGA JOHNSON
Official Seal
Notary Public - State of Illinois
My Commission Expires Jan 28, 2025

Notary Public



© 2024 Point Digital Finance, Inc

DOCSET: AZ23.1

# NOTICE OF RIGHT TO CANCEL

**Homeowner:** James B. Muskal

**Property Address:** 6023 E TURQUOISE AVE
PARADISE VALLEY, AZ 85253

**Option Agreement ID:** 2024252-TEDOG

## Your Right to Cancel

You are entering into a transaction that will result in a new security interest in your home. You have a right to cancel this transaction, without cost, until midnight of the third business day after, whichever of the following events occurs last:

(1) the effective date of the transaction, which is July 15, 2024; or
(2) the date you received your Closing Disclosure; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## How to Cancel

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Point Digital Finance, Inc.
Attn: Closing Department
444 High Street, 4th Floor
Palo Alto, CA 94301

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of July 18, 2024 (or midnight of the third business day following the latest of the events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective as to all borrowers.

## Cancellation Request

I wish to cancel this transaction.

Date

Homeowner Signature

## Acknowledgment of Receipt

Each of the undersigned hereby acknowledges receiving 2 copies of this notice.

James B. Muskal

7/15/24
~~07/16/24~~ JBM
Date

# NOTICE OF RIGHT TO CANCEL

**Homeowner:** Cheryl C. Collins-Muskal

**Property Address:** 6023 E TURQUOISE AVE
PARADISE VALLEY, AZ 85253

**Option Agreement ID:** 2024252-TEDOG

## Your Right to Cancel

You are entering into a transaction that will result in a new security interest in your home. You have a right to cancel this transaction, without cost, until midnight of the third business day after, whichever of the following events occurs last:

(1) the effective date of the transaction, which is July 15, 2024; or
(2) the date you received your Closing Disclosure; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## How to Cancel

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Point Digital Finance, Inc.
Attn: Closing Department
444 High Street, 4th Floor
Palo Alto, CA 94301

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of July 18, 2024 (or midnight of the third business day following the latest of the events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective as to all borrowers.

## Cancellation Request

I wish to cancel this transaction.

______________________
Date

______________________
Homeowner Signature

## Acknowledgment of Receipt

Each of the undersigned hereby acknowledges receiving 2 copies of this notice.

[signature] Cheryl C. Collins-Muskal

7/15/24
Date

2024252-TEDOG

James B. Muskal

POINT

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**

Initials — I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.

Initials — I am responsible for any of my debts that are not paid off with the funds received from Point.

Initials — I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.

Initials — Point is **not** buying part of my home today. Instead, Point is buying the right to 34.50% of my home's future change in value. This right is called the "option."

Initials — When I am ready to repay Point, Point will determine my home's change in value by subtracting the Appreciation Starting Value from the Final Home Value. To determine the Appreciation Starting Value, Point lowered the assessed value of my home by 27.00%. This is called the risk adjustment. The Appreciation Starting Value for my home is $2,044,000.00. To determine my home's Final Home Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).

Initials — My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount (referred to as the Capped Repayment Amount) is the result of applying an annual rate, 19.00%, compounded monthly, to the funds I receive from Point. This rate is called the Homeowner Protection Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.

Initials — If my home value increases, my repayment amount will also increase, up to the Capped Repayment Amount. Even if my home value does not increase, my repayment amount may increase over time. This is because the Appreciation Starting Value is less than my home's current assessed value.

Initials — I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.

Initials — If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.

Initials — Lenders may not be willing to refinance my mortgage unless I also repay Point.

2024252-TEDOG

Cheryl C. Collins-Muskal

POINT

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**

Initials — I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.

Initials — I am responsible for any of my debts that are not paid off with the funds received from Point.

Initials — I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.

Initials — Point is **not** buying part of my home today. Instead, Point is buying the right to 34.50% of my home's future change in value. This right is called the "option."

Initials — When I am ready to repay Point, Point will determine my home's change in value by subtracting the Appreciation Starting Value from the Final Home Value. To determine the Appreciation Starting Value, Point lowered the assessed value of my home by 27.00%. This is called the risk adjustment. The Appreciation Starting Value for my home is $2,044,000.00. To determine my home's Final Home Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).

Initials — My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount (referred to as the Capped Repayment Amount) is the result of applying an annual rate, 19.00%, compounded monthly, to the funds I receive from Point. This rate is called the Homeowner Protection Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.

Initials — If my home value increases, my repayment amount will also increase, up to the Capped Repayment Amount. Even if my home value does not increase, my repayment amount may increase over time. This is because the Appreciation Starting Value is less than my home's current assessed value.

Initials — I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.

Initials — If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.

Initials — Lenders may not be willing to refinance my mortgage unless I also repay Point.

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Closing Disclosure

*This form is a statement of final option terms and closing costs. Compare this document with your Option Agreement Estimate.*

## Closing Information

| | |
|---|---|
| **Date Issued** | 07/15/2024 |
| **Effective Date** | 07/18/2024 (projected) |
| **Disbursement Date** | 07/24/2024 (projected) |
| **Settlement Agent** | Vantage Point Title |
| **Escrow Account #** | C-AZ892254 |
| **Property** | 6023 E TURQUOISE AVE<br>PARADISE VALLEY, AZ 85253 |

## Transaction Information

| | |
|---|---|
| **Homeowners** | Cheryl C. Collins-Muskal<br>James B. Muskal |
| **Homeowner Address** | 1312 N Astor St<br>Chicago, IL 60610 |
| **Investor** | Point Digital Finance, Inc |
| **Option Agreement #** | 2024252-TEDOG |
| **Occupancy Type** | Non-Owner Occupied Property |

## Option Terms

***Except for the Estimated Debt Payoff Amount, the Option Terms below will not change after closing.***

***There are no monthly payments and no interest accrues.***

| | | |
|---|---|---|
| **Investment Amount** | $210,000.00 | *This is the amount Point will invest in your Property in exchange for an Option in your Property.* |
| **Appraised Value** | $2,800,000.00 | *This is the value determined by Point in reliance on various methods, such as traditional appraisals or automated valuation models.* |
| **Homeowner Protection Cap** | 19.0% | *An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 of your Option Agreement.* |
| **Appreciation Starting Value** | $2,044,000.00 | *This is the beginning value of your Property used to calculate Point's share of the Property's appreciation and the Point Proceeds. The Property's appreciation value can be positive or negative depending on the Final Home Value. The Point Proceeds is the amount you pay Point upon your repurchase, a sale of the Property, or at the end of the term. In all cases, the Point Proceeds will be subject to the Homeowner Protection Cap.* |
| **Investment Term** | 30 Years | |
| **HEI Percentage** | 34.5000% | *This is the percentage of appreciation you will pay Point upon repayment, unless the result is more than the Capped Repayment Amount.* |
| **Estimated Debt Payoff Amount** | $42,217.80 | *The estimated amount of the Investment Amount that will be paid to settle existing debts and obligations.* |
| **Acknowledged Pre-Existing Loans** | $1,469,203.95 | *This is the current sum of debt obligations on your Property.* ***Contact Point immediately if this is not correct.*** |

## Closing Summary

***See Calculating Cash to Homeowner on page 3 for details.***

| | | |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $625.00 | Includes $1,901.55 in Option Agreement Costs<br>+ $30.00 in Other Costs - $1,306.55 Paid by Point |
| **Cash to Homeowner** | $167,157.20 | After deducting Closing Costs Paid by Homeowner and Payoffs Made at Closing Through Escrow. |

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Closing Cost Details

| Option Agreement Costs | | Homeowner-Paid At Closing | Homeowner-Paid Before Closing | Paid by Point |
|---|---|---|---|---|
| **Processing Charges** | | **$0.00** | | **$0.00** |
| Processing Fee | | $8,190.00 | | |
| Credit | for Credited Processing Fee | ($8,190.00) | | |
| **Third Party Services** | | **$625.00** | | **$1,276.55** |
| Credit Report Fee | to Equifax | | | $46.55 |
| Flood Certification Fee | to Corelogic | | | $12.00 |
| Tax Service Fee | to Subservicer | $75.00 | | |
| Title - Insurance Policy | to ClearEdge Title | | | $1,193.00 |
| Title - Escrow Fee | to ClearEdge Title | $550.00 | | |
| Title - Closing Protection Letter | to ClearEdge Title | | | $25.00 |
| **Total Option Agreement Costs** | | **$625.00** | | **$1,276.55** |
| Option Agreement Costs Subtotals | | $625.00 | $0.00 | $1,276.55 |

| Other Costs | | Homeowner-Paid At Closing | Homeowner-Paid Before Closing | Paid by Point |
|---|---|---|---|---|
| **Taxes and Other Government Fees** | | **$0.00** | | **$30.00** |
| Recording Fee | for Deed of Trust | | | $30.00 |

| | | Homeowner-Paid At Closing | Homeowner-Paid Before Closing | Paid by Point |
|---|---|---|---|---|
| **TOTAL CLOSING COSTS** | | **$625.00** | | **$1,306.55** |
| Closing Costs Subtotals | | $625.00 | $0.00 | $1,306.55 |

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Cash to Homeowner

## Calculating Cash to Homeowner

***Use this table to see what has changed from the Option Agreement Estimate.***

| | Option Agreement Estimate | Closing Disclosure | Did this change? | |
|---|---|---|---|---|
| Investment Amount | $210,000.00 | $210,000.00 | No | |
| Total Closing Costs | -$2,081.55 | -$1,931.55 | Yes | *See Total Option Agreement Costs and Other Costs* |
| Closing Costs Paid Before Closing by Homeowner | $0.00 | $0.00 | No | |
| Estimated Total Payoffs and Payments Made at Closing | -$42,217.80 | -$42,217.80 | No | *Please be aware that Point is only paying off debts listed on this Closing Disclosure. Any additional debts you wish to pay off with the funds you receive from Point will be your responsibility.* |
| Closing Costs Paid by Point | $1,306.55 | $1,306.55 | No | |
| Cash to Homeowner | $167,007.20 | $167,157.20 | Yes | *This is the amount of funds you will receive at closing.* |
| **Closing Costs Paid at Closing by Homeowner** | $775.00 | $625.00 | Yes | *This is the amount of closing costs paid from the Investment Amount.* |

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

## Estimated Payoffs and Payments

*Use this table to see a summary of estimated payoffs and payments that will be paid from your Investment Amount.*

### Made at Closing through Escrow

| TO | AMOUNT |
|---|---|
| 01 Point [account ending in 8929] | $42,217.80 |
| 02 | |
| 03 | |
| 04 | |
| 05 | |
| 06 | |
| 07 | |
| 08 | |
| 09 | |
| 10 | |
| 11 | |
| 12 | |
| **ESTIMATED TOTAL PAYOFFS AND PAYMENTS MADE AT CLOSING** | **$42,217.80** |

### Contact Information

| | Investor | Settlement Agent |
|---|---|---|
| **Name** | Point Digital Finance, Inc | Vantage Point Title |
| **Address** | 444 High Street, 4th Floor<br>Palo Alto, CA 94301 | 2605 Enterprise Road E, Suite 270<br>Clearwater, FL 33759 |
| **Contact** | Alexander Marek | Dave Silcott |
| **Email** | amarek@point.com | teamclear@cetitle.com |
| **Phone** | (650) 999-9733 | (877) 536-3390 |

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Additional Information

## Appraisal

Your property was appraised. Point will give you a copy of the appraisal at no additional cost at least 3 days before closing. If you have not yet received it, please contact Point.

## Option Agreement

To finalize Point's purchase of the option, you and Point will sign a separate Option Agreement. This Option Agreement will include information about:

- option exercise triggers, including in the event of a default
- details on how Point Proceeds will be calculated, including the Capped Repayment Amount which may limit the amount you will owe to Point upon your repurchase or Point's exercise in connection with a Property Sale
- your obligations to maintain insurance and provide information to Point upon request
- limitations on your ability take out additional loans on the Property
- details on your obligations to pay the Debt Payoff Amount
- Point's right to make Preservation Payments to protect the Property in the event you fail to take required actions under the Option Agreement
- limits on rental or lease agreements that prohibit the Property from being subject to a rental or lease period that extends beyond the Expiration Date without Point's prior written consent

## Point Proceeds

- When the Property is sold after Point exercises its option or when you repurchase the option during or at the end of the term, you will pay Point the initial Investment Amount plus Point's percentage of the appreciation calculated as of the repurchase date. The Point Proceeds will be subject to the Homeowner Protection Cap. If the Final Home Value is less than the Appreciation Starting Value, the amount you pay Point may be less than the Investment Amount.
- No adjustments will be made to the Point Proceeds to exclude gains from renovations or other property improvements made during the term.
- In the event of a depreciated sale of a Property bearing a mortgage (i.e., the Final Home Value is less than the Appreciation Starting Value of the Property), any remaining funds available from the sale after the mortgage has been repaid may be due to Point to pay the Point Proceeds.
- In the event that you have not sold the Property before the end of the term of the Option Agreement, you may repurchase Point's fractional interest in your Property. If you do not repurchase Point's interest at the end of the term, Point may exercise the option and initiate a sale process.

## Security Interest

If you sign the Option Agreement, you will grant a security interest in:
**6023 E TURQUOISE AVE, PARADISE VALLEY, AZ 85253**
You may lose this Property if you do not satisfy the obligations of the Option Agreement.

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

## Additional Information

### Insurance

We require homeowner's insurance on the Property, which you may obtain from a nationally recognized company of your choice that we find acceptable.

### Confirm Receipt

By signing, you are only confirming that you have received this form. You do not have to accept the Option Agreement because you have signed or received this form.

[signature]
James B. Muskal

07/15/24
Date

[signature]
Cheryl C. Collins-Muskal

7/15/24
Date

POINT

444 High Street, 4th Floor
Palo Alto, California 94301
1-888-764-6823

# POINT DIGITAL FINANCE, INC
# HOMEOWNER AGREEMENTS

When you sell Point the right to acquire a fractional interest in your equity in your home, you will sign and deliver two documents that make up the Point Homeowner Agreements: the Point Option Purchase Agreement and the Security Instrument. Depending on the circumstances, you may also deliver the Consent of Spouse.

1. **Point Option Purchase Agreement**: This is the main agreement between you and Point, and sets forth the financial terms of the deal (summarized in Section 1.1), restrictions applicable to you, your responsibilities with respect to the Property, your right to buyback Point's interest in your Property by repurchasing Point's option during the agreement term, triggering events for Point exercising its option, and other rights of Point.
   Some important financial terms:
   - There are no monthly payments; no interest accrues.
   - The amount of additional debt you may be able to take out on the Property will be subject to Point's approval.
   - When you repurchase the option during the agreement term or the Property is sold in connection with your repurchase or after Point exercises its option, you will pay to Point the amount of the initial payment you receive now <u>plus</u> Point's percentage of the appreciation. If the Final Home Value is less than the Appreciation Starting Value of the Property, the amount you will pay Point may be less than the initial payment you receive now. The total amount you will owe to Point is subject to a cap, which is calculated based on the length of time between the dates you sign the Point homeowner agreements and Point receiving your payment.
   - If the Property has depreciated when you sell it (i.e., the Final Home Value is less than the Appreciation Starting Value of the Property), any remaining funds available from the sale after your mortgage has been repaid may be due to Point to pay the amount owed. Point, however, has no further recourse against you or your personal assets.
   - In the event you have either not sold the Property or repurchased the option before the expiration of the agreement term, Point may exercise the option and initiate a sale process.

2. **Security Instrument**: The Security Instrument (also called a Deed of Trust or Mortgage) is filed in the public records of the county where the Property is located in order to "perfect" Point's security interest in the Property. You grant Point a security interest in the Property that would permit Point to foreclose on the Property in event of your default due to a delinquency on another lien secured by the Property, failure to pay property taxes, failure to maintain insurance on the Property, or bankruptcy, among other defaults, under the Option Purchase Agreement. The Security Instrument is subordinated to any interest your mortgage lender has in the Property.

3. **Consent of Spouse**: If you are married, but your spouse is not listed on title to the Property, your spouse must sign the Consent of Spouse, acknowledging that his/her interest in the Property will be affected by the Option Purchase Agreement.

© 2024 Point Digital Finance, Inc

POINT

# About My Re-Point

*This document is designed to educate homeowners about Re-Point so that they are informed and empowered to decide if Re-Point is right for them.*

## What is "Re-Point"?

A Re-Point is a new Home Equity Investment (HEI) that pays off an existing HEI and provides additional cash to the homeowner. See the comparison table below for how the terms of your original HEI will differ from a Re-Point.

### HEI Information

| HEI Terms | Original HEI | Re-Point (New HEI) |
|---|---|---|
| New Cash to Homeowner (less Closing Costs, Payoff Amount, and any other debt payoffs) | N/A | $167,157.20 |
| Investment Amount (formerly Option Investment Payment) | $40,000.00 | $210,000.00 |
| Appreciation Starting Point (formerly Original Agreed Value) | $1,988,000.00 | $2,044,000.00 |
| Risk Adjustment | 29.00% | 27.00% |
| Investment Term (in years) | 30 | 30 |
| HEI Percentage (formerly Option Percentage) | 6.7% | 34.5% |
| Homeowner Protection Cap (formerly Point Proceeds Cap Factor) | 20.5% | 19.0% |
| Debt Payoff | N/A | $42,217.80 |
| Closing Costs Paid by Homeowner | $2,525.00 | $625.00 |

## Key Terms to Know:

- **New Cash:** This is the amount of new money you will receive after deducting your original HEI repayment and any new closing costs. In deciding whether to proceed with a Re-Point you should understand how the new terms will impact your future repayment and whether the new cash and new terms will fit your personal circumstances. This figure may vary until all underwriting criteria such as Investment Amount, outstanding mortgage balance, and debt payoffs are finalized.
- **Investment Amount:** This is the total amount you will receive in exchange for a percentage of your future appreciation. Repayment of your original HEI and any closing costs will be deducted from this amount. Increasing or decreasing your Investment Amount may impact your HEI Percentage and amount of new cash. Your new Investment Amount will be higher than your original investment due to including your Option Payoff.
- **Appreciation Starting Point:** The starting value for calculating Appreciation and Homeowner Protection Cap at the time of exit. This is calculated by multiplying the Risk Adjustment against your Appraised Value.
- **HEI Percentage:** This is the percentage of Appreciation that Point shares in starting from the Appreciation Starting Point. A higher Investment Amount can increase the HEI Percentage, while a lower Investment Amount can decrease the HEI Percentage.
- **Homeowner Protection Cap:** An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount. The Capped Repayment is the maximum amount you may pay. Final repayment will be the lesser of the Appreciation or Capped Repayment.
- **Option Payoff:** This is the amount of money that will go towards paying off the original HEI investment.

## Are My Terms Final?

- Your terms are not locked until final pricing. Initial Pricing Estimates are based on stated information in your application and your credit report. Final pricing is subject to final verification of your property and credit.
- Additional term changes may occur if the Investment Amount increases or decreases.
- You will receive a revised estimate in the event changes do occur. If at any point you do not agree to updated terms, you may withdraw your application at no cost to you.

## What are my next steps?

If you believe a Re-Point makes sense for your financial situation and would like to move forward in the process, we ask that you acknowledge the following statements and sign this document.

- I understand the costs associated with the Re-Point;
- I have been provided a repayment calculator to help me understand future repayment;
- The Re-Point may have different terms (including the Risk Adjustment, HEI Percentage, and Homeowner Protection Cap) than my original HEI;
- The Re-Point will provide a reasonable benefit to me after taking into account the terms of both the Re-Point and original HEI, the cost of the Re-Point, and my particular circumstances; and
- If I change my mind and wish to not proceed with the Re-Point or exercise my right to cancel, I will not be charged any fees for withdrawing my application and that the terms of my original HEI will not be impacted.

I have considered the terms of both the original HEI and Re-Point, the cost of the Re-Point, and my personal circumstances. The overall benefits of the Re-Point make the Re-Point beneficial to me. By signing below, I certify that I have read and understand the "About My Re-Point" form.

Applicant: ~~[signature]~~ [signature]

7/15/24

Date: ~~4/15/24~~ JBM

C. Nicole Pelcic
Arizona Bar No. 029503
KLINEDINST PC
2701 E Camelback Road, Suite 150
Phoenix, Arizona 85016-4324
(602) 813-0000
npelcic@klinedinstlaw.com

*Attorney for Defendant*
*Point Digital Finance, Inc.*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>vs.<br><br>POINT DIGITAL FINANCE, INC.,<br><br>Defendants. | CASE NO. CV2025-024855<br><br>**DEFENDANT POINT DIGITAL FINANCE, INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT, OR ALTERNATIVELY, STAY PROCEEDINGS** |

Pursuant to A.R.S. §§ 12-1501 *et seq.*, A.R.S § 12-3007, and Ariz. R.Civ.P.7.1, and the California Arbitration Act [Civ. Proc. Code § 1280 *et seq*] and the Federal Arbitration Act 9 U.S.C. § 1 *et seq.* ("FAA"), Defendant Point Digital Finance, Inc. ("Point"), by and through undersigned counsel, moves to dismiss this action and compel arbitration of the complaint filed by Plaintiff Steven Muskal, as Independent Administrator of the Estate of James B. Muskal ("Plaintiff") in its entirety. In the alternative to a dismissal of the action, Point further requests that the Court order a stay of the proceedings until the completion of

EXHIBIT B

the arbitration. Point's motion is supported by the following memorandum of points and authorities, Point's declaration, and attached exhibits.

## I. INTRODUCTION

On July 15, 2024, James B. Muskal ("James") and Cheryl C. Collins-Muskal ("Cheryl") (collectively, "Owners") entered into a valid and enforceable written agreement with Point, which mandated that disputes related to the agreement be arbitrated. Indeed, Owners agreed to arbitrate "any and all controversies, claims, or disputes" with Point arising out of, relating to, or resulting from the Point Digital Finance Option Purchase Agreement (the "Option") they signed with Point. Now, Plaintiff, as the purported administrator of the Estate of James B. Muskal (the "Estate"), brings this complaint against Point asserting three (3) causes of action, each of which relate entirely to underlying Option. Arizona has a strong policy favoring arbitration, particularly where there is a valid and enforceable arbitration agreement between the parties. As such, this Court should compel arbitration.

While Point maintains—and is prepared to demonstrate—that Plaintiff's claims lack legal and factual merit, Plaintiff's lawsuit is improper and accordingly fails at the outset because Plaintiff is attempting to litigate this dispute in the wrong forum. Accordingly, Point respectfully requests that the Court enter an order compelling arbitration of Plaintiff's claims against Point, dismissing the complaint, or, alternatively, staying the proceedings until the completion of the arbitration.

## II. FACTUAL BACKGROUND

Effective July 15, 2024, Owners, as the sole owners to the subject property located at 6023 E. Turquoise Ave., Paradise Valley, AZ 85253 (the "Property"), entered into a series of

agreements with Point in connection with Point's product, including the Option, whereby Point made an initial option investment payment of $210,000 to the Owners and in exchange Owners granted Point an option to purchase an undivided 34.5% interest in the Property. Decl. of ________________ ("Point Decl."), ¶ 4, Ex. A (Option).

Commencing in Section 7.20 of the Option, there is section regarding arbitration ("Arbitration Provision") which provides in relevant part as follows:

> OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE "**RULES**") OF, AND PURSUANT TO THE STATE LAW OF, THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2
>
> * * *
>
> ***Remedy***. EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSICE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND POINT.

Point Decl., ¶¶ 4-5, Ex. A (Option) §§ 7.20-7.20.6 (emph. in original).

In doing so, Owners affirmed their agreement to be bound by the Arbitration Provision, which expressly states Owners agree to arbitrate "any and all controversies, claims, or disputes," arising from or relating to the Option. *Id.* at 6.

Owners and Point agreed the Option and related documents are governed "in accordance with California law[.]" *Id.*, ¶ 7 (citing Option § 7.10 (Choice of Law; Venue)).

On July 15, 2024, Owners and Point Titling Trust ("PTT"), as assignee beneficiary of Point, also entered into a deed of trust (the "Point DOT"), which secured Owners' performance under the Option. Point Decl., ¶ 8, Ex. B (Point DOT). The Point DOT created

a valid and enforceable lien against the Property and the Point DOT was subsequently recorded on July 22, 2024 in the Maricopa County Recorder's Office. *Id.*[1]

On July 15, 2025, Plaintiff filed this Complaint against Point alleging James passed away in March 2025 and that Plaintiff was duly appointed as the administrator of the Estate, with authority to bring the action. Compl. ¶¶ 1-2. Plaintiff brings three (3) causes of action challenging the Option under state and federal law, alleging (i) rescission of unconscionable contract by asserting the Option contains misleading and false statements, (ii) consumer fraud pursuant to A.R.S. § 44-1522 by asserting the Option contains various false or misleading statements, and (iii) a violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA") on the basis that the Option fails to comply with various disclosure requirements. *See generally* Complaint.

## III. LEGAL ARGUMENT

### A. The Federal Arbitration Act Requires Arbitration of Plaintiff's Claims

The Option is governed by the FAA. The FAA (9 U.S.C. § 1, *et seq.*) provides:

> A written provision in […] a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction,… shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract…

9 U.S.C. § 2. The FAA requires courts to "enforce arbitration agreements according to their terms..." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018). "[T]he FAA's purpose is to give preference (instead of mere equality) to arbitration provisions." *Mortensen v.*

[1] Since the Arbitration Provision makes clear it applies to Point and Point's affiliates, it governs any dispute between Owners, on one hand, and Point and PTT as the assignee beneficiary and affiliate of Point, on the other hand. Point Decl., ¶ 4, Ex. A (Option). Moreover, the Option expressly authorizes Point to assign its rights, title, and interest in the Option, and that upon such assignment, the assigned shall "automatically have all the rights and remedies of Point under the Option Documents," including the right to resolve Plaintiff's claims against Point through arbitration. *Id.*

*Bresnan Commc'ns., LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013). By enacting the FAA, Congress sought to overcome widespread judicial hostility to the enforcement of arbitration agreements. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (FAA was enacted "[t]o overcome judicial resistance to arbitration"). Accordingly, it reflects "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see Beard v. SC Consumer USA, Inc.*, 2012 WL 1292576, at *3 (E.D. Cal. 2012).

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," *Moses H. Cone*, 460 U.S. at 24, and is controlling in both state and federal courts. *Siegel v. Prudential Ins. Co. of Am.*, 67 Cal.App.4th 1270, 1276 (1998). The FAA permits private parties to "trade[] the procedures...of the courtroom for the simplicity, informality, and expedition of arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)); *Moses H. Cone*, 460 U.S. at 22 (stating the FAA was designed "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible").

In addition, Congress sought to guarantee that arbitration agreements are enforced as written and to prevent parties from avoiding their contractual obligations to arbitrate under the FAA. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). To achieve that end, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-

25; *Mitsubishi Motors*, 473 U.S. at 626; *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650-51 (1986); *Cione v. Foresters Equity Servs., Inc.*, 58 Cal.App.4th 625, 641 (1997). Indeed, Congress considers this policy to be so important that a trial court's *denial* of a motion to compel arbitration is immediately appealable, whereas the *grant* of such a motion is not appealable. 9 U.S.C. §§ 16(a)(1)(B), 16(b)(1)(2); *see* Civ. Proc. Code § 1294(a) (orders dismissing or denying petition to compel arbitration are immediately appealable). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. – Ala. v. Randolph*, 531 U.S. 79, 91 (2000); *see also Paulson v. Dean Witter Reynolds, Inc.*, 905 F.2d 1251, 1255 (9th Cir. 1990).

Accordingly, the FAA governs any (1) written arbitration provision (2) in a contract evidencing a transaction "involving commerce." *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). As set forth below, there is no dispute that Owners entered into the Option, which contains the Arbitration Provision. Point Decl., ¶ 4, Ex. A (Option signed by Owners effective July 15, 2024). Second, the Option is indisputably a transaction involving interstate commerce and thereby governed by the FAA. 9 U.S.C. § 2; *Giuliano v. Inland Empire Pers., Inc.*, 149 Cal.App.4th 1276, 1286 (2007) ("involving commerce" must be interpreted broadly). "The words 'involving commerce' are to be interpreted broadly since the FAA 'embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause.' The phrase 'evidencing a transaction' simply means that 'the 'transaction' in fact 'involves' interstate commerce, even if the parties did not contemplate an interstate commerce connection.'" *Dobson*, 513 U.S.

265, 273 (1995) ("[W]e conclude that the word 'involving' is broad and is indeed the functional equivalent of 'affecting'"); *Perry v. Thomas*, 482 U.S. 483, 490 (1987). Here, the Option involves real property located in Arizona and was entered into between Owners and Point, a consumer financial services company with a principal place of business in Palo Alto, California. Point Decl., ¶ 2. Therefore, the Option and Arbitration Provision therein involve interstate commerce governed by the FAA.

**B. The Court Must Enforce the Arbitration Provision**

The FAA declares unambiguously that in "any suit or proceeding...brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is proceeding shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. In determining whether to compel a party to arbitration, the court must limit its inquiry to (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). In this case, both requirements have been satisfied.

**i. The Arbitration Provision Is Valid and Enforceable**

Congress and the Supreme Court declared a "national policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (citing the FAA, 9 U.S.C. § 2); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996) ("The FAA not only reversed judicial hostility to enforcement of arbitration contracts but also created a rule of contract construction favoring arbitration."). An arbitration provision governed by the

FAA is presumed valid and enforceable. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987). The FAA mandates that "an agreement in writing to submit to arbitration an existing controversy...shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity...." 9 U.S.C. § 2.

Like the FAA, Arizona has a "strong policy approving of arbitration." *Matter of Noel R. Shahan Irrevocable and Inter Vivos Trust*, 188 Ariz. 74, 77 (Ct. App. 1996) (citing *Meineke v. Twin City Fire Ins. Co*., 181 Ariz. 576, 581 (Ct. App. 1994); *see also City of Cottonwood v. James L. Fann Contracting*, 179 Ariz. 185, 877 P.2d 284 (Ct. App.1994) ("Because of public policy favoring arbitration, arbitration clauses are construed liberally and any doubts about whether matter is subject to arbitration are resolved in favor of arbitration.") *citing U.S. Insulation, Inc. v. Hilro Constr. Co*., 146 Ariz. 250, 258 (Ct. App.1985). Under Arizona law, "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." A.R.S. § 12- 1501; *Foy v. Thorp*, 186 Ariz. 151, 153 (Ct. App. 1996) (noting that Arizona law favors arbitration, as a public policy endorsed both by the courts and statutorily). Thus, where a valid and enforceable agreement exists between the parties which requires the submission of claims to arbitration, Arizona courts must compel arbitration. Ariz. Rev. Stat. §§ 12-1501, 12-1502; *see also* A.R.S. §§ 12-3006-12-3007 (authorizing a motion to compel arbitration where the parties' agreement is valid and enforceable).

Likewise, the California Arbitration Act, which expressly governs the Arbitration

Provision, also favors arbitration of Plaintiff's claims. Civ. Proc. Code § 1280 *et seq*. "California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration." *Coast Plaza Doctors Hosp. v. Blue Cross of California*, 83 Cal.App.4th 677, 686 (2000) (citations omitted). The general rule is that "arbitration should be upheld 'unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute.'" *Id*. (quoting *Bos Material Handling, Inc. v. Crown Controls Corp*., 137 Cal.App.3d 99, 105 (1982)); *Sanchez v. Valencia Holding Company, LLC*, 61 Cal.4th 899 (2015); *see also Bunker Hill Park Ltd. v. U.S. Bank, N.A*., 231 Cal.App.4th 1315, 1325 (2014) (same); *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1143–1145 (2013).

Here, the Option, which contains the Arbitration Provision, is a writing and was executed by Owners. Point Decl., ¶ 4, Ex. A (Option). The Option further makes clear that the Option and all related documents "shall be binding upon and insure to benefit of Owner and Point and their respective heirs, successor and assignees. If the Owner dies, then the Option Documents shall be binding on the Owner's Estate." *Id*., ¶ 4, Ex. A, § 7.7 (Successors and Assignees; Owner's Estate). Accordingly, to the extent Plaintiff purports to be the duly appointed administrator of the Estate with "legal authority to bring this action on behalf of the Estate," the Option and Arbitration Provision is binding on Plaintiff. *Id.*; Compl. ¶ 1. By signing the Option, Owners received, understood, and agreed to its terms, including agreeing to arbitrate all claims against Point related to the Option. Moreover, Plaintiff, as the party opposing arbitration, bears the burden of demonstrating "an arbitration clause cannot be interpreted to require arbitration of the dispute," and any reasonable doubt "must be resolved

in favor of arbitration." *Coast Plaza Doctors Hosp*., 83 Cal.App.4th at 686-87; *Mitsubishi Motors*, 473 U.S. at 626. For these reasons, Point respectfully submits that, because Owners assented to the Option, the Arbitration Provision is valid and enforceable, and Point is entitled to an order compelling Plaintiff's action to arbitration. A.R.S. § 12-1502; *see also* A.R.S. §§ 12-3004, 12-3007; Civ. Proc. Code § 1280 *et seq*.

**C. Plaintiff's Claims Fall within the Scope of the Arbitration Provision**

A court must compel parties to arbitrate claims, which fall within the arbitration agreement. *See*, *e.g.*, *Green Tree Fin. Corp*., 531 U.S. at 89. By its terms, the Arbitration Provision applies to "any and all" "controversies, claims, or disputes," arising from or relating to the Option between Owners (and therefore Plaintiff) and Point. Point Decl., ¶¶ 4-6. Here, Plaintiff's three causes of action in the Complaint fall squarely within the scope of the Arbitration Provision, as they each relate to and challenge the Option. Specifically, Plaintiff's first cause of action alleges that the Option is procedurally and substantively unconscionable on the basis that it contains misleading information, fails to disclose certain future costs, and contains terms which, according to Plaintiff, are substantively unfair. Compl. ¶¶ 37-47. In his second cause of action for consumer fraud, Plaintiff alleges the Option contains specific terms which are misleading in false. *Id.* ¶¶ 48-53. Lastly, in Plaintiff's third cause of action, Plaintiff alleges that the Option constitutes a "residential mortgage loan" under TILA and fails to comply with specific disclosure requirements under the statute. *Id.* ¶¶ 54-59. Accordingly, each of Plaintiff's claims are "controversies, claims, or disputes" under the Arbitration Provision as they are claims under state and federal law "arising out of, relating to, or resulting from [the Option]." *See* Point Decl., ¶¶ 4-6. The

operative language of this provision—'relating to'—is similar to language described by California courts as indicating a broad arbitration clause. *Larkin v. Williams, Woolley, Cogswell, Nakazaw & Russell*, 76 Cal.App.4th 227, 229-30 (1999) (finding an arbitration clause extending to "any controversy or claim arising out of or relating to" an agreement to be "very broad"); *see also EFund Cap. Partners v. Pless*, 150 Cal.App.4th 1311, 1322 (2007) ("Plaintiff's agreement to arbitrate '[a]ny dispute or other disagreement'...is plain, clear, and very broad...The language '[a]ny dispute or other disagreement' extends beyond contract claims to encompass tort causes of action."). Thus, the claims asserted by Plaintiff, on behalf of the Estate, fall within the scope of the Arbitration Provision and thus are subject to arbitration. *See Coast Plaza Doctors Hosp.*, 83 Cal.App.4th at 684, 686-87 (citations omitted) (finding arbitration clause extending to "any problem or dispute" to be "very broad" and if there is any reasonable doubt as to whether claims come within the clause, "that doubt must be resolved in favor of arbitration, not against it").

**D. This Action Should Be Dismissed or, Alternatively, Stayed Pending Arbitration**

In addition to moving to compel arbitration, Point moves for dismissal or, alternatively, a stay of the proceedings pending completion of arbitration. This court has discretion to order dismissal without prejudice in lieu of a stay, and a dismissal is proper, where all issues raised in the Complaint must be submitted to arbitration. *See Moses H. Cone*, 460 U.S. at 26-28 (finding no substantive distinction between a stay and a dismissal without prejudice). Alternatively, once the Court is satisfied that the matter can be arbitrated, the FAA provides that it "shall on application of one of the parties, stay the trial of the action." 9 U.S.C. § 3; *Moses H. Cone*, 460 U.S. at 26 ("[S]tate courts, as much as federal courts, are

obligated to grant stays of litigation under § 3 of the [FAA]."). Both Arizona and California law empower courts to stay proceedings pending arbitration. 9 U.S.C. § 3; A.R.S. § 12-1502(D) ("Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section."); A.R.S. § 12-3007(E) ("If the court orders arbitration, the court on just terms shall stay any judicial proceeding that involves a claim subject to the arbitration."); *see also* Code Civ. Proc § 1281.4 ("the court in which [an] action or proceeding is pending shall, upon a motion of a party to such action or proceeding, stay the action or proceeding until the application for an order to arbitrate is determined and, if arbitration of such controversy is ordered, until an arbitration is had in accordance with the order to arbitrate or until such earlier time as the court specifies."); *see AF Sterling Homebuilders, LTD v. Fourth St. Guys, L.L.C*, 2009 Ariz. Super. LEXIS 1615, *6 (compelling arbitration and staying the case pending arbitration).

The purpose of such a stay is to prevent the parties from having to litigate their dispute in two different forums at the same time. *See Marcus v. Superior Ct*., 75 Cal.App.3d 204, 211 (1977). Moreover, "the continuation of the proceedings in the trial court disrupts the arbitration proceedings and can render them ineffective," a result expressly disfavored by the California *Supreme Court. Cruz v. PacifiCare Health Sys., Inc*., 30 Cal.4th 303, 320 (2003). Accordingly, because all of Plaintiff's cause of action fall within the scope of a valid Arbitration Provision, Point respectfully requests a stay of any further litigation pending completion of arbitration.

## IV. CONCLUSION

For the foregoing reasons, Point respectfully requests that the Court enter an order compelling Plaintiff to arbitrate his claims set forth in the Complaint and staying all further proceedings in the interim against Point, as well as entering such further relief as the Court deems just proper and necessary.

KLINEDINST PC

DATED: September 22, 2025

By: ______________________

C. Nicole Pelcic
*Attorney for Defendant*, *Point Digital Finance, Inc.*

Andrew Rahtz, Bar No. 026151
Blake A. Bracht, Bar No. 037886
**PLATT & WESTBY, P.C.**
2916 N. Seventh Avenue, Suite 100
Phoenix, Arizona 85013
Telephone: 602-277-4441
courtemails@plattwestby.com
*Attorneys for Plaintiff*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>vs.<br><br>POINT DIGITAL FINANCE, INC.,<br><br>Defendant. | Case No.: CV2025-024855<br><br>**REPONSE TO MOTION TO COMPEL ARBITRATION** |

Plaintiff Steven Muskal, by and through undersigned counsel, hereby responds to Defendant Point Digital Finance's Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings ("Motion to Compel"). Defendant's Motion must be denied. Defendant spends its entire Motion discussing the California Arbitration Act, the Arizona Revised Uniform Arbitration Act, and the Federal Arbitration Act as if those form the relevant bodies of law to the analysis of its Motion. In fact, Defendant has failed to inform the Court of, or discuss in any way, the relevant authority that defeats arbitration in this case: "No residential mortgage loan . . . may include terms which require arbitration or any other nonjudicial procedure as the motion for resolving any controversy or settling any claims

arising out of the transaction." 15 U.S.C. § 1639c(e)(1). Defendant's product is a residential mortgage loan under the Truth in Lending Act, and the arbitration provision is therefore invalid on its face. Because the arbitration provision is directly prohibited by federal law, Defendant's Motion must be denied. This Response is supported by the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

This matter arises out of a relatively new financial product, a "home equity investment" product or "HEI." Defendant, Point Digital Finance, Inc. ("Defendant") offers these products across the United States and in Arizona. This suit involves one such product, which Defendant and James B. Muskal ("Decedent") (along Decedent's spouse, Cheryl, who pre-deceased Decedent) entered into on or about July 15, 2024.

HEIs are a relatively new product on the market and is offered by Defendant and other lenders. *See* Jennifer Wagner, "Courts Expose Deception of Home Equity 'Investments,'" National Consumer Law Center, August 15, 2025 https://library.nclc.org/article/courts-expose-deception-home-equity-investments (last accessed October 13, 2025). Typically, lenders offer an up-front cash payment in exchange for a percentage of either the future full value of a home or a percentage of the future appreciation of the home. *Id.* Lenders characterize the product as an "option," advertise that there is no interest and no monthly payments, and claim that they risk the loss of their initial investment. *Id.* However, lenders structure the products in such a way that they are nearly guaranteed to turn a profit and will, as a functional matter, *always*

redeem their rights under the product. *Id.* Making matters worse, these products are secured by a lien on the collateral property (or, as here, a deed of trust) that allows the lender to engage in non-judicial foreclosure to ensure repayment.

Defendant's Motion is little more than a distraction from the relevant issues in this case. Defendant would have the Court believe that this matter is a routine question of arbitration and public policy in favor of arbitration. Nothing could be further from the truth. In fact, the central question to whether arbitration may be compelled in this case is whether or not Defendant's product is a residential mortgage loan, for which arbitration provisions are expressly unenforceable under federal law. Why does Defendant avoid the issue entirely? Quite simply, because suits regarding similar products are beginning to make their way through the courts all over the country, and things are not going well for home equity investment products such as Defendant's. Instead, Defendant hopes that the Court will focus on routine legal issues such as arbitration, thereby implicitly dismissing Truth in Lending Act claims without engaging in the substantive issues and simultaneously sending litigation to a more favorable forum. The Court must not fall for the smoke and mirrors of Defendant's arbitration arguments. Arizona consumers, particularly elderly homeowners, need protection from predatory products such as Defendant's.

## II. LEGAL ARGUMENT

### A. Defendant's product is a residential mortgage loan under the TILA.

The Truth in Lending Act (TILA) defines a "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage, deed of trust, ... or other equivalent

consensual security interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602(dd)(5). It is not disputed that Defendant's product is secured by a deed of trust on the Property. *See* Complaint ¶ 12; *see also* Motion to Compel at 3. Therefore, if Defendant's product is also a "consumer credit transaction," then it is a "residential mortgage loan" for purposes of the TILA. "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f). "Consumer," in the context of a credit transaction, is one where "the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id.* § 1602(i). Clearly, the deceased was a natural person, and the subject credit was extended for personal, family, or household purposes. Therefore, the sole relevant issue is whether Defendant's product is "credit."

"Credit," once again, is defined by the TILA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f). "Debt" is not defined in the TILA. In the absence of a statutory definition, courts must apply the plain meaning of the statutory language and may look to the dictionary definition of terms used in a statute. *Garibay v. Johnson in and for County of Pima*, 259 Ariz. 248, ¶ 24 (2025); *see generally Sackett v. Environmental Protection Agency*, 598 U.S. 651, 718 (Kavanaugh, J. concurring in judgment) (utilizing various editions of Black's Law Dictionary to evaluate definition of undefined term). Black's Law Dictionary defines "debt" as "liability on a claim; a specific sum of money due by agreement or otherwise." Debt, *Black's Law Dictionary* (12th

ed. 2024). Other dictionaries have similar definitions: "Something owed." Debt, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/debt. "Something, especially money, that is owed to someone else, or the state of owing something." Debt, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/debt. Black's also includes a term for "contingent debt," which is "a debt that is not presently fixed but that may become fixed in the future with the occurrence of some event." Contingent Debt, *Black's Law Dictionary* (12th ed. 2024). In addition, as a remedial statute, definitions in the TILA must be construed "liberally in favor of the consumer." *See Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009).

Here, clearly, Defendant's product involves incurring debt, then Defendant deferring payment of that debt until a later date. In this case, Defendant provided Decedent with a cash advance of $210,000 following execution of the written agreement on or about July 15, 2025. *See* Declaration of Kevin Gallagher in Support of Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration (hereinafter, "Gallagher Declaration") ¶ 4. As a functional matter, that initial payment will always be paid back to Defendant, with significant additional charges. Plaintiff discusses the nature of this in detail in the Complaint at Paragraphs 13-27. Because the initial cash advance will essentially always be returned to Defendant upon a payment event, along with substantial other charges that are statistically near-certain to outpace the rate of interest for other available mortgage products, Defendant's product clearly satisfies the definition of a "debt," and is therefore "credit" within the meaning of the TILA. Even Defendant's own description of exiting its product implies that it is a debt. In the "About

My Point Agreement" document attached to Defendant's contract, Defendant describes the act of exiting its product as "repay[ing] Point." Gallagher Declaration, Exhibit A, p. 1-2.

As Defendant's product meets the statutory definition of a "residential mortgage loan" under the TILA, federal law prohibits the very arbitration provision upon which Defendant's Motion relies upon. *See* 15 U.S.C. § 1639c(e)(1).

**B. Courts nationwide have rejected arguments that similar products are "options" and therefore excluded from the TILA.**

Throughout the Motion, the Gallagher Affidavit, and likely in the coming Reply, Defendant claims that its product is not a loan at all, but rather an "option." Again, why take this position? Because options are not typically considered debts pursuant to agency comments on regulations promulgated under the TILA:

> 1. Exclusions. The following situations are not considered credit for purposes of the regulation:
>
> ****
>
> vii. The execution of option contracts. However, there may be an extension of credit when the option is exercised, if there is an agreement at that time to defer payment of a debt.
>
> viii. Investment plans in which the party extending capital to the consumer risks the loss of the capital advanced. This included, for example, an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value.

12 C.F.R. Pt. 1026, Supp. 1, Subpt. A at cmt. 2(a)(14)(1)(vii), (viii).

Defendant will argue, just as other companies who sell similar products have argued,

that their product meets the definition of an "option" or "investment plan," and are therefore not debt. This is, quite simply, not true. In arguing that its product is indeed an "option," Defendant will likely argue that it bears the risk of loss of its initial investment if the value of the Property ultimately decreased over the 30-year term of its product, and that it had the right, but not necessarily the obligation, to exercise its "option." Both arguments distract from the economic reality of Defendant's product.

First, as stated in Plaintiff's Complaint, Defendant's "risk" to its initial investment is so remote that it is essentially zero, and in any case, no more risky than a conventional mortgage. In Defendant's product, its initial investment is not based upon the actual fair market value of the underlying property, but rather on a substantially discounted value. The "Appreciation Starting Value" utilized in Defendant's product is discounted a staggering **27%** from the property's actual fair market value. Gallagher Declaration, Exhibit A, p. 1-2. In effect, this means that Defendant only stands to *lose* money if the value of the underlying property were to plummet by more than 27%. Since data has been recorded, the only time such a dramatic price drop has occurred in the Phoenix metro area was during the Great Recession housing crisis from its peak in Q4 2006 at a home price index of $292,480 to its lowest in Q2 2011 at $142,920. *See All-Transactions House Price Index for Phoenix-Mesa-Chandler, AZ*, Federal Reserve Bank of St. Louis https://fred.stlouisfed.org/series/ATNHPIUS38060Q (last accessed October 13, 2025). With that sole exception, the home price index in the Phoenix area has *never* exceeded a 10% drop from peak to valley, even in other recession scenarios. *Id.* In short, Defendant's initial

investment is only at risk if the housing market experiences another generation-defining crash.

Second, even if Defendant stands to lose money, however, the underlying product's formula is such that Defendant will *always* exercise its "option," even if only to mitigate its losses. In order for it to be rational for Defendant to decline to exercise its "option," the underlying value of the home would need to drop below the balance of the first priority mortgage or, in the case where there is no first priority mortgage, would need to plummet below the "option consideration" for the contract, here below 34.5% of the *already-discounted* Appreciation Starting Value. This fails to differentiate Defendant's product from any other non-recourse secondary mortgage, which also stands to lose its investment if the collateral property sells for less than the balance of the first-priority mortgage. The economic reality of Defendant's product differentiates itself from a typical option, where the holder has actual loss exposure if the underlying product does not appreciate from its fair market value.

In fact, Defendant has *less* risk than most mortgages. In a conventional mortgage where the buyer puts 20% down (already a rarity in today's market), the value of the collateral must drop by 20% before the lender's principal is at risk. Here, Defendant is only exposed to downside risk if prices drop 27% from current fair market value *and* the borrower decides to sell, all while putting up substantially less initial capital than a mortgage lender.

Likewise, Plaintiff intends to show in discovery that, among other disturbing effects of Defendant's product, Defendant has a profit incentive to solicit refinances from its customers after relatively short periods of time due to the effect of its discounted Appreciation Starting

Value and its misleadingly-labeled Homeowner Protection Cap. Because the Homeowner Protection Cap functions as compound interest, the practical effect is that if the borrower refinances Defendant's product within 18 months (assuming that the underlying fair market value of the collateral has not changed) the borrower has done nothing more than borrowed the initial cash investment (here $210,000) at a high rate of compound interest (here 19%). This is because in this time period, the "cap" calculated by compound interest at near credit card rates, has not yet exceeded the 27% discount applied against the underlying property value at the outset. It is therefore in Defendant's financial interest to solicit refinances, which Defendant calls "Re-Points," whereby the unwitting customer borrows even more to pay off the underlying debt and receives additional cash under the false guise of accessing more of the home's equity, only for the clock to restart on Defendant's Homeowner Protection Cap. This has the effect of taking out yet another loan, often for significant figures, at rates otherwise only seen with credit card cash advances.

Courts nationwide are wising up to the practical effect of products like Defendant's. The Ninth Circuit Court of Appeals released an unpublished decision on August 7, 2025, in *Olson v. Unison Agreement Corporation*, holding that the practical effect of a very similar product to Defendant's here was that of a mortgage under Washington law. 2025 WL 2254522 (9th Cir. 2025). In that case, the Ninth Circuit did not directly address whether the product was a mortgage under the Truth In Lending Act because no TILA claim was brought by the plaintiff, it addressed the very same definitions of "credit" and "debt" applicable to analysis under the TILA. *Id.* Likewise, it noted that regardless of the nominal presence of an

"option" within the product at issue, the structure of the obligation rendered it such that the option will essentially always have marginal value even in the case of a severe market crash, rendering the product no different than a non-recourse mortgage. *Id.* The product in *Olson* nearly identical to the product at issue in this case.

Likewise, the Massachusetts Attorney General is presently pursuing litigation against another HEI lender, Hometap Equity Partners, L.L.C. In that action, a Massachusetts Superior Court judge denied Hometap's motion to dismiss, finding that at the pleading stage the Commonwealth had adequately pleaded claims that Hometap's products within the State of Massachusetts constitute unlawful mortgage loans, violate criminal usury statutes, are marketed deceptively, fail to include state and federal loan disclosures (including TILA disclosures), and are unfair, oppressive or otherwise unconscionable products under Massachusetts law. *Massachusetts v. Hometap Equity Partners, LLC, et al.*, 2025 WL 2468564 (Mass. Super. Ct. Aug. 21, 2025). Just as in *Olson*, the products at issue are extremely similar to the product at issue in this case.

Still again, in a Chapter 13 bankruptcy case, the United States Bankruptcy Court for the District of Colorado denied a motion to dismiss in an adversarial proceeding brought against Unison Agreement Corporation, the same lender as in *Olson* and again regarding a nearly identical product as at issue here, holding that the debtor adequately stated claims that Unison's product, among other things, is unconscionable, violates the Colorado Consumer Protection Act, and violates Colorado mortgage statutes. *In re Stone*, 671 B.R. 752, 2025 WL 2222829 (Bankr. D. Colo. July 30, 2025).

Another case, which undersigned counsel is following closely, is currently pending in the District of New Jersey involving another extremely similar product by another HEI lender, Unlock Partnership Solutions. *See Roberts v. Unlock Partnership Solutions, et al.*, case no. 24-cv-01374-CPO-AMD. That case, which does directly allege TILA violations, is presently awaiting a decision on Unlock's Motion to Compel Arbitration, which presents essentially identical issues as those before this Court.

Courts across the country are recognizing products like Defendant's for what they are: predatory, deceptively marketed, and usurious loans. This Court should join them.

## III. CONCLUSION

Defendant's Motion should be denied. It is clear that federal law prohibits mandatory arbitration in cases involving residential mortgages. 15 U.S.C. § 1639c(e)(1). Here, Defendant's product squarely meets the definition of a residential mortgage. Despite Defendant's likely protests, courts nationwide agree: HEIs are debt. HEIs are mortgages. Attempts like Defendant's to create a product that circumvents the requirements of the TILA cannot defeat federal law by asking courts to place form over substance. This Court must therefore deny Defendant's Motion and make them defend their fraudulent and predatory product in open court, where it belongs.

**DATED** this 13th day of October, 2025.

**PLATT & WESTBY, P.C.**

*/s/ Blake A. Bracht*

Blake A. Bracht
*Attorney for Plaintiff*

Copy of the foregoing electronically
filed this 13th day of October, 2025 with:

Clerk of the Superior Court
Maricopa County, Arizona

COPY of the foregoing sent via mail
this 13th day of October, 2025 to:

C. Nicole Pelic
Klinedinst PC
npelcic@klinedinstlaw.com
*Attorney for Point Digital Finance, Inc.*

By: AMA

**Klinedinst PC**
Nicole Pelcic
NPelcic@KlinedinstLaw.com
2701 E Camelback Road, Suite 150
Phoenix, AZ 85016-4324
Telephone: (602) 813-0000

*Attorney for Defendant*
*Point Digital Finance, Inc.*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>vs.<br><br>POINT DIGITAL FINANCE, INC.,<br><br>Defendants. | CASE NO. CV2025-024855<br><br>**DEFENDANT POINT DIGITAL FINANCE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT, OR ALTERNATIVELY, STAY PROCEEDINGS** |

## I. INTRODUCTION

Plaintiff's[1] opposition to Defendant Point Digital Finance, Inc.'s ("Point") motion to compel arbitration does not dispute the fact that an agreement to arbitrate exists, which obligates Plaintiff to arbitrate any and all claims arising out of, or relating to, the underlying Point Digital Finance Option Purchase Agreement (the "Option") entered into by James B. Muskal and Cheryl C. Collins-Muskal (collectively, "Owners"). In opposition, Plaintiff argues the court should look past the parties' governing agreement to arbitrate, which

[1] Steven Muskal's, as Independent Administrator of the Estate of James B. Muskal ("Plaintiff").

EXHIBIT D

Plaintiff characterizes as a "distraction," because option contracts like Point's constitute a "residential mortgage loan" under the Truth in Lending Act ("TILA"). On that basis, Plaintiff argues the arbitration provision contained in the Option is invalid under federal law. But Plaintiff introduces no binding authority for his unfounded position, and instead, relies on *non-precedential*, *unpublished*, and *irrelevant* case law as a last-ditched attempt to avoid arbitration. Plaintiff's argument, however, is misplaced as applicable state and federal law consistently hold that an option contract or investment plan, like Point's product, do not meet the definition of a loan or credit.

Moreover, the arbitrator—not the court—must decide the issue. The claim indisputably arises out of and relates to the Option, and therefore falls squarely within the scope of the arbitration agreement. Given Plaintiff's complaint raises this very claim—that Point violated TILA by failing to comply with specific disclosure requirements—Plaintiff's opposition is nothing more than a misguided attempt to obtain a ruling on the merits of his claims, which is improper at this stage. The applicable arbitration agreement, which Owners undisputedly executed, expressly compels Plaintiff's claims to arbitration and Plaintiff's opposition does not change this analysis. The only step required by the court is determining whether a valid agreement to arbitrate exists and, if so, whether the agreement encompasses Plaintiff's dispute. Since Point's motion establishes both requirements are met, this Court should reject Plaintiff's arguments and grant Point's motion to compel arbitration, dismiss the complaint, or, alternatively, stay the proceedings until the completion of the arbitration.

## II. LEGAL ARGUMENT

### A. The Arbitration Provision is Valid and Enforceable and Plaintiff's Claims Fall Within its Scope

As set forth in Point's motion to compel arbitration, there is no dispute that Owners and Point entered into the Option, which contained a valid and enforceable arbitration provision. Decl. of K. Gallagher ("Point Decl.") ¶ 4, Ex. A (Option). By signing the Option, Owners received, understood, and agreed to its terms, including agreeing to arbitrate "any and all…controversies, claims, or disputes," arising from or relating to the Option between Owners (and therefore Plaintiff) and Point. Point Decl., ¶¶ 4-6. Thus, there is no question that Plaintiff's three causes of action fall squarely within the scope of the arbitration provision. Compl. ¶¶ 37-59. As a result, this court must compel Plaintiff's claims to arbitration.

Plaintiff does not dispute the fact that the written arbitration provision requires arbitration of his claims. Instead, Plaintiff argues arbitration is generally prohibited on the basis that Point's product constitutes a "residential mortgage loan" under TILA, for which arbitration clauses are prohibited. Plaintiff's Response to Motion to Compel Arbitration ("Opp."), p. 6. But Plaintiff's argument is flawed. First, as explained in greater detail below, there is no legal or factual support for Plaintiff's conclusion that Point's product meets the definition of a "residential mortgage loan" under TILA, especially considering courts routinely hold that similar products are <u>not</u> governed by TILA. Second, Owners undisputedly proceeded with entering into the Option for which they received $210,000 in consideration (the "Investment Amount"). Point Decl. ¶¶ 4, 6. Plaintiff does not deny that Owners were presented with the Option, which contained the arbitration provision, and all

other supporting documents, and nonetheless signed the Option and consented to the terms contained within it—including the agreement to arbitrate all claims related to the Option. Plaintiff therefore has not, and cannot, meet his burden to show otherwise.

## B. The Option is Not Subject to TILA as it Does Not Meet the Definition of Credit

Plaintiff primarily argues that Point's product is a "residential mortgage loan" under TILA, and therefore, the arbitration provision in the Option is prohibited under 15 U.S.C. § 1639c(e)(1). Opp., pp. 3-6. Yet, the law is clear that option contracts and/or investment plans, like Point's product, are excluded from the definition of "credit" and therefore do not meet definition of a "residential mortgage loan" under TILA. In other words, since Point's product is not governed by TILA, any prohibition imposed by 15 U.S.C. § 1639c(e)(1) does not apply.

### 1. The Option Is Not a "Residential Mortgage Loan" Under TILA or Arizona Law

TILA, implemented through Reg Z, applies to "credit," which is "right to defer payment of debt" or to "incur debt and defer its payment." 12 C.F.R §§ 226.1(e), 226.2(a)(14); 15 U.S.C. § 1602(f). In other words, if "credit" exists then a "debt" must exist. While Reg Z does not define "debt,"[2] Official Staff Commentary to Reg Z (the "Commentary") states that neither "investment plan[s]" nor "option contracts" constitute "credit." 12 C.F.R. 1026.2, Supp. I cmt. 2(a)(14)(1)(vii), (viii).[3] By way of example, the

---

[2] Undefined terms, like "debt" or "loan," have "meanings given to them by state law or contract." 12 C.F.R. § 1026.2(b)(3); *see Billings v. Propel Fin. Servs*., 821 F.3d 608, 610 (5th Cir. 2016) ("TILA does not define the term "debt," and thus takes on the definition given to it by state law."). Under Arizona law, a loan is a generally defined as a "sum of money lent at interest." *Blue Sky Int'l, Inc. v. Grand Canyon Educ*., Inc., 2013 WL 5745373, at *2 (Ariz. Ct. App. Oct. 22, 2013) (citing Webster's II New College Dictionary 271, 658 (3rd ed. 2005)).

[3] *See Ford Motor Credit v. Milhollin*, 444 U.S. 555, 565 (1980) (unless demonstrably irrational, Federal Reserve Board staff opinions construing TILA are dispositive).

Commentary excludes an investment plan with a home purchaser where the investor pays a portion of the down payment and mortgage payments in return for an ownership interest, and shares in any gain or loss of property value. *Id.* Likewise, Black's Law Dictionary provides that the term "debt" represents a "liability" or "a specific sum of money due by agreement." Debt, BLACK'S LAW DICTIONARY (12th ed. 2024). While TILA defines "credit" effectively as an agreement where one receives money from another and agrees to pay it back, there is no such agreement here.

Here the Option does not create a "debt," as Owners are not liable for a specific sum of money and have no obligation to repay the $210,000 Investment Amount. Point Decl. ¶¶ 4, 8, Ex. B (Deed of Trust) § 2(b) ("Owner shall not be obligated to repay any part of the Investment Amount (as such term is defined in the Option [])"). Likewise, Point is not required to exercise the Option. *See Andrews v. Blake*, 205 Ariz. 236, 243 (2003) ("Generally, Arizona courts have strictly construed options….because such provisions allow the optionee freedom to exercise or not exercise the option, whereas the optionor is bound by the option."); *see also Mack v. Coker*, 22 Ariz. App. 105, 108 (1974) (holding the upon the *exercise* of the option created a bilateral contract); Point Decl. ¶ 4, Ex. A (Option) §§ 2.1, 2.2, 2.3 ("If you do not elect to repurchase Option, then we shall have the right, *but not the obligation*, to exercise the Option…") (emph. added). In other words, Point is permitted, but is not obligated, to exercise the Option. Point paid Owners $210,000 in consideration for that choice and the Option itself confers no unconditional right for Point to recover the Investment Amount. Point Decl. ¶¶ 4, 8, Ex. B (Deed of Trust) § 2(b) ("Owner shall not be obligated to repay any part of the Investment Amount (as such term is defined in the Option

[])"). Rather, the Option provides Point with an option to participate in the property's future appreciation, *if any*. *Id.*, ¶ 4, Ex. A (Option) § 2(b) ("[Owners] agree to sell to [Point] an exclusive and irrevocable option [] to purchase an undivided interest of fee simple title ownership [] in and to the Property in exchange for our agreement to pay you the Investment Amount."). The Option contains no absolute repayment obligations and are wholly contingent on the success of the real estate market. *Id.*, ¶ 4, Ex. A (Option) § Schedule 2; *see Seargeant v. Smith*, 63 Ariz. 466, 468-69 (1945) (acknowledging the general rule that when determining whether a transaction is a loan and therefore usurious, a court must determine, among other things, whether the "sum loaned must be absolutely, not contingently, repayable[.]"). In other words, if the Property fails to appreciate, and Point exercised the Option, which it has not done,[4] Point would realize no benefit and lose money, a fact Plaintiff concedes in his opposition. Opp., p. 7 (admitting Point "stands to lose money" if the property value drops by a certain threshold), pp. 7-8 ("Defendant's initial investment is only at risk if the housing market experiences another generation-defining crash"), p. 8 (admitting Point is "exposed to downside risk under the Option). Thus, Point acts as an investor and risks the loss of its Investment Amount and shares only in any gain or loss. Without a required repayment, the Option does not constitute "credit" under TILA.

While Plaintiff's opposition argues that a number of inapplicable, unpublished, and out-of-jurisdiction cases bear relevance, he omits the directly relevant cases which analyzed this exact legal question and held that similar transactions involving an option to participate

[4] Plaintiff's opposition also omits that since filing his complaint the property was sold to a third-party and Plaintiff settled the Option with Point thereby rendering his claims moot.

in the appreciation of property is "not a loan" or "credit" under TILA. *Foster v. EquityKey Real Est. Invs*., 2017 WL 1862527, at *4 (N.D. Cal. 2017). In *Foster*, EquityKey paid the plaintiff $196,000 to purchase an option to participate in the property's appreciation, which was secured by a deed of trust securing performance obligations. *Id*. at *1-2. The plaintiff sued under TILA, arguing EquityKey fraudulently concealed the agreement was a loan, but the court disagreed and focused on the fact that plaintiff owes no debt and "there [was] no guarantee that the payment received by [plaintiff] need ever be returned," considering that EquityKey "[was] not obliged to exercise its option." *Id*. at *4-5. Because plaintiff "did not agree to 'repay absolutely,'" the option was "not a loan." *Id*. (quoting *In re Grand Union Co*., 219 F.353, 356 (2d Cir. 1914));[5] *see also Goldwater Bank, N.A. v. Elizarov*, et al., 5:21−cv−00616−JWH−SPx (C.D. Cal. 2022) (rejecting argument that an option contract was a "loan" and relying on *Foster* to hold the product "made clear that Option Agreement was not a loan"). The rationale supporting *Foster* applies here. First, the Commentary expressly excludes an "option" and "investment plan" from "credit." 12 C.F.R. 1026.2, Supp. I cmt. 2(a)(14)(1)(vii), (viii); *Foster*, 2017 WL 1862527, at *5. Even if it were not excluded, like *Foster*, the Option contains no element of credit as it does not require repayment, since Point is not required to exercise the Option. *See Blake*, 205 Ariz. at 24; *Coker*, 22 Ariz. App. at 108; Point Decl. ¶ 4, Ex. A (Option) §§ 2.1, 2.2, 2.3 ("If you do not elect to repurchase Option, then we shall have the right, *but not the obligation*, to exercise the Option…") (emph. added). Additionally, as demonstrated above, Point has no unconditional right to

---

[5] The court also reasoned the transaction shares features of an "investment plan" as described in the Commentary, which is similarly excluded from the definition of "credit." *Id*. at *5. The court held that EquityKey "risked the loss of the capital it advanced," since a decrease in home values could cause it to lose money on the transaction. *Id*.

recover the Investment Amount made to Owners. *Id.*, ¶ 4, Ex. A (Option) § Schedule 2, ¶ 8, Ex. B (Deed of Trust) § 2(b) ("Owner shall not be obligated to repay any part of the Investment Amount (as such term is defined in the Option [])"). Like the defendant in *Foster*, Point bears the risk of loss if the property fails to appreciate or appreciates at a slower rate than inflation.[6]

Arizona law follows the same rationale. While many Arizona statutes do not define the terms "loan" or "mortgage loan" [*see*, *e.g.*, Ariz. Rev. Stat. § 6-901(12)], courts define the term "loan" to ordinarily mean "[a] sum of money lent at interest." *Blue Sky Int'l, Inc. v. Grand Canyon Educ., Inc.*, 2013 WL 5745373, at *2 (Ariz. Ct. App. Oct. 22, 2013) (citing Webster's II New College Dictionary 271, 658 (3rd ed. 2005)); *Goetz v. Phillips*, 2 Ariz. App. 370, 373 (1965) ("A loan…is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use."). Other provisions of Arizona law are in accord. *See*, *e.g.*, Ariz. Rev. Stat. § 20-1603(9) (defining "loan" as an "an advance or commitment of certain funds pursuant to a repayment agreement.").[7]

Accordingly, Plaintiff's argument that the Option constitutes a "residential mortgage loan" under TILA is not grounds for this Court to deny Point's motion to compel arbitration,

[6] *Foster*, at *5 ("EquityKey is not obliged to exercise its option. If home prices decrease, it would have little reason to do so. If home values increase, but at a rate that is slower than inflation (or at a slower rate than the rate of return one could receive from a prudent investment of the option premium), then even if EquityKey calls the option, it would ultimately lose money on the deal.").

[7] Plaintiff's opposition offers no Arizona legal authority for the proposition that Point's product meets the definition of "credit" or a "loan" under Arizona law. *See generally* Opp. Instead, Plaintiff relies on *Garibay v. Johnson*, 565 P.3d 236, 244 (Ariz. 2025) for the proposition that the Court may consult with legal dictionaries when analyzing such terms. Opp., p. 4. However, as set forth herein, the legal definitions of "debt" and "credit" under legal dictionaries do nothing to support Plaintiff's theory. *See supra*.

particularly when Plaintiff's claims fall squarely within the scope of the valid and enforceable arbitration provision that Owners undisputably signed.

### 2. Plaintiff's Non-Binding Out-of-State Authority Has No Relevance to this Action

In his opposition, Plaintiff argues that courts around the nation purportedly analyzing similar products and recognize products like Point's are "predatory, deceptively marketed, and usurious loans," which warrants this Court to join them and reject the argument that an option contract is excluded from the definition of "credit" under TILA. Opp., pp. 6-11.[8] In support, Plaintiff relies on four out-of-jurisdiction cases—none of which bear relevance to the adjudication of Point's motion to compel arbitration or support Plaintiff's arguments made in opposition.

Plaintiff first attempts to rely on the *unpublished* memorandum opinion issued by the Ninth Circuit in *Olson v. Unison Agreement Corp.,* 2025 U.S. App. LEXIS 19947 (9th Cir. 2025) by arguing the court "addressed the very same definitions of 'credit' and 'debt' applicable to analysis under the TILA," and since Point's product is "nearly identical" to the product in *Olson*, this Court should hold that Point's product meets the definition of a "residential mortgage loan" under TILA. Opp., pp. 9-10. The *Olson* court, however, analyzed a claim under the Washington Consumer Loan Act, based on the definition of "reverse mortgage loan" and "credit" under Washington state law, and not any claim under TILA. 2025 U.S. App. LEXIS 19947, at *9 (relying on Washington state law to interpret the

[8] Notably, however, Plaintiff's complaint does not allege or bring claims relating to any purported "predatory, deceptively marketed, and usurious loans," and therefore Plaintiff's arguments in support of reliance on these cases is misguided from the start. *See generally* Compl.

definition of "credit"). Plaintiff concedes as much by admitting *Olson* "did not directly address whether the product was a mortgage under the Truth in Lending Act because no TILA was brought by the plaintiff." *Id.*, p. 9. For these reasons, the unreported and non-precedential opinion in *Olson* does nothing to support Plaintiff's conclusion that Point's product is a "residential mortgage loan" under TILA.

Plaintiff next relies on another out-of-state case with even less relevance to the case at hand—*Massachusetts v. Hometap Equity Partners, LLC*, 2025 WL 2468564 (Mass. Super. Ct. Aug. 21, 2025)—which Plaintiff claims involved claims involving a similar home equity investment company. Opp., p. 10. Plaintiff's reliance on *Hometap* is misplaced. First, the *Hometap* court merely *denied* a defendant's motion to dismiss at the pleading stage, and thus nothing in that ruling support Plaintiff's contention that his claims should not be compelled to arbitration. Nor is there anything in the court's ruling in *Hometap* that remotely stands for Plaintiff's misconstrued proposition that option contracts and/or investment plans conclusively meet the definition of a "residential mortgage loan" under TILA. For example, the *Hometap* court addressed whether the Commonwealth sufficiently alleged, *at the pleading stage*, whether the product was a "loan" *under Massachusetts state law*—and not, as Plaintiff suggests, whether it met the definition of a "residential mortgage loan" under TILA or was excluded from the definition of "credit" as an "option contract" or "investment plan." *See generally Hometap*, 2025 WL 2468564. Since the *Hometap* court analyzed a *different* product, *different* laws, in a *different* jurisdiction, Plaintiff's reliance on this non-precedential decision goes nowhere.

In another attempt to rely on an out-of-state order on a motion to dismiss, Plaintiff cites *Stone v. Real Est. Equity Exch., Inc. (In re Stone)*, 671 B.R. 752 (Bankr. D. Colo. 2025) a decision in the U.S. Bankruptcy Court for the District of Colorado which purportedly held that the plaintiff adequately stated claims related to Colorado Consumer Protection Act and Colorado mortgage statutes. Opp., p. 10. Like before, however, Plaintiff makes no attempt to explain how a non-precedential, out-of-court order on a motion to dismiss has relevance to the crux of Plaintiff's argument—whether this Court is precluded from compelling arbitration because Point's product meets the definition of a "residential mortgage loan" under TILA—as Plaintiff argues, without support. In fact, the *Stone* court neither analyzed nor addressed any claims under TILA because the plaintiff solely alleged violations of Colorado state laws which are materially different from TILA. *See generally* 671 B.R. 752. Plaintiff's reliance on *Stone* is therefore misplaced.

In his last attempt to conjure support for his deficient argument, Plaintiff cites *Roberts v. Unlock P'ship Sols.*, No. 1:24-cv-1374 (D.N.J. 2024), an out-of-jurisdiction case pending in the District of New Jersey. *Id.* Plaintiff concludes, without support, that *Roberts* involves an "extremely similar product" and raises "essentially identical issues as those before this Court." Opp., p. 11. Critically, however, Plaintiff admits *Roberts* has no precedential value as the court has *yet to rule on the pending pleading challenge*. Opp., p. 11 ("That case...is presently awaiting a decision on [defendant's] Motion to Compel Arbitration, which presents essentially identical issues as those before this Court."). Thus, even if the *Roberts* case were analogous, which Point maintains it is not, the court has made no any and therefore Plaintiff's reliance is futile. Regardless, the *Roberts* case analyzes entirely different issues, including

the statute of limitations applicable under TILA, a legal argument that is not at issue here. *See generally* Compl. Moreover, the product analyzed in the *Roberts* has material differences from Point's product, all of which render Plaintiff's comparison irrelevant and does overcome this Court properly compelling arbitration pursuant to the valid and enforceable arbitration provision. For example, the *Roberts* case analyzed a "forward sale and exchange agreement" (not an option contract, like here), which was subject to a 10-year term (not a 30-year term, like here) and unlike *Roberts* where the product required repayment through a percentage of the home's value or the initial payment plus 18% annual interest, Plaintiff has not, and cannot, allege any similar required repayment or required annual interest rate under Point's product. *See generally Roberts*. These factual differences confirm Point's product is distinguished from the product analyzed in *Roberts* and therefore reliance on *Roberts* has no bearing on Plaintiff's arguments in opposition to Point's motion to compel arbitration.

Since none of Plaintiff's cited authority supports the position that Point's product meets the definition of a "residential mortgage loan" under TILA, this court should decline to consider Plaintiff's authority and arguments as a means to overcome an order compelling arbitration.

///

///

///

## III. CONCLUSION

Since Point's product is not governed by TILA, and therefore the applicable arbitration provision is valid and enforceable, Point respectfully requests that the Court enter an order compelling Plaintiff to arbitrate his claims and dismissing the complaint, or in the alternative staying all further proceedings, as well as entering such further relief as the Court deems just proper and necessary.

DATED: October 27, 2025

**KLINEDINST PC**



By: ______________________

Nicole Pelcic
Klinedinst PC
2701 E Camelback Road, Suite 150
Phoenix, AZ 85016-4324
Telephone: (602) 813-0000
NPelcic@KlinedinstLaw.com

*Attorney for Defendant*
*Point Digital Finance, Inc.*

KLINEDINST PC
2701 E CAMELBACK ROAD, SUITE 150
PHOENIX, ARIZONA 85016-4324

# PROOF OF SERVICE

**Steven Muskal, et al v Point Digital Finance, Inc.**
**Case No. CV2025-024855**

**STATE OF ARIZONA, COUNTY OF MARICOPA**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Maricopa, State of Arizona. My business address is 2701 E Camelback Road, Suite 150, Phoenix, Arizona 85016-4324.

On October 21, 2025, I served true copies of the following document(s) described as **DEFENDANT POINT DIGITAL FINANCE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT, OR ALTERNATIVELY, STAY PROCEEDINGS** on the interested parties in this action as follows:

PLATT & WESTBY, P.C.
Andrew Rahtz
Blake Bracht
2916 N Seventh Avenue, Suite 100
Phoenix, AZ 85013
602-277-4441
arahtz@plattwestby.com
bbracht@plattwestby.com
courtemails@plattwestby.com
*Attorneys for Plaintiff*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address rnatera@klinedinstlaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY ELECTRONIC SERVICE:** Complying with Arizona Rules of Civil Procedure rule 5(c)(2)(E), my electronic business address is rnatera@klinedinstlaw.com and I caused such document(s) to be electronically served through the Turbo Court system for the above-entitled case to those parties on the Service List maintained on its website for this case. The file transmission was reported as complete and a copy of the Filing/Service Receipt will be maintained with the original document(s) in our office.

I declare under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct.

Executed on October 21, 2025, at Phoenix, Arizona.

[signature]

Ricquell M. Natera

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STEVEN MUSKAL,<br>Plaintiff,<br>v.<br>POINT DIGITAL FINANCE, INC.,<br>Defendant. | CASE NO. CV2025-024855 |

Phoenix, Arizona
December 17, 2025
1:59 p.m.

BEFORE THE HONORABLE JOSEPH KREAMER
SUPERIOR COURT JUDGE

TRANSCRIPT RE: ORAL ARGUMENT

Transcript prepared by:

VERBATIM REPORTING & TRANSCRIPTION, LLC

# A P P E A R A N C E S

On Behalf of the Plaintiff:

Blake A. Bracht, Esq.
2916 North 7th Avenue
Phoenix, Arizona 85013

On Behalf of the Defendant:

Collette Nicole Pelcic, Esq.
P.O. Box 25006 PMB 12089
Phoenix, Arizona 85002

P R O C E E D I N G S

THE COURT: Okay. Are you ready to go?

MR. BRACHT: Thank you, Your Honor. Yes, we are.

THE COURT: Okay. Let me let Ms. Pelcic into the courtroom virtually. Hopefully you saw my minute entry that said you could appear virtually if you wanted to.

MR. BRACHT: Yes, Your Honor, I did.

THE COURT: All right. Ms. Pelcic, can you hear me? It's Judge Kreamer.

MS. PELCIC: Yes, good afternoon, Your Honor.

THE COURT: Okay. I think we are ready to go, so I'm going to go ahead and call the case. This is CV2025-02-4855, Steven Muskal, as the Administrator of the Estate of James B. Muskal vs. Point Digital Finance, Inc. This is the time set for Oral Argument on Defendant's Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, to Stay the Proceedings. Would counsel, starting with counsel for the Plaintiff, please state their appearances.

MR. BRACHT : Thank you, Your Honor, Blake Bracht appearing for Steven Muskal. And I should notify the Court. My client informed me that he intended -- intends to attend remotely, so he may show up in the waiting room at some point.

THE COURT: And a couple things. One, after I get defense counsel's appearance, I'm going to wait a minute or two because I actually technically started a couple minutes

early. I'll see when your client, if and when he shows up trying to get into the meeting, and I can let them in.

MR. BRACHT: Thank you, Your Honor.

THE COURT: All right. Counsel for the Defendant?

MS. PELCIC: Yes, Your Honor. Nicole Pelcic, appearing on behalf of Defendant Point Digital Finance.

THE COURT: Good afternoon. I'll -- let me make a record first. Ms. Pelcic filed a motion to be permitted to appear virtually today. I granted that motion. As part of granting that motion, I indicated that if Plaintiff's counsel wanted to appear virtually, he could also. And Mr. Bracht's here, and Mr. Muskal is right on time, so I'm going to let him in.

Good afternoon, this is Judge Kreamer. I just admitted, I think, Mr. Muskal into the courtroom virtually. Good afternoon. I just called the case. You've missed nothing. The lawyers just introduced themselves, and we're ready to go forward. So as I said, we're here on Defendant's Motion to Compel Arbitration and to Dismiss the Complaint, or Alternatively, to Stay the Proceedings. That was filed on September 22nd. Plaintiff's response was filed on October 13th, and Defendant's reply was filed on October 21st. I've obviously read the motion, the response and the reply, the documents attached as well. And I've read not every single case that was cited, but I've read some cases as well.

Let me talk to you first about how I conduct oral argument. My style of conducting oral argument is not simply to ask parties to tell me what they want to tell me for a set period of time and then take it under advisement. What I typically will do, and I'm about to do, is I'm going to tell you my understanding of the facts, the arguments of the parties, what their positions are, and then I'll give you a sense of where I'm at and then I'll let whoever disagrees with where I'm at tell me where I have it wrong. My intent is generally to rule at the conclusion of the oral argument and not wait and essentially let the transcript of the oral argument provide the record for any appellate court. So that's what I plan on doing here.

So I'm going to go ahead and do that going forward. First, let me make sure that it's clear who the parties are. Obviously, Mr. Muskal, who's with us virtually now, is the Administrator for the Estate of James and Cheryl Muskal, who are both now unfortunately deceased. And I'm going to be referring to, and I may interchange, but the term owners applies to James and Cheryl Muskal, and that's the term that was utilized in the actual contract here. But obviously, Stephen Muskal stands in their shoes for purposes of today's argument. So I may say owners, I may say plaintiff, but we're, I think obviously talking about the owners as set forth in the contract at issue, which was dated July 15, 2024.

So here's the facts as I understand them, and then I'll tell you essentially at least what I initially think. The owners and the Defendant, Point Digital Finance, entered into a series of agreements on July 15, 2024. The parties call what the agreements are slightly different things. Plaintiffs call Defendant's product a home equity investment. Defendant calls it a product or an option agreement. But the label really doesn't matter from my perspective. The basic idea is that a lender will offer an up-front cash payment in exchange for a percentage of either the future value of a home or a percentage of the future appreciation of the home. The lender's interest is secured either by a lien, or as in this case, a deed of trust that will allow a lender to engage in a non judicial foreclosure.

The contract itself between the parties has a broad arbitration clause, which if enforced, would require these parties to arbitrate Plaintiff's claims. Defendant seeks to enforce that clause. Plaintiff argues that the arbitration clause is invalid on its face because Defendant's product is a residential mortgage loan under the Truth in Lending Act. And I'll call it probably both TILA and the Act as we talk. It's codified in 15 USC 1639(c)(E)(1). And the Act provides that no residential mortgage loan agreement may include a mandatory arbitration term.

So if the contract is subject to the Act, then the

arbitration clause is invalid to me. If it's not subject to the Act, then it's likely valid. But we'll obviously talk about that. The Act defines a residential mortgage loan as a, quote, "consumer credit transaction," unquote, secured by a mortgage or a deed of trust. And we have that deed of trust here. Defendant's interest is secured by a deed of trust. So the threshold question is whether Defendant's product is a consumer credit transaction under TILA; more specifically, whether this is a credit transaction. And then we drill down even further because now we have to define credit or a credit transaction.

And the Act says that credit is the right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer its payment. Although the parties don't necessarily agree on the exact definition of credit, the parties do seem to agree that the ultimate question is whether the product creates a debt. And that's what the parties focus on. If it does create a debt, the product is subject to the Act and the arbitration clause is unenforceable. If it doesn't, the parties have a valid arbitration agreement. So now, I think we drill down to is essentially the product -- does the product create a debt or not?

So the parties each cite to Black's Law Dictionary and other definitions. Black's Law Dictionary's definition of debt generally describes debt to be a specified or fixed and

certain amount, as pointed out by the Defendant. And from the Defendant's perspective, because there's not a fixed amount, then it doesn't fit the definition of debt and for other reasons as well, but when we just look at the definition. But on the flip side, the definition of contingent debt appears to fit our situation from -- at least from my perspective and from Black Law's perspective as well.

Adding to at least my individual headache, I don't think there is much law, and there's nothing directly on point that says we're going to analyze a contract for purposes of the arbitration, whether arbitration can be compelled under TILA. But there's one case, I think is probably closer, and that's cited by the Defendant. That's the *Foster vs. Equity/ Key Real Estate Investments* case, which is a 2017 decision, I think, out of Northern California.

That case held that a contract just like this -- I mean, it's very similar -- was an option contract and not a disguised loan. So Defendant really focuses on -- this is an option contract. There's an option that may never be exercised, and so this transaction should be viewed as an option contract, not a loan.

And the *Foster* court found that it was -- because it was an option contract, it was not subject to TILA. Now, That surrounded whether there had been a violation of TILA's disclosure requirements, not applying the arbitration clause.

But it still got -- it was essentially where we're at because it was analyzing whether TILA applied or not, and thus whether this was a credit transaction or not.

So Defendant's argument coming out of all of this essentially is that the option does not create a debt, because the owners are not liable for specific sum of money; they have no obligation to repay the $210,000 investment; the Defendant is permitted, but not required to exercise the option to purchase a 34.5 percent interest in the property. They may never exercise the option. If the property appreciates, the Defendant makes money. If it depreciates, they lose money. There's no guarantee.

Plaintiff's view of whether there's a debt is that because the initial cash advance will essentially always be returned to Defendant along with other charges, owners are going to repay Defendant and more. They just are. It's the reality of the transaction. So you're loaning money with a virtual guarantee of getting repaid, secured by a deed of trust, and this is a residential loan dressed up under a different name.

And Plaintiff argues that courts around the country have recognized what this is, and they -- here's the -- I'm quoting Plaintiff -- they are wising up to the practical effects of product like Defendant's. From my perspective, I look at the cite, the cases that Plaintiff cites, and I

essentially, at least in terms of how we look at these cases, agree with the Defendant's argument that they're not really on point or applicable because the -- they're not TILA cases. *Olson vs. Unison Agreement* is a Washington state law case. *Massachusetts vs. Hometap Equity Partners* applies Massachusetts law. *Stone vs. Real Estate Equity Exchange* is a bankruptcy case applying Colorado law. And finally, *Roberts vs. Unlock Partnership*, which may be considering the same issue out of New Jersey, I believe, hasn't even ruled yet on the motion to compel arbitration. At least they hadn't.

MR. BRACHT: I can provide an update for the Court on that, Your Honor.

THE COURT: Okay. So hold on for a sec. I'll give you an opportunity to do that. Let me get through my thing and then I'm going to give the parties an opportunity. I'm probably going to be starting with you, Mr. Bracht as well.

So I tend to agree with Defendant's analysis of the law, but where that leaves me -- not the law -- of what the cases have said and where they come down -- but where that leaves me is a very unsatisfying position of hardly anybody has taken on this issue directly. It's going to get litigated around the country. Whatever I do is going to get -- probably go up, and that's fine. But from my perspective, I'm kind of on the front lines of issuing a ruling, and I don't feel good about my lack of authority in conjunction with that.

So let me -- and Mr. Bracht, before I hear from you and get an update on the New Jersey case, my initial thought is that I -- that because Foster is closest to being on point, and it looks to me like TILA contemplates a different kind of contract that we have here, I don't -- I'm not inclined to find that TILA applies. However, I am going to explore with the Defendant, because the Defendant's argument that there is no required repayment -- I mean, they specifically say that -- if you look at the document that the owner signed, not the contract but the document that it was -- this was provided by Defendant -- that says about my point agreement, Paragraph 8 starts with this, that's initialed, "I must repay point within 30 years."

So if you're going to say there's no repayment, I'm not sure why you say, or the owners have to say they will repay point within 30 years. In fact, Paragraph 5 starts with, "When I am ready to repay Point." Paragraph 6, "My repayment amount will be the lesser of two amounts." Paragraph 7, "If my home value increases, my repayment amount will increase." There's a lot of talk about repayment when Defendant's telling me that there is no repayment obligation. And finally, Paragraph 9, "If I repay Point by selling my loan."

Sure feels like it's contemplated the owners have to repay Point, so not sure why I should accept the, "there's no

required repayment." It looks to me there's a 30-year term and they have to repay by selling their home, but they're repaying.

So with that Mr. Bracht, my inclination at this point in a very close question is to essentially find that TILA doesn't apply, and therefore I wouldn't dismiss the case. I would stay it. I would not dismiss it. So I tend to agree with the Defendant. I do so reluctantly. I see arguments about issues with this contract and what the numbers actually add up to and all of those things. But if I'm here to consider, does TILA apply, and I really have to get to the narrow issue of is it a loan and is there a debt, I'm -- I feel like I'm compelled to agree with the Defendants. But I'm going to let you tell me why I have it wrong.

MR. BRACHT: Thank you, Your Honor. The first thing I want to start out with is the characterization of *Foster vs. Equity Key*, because the Courts characterized this case as very similar to the facts at hand. And that is simply not true. *Foster vs. Equity Key* involved actually something that was very close to an option contract.

As the facts are described in that opinion, Equity Key in that case simply gave a $196,000 up-front payment to the -- whether we want to call it borrower or the plaintiff in that case, or the option to participate at a rate of 100 percent in the appreciation of the property, if any, from its

initial value of $1.2 million.

Now, this is fundamentally different from the facts of this case for a number of reasons. The first and most clear reason is this contract in Foster is fundamentally much simpler than the contract that is at issue here. It is a. It actually sounds very much like a classic option contract where one side will pay a premium price for the right to purchase some product at some point in the future at a fixed price.

The functional result of the contract in *Foster* is that *Equity Key* paid the plaintiff $196,000 for what amounts to the option to purchase that property at the current market price of $1.2 million at some point in the future. That is the functional result of that contract. It sounds exactly like the classic option contract that we might think of when we're talking about, say, the stock market or other common option contracts.

The functional reality of that case is the likelihood of that contract being executed was contingent on nothing other than the appreciation of the property itself. In a case like this, if the property failed to appreciate in value, if it declined in value, the option would not be executed at all, because then the lender or the buyer, however we want to characterize that in that case, would stand to lose even more money than their initial $196,000 investment. That initial investment, it plays no factor whatsoever in the

calculation of the repayment amount. That is not the case with the contract that is before the Court. The contract before the Court here, as I'm sure the Court noticed in the review, is rather complicated, and in fact the initial payment is squarely within the calculation of what must be repaid at some point in the future.

So this is not a situation where if the property declined in value, then one would expect with Point behaving as a rational self-interested economic entity, one would not expect Point to exercise its contract if it was as simple as it is in *Foster*. That is not the case here. Instead, what Point does is through a rather complicated formula and through a series of initial substantial discounts from the initial fair market value, what Point has done is created a situation where on day one, if the day after this contract is executed, the buyer chooses to execute -- chooses to cash in the option contract, chooses to, however they want to characterize it, Point will essentially immediately return its, here, 19 percent equity -- 19 percent interest cap for the month because it would essentially immediately return 27 percent, which is the discount from actual fair market value.

THE COURT: When you use the word return, you mean they would get?

MR. BRACHT: That's correct, Your Honor, because the way the formula works in this case is it fundamentally acts as

a function of the initial cash advance. As I'm sure the Court reviewed when Point talks about its homeowner protection cap, which as part of our complaint we allege to be a fundamentally misleading term, that protection cap acts as a monthly compounding interest rate of, here, 18 percent, or --

THE COURT: 19 percent.

MR. BRACHT: 19 percent, rather. And the reason that is important is because the way the mathematics work is if home prices stay static, if they do not change, as long as the product is either cashed in or is refinanced or is otherwise -- points position is otherwise bought out within nearly 18 months -- it's not perfect with the math -- but within 18 months of the initial purchase of the contract that the formula that is used in order to determine what point we'll receive will be the initial payment here, $210,000, plus compound monthly interest at 18 percent.

So -- and that is only -- that's if the home itself does not appreciate. So theoretically, the home could still depreciate, in fact, from its actual true fair market value over the course of a number of months following, and Point might still be owed its 18 percent compound monthly interest, because it is not until 18 months where those curves intersect between the -- where the 18 percent compound monthly interest exceeds the initial 27 percent discount from fair market value that Point uses in its repayment.

So the functional effect of Point's product is that they will always exercise this option. They will always end up taking their share in the house, putting it on the market, and getting repaid. Because it is not simply if the product -- if the house fails to appreciate, now there's not any value left in the option, as you would expect in any other typical option contract.

In order for there to be no marginal value and for Point to be expected as a rational self-interested economic entity and for it to no longer be in Point's interest to redeem this product, put the force of sale or otherwise make sure it gets paid back some amount, the way the math works out is the home would need to depreciate more than 34 and a half percent from the already discounted by 27 percent starting value that Point uses to begin their calculations.

That far exceeds the -- any reasonably expected decline in the market -- I believe I put in our pleadings based on the publicly available data -- the only time such a drastic drop in value has occurred in recorded history in the United States is during the housing market crisis between 2009 and 2011. At no other point in history has there been greater than a 10 percent difference market-wide in the Phoenix area between the peak and a valley of the median home prices.

So we are talking about a product that is so mathematically insulated from risk, except in such extremely

isolated situations, that we would essentially always expect Point to redeem its interest in the home. To take an analogy, if we were to take points -- interpretation of the Truth in Lending Act and what it considers to be an option, Payday Lenders could completely circumvent the purpose of the Truth in Lending act, completely circumvent all of those requirements by instead selling an option to purchase my paycheck in the future and by calling it an option.

We know just by the smell test that that is not an option. We're talking about a loan that uses perhaps option language within it. But when the functional economic reality is that the quote "option" will always be redeemed because there will essentially always be marginal value to it, we aren't talking about an option anymore. We're talking about a loan that while there may be some risk of loss, just like with any lender -- as I'm sure the Court is aware, non-recourse mortgages are the norm and in fact the law in primary residences -- in fact, Point bears no more risk than any other residential lender, because those other lenders, even as we noted, even though -- even in a traditional situation where you have a 20 percent down payment on a residence which is already a rarity in today's market, in a non-recourse obligation that lender again only stands to lose anything on its investment if the home declines by greater than 20 percent.

And so in fact here, Point bears less risk than what we would consider a traditional mortgage lender, because the product would need to decline by first, by the 27 percent of their initial discount for them to even lose any money at all, and by 34.5 percent for the -- from 34.5 percent not from the actual fair market value, but from the already more than one-quarter-discounted initial starting value using their formulations before their position would have no marginal value at all, and they would no longer be expected, as a rational self interested entity to exercise their interest.

And so if we're talking about this theoretical, there's no absolute obligation to pay, under Point's preferred interpretation of what that means, no contract ever has an affirmative obligation to pay, because anyone could at any time act against their own economic interest and waive performance. But we do not under the law expect people to do that, because that would be plainly irrational. And we know from human experience that rational individuals, and businesses particularly, do not behave that way.

In fact, it would be a violation to their shareholders for them to behave in such a way. So to say that there's no absolute obligation to repay at least some portion of this, barring economic catastrophe most likely nationwide, is just not reflective of the economic reality of this product, Your Honor.

THE COURT: Let me ask you, *Foster*, also, the agreement in *Foster* also, according to the opinion, it says that the grant of the option does not give *Equity Key*, the entity there, any present ownership or possession rights with respect to the property. That's not our case, right?

MR. BRACHT: Well, Your Honor, so it doesn't give necessarily any present possession rights. But again, that is still no different than a mortgage lender, which does not have any present possessive rights to the property. It only acquires rights when there's a breach of the agreement, which is exactly the same as the substance of the agreement here. And furthermore, to Point's contention that this is closer to what they might call an investment plan, which under the Regulation Z, talking about the Truth in Lending Act, is again typically not considered credit.

The example used in the regulations is a situation where a company provides a portion of a down payment in order to purchase a home and agrees to share in the cost of the mortgage and the cost of monthly maintenance in exchange for a percentage of future appreciation where the entity is actually bearing risk, acting as an owner. There is no indication from the nature of this contract that Point ever intends to actually operate as an owner, but rather that they will always ultimately put the house on the market in order to realize the monetary value of their interest. So this is fundamentally

different than an investment plan as contemplated under the regulations.

THE COURT: Okay. What's the update on the New Jersey case?

MR. BRACHT: The New Jersey case, Your Honor, went to oral argument a couple weeks ago, and then early last week was ultimately the Defendants, *Unison* in that case, withdrew its motion to compel arbitration. So there's no substantive ruling from the court in that case and is proceeding to discovery.

THE COURT: All right. So Ms. Pelcic, let me give you an opportunity to respond. Let me -- and I am struggling, more so than I typically struggle with making a decision one way or the other, because, *Foster* does help you. But there, as I think Mr. Bracht pointed out, there are some differences in the contracts. But in its -- at its fundamental level, when I just look at -- what does this agreement do? Essentially, Point Digital said, we'll give you $210,000, and now we got an interest in your home.

And there is always going to -- there's clearly, clearly a communication, an expectation that they're going to pay that back and maybe a lot more, and there's almost no reasonable scenario by which Point doesn't exercise its option and pay them back. It just feels like a way of just renaming the same kind of relationship as it relates to a loan or

residential loan with a security.

So I'll let you tell me why Mr. Bracht has it wrong. You can talk about *Foster* as well, and then any disagreement in terms of what happened in the New Jersey case.

MS. PELCIC: So we're here today to talk about whether this particular contract should be compelled to arbitration. We're not talking about the substantive value of -- or enforceability of the claims, the usuriousness of the rate of interest or anything like that, which is, I think, a big subject of Plaintiff's arguments. And all of the applicable statutes require that an arbitration clause be upheld unless otherwise prohibited by law or by equity. And as Your Honor pointed out, where the law stands right now is that this arbitration clause should be enforced.

I think that it's important to look at the purpose that this type of agreement serves. I think that the loan was obtained without an application based on credit or financial ability to repay, which I think not only supports the conclusion that there is no obligation to repay, but it also, from a public policy standpoint, provides an opportunity for people to have access to funds that they otherwise would not be able to, which is also the policy that supports the different regulatory requirements for institutional lenders versus hard money lenders, for example. So I bring that up because just the fact that a deed of trust has been recorded

against the property doesn't turn this into a mortgage loan and thereby subject to TILA.

Your Honor, pointed out that the preparatory checklist on the contract discusses repayment, but repayment would only apply if Point exercised its option under the agreement. And I don't think that it's entirely ingenuous to say that Point would never not exercise its option. I mean, that is the risk that's involved with this agreement -- in this agreement, and they take that risk specifically because they don't have to be subject to the normal standards for a residential mortgage loan.

As an example, something that might be contrary to, you know, someone's financial interest, institutional lenders and hard money lenders frequently participate in loan modification agreements with borrowers, even though they're not required to. There's no legal requirement for a mortgage lender to provide a loan modification agreement for a borrower who's in distress.

But they do that rather than foreclose on the property, which would be, against -- you know, some -- obviously, some circumstances there would be a financial loss by foreclosing, but frequently there's plenty of equity available. And yet lenders do that. I'm just using that as one example before the Court as to why Point might not exercise its option under this contract.

So I think that just from a policy perspective, this arbitration agreement clause should be enforced.

THE COURT: Let me ask you this. If I'm looking at the actual agreement, the finance option purchase agreement itself --

MS. PELCIC: Yes.

THE COURT: On Page 2, expiration date, and that's defined -- the definition is the date on which the investment term expires, July 15, 2054. That's 30 years. What happens when -- if nothing happened with the home, what happens after 30 years, according to this contract? What happens?

MS. PELCIC: The option expires.

THE COURT: The option -- the option expires?

MS. PELCIC: Correct.

THE COURT: Okay. But the -- how does that jive with Paragraph 8 with -- about my Point agreement, "I must repay point within 30 years." I guess, what does that mean? "I must repay point within 30 years." What does that mean?

MS. PELCIC: Well, from my perspective, it means that should Point exercise its option, then it must be repaid within the 20 years, because repayment under the agreement is not triggered unless Point exercises its option.

THE COURT: But doesn't this, about my Point agreement, communicate the reality of, they're going to have to repay within 30 years, because Point's going to exercise

its option. I mean, that's what it seems to say to me. I mean, realistically, if I'm signing this, I'm like, okay, I got to repay it within 30 years. They're giving me 210,000 bucks. I got to repay it within 30 years. And it doesn't -- there's no hedging language, like, if Point exercises its option.

I understand this isn't the contract itself, so -- and I get that. This is about my Point agreement, but it's information being communicated about the practical effect of this contract. And that's kind of what I'm trying to -- what I'm trying to apply. What's the practical impact of this effect or impact of this contract?

And it's the -- to me, just breaking down some of the -- whether we're defining terms; we call it an option, the bottom line is these folks got 210,000 bucks, and the person that get -- or the entity that gave them the $210,000, thus had an interest that if they ever wanted to move their house, they got to give -- essentially, Point's going to get a percentage, and they have the ability to enforce it, but they're also being told that in conjunction with the contract, what's called the expiration date, then essentially they've got to repay Point.

I'm struggling when I'm trying to apply what really is this? And I recognize there's no -- I have really almost no authority to help me here in terms of courts interpreting

it. I know it's a new form of agreement, but if I'm just applying as best I can my practical, how do I view this, just looking at the net effect of what it does, it looks like they've got to pay it back within 30 years. And, although Point doesn't have to exercise its option, and in a theoretical sense, Point might never -- that's not the economic reality.

I mean, I agree largely with what Mr. Bracht said. Theoretically, in every contract, if I loan Mr. Bracht $1,000, I can choose to say you never have to pay it back, but that doesn't make it an option contract. So it just feels to me like it's closer to a loan secured by rights in the property.

MS. PELCIC: The distinction in what, Your Honor, just said is that the option, the exercise of the option, is not part of the contract itself, whereas that is what's here. I mean, of course, anyone can at any point disclaim any interest in the property or waive any right to collect on a contract, but this specific agreement is expressly a contract for Point to be able to exercise the option.

THE COURT: Any -- from -- are there any cases other than *Foster*, Ms. Pelcic, from your perspective that come close to analyzing this situation?

MS. PELCIC: No, but I will point out that they are exactly on point as to the structure of the contract that's at issue.

THE COURT: When you say "they," are you talking about other cases or *Foster*?

MS. PELCIC: I'm talking about *Foster*, but we also did reference *Goldwater Bank vs. Elizarov*, which is not a cited case, but it's rather a memorandum and opinion in a federal court case in California.

THE COURT: Okay. So I'm not excited about either route from my perspective, because I think both sides have an argument to be made. But I got to make a choice, and I'm going to make that choice, and I'm going to make that choice by the time we're done arguing here.

At the end of the day, Mr. Bracht, isn't it true that Point Digital really -- it is an option that there's no guarantee that they're going to exercise it? I mean, the market has crashed before, not that long ago. It could crash again, and they could essentially be out in such a way that they would never exercise that option. And then we get back to the definition of debt, and it then doesn't fit into that definition anymore.

MR. BRACHT: Your Honor, I would disagree with the economic reality of that, because while theoretically that may be a possibility, it does not render Point's risk any different than any other non-recourse mortgage lender. The only difference is that the way Point's investment is structured is that it puts up less capital up front than any

other mortgage lender. Again, as we went through the example earlier of a traditional mortgage lender in a non-recourse loan where someone puts down 20 percent, of course, that lender is going to be at risk of losing money if the value of property dips greater than 20 percent.

And in fact, I would also raise that Point's position is no different than perhaps a secondary loan obligation, such as a home equity line of credit, that in the event that home prices significantly decline, that home prices may decline further than the balance of a first priority mortgage, which may render that secondary loan entirely valueless. Yet, those products are regulated under the Truth in Lending Act. They are residential mortgages, even though they do bear risk in the market of never getting a penny back.

So to create this arbitrary distinction, just because Point has included language that purports to be an option in their contract, defies the economic reality of the situation and is really a distinction without meaning between it and other similar secondary products.

And I do want to point out something because counsel cites Goldwater Bank. I pulled that decision. The only time that *Foster* is cited in that decision, as referenced by counsel, is in a footnote. That decision not only did not turn on the application of the Truth in Lending Act, but rather discussed a claim by the Plaintiff in that case that

the terms of his agreement were just never disclosed to him at all and he never had a copy of the contract to begin with. But in fact, the very decision that counsel cites was overturned by the Ninth Circuit, reversed and remanded in March of this year. So not only did it not apply the law in this similar in this case, it's not even a good decision.

So the reality that the Court has before it today is that there is no controlling authority anywhere on these types of agreements. And so I would note for the Court that it is settled law in the Ninth Circuit and nationwide that the Truth in Lending act is a remedial statute, and we are compelled to interpret it liberally in favor of the consumer.

And so in the case where the Court is unsure or could go either way as to whether this product is credit or is not credit, I would posit to the Court that the law compels the Court at that stage to find at this stage for the Plaintiff as the consumer, as the entity, as the individual or individuals, rather, that the law was designed to protect. And if Point wishes to take that issue up on appeal, they may do so. But the law is clear that if we're talking about a 50/50 decision, the consumer prevails in a Truth in Lending Act case.

THE COURT: Okay. Ms. Pelcic, I'm going to give you the last word. It's your motion.

MS. PELCIC: Yeah. Thank you. We're here on the

motion to compel arbitration. And in a motion to compel arbitration, the burden of proof is on the party disputing the validity of the arbitration clause. So this is not a TILA motion.

And one other point that I wanted to bring up is, just to give the Court an idea of how this differentiates from a secondary, a second position loan or HELOC, something similar to that, is that there are specific rights available to a HELOC holder, second deed of trust holder, that at this point is unclear whether that would be available to an option contract.

For example, if the first position loan was to foreclose, ordinarily, the excess proceeds would then go to the second position lender. Is that something that is to be considered the borrower's equity, such that Point could have an option to have access to that? I don't think so.

Also, if the borrowers filed bankruptcy. In bankruptcy, if there's actual value, a second position loan holder would have rights in there. But if -- would bankruptcy wipe out an option contract? Probably they don't. They definitely wouldn't be treated as an interest in real property strictly because they have a deed of trust. I think that this is a distinctly different type of arrangement than mortgage loan considered under TILA.

THE COURT: All right. So here's what we're going

to do. I -- it's a difficult question from my perspective. I don't think there's any real controlling authority here. *Foster* is the closest. There are some differences there. And it is a district court decision out of California anyway. And so the Court's left with trying to essentially analogize this agreement to other types of agreements that have been found and not found to be subject to the Truth in Lending Act.

The Court absolutely agrees with -- both can be true, that TILA is a remedial statute and the Court interprets it liberally, but also a party opposing an arbitration, essentially an arbitration clause or application of a clause does have a burden as well. But when I put it all together from my perspective, I come back to my best reading of a complicated, complicated contractual agreement. And that for me, my reading is such that it did create a debt, a functional debt, and therefore fits in the TILA definition of a consumer credit transaction, which makes the agreement subject to TILA.

And therefore, I'm going to deny the motion to dismiss because the Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when I apply the language of the Act. I have no doubt that other courts are going to consider this and may go in other directions. But I have to do the best I can with the plain language and applying the economic reality of what I see the agreement to be and the effect of the agreement.

I ultimately agree that the option held by Point here is ultimately a distinction without a true meaning with respect to the responsibilities of the parties and the nature of this relationship. And so under those circumstances, I don't believe that the arbitration clause in the contract is enforceable because it is not enforceable under TILA, so I'm going to deny the motion to dismiss for those reasons.

What -- I'm just fine if somebody wants to special action me, meaning the Defendant, because this has got to -- somebody's got to resolve it. And the court of appeals and the Arizona Supreme Court might disagree with me as well. But from my perspective, that's my best effort in terms of analyzing what the agreement was and whether it fits under TILA, and that's the threshold issue that both parties agree with, or a threshold issue.

So for those reasons, the reasons stated on the record, it's sort of denying Defendant's motion to dismiss. So that puts us back in the mode of case goes forward.

Ms. Pelcic?

MS. PELCIC: I'm sorry to interrupt you. I just wanted to clarify. You said motion to dismiss. You mean motion to compel arbitration?

THE COURT: Thank you. Yes.

MS. PELCIC: Just wanted to clarify the record.

THE COURT: Well, thank you. And the motion is a

motion to compel arbitration and dismiss the complaint. That's where I have the dismiss. It's, at its core, a motion to compel arbitration and dismiss the complaint only because the arbitration would be compelled. I was never going to dismiss the complaint. Even if I compelled arbitration, I would have just stayed it. But that doesn't matter now. So the case otherwise moves forward.

Let me check while we're together. Mr. Bracht, from your perspective, is there anything else we should be talking about today in light of my denial of the motion?

MR. BRACHT: Merely the timeline for the defendants to file an answer, Your Honor.

THE COURT: I believe it would be 20 days from today.

Ms. Pelcic, questions about my ruling or what happens next?

MS. PELCIC: No, Your Honor.

THE COURT: All right. Then I'll look forward to -- obviously, the answer gets filed within 20 days, and then parties can consult in terms of a schedule, and we'll take it from there going forward.

MS. PELCIC: Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. BRACHT: Thank you, Your Honor. Have a great day.

THE COURT: You're welcome. You, too.

(Proceedings concluded at 2:47 p.m.)

C E R T I F I C A T E

I, KIMBERLY McCRIGHT, CET, certified electronic transcriber, do hereby certify that the foregoing pages 1 through 33 constitute a full, true, and accurate transcript from electronic recording of the proceedings had in the foregoing matter.

DATED this 25th day of February, 2026.

/s/ Kimberly C. McCright
Kimberly C. McCright, CET
Certified Electronic Transcriber

Clerk of the Superior Court
*** Electronically Filed ***
12/19/2025 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855 12/17/2025

HONORABLE JOSEPH KREAMER

CLERK OF THE COURT
E. Valadez
Deputy

STEVEN MUSKAL BLAKE A BRACHT

v.

POINT DIGITAL FINANCE INC COLLETTE NICOLE PELCIC

JUDGE KREAMER

HEARING

East Court Building – Courtroom 811 – VC -CV

1:59 p.m. This is the time set for a hybrid Oral Argument on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings, filed September 22, 2025. Plaintiff Steven Muskal, who is not present, is represented in-person by counsel, Blake A. Bracht. Defendant Point Digital Finance, Inc. is represented virtually by counsel, Collette Nicole Pelcic.

A record of the proceedings is made digitally in lieu of a court reporter.

Plaintiff's counsel informs the Court that Plaintiff Steven Muskal may appear virtually for today's oral argument.

The Court notes Defendant's counsel filed a Motion for Remote Appearance at Oral Argument, filed November 14, 2025. The Court granted the Motion and informed Plaintiff's counsel that he too may appear virtually.

2:00 p.m. Plaintiff Steven Muskal connects to the TEAMS meeting.



EXHIBIT F

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855 12/17/2025

The Court informs counsel regarding the Court's preferences when hearing oral arguments.

The Court states its initial thoughts on the Motion to be argued today and further states its inclinations of the record.

Oral argument is held on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings.

Based on the foregoing,

**IT IS ORDERED** denying Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings. The Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act.

**IT IS FURTHER ORDERED** Defendant may file an Answer within **20 days** of today.

2:47 p.m. Matter concludes.

DIVISION ONE
FILED: 03/16/2026
MATTHEW J. MARTIN, CLERK
BY: MEW

IN THE

# COURT OF APPEALS

STATE OF ARIZONA
DIVISION ONE

| | |
|---|---|
| STEVEN MUSKAL, Plaintiff/Appellee, | Court of Appeals Division One No. 1 CA-CV 26-0131 |
| v. | |
| POINT DIGITAL FINANCE INC, Defendant/Appellant. | Maricopa County Superior Court No. CV2025-024855 |

**ORDER STAYING APPEAL**

The court has reviewed the record pursuant to its duty to determine whether it has jurisdiction over this appeal. *See Sorensen v. Farmers Ins. Co.*, 191 Ariz. 464, 465 (App. 1997).

Appellant appeals from an unsigned ruling dated December 17, 2025, and filed December 19, 2025. Unsigned rulings are not appealable. Ariz. R. Civ. P. 54(a), 58(b)(1). **For this appeal to proceed, appellant must obtain a signed order corresponding to the minute entry dated December 17, 2025, and filed December 19, 2025.** *Eaton Fruit Co. v. California Spray-Chemical Corp.*, 102 Ariz. 129, 130 (1967). Therefore, pursuant to Arizona Rule of Civil Appellate Procedure 3(b),

IT IS ORDERED staying this appeal until April 15, 2026.

IT IS FURTHER ORDERED revesting jurisdiction in the Maricopa County Superior Court and authorizing that court to consider a

EXHIBIT G

motion for a signed order corresponding to the minute entry dated December 17, 2025, and filed December 19, 2025.

IT IS FURTHER ORDERED that appellant must file a motion asking the superior court to enter a signed order.

IT IS FURTHER ORDERED that if the superior court has not entered a signed order by April 15, 2026, appellant must file a motion to continue the stay of this appeal that describes the status of the matter. Otherwise, this court will dismiss this appeal.

IT IS FURTHER ORDERED directing the Clerk of the Maricopa County Superior Court to transmit a certified copy of the ruling within 10 days after entry, marked for filing in this appeal. The stay will be lifted automatically when this court receives the signed order.

IT IS FURTHER ORDERED that the opening brief is due by May 15, 2026. If the brief is not timely filed, this court will dismiss this appeal.

IT IS FURTHER ORDERED directing the clerk of this court to send this order to the Honorable Joseph Kreamer and to the Clerk of the Maricopa County Superior Court.

____________/s/________________
Melina Brill, Judge Pro Tempore

CLERK OF THE SUPERIOR COURT
FILED
APR 0 3 2026 8:50 am
A. Walker, Deputy

~~EXHIBIT A~~

**Klinedinst PC**
Nicole Pelcic
NPelcic@KlinedinstLaw.com
2701 E Camelback Road, Suite 150
Phoenix, AZ 85016-4324
Telephone: (602) 813-0000

*Attorney for Defendant*
*Point Digital Finance, Inc.*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,<br><br>Plaintiff,<br><br>vs.<br><br>POINT DIGITAL FINANCE, INC.,<br><br>Defendant. | CASE NO. CV2025-024855<br><br>**[~~PROPOSED~~] ORDER DENYING DEFENDANT POINT DIGITAL FINANCE, INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT, OR ALTERNATIVELY, STAY PROCEEDINGS**<br><br>Judge Joseph Kreamer |

Before the Court is the motion to compel arbitration and dismiss the complaint, or alternatively, stay proceedings filed by Defendant Point Digital Finance, Inc. ("Point") to the complaint filed by Steven Muskal as Independent Administrator of the Estate of James B. Muskal ("Plaintiff").

On December 17, 2025, the Court held oral arguments on Point's motion, and after oral arguments, on December 19, 2025, the Court issued a minute order **DENYING** Point's motion and further **ORDERING** Point to file an answer within 20 days of the date of the minute order. ~~A true and correct copy of the minute order is attached as **Exhibit A**~~. JK



EXHIBIT H

KLINEDINST PC
2701 E CAMELBACK ROAD, SUITE 150
PHOENIX, ARIZONA 85016-4324

KLINEDINST PC
2701 E CAMELBACK ROAD, SUITE 150
PHOENIX, ARIZONA 85016-4324

For the reasons set forth in the Court's December 19, 2025 minute order, the Court hereby **DENIES** Point's motion and **ORDERS** Point to file an answer within 20 days of the date of the December 19, 2025minute order.

**IT IS SO ORDERED.**

DATED: 4/2/26

Honorable Judge Joseph Kreamer

Clerk of the Superior Court
*** Electronically Filed ***
12/19/2025 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855 12/17/2025

HONORABLE JOSEPH KREAMER

CLERK OF THE COURT
E. Valadez
Deputy

STEVEN MUSKAL BLAKE A BRACHT

v.

POINT DIGITAL FINANCE INC COLLETTE NICOLE PELCIC

JUDGE KREAMER

HEARING

East Court Building – Courtroom 811 – VC -CV

1:59 p.m. This is the time set for a hybrid Oral Argument on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings, filed September 22, 2025. Plaintiff Steven Muskal, who is not present, is represented in-person by counsel, Blake A. Bracht. Defendant Point Digital Finance, Inc. is represented virtually by counsel, Collette Nicole Pelcic.

A record of the proceedings is made digitally in lieu of a court reporter.

Plaintiff's counsel informs the Court that Plaintiff Steven Muskal may appear virtually for today's oral argument.

The Court notes Defendant's counsel filed a Motion for Remote Appearance at Oral Argument, filed November 14, 2025. The Court granted the Motion and informed Plaintiff's counsel that he too may appear virtually.

2:00 p.m. Plaintiff Steven Muskal connects to the TEAMS meeting.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855 12/17/2025

The Court informs counsel regarding the Court's preferences when hearing oral arguments.

The Court states its initial thoughts on the Motion to be argued today and further states its inclinations of the record.

Oral argument is held on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings.

Based on the foregoing,

**IT IS ORDERED** denying Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings. The Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act.

**IT IS FURTHER ORDERED** Defendant may file an Answer within **20 days** of today.

2:47 p.m. Matter concludes.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STEVEN MUSKAL, as Independent Administrator of the Estate of James B. Muskal,

Plaintiff,

v. POINT DIGITAL FINANCE, INC., a Delaware Corporation, and DEER PARK 1850 FUND, L.P.

Defendants.

## COMPLAINT

### I. Nature of Action

1. State and federal laws create strong protections and disclosure rules for homeowners in mortgage lending, where people's homes and financial security are on the line. Defendant Point Digital has designed a very complex mortgage product called a Home Equity Investment (HEI) loan that poses greater risks than traditional mortgages, but purports to be exempt from all mortgage laws protecting homeowners. After plaintiff accepted a lump sum payment, Point got a mortgage on his home. The Point HEI mortgage loan imposes astronomical interest rates – 21.94% APR in plaintiff's first year unless his home value had declined by over 20%; then 20% APR over plaintiff's first two years unless his home value had declined. Point's assertion this is not a mortgage loan is false, and its misleading disclosures and fraudulent claims of "no interest" violated federal and state laws. In an Arizona action between the parties on an HEI loan used in Arizona, that court has already held that Point's HEI contract is a mortgage loan such that TILA's prohibition against arbitration applies; and that holding is binding here as well under collateral estoppel. The remedies for Point's violation of federal mortgage protections include rescission of this loan.

EXHIBIT I

### II. Jurisdiction and Venue

2. Jurisdiction of this Court arises under 15 U.S.C. §1640, 28 U.S.C. §§ 1331; and supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

3. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

### III. Parties

4. Plaintiff Steven Muskal is the Cook County Illinois court-appointed Independent Administrator of the Estate of James B. Muskal and is authorized to act on behalf of the Muskal Estate to instigate this lawsuit to recover James B. Muskal's property.

5. James B. Muskal ("Muskal" or "plaintiff" below) was born on July 28, 1938, and passed away in Chicago, Illinois, on March 13, 2025, at age 86.

6. Upon information and belief, Defendant Point Digital Finance, Inc. ("Point"), is a Delaware corporation with its principal place of business in the State of California.

7. Defendant Deer Park 1850 Fund, L.P. is an interested party having been assigned Point's mortgage loan on the Property and recorded such assignment.

### General Allegations

8. On or about January 20, 2023, Defendant Point Digital Finance entered into a contract with James B. Muskal, a copy of which is attached hereto as Exhibit 1 (the "Contract" or "loan").

9. At the time, James owned real property located at 1312 N. Astor St. in Chicago (the "Property") as an individual.

10. His spouse Cheryl was not on title and did not sign the Contract, but on information and belief Cheryl signed a Consent of Spouse form at the same time as the Contract, and the form stated: "I am aware that the legal, financial and related matters contained in the Agreement are complex

and that I am encouraged to seek independent professional guidance or counsel with respect to this consent."

11. Unlike Cheryl, James – who actually signed the Contract -- was never told by Point that "the legal, financial and related matters contained in the Agreement are complex."

12. Unlike Cheryl, James – who actually signed the Contract -- was never told by Point "that I am encouraged to seek independent professional guidance or counsel with respect to this Agreement."

13. James passed away on March 13, 2025, and on February 15, 2025, Cheryl had passed as well.

14. Pursuant to the Contract, Point paid James an up-front sum of $350,000, less closing costs, which Point refers to as their "investment amount."

15. Point then recorded a deed of trust against the Property.

16. Instead of a traditional interest rate based upon the principal amount of the loan, Point instead contracted to receive (1) a 44.2% interest in the future price changes of the home from the assessed value of $2.2 million; plus (2) a repayment of $622,272 –$272,272 more than the $350,000 amount plaintiff actually borrowed.

17. The additional $272,272 is owed because the agreed-upon starting value utilized in Point's contract is already discounted substantially from the assessed fair market value of the home of 2.2 million dollars at the time of the contract -- in this case discounted by 28%, essentially insulating Point from any market risk. The 28% discount of the actual appraised value of the home times 44.2% equals $272,000.

18. In effect, in order for Point to lose money on the transaction, the value of the Property would

have to plummet 28% from its true starting assessed fair market value.

19. In the "About My Point Agreement" (attached as Exhibit 2) sent to plaintiff, Point wrote, "To determine the Original Agreed Value, Point lowered the assessed value of my home by 28%. This is called the risk adjustment."

20. The reduction in assessed value by Point by 28% was not a "risk adjustment" but a measure to guarantee profits by immediately having plaintiff owe an additional $272,272 on his $350,000 loan, subject to the "Homeowner Protection Cap" described below.

21. Alternatively, Point includes a maximum rate of return of profit on their "investment" here at a purported "20.00%" rate, which the agreement calls a "Point Proceeds Cap Factor." Ex. 1.

22. The actual rate of the "Point Proceeds Cap Factor" is not the implied 20% annual rate, but instead is compounded monthly for an actual undisclosed APR of 21.94%.

23. Point misleadingly refers to its maximum rate of return of 21.94% APR as the "Homeowner Protection Cap" on its closing disclosure sent to plaintiff.

24. Past a short period of time, however, the "Homeowner Protection Cap" becomes mathematically meaningless - after only five years, the "cap" on Point's profits above the loaned $350,000 proceeds has grown to $942,624. At the expiration of the 30-year option period, the "cap" on Point's profit is $134,416,865.86

25. Upon information and belief, the typical market rate for 10-year home equity lines of credit in mid-January 2023 was approximately 7% simple interest.

26. The Point mortgage product immediately imposes on plaintiff extraordinarily high interest rates after applying both the "risk adjustment" and the "Homeowner Protection Cap" terms – 21.94%

APR in the first year in the case of plaintiff, unless his home value had declined by over 20%; then 20% APR over the first two years for plaintiff unless his home value had declined.

27. Point provides no mechanism by which a borrower can pay down accumulated interest to prevent compounding or pay down the "investment" balance without a full refinance.

28. Point deceptively and misleadingly states that "no interest accrues" on its loan, asserting that "no interest accrues" in both the Point Option Agreement Estimate document provided to plaintiff shortly before closing, as well as in the Point Option Closing document provided to plaintiff at their closing on the loan. Examples of both documents provided to plaintiff are attached as Exhibit 3 (these particular documents concerned the Arizona Point HEI with plaintiff further described below).

29. The term of Point's "option" is 30 years; essentially, by paying a strike price of $350,000, Point has the right to force a sale of the Property either at the expiration of the 30-year term or the occurrence of certain triggering events, at which time Point acquires a 44.2% interest in the *entire* value of the Property.

30. Point deliberately backloads the remaining option consideration to disguise the nature of the transaction; functionally, it acquired a 44.2% interest in all future appreciation of the Property by paying less than 25% of the already-discounted starting value; the "exercise price" becomes mathematically meaningless to the borrower except to all but guarantee that Point's initial investment must be paid back in the future and create the illusion of sufficient consideration.

31. However, Point also profits based on the rarity of anyone staying in one home for 30 years.

32. The median period of time that Americans live in one home is approximately 11.9 years.

Plaintiff Muskal entered into the Point contract at age 83, and thus was likely to pass away or sell his home long before the 11.9 year average.

33. Functionally, there are only three ways to exit Point's product:

    a. First, hold the Property for the full 30-year term, and Point does not elect to exercise the option. The likelihood of this scenario is statistically extremely remote; in the case of the Subject Property, the Property's fair market value in 2054 would need to be less that the already-discounted initial agreed-upon value of $1,584,000 before Point fails to cover its initial investment of $350,000 and less than $1,188,000 for Point to receive nothing at all.

    b. Second, hold the Property for the full 30-year term, and Point exercises its option and forces a sale. For the reasons stated in *a.* above, the statistical likelihood of Point not exercising the option after 30 years is functionally zero.

    c. Third, pay off Point's initial $350,000 back, plus its 44.2% share of appreciation (limited to no more than 20% interest, compounded monthly), either by refinancing, selling the Property, or otherwise paying Point in full. As stated in *a.* above, there is essentially no statistically plausible scenario where Point declines to exercise its option on its own in the event of a sale of the Property.

34. Point's product is deliberately designed to minimize risk to Point at the expense of the homeowner - if the homeowner buys Point out within a relatively short period of time, Point's

substantial discount on the agreed-upon initial value of the Property nearly guarantees that Point's return on its initial investment will be calculated using the exorbitant compounding-interest "cap," substantially outpacing the expected return of nearly any relatively stable investment product available on the market. If Point's option remains for more than a few years, Point has functionally bought into the housing market by diverting a substantial fraction of the homeowner's accumulated real estate wealth from the individual to Point's shareholders, all while also charging equally exorbitant application, processing, and other fees to further strip equity from homeowners.

35. On its face, the Contract fails to identify the initial investment amount of $350,000 as a loan.

36. On its face, the Contract fails to identify the Point Proceeds accurately as a balloon payment.

37. On its face, the Contract falsely identifies the Exercise Payment as part of consideration for the Contract.

38. Point misleadingly states that no interest accrues on the balance of the loan.

39. Point misleadingly describes a 20% monthly compounding interest rate as "protecting" the homeowner.

40. The Contract misleadingly describes Point's profits capped at an annual interest of 20% where under the actual monthly compounding the APR interest rate imposed is 21.94%.

41. James Muskal relied upon the misrepresentations and misleading language in the contract in agreeing to enter the Contract, ultimately unknowingly agreeing to pay far more to Point than any conventional loan or HELOC would have charged.

42. Plaintiff has requested rescission of the Point loan on the property, and the request has not been

accepted.

43. The Property was assessed in 2025 at $1,800,000, and under such assessment plaintiff will owe Point's assignee Deer Park a total of $445,472 upon sale, for a loss of $95,472 after repaying the $350,000 from just three years ago.

**Application of the Arizona court case between the parties to this matter**

44. Plaintiff and Point are litigating another HEI contract case in Arizona involving the same borrower -- James B. Muskal -- in Arizona state court, Maricopa County Case No. CV2025-024855. In the Arizona court case, Point sought arbitration pursuant to sections 7.10 and 7.20 of the Arizona HEI agreement, which is identical to the arbitration provisions in sections 7.10 and 7.20 of the Illinois agreement here.

45. In an 11-page October 13, 2025, brief, plaintiff asserted that the TILA prohibition of arbitration for residential mortgage loans under 15 U.S.C. § 1639c(e)(1) barred application of the arbitration provision. Plaintiff's brief noted that TILA defines a "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage" (§ 1602(dd)(5)), and "credit" is defined by TILA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." Id. § 1602(f). Plaintiff's brief explained that the HEI at issue constituted "debt" under the standard dictionary definitions such as "liability on a claim" or "something owed" (p. 3-4), as well as under numerous recent court cases examining extremely similar HEI agreements such as *Olson v. Unison Agreement Corporation*, 2025 WL 2254522 (9th Cir. 2025).

46. In Point's 13-page October 21, 2025, brief responding to plaintiff, Point argued that the TILA prohibition of arbitration was not applicable because Point's products are "excluded from the definition of 'credit' and therefore do not meet definition of a 'residential mortgage loan' under TILA." (p. 4). Point agreed that TILA applied to "credit," which is the right to "incur debt and defer its payment" (p. 4), but then argued: "Here the Option does not create a 'debt,' as Owners are not liable for a specific sum of money and have no obligation to repay the $210,000 Investment Amount." (p. 5). Point concluded: "Point's product is not governed by TILA, and therefore the applicable arbitration provision is valid and enforceable." (p. 13).

47. On December 17, 2025, after a hearing on the merits, the Arizona court issued its order denying arbitration because "the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act."

48. The Arizona court's decision between plaintiff and Point operates as collateral estoppel between the same parties in this Court pursuant to Seventh Circuit law in *Gilldorn Sav. Asso. v. Commerce Sav. Asso.*, 804 F.2d 390 (7th Cir. 1986), where the Arizona court's decision was fully briefed and heard. Accordingly, Point is precluded in this Court from further relitigating the issues of whether the loans herein are considered "residential mortgage loans" subject to the TILA, and whether the TILA 15 U.S.C. § 1639c(e)(1) prohibition on arbitration of such mortgage loans applies here.

**COUNT I**

**VIOLATION OF TILA**

49. Plaintiff incorporates the foregoing paragraphs 1-45 as though the same were set forth at length herein.

50. The Contract is a residential mortgage loan as defined by 15 U.S.C. § 1602(dd)(5).

51. James Muskal was a natural person.

52. The transaction was entered into primarily for personal, family, and household purposes.

53. Point is a creditor.

54. The Contract fails to comply with the disclosure requirements of the Truth in Lending Act in that it, among other things:

a. Fails to adequately disclose the annual percentage rate associated with the Contract.

b. Fails to adequately disclose the finance charge associated with the Contract.

c. Fails to identify the initial payment of $350,000 to plaintiff as the "amount financed."

d. Fails to provide a statement of the consumer's right to obtain, upon written request, a written itemization of the amount financed.

e. Fails to disclose in conspicuous type a good faith estimate of the total cost of the mortgage to the consumer expressed as a table of annual rates.

f. Fails to disclose the projected total cost of the Contract

g. Fails to disclose in conspicuous type size that "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan" as required by § 1639(a)(1)(B);

h. Fails to accurately disclose the annual percentage rate as required by § 1639(a)(2), instead falsely stating that "no interest accrues" on the loan;

i. Fails to provide required disclosures at least three business days prior to consummation of the transaction as required by § 1639(b); and

j. Fails to provide a good faith estimate of the total cost of the mortgage expressed as a table of annual percentage rates as required for high-cost mortgages.

55. The conduct of Defendant was a direct and proximate cause of serious injuries, actual damages and harm to Muskal that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff under 15 U.S.C. § 1640 for the full amount of actual and statutory damages, along with the attorneys' fees and the costs of litigation, as well as such further relief as may be permitted by law.

56. Plaintiff is also entitled to rescission of the Point agreement and voiding of all associated recorded instruments by Point and Deer Park based on the agreement pursuant to 15 U.S.C. § 1635(a) and (f) and 12 CFR § 1026.23(a)(3).

WHEREFORE, plaintiff respectfully requests the opportunity for rescission pursuant to 15 U.S.C. § 1635(a) and (f) and 12 CFR § 1026.23(a)(3), as well as all statutory relief, statutory and other damages, costs, and attorneys' fees available pursuant to TILA, and for such other relief as is equitable and just.

**COUNT II**

**HOME OWNERSHIP EQUITY PROTECTION ACT**

57. Plaintiff incorporates the foregoing paragraphs 1-56 as if the same were set forth at length herein.

58. Point's conduct herein constitutes violations of the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1639, *et. seq*.

59. Point's HEI loan with plaintiff was a high-cost mortgage loan. The loan initially imposes for several years an APR of 20% or more which exceeds the Average Prime Offer Rate (APOR) by more than 8.5 percentage points. The loan's "risk adjustment" also imposes total points and fees on the loan which exceed 5% of the total loan amount after the first year of the loan.

60. Point failed to provide accurate disclosures as required by section 1639(a)(1) and (2), including the APR disclosure.

61. Point failed to provide the specific disclosures as required by section 1639(a)(1) and (2).

62. Point's "risk adjustment" to increase the owed loan amount from $350,000 to $722,000 in just a few years without a change in home value is an indirect financing of points in violation of section 1639(m).

63. Point failed to provide a good faith estimate of the total cost of the mortgage expressed as a table of annual percentage rates as required for high-cost mortgages.

64. Plaintiff is entitled to relief under section 1640 of the Act for all the above violations against both Point Digital as well as Deer Park pursuant to section 1641(d).

WHEREFORE, plaintiff respectfully requests all statutory relief including rescission, damages, statutory damages, costs, attorneys' fees, and for such other relief as is equitable and just.

**COUNT III**

**ILLINOIS HIGH RISK HOME LOAN ACT**

65. Plaintiff incorporates the foregoing paragraphs 1-66 as if the same were set forth at length herein.

66. Point's conduct herein constitutes violations of the Illinois High Risk Home Loan Act, 815 ILCS 137/1, *et seq*.

67. Point's HEI loan with plaintiff was a high risk loan under the Act. The loan initially imposes for several years an APR of 20% or more which exceeds the Average Prime Offer Rate (APOR) by more than 8.5 percentage points. The loan's "risk adjustment" also imposes total points and fees on the loan which exceed 5% of the total loan amount after the first year of the loan.

68. Point employed fraudulent or deceptive acts or practices in the making of a high risk home loan, including numerous misrepresentations about its loan to plaintiff, including but not limited to: (1) there was "no interest on the loan"; (2) interest was capped at 20% when it was actually 21.92% per year; and (3) reducing plaintiff's home value by 28% for the transactions at issue was a "risk adjustment."

69. Point employed fraudulent or deceptive acts or practices in the making of a high risk home loan by not making proper disclosures in violation of TILA and HOEPA.

70. Point violated section 55 of the Act where its "risk adjustment" to increase the owed loan amount from $350,000 to $722,000 in just a few years without a change in home value is an indirect financing of points.

71. Point violated section 95 of the Act by not making the required disclosure.

72. Point violated section 110 of the Act in not informing Muskal of the provisions of the Mortgage Awareness Program.

73. Plaintiff is entitled to relief under section 135 of the Act for these violations against both Point Digital as well as Deer Park pursuant to section 135(d).

WHEREFORE, plaintiff respectfully requests all relief including rescission of the Point agreement and any assignment, damages, statutory damages, costs, attorneys' fees, and for such other relief as is equitable and just.

**COUNT IV**

**ILLINOIS CONSUMER FRAUD ACT**

74. Plaintiff incorporates the foregoing paragraphs 1-73 as if the same were set forth at length herein.

75. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act") declares that unfair methods of competition and unfair or deceptive acts or practices are unlawful, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact. 815 ILCS 505/2.

76. In its violations of the TILA, Point concealed, suppressed and omitted from the plaintiff the material facts and true nature of his mortgage loan, and these violations of TILA also constitute Consumer Fraud Act violations.

77. Point also made numerous misrepresentations about its loan to plaintiff, including but not limited to: (1) there was "no interest on the loan"; (2) interest was capped at 20% when it was actually 21.92% per year; and (3) reducing plaintiff's home value by 28% for the transactions at issue was a "risk adjustment."

78. Point numerous misrepresentations about its loan constitute Consumer Fraud Act violations.

79. Point's violations of the HOEPA also constitute Consumer Fraud Act violations.

80. Point's violations of the High Risk Home Loan Act also constitute Consumer Fraud Act violations.

81. Point committed its misrepresentations, concealment, suppression and omission of material facts regarding the HEI loan with the intent that Muskal rely upon the misrepresentation, concealment, suppression or omission of such material facts.

82. Point's misrepresentation, concealment, suppression or omission of such material facts regarding its HEI loan was intentional and part of its standard business practice across numerous home-owners. Moreover, Point's targeting of the same elderly homeowner Muskal for separate HEI transactions on properties in both Illinois and Arizona demonstrates a deliberate pattern of predatory conduct. Punitive damages to deter such intentional and widespread consumer fraud against Muskal and others is particularly appropriate. Point's conduct was willful, intentional, and done with an evil motive and reckless indifference to the rights of Muskal.

WHEREFORE, plaintiff respectfully requests compensatory damages, reimbursement of fees and costs pursuant to 815 ILCS 501/10(c), appropriate prejudgment interest and postjudgment interest, punitive damages of over $1 million, and for any such other and further relief or alternate damages statutory or otherwise against the Bank as the Court deems equitable and just.

**Jury Trial Demand**

Plaintiff demands trial by jury on all issues so triable.

By:____/s/ Michael Steigmann_____

Attorney for Plaintiff

Michael Steigmann
150 S. Wacker Dr. #2400
Chicago, Illinois 60601
(312) 833-5945

Option Agreement ID: 2022155-ESOLO

# POINT DIGITAL FINANCE OPTION PURCHASE AGREEMENT

This Point Digital Finance Option Purchase Agreement is entered into as of January 20, 2023 (**"Effective Date"**), by and between James B. Muskal and Point Digital Finance, Inc., a Delaware corporation. **"We"**, **"us"**, **"our"** and **"Point"** refer to Point Digital Finance, Inc. and its successors and assigns. **"You"**, **"your"** and **"Owner"** refer to James B. Muskal and Owner's permitted assigns under this Agreement. Capitalized terms used but not defined in the text of this Agreement have the meanings set forth in the attached Appendix A.

## Section One:<br>Option Terms

1.1 **Grant of Option and Consideration.** You agree to sell to us an exclusive and irrevocable option (the **"Option"**) to purchase an undivided percentage interest of fee simple title ownership (the **"Option Percentage"**) in and to the Property in exchange for our agreement to pay you the Option Investment Payment. Point may exercise the Option and purchase the Option Percentage by paying you the Exercise Payment. The Property is commonly known as 1312 N ASTOR ST, CHICAGO, IL 60610 and is more specifically described on Schedule 1 (the **"Property"**).

You hereby agree to the specific terms of our Option as set forth below in the column entitled "Owner's Information":

| | **Definition** | **Owner's Information** |
|---|---|---|
| **Option Investment Payment** | the first payment of the Option Consideration, to be paid shortly after execution of this Agreement | $350,000.00 |
| **Option Percentage** | the percentage interest of Appreciation that Point shares in; also the percentage interest of the Property that we would acquire upon Option Exercise | 44.2000% |
| **Original Agreed Value** | the starting value of the Property for calculating Appreciation and Point Proceeds | $1,584,000.00 |
| **Point Proceeds Cap Factor** | the factor used to determine the Point Proceeds Cap which limits the Point Proceeds | 20.00% |
| **Exercise Payment** | the payment Point will make to you if Point exercises the Option | $350,128.00 |
| **Option Consideration** | the total purchase price for the Option Percentage, which is the sum of the Option Investment Payment and the Exercise Payment | $700,128.00 |
| **Amount of Acknowledged Pre-Existing Loans** | Acknowledged Pre-Existing Loan is defined in Appendix A | $733,867.28 |
| **Expiration Date** | the date on which the Option Term expires | January 20, 2053 |
| **Legal Form of Ownership of Property** | -- | as an individual |
| **Owner Occupied Property vs. Non-Owner Occupied Property** | both terms are defined in Appendix A | Owner Occupied Property |
| **Property Type** | -- | Single Family Home |



© 2023 Point Digital Finance, Inc. 

EXHIBIT 1

1.2 **Term of Option and Term of Agreement**. The term of the Option you grant to us (the **"Option Term"**) will commence on the Effective Date and will expire at 11:59 p.m., Pacific Time, on the Expiration Date, unless otherwise extended pursuant to Sections 2.2.1 or 7.9. The term of this Agreement will continue until the receipt of the full amount of our Point Proceeds following (i) an Owner Option Repurchase or (ii) an Option Exercise. Certain obligations and provisions of this Agreement shall survive termination as provided in Section 7.8.

1.3 **Payment of Option Consideration**. We will pay you the total Option Consideration in two parts as set forth below.

1.3.1 **Payment of the Option Investment Payment and Option Grant Closing**. We shall pay you the Option Investment Payment within five Business Days of confirmation by an Escrow Agent that the escrow for the granting of the Option has closed including, but not limited to, confirmation of the following (the **"Option Grant Closing"**):

(a) You have executed and delivered to the Escrow Agent each of the following Option Documents: (i) a signed original of this Agreement; (ii) a signed and notarized original of the Security Instrument; and (iii) any other required documents;

(b) the Security Instrument and any other required documents are properly recorded in the appropriate state or county recorder's office; and

(c) Point has been added as an additional named insured under your insurance policies in compliance with Section 4.1.1.

1.3.2 **Payment of the Exercise Payment**. If you choose to repurchase the Option, Point will calculate the Point Proceeds and account for the Exercise Payment according to Schedule 2. If Point exercises the Option, Point will credit the Exercise Payment against its share of proceeds from a Property Sale except as indicated in Section 2.3.

1.4 **Payment of Point Proceeds**. Except as otherwise noted, your obligations under this Agreement will cease once you pay us our Point Proceeds, which will always be calculated per Schedule 2. This will typically occur by (a) your election to terminate and repurchase the Option by paying us the Point Proceeds (an **"Owner Option Repurchase"**), or (b) our election to exercise the Option upon the events specified in Section 1.4.2 event and be paid the Point Proceeds in a Property Sale. The Calculation of the Point Proceeds takes into account a cap (the **"Point Proceeds Cap"**) that may limit the amount of Point Proceeds you are obligated to pay to Point. The Point Proceeds Cap is based, in part, on the length of time that has elapsed between the Effective Date and the date Point receives the Point Proceeds.

1.4.1 **Owner Option Repurchase**. At any time during the Option Term, you may elect to repurchase and thereby terminate the Option by paying us the Point Proceeds. To initiate an Owner Option Repurchase, you must deliver written notice to us at least 15 days prior to the proposed closing date. You may be required to provide additional notice if you are repurchasing the Option in connection with a Property Sale or at the Expiration Date. The closing of the Owner Option Repurchase will be scheduled to allow us to conduct an Appraisal, at your cost, to determine the Ending Agreed Value.

We shall retain the right to reject any tender by you of the Point Proceeds that is less than the full amount of the Point Proceeds, is less than $0, is not actually received by Point or is not tendered within the time frame agreed to by you and Point, or is in violation of applicable law. Upon our acceptance of the Point Proceeds, the Option shall terminate.



© 2023 Point Digital Finance, Inc. 

1.4.2 **Option Exercise Triggers.** At any time prior to you consummating an Owner Option Repurchase, we have the right to exercise the Option upon the following events: (a) any Transfer of the Property or any portion of the Property as provided in Section 2.1; (b) at the Expiration Date, as provided in Section 2.2; (c) upon an Event of Default as provided in Section 2.3; or (d) upon special circumstances as provided in Sections 4.4 and 4.5.

1.5 **Recording and Securing the Option.** You grant us the right to secure your performance under the Agreement and our right to our Option Percentage through a Security Instrument (a Deed of Trust or Mortgage), substantially in the form attached as Exhibit A (the **"Security Instrument"**), which will be properly recorded or filed. You also grant us the right to record public notice of the Option either through (a) a rider or other means of incorporation into the Security Instrument or (b) a separately recorded memorandum evidencing: (i) the provisions of this Agreement that constitute covenants running with the land and (ii) the terms of this Agreement (**"Notice of Option Purchase Agreement"**).

## Section Two:
## Owner Option Repurchase and Option Exercise

2.1 **Owner Option Repurchase or Point Option Exercise Upon a Sale.** In connection with any Property Sale you may elect to terminate and repurchase the Option. If you do not elect to repurchase the Option, then we shall have the right, but not the obligation, to exercise the Option and be paid our Point Proceeds (**"Option Exercise Upon a Sale"**).

2.1.1 **Permitted Sale.** Any Property Sale by you, whether in connection with an Owner Option Repurchase or our Option Exercise, must meet the following conditions (a **"Permitted Sale"**): (a) you must use a licensed real estate agent to market and sell the Property; (b) you must hold at least two open houses; (c) the home must be listed for sale on the Multiple Listing Service for at least 14 days; (d) the sale must be an Arm's Length Transaction; (e) you will be solely responsible for conveying title free and clear of any liens to the satisfaction of the Third Party Buyer, and for satisfying any and all loans and other obligations secured by liens on the Property; (f) the transfer of the title to the Property at the closing of a Property Sale to a Third Party Buyer must convey the Property without being subject to the Option or any of the Option Documents; and (g) the Property Sale and transfer of the title to the Property may not be defeasible by you or the Third Party Buyer after close of Escrow upon the occurrence of some future contractually-specified event. A Permitted Sale includes a Property Sale that is not in accordance with this Section 2.1 but is otherwise expressly consented to in writing by Point. If you do not comply with all requirements, Point may order an Appraisal at your cost and use the Appraised Value of the Property rather than the sale price to calculate Point Proceeds.

2.1.2 **Notices and Documentation Upon Proposed Property Sale.**

(a) Owner Notice of Intention to Sell. You must give us prompt written notification, but no later than when you list the home for sale or, if the Property will be sold off the market, then at the time that you know you intend to sell.

(b) Owner Notice of Acceptance of Offer. If you accept an offer to purchase the Property, you must give us immediate, written notification but in no event more than 5 days after your acceptance of such offer and at least 15 days prior to a closing of any such transaction.



© 2023 Point Digital Finance, Inc. 

(c) Owner Notice Requirements. When you provide your notice of intent to sell or accept an offer, you must (a) indicate whether you elect to make an Owner Option Repurchase, or acknowledge we may make an Option Exercise in connection with the Property Sale; (b) include all related documents and agreements executed, created, obtained or delivered by you in connection with the marketing or sale of the Property; and (c) disclose whether the Property has been a Non-Owner Occupied Property at any time in the six-month period prior to the notice of intent to sell.

(d) Point Notice of Option Exercise Upon a Sale. If your notice of intent to sell or accept an offer does not indicate that you will make an Owner Option Repurchase, within five Business Days of our receipt, we may deliver a written notice to you informing you of our intent to commence our Option Exercise Upon a Sale (**"Notice of Option Exercise Upon a Sale"**). If you do not provide us with a notice of intent to sell or accept an offer, we will not have any obligation to deliver a Notice of Option Exercise Upon a Sale.

(e) Required Documentation. You shall promptly provide us all documents, purchase offers, escrow instructions, preliminary title reports and any other materials relating to the proposed sale or transfer as they become available.

2.1.3 **Ending Agreed Value and Appraisal in Property Sale**. Prior to closing on your Property Sale, we may order an Appraisal at your cost as provided in Section 4.3. You agree to comply with such process. In any Property Sale in connection with an Owner Option Repurchase or an Option Exercise Upon a Sale, the Ending Agreed Value is determined according to Schedule 2 Paragraph C.1.

2.1.4 **Closing of Sale and Owner Option Repurchase or Option Exercise Upon a Sale.**

(a) Escrow. Any Property Sale must be consummated through a licensed real property Escrow using the services of an Escrow Agent. Any instructions to the Escrow Agent regarding the disbursement of sales proceeds, the payment of our Point Proceeds and the release of the Security Instrument and, if applicable, the Notice of Option Purchase Agreement must have our prior written consent. Our consent will be given and conditioned upon our determination of your compliance with the terms and conditions of this Agreement.

(b) Concurrent Closings. The closing of an Owner Option Repurchase may occur prior to or concurrently with the Property Sale through the same Escrow as the Property Sale.

(c) Escrow Deliveries. On or prior to the close of Escrow upon any Property Sale where there will be an Owner Option Repurchase or Option Exercise Upon a Sale, (i) you agree to deliver or cause to be delivered to the Escrow Agent the appropriate deeds, affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to us, to effect your Owner Option Repurchase or our Option Exercise; and (ii) we agree to deliver or cause to be delivered the Exercise Payment to the Escrow Agent, or, at our election, the amount of the Exercise Payment may be debited against the Point Proceeds.

(d) Payment Allocations. At close of and through Escrow for a Property Sale, we shall be paid an amount equal to the Point Proceeds. You will be solely responsible for paying Closing Costs and Sales Commissions and satisfying and removing any and all loans and other obligations secured by liens on the Property.

2.2 **Owner Option Repurchase or Point Option Exercise as of Expiration Date.** Prior to the Expiration Date, (a) you may elect to terminate and repurchase the Option by paying us the Point



© 2023 Point Digital Finance, Inc. 

Proceeds through an Owner Option Repurchase in accordance with Section 2.2.1, or (b) if you do not consummate your Owner Option Repurchase, then we shall have the right, but not the obligation, to exercise the Option as of the Expiration Date, subject to the terms and conditions of Section 2.2.2 (**"Option Exercise as of Expiration Date"**).

2.2.1 **Owner Option Repurchase as of Expiration Date.** To initiate an Owner Option Repurchase in connection with the expiration of the Option Term, you must deliver written notice to us of your election to make an Owner Option Repurchase at least 50 days prior to the Expiration Date. The closing of the Owner Option Repurchase must occur prior to the Expiration Date and should be scheduled so as to allow us to conduct the Appraisal to determine the Ending Agreed Value for purposes of calculating the Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated prior to the Expiration Date, then (a) in Point's sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated, and (b) the Option Term shall automatically be extended by 90 days after the original Expiration Date to permit us the opportunity to make an Option Exercise as of Expiration Date.

2.2.2 **Option Exercise as of Expiration Date and Property Sale.** In the event of an Option Exercise as of Expiration Date, you will first be required to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. We will then purchase the Option Percentage of the Property by paying you the Exercise Payment, which will be held in an interest-bearing escrow account (the **"Exercise Payment Escrow Account"**). Upon closing of Escrow on the exercise of the Option, we will thereby take joint ownership of the Property with you and have the right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale subject to the procedures set forth in Section 2.2.2(d). The Exercise Payment will not be released until the closing of a subsequent Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise as of Expiration Date. You shall retain physical possession and the exclusive right to occupy the Property prior to a Property Sale (except if we determine, in our sole discretion, that there are extreme circumstances affecting the condition of the Property, such as abandonment, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(a) Notice of Option Exercise as of Expiration Date. To commence our Option Exercise as of Expiration Date, we will deliver written notice to you of our intention to exercise the Option (**"Notice of Option Exercise as of Expiration Date"**) at least 30 days prior to the Expiration Date.

(b) Documentation; Appraisals; Inspections; Confirmation of Title. Within 15 days following delivery of the Notice of Option Exercise as of Expiration Date, you agree to allow us to conduct both a home inspection and an Appraisal of the Property, at your cost, for the purpose of ascertaining the market value and the condition of the Property. Upon our request, you will also provide us with Confirmation of Title to our satisfaction, effective as of the date of closing of the Option Exercise as of Expiration Date. You will deliver to us any documents necessary to grant us the exclusive right to market and sell the Property. If we are not satisfied, in our sole discretion, with the value of the Property following the Appraisal or with the Confirmation of Title, we may withdraw our intention to exercise the Option and cancel our Notice of Option Exercise as of Expiration Date in writing, without any penalty to us or any further obligation to exercise the Option.



© 2023 Point Digital Finance, Inc. 

(c) Closing on Option Exercise as of Expiration Date.

(i) **Escrow for Option Exercise as of Expiration Date.** To effect the Option Exercise as of Expiration Date and purchase our Option Percentage of the Property, we shall open an Escrow, separate from the Exercise Payment Escrow Account. The parties shall use best efforts to close Escrow by the Expiration Date, with the Exercise Payment to be held in the Exercise Payment Escrow Account until the closing of a subsequent Property Sale.

(ii) **Closing Deliveries for Option Exercise as of Expiration Date.** On or prior to the close of Escrow upon our Option Exercise as of Expiration Date, you agree to deliver or cause to be delivered to the Escrow Agent the following: (i) a Grant Deed; (ii) Closing Costs, if any; (iii) any documents or other instruments that may be required by the Escrow Agent in connection with Confirmation of Title; (iv) the appropriate affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to Point; (v) any documents necessary for Point to conduct a Property Sale following Option Exercise; and (vi) instructions to the Escrow Agent that the Exercise Payment be deposited and held in an interest bearing Exercise Payment Escrow Account pending the closing of a Property Sale. We agree to deliver or cause to be delivered to the Escrow Agent (a) a preliminary change of ownership report (or similar document) required under applicable state or local law, and (b) the Exercise Payment which will be deposited in the Exercise Payment Escrow Account, less all monetary amounts owed to Point in the form of unpaid Service Fees and unreimbursed Preservation Payments.

(d) Property Sale in Connection with Option Exercise as of Expiration Date.

(i) **Initiation of Property Sale by Owner.** If you intend to initiate a Property Sale following our initiation of Option Exercise as of Expiration Date, you must meet the Owner obligations upon a Property Sale, and the sale must meet the conditions for a Permitted Sale, as described in Section 2.1.

(ii) **Initiation of Property Sale by Point.** If we choose to initiate a Property Sale after or in conjunction with our Option Exercise as of Expiration Date, we shall provide you with 10 Business Days advance notice of our intention to solicit buyers and sell the Property to one or more third parties in a Property Sale. You shall cooperate by allowing access to the Property and promptly executing all documents reasonably presented to you by us to effect a transfer of your interest in the Property to the Third Party Buyer.

(iii) **Ending Agreed Value and Payment of Proceeds.** In any Property Sale following our Option Exercise as of Expiration Date, the Ending Agreed Value shall be as determined by <u>Schedule 2</u> Paragraph C.1. At close of and through the Escrow for the Property Sale by us under this Section 2.2.2(d), the Escrow shall be conducted and sale proceeds shall be allocated and paid in the manner described in Section 2.1, except that the amount in the Exercise Payment Escrow Account shall be released to you and we shall also be paid (i) any Closing Costs that we pre-paid; and (ii) any other commercially reasonable sums expended by us in good faith in the preparation and marketing of the Property for sale.

2.3 **Option Exercise After Default and Property Sale.** At any time during the term of this Agreement, upon the occurrence of any Event(s) of Default described in Section 6.1 below, we shall have the



© 2023 Point Digital Finance, Inc. 

right, but not the obligation, to exercise the Option (an **"Option Exercise After Default"**) pursuant to the terms of this Section 2.3 and purchase the Option Percentage of the Property by paying you the Exercise Payment which will be held in a separate Exercise Payment Escrow Account. We may then require you to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. Following the closing of escrow on Option Exercise After Default, we will thereby take joint ownership of the Property with you and have the exclusive right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise After Default. Prior to a Property Sale, you shall retain physical possession and the exclusive right to occupy the Property (except if we determine, in our sole discretion, that the Property is at risk of waste or gross neglect, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property). At any time from an occurrence of any Event of Default until the cure of such default to our sole satisfaction, we may order one or more Appraisals.

2.3.1 **Notice of Option Exercise After Default.** Upon the occurrence of any Event(s) of Default giving rise to our right to exercise the Option, we shall provide written notice to you of the default and your right to cure (the **"Notice of Right to Cure Default"**). In the event that you fail to cure the default, as determined in our sole discretion, within 30 days following delivery of Notice of Right to Cure Default, we may, but are not obligated to, declare a default and our election to exercise the Option by delivering to you a written Notice of Option Exercise After Default (the **"Notice of Option Exercise After Default"**). Upon delivery of the Notice of Option Exercise After Default, we shall automatically be permitted to commence the process to exercise the Option and close on the Option Exercise, without further notice to you, pursuant to those terms and conditions set forth for Option Exercise as of Expiration Date in Sections 2.2.2(b) - (d) above; except that we shall additionally deliver instructions to the Escrow Agent, in form and content acceptable to us, concerning disbursement of the funds in the Exercise Payment Escrow Account to remedy the Events of Default in accordance with Section 2.3.3 below. We may, but are not obligated to, record the Notice of Option Exercise After Default in the county where the Property is located.

2.3.2 **Owner Cure or Failure to Cure After Notice.** In the event we deliver you a Notice of Option Exercise After Default, you shall retain the right to cure such default, with Point to determine the sufficiency of such cure in its sole discretion, on or before the 90th day following delivery of such Notice. In the event you fail to timely or sufficiently cure the default, as determined in our sole discretion, we shall notify you of the date we have selected for close of Escrow on our Option Exercise After Default; provided, however, that close of Escrow may not occur until the 120th day following delivery of the Notice of Option Exercise After Default, at the earliest.

2.3.3 **Amounts Chargeable to Owner After Default.** You authorize us to pay all amounts necessary to any third parties to enable us to cure and remedy your Event of Default by either (a) prior to Option Exercise, reducing the Exercise Payment that is owed to you through the Escrow for our Option Exercise After Default or (b) following Option Exercise, making disbursements from the Exercise Payment Escrow Account as described in Section 2.3.1. To cure and remedy the default, we may make payments to cover your delinquent payments, accrued interest, late fees, reinstatement fees, taxes and other penalties, together with any and all amounts which we deem necessary, in our discretion, to repair, protect and maintain the Property. Additionally, Point may charge you reasonable administrative fees for our oversight of the default process.

2.3.4 **Property Sale Following Option Exercise After Default.** Any Property Sale initiated by you or Point following Point's Option Exercise After Default must be conducted in accordance with the terms and conditions of Section 2.2.2(d), provided that, the Ending Agreed Value shall be determined according to Schedule 2 Paragraph C.2.

2.3.5 **Concurrent Remedies.** Our right of Option Exercise After Default under this Section 2.3 shall be, to the extent permissible under law, concurrent with our other rights and remedies at law and in equity, including, without limitation, remedies specified in Section 6 below. We retain full discretion to select the appropriate remedy following default, and are not obligated to initiate Option Exercise prior to initiating foreclosure proceedings.

2.3.6 **Owner Option Repurchase After Default.** At any time following our delivery of a Notice of Right to Cure Default but prior to the consummation of our Option Exercise After Default, you may elect to terminate and repurchase the Option by paying us our Point Proceeds in an Owner Option Repurchase as provided in Section 1.4.1; provided that the closing of such Owner Option Repurchase must (a) occur (i) within 20 days of you providing us notice of your election to make the Owner Option Repurchase, and (ii) prior to any scheduled closing of an Option Exercise After Default; and (b) use an Ending Agreed Value determined according to Schedule 2 Paragraph C.2 to determine the amount of Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated within the prescribed periods in this Section 2.3.6, then (a) in our sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated; (b) any waiting periods for us to be allowed to exercise of our remedies shall not be impacted; and (c) if we had delayed any exercise of our remedies because of your election, such delay shall not limit any of our rights to such remedies.

## Section Three:
## Terminations

3.1 **Non-Exercise; Other Terminations of Option.** Subject to the continuing duties, rights and obligations of the parties under Section 5 (Representations and Warranties) and Section 6 (Default and Remedies for Default), the Option shall terminate under the following conditions if there has not been a prior Owner Option Repurchase or Option Exercise:

(a) upon a Property Sale for which Point receives notice of intention to sell or acceptance of an offer, as provided in Section 2.1.2, and Point elects not to exercise the Option, provided such Property Sale would have otherwise met the conditions for a Permitted Sale;

(b) Point elects not to exercise the Option, and allows it to lapse, as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of the sale of the Property are paid to Point in the full amount specified in Section 4.4.2;

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to Point in the full amount specified in Section 4.5; or

(e) Point voluntarily terminates the Option Documents in writing.

3.2 **Effect of Non-Exercise and Termination.** If the Option is terminated as provided in Section 3.1 above, then (a) the Option and our rights to exercise the Option shall immediately terminate without notice; (b) the Option Investment Payment paid to you by us shall be retained by you in



© 2023 Point Digital Finance, Inc. 

consideration of the granting of the Option; and (c) subject to any survival provisions, this Agreement and the other Option Documents shall terminate.

3.3 **Termination Following Exercise**. In the event of an Option Exercise, this Agreement shall continue in full force and effect, as provided in Section 1.2, and terminate following the consummation of a Property Sale, or other event, where we receive the full amount of our Point Proceeds; provided, however, that certain obligations and provisions of this Agreement shall survive such termination as provided in Section 7.8.

3.4 **Release after Termination**. Point will file or will cause to be filed a termination and release of the Notice of Option Purchase Agreement, if applicable, and a reconveyance or satisfaction of the Security Instrument after the Option terminates.

## Section Four: Additional Covenants of Owner and Point

4.1 **Covenants and Rights of Owner.**

4.1.1 **Insurance**. You shall maintain at your own expense, and at a level that will cover the cost of replacement of the Property plus improvements, insurance on the Property against fire and other hazards with only those exclusions customarily associated with special form policies, and exceptions to those exclusions for ensuing loss. In addition, Point may from time to time reasonably require by written notice that you obtain and maintain (a) insurance against any other hazards, such as flood hazards or earthquakes, which insurance is common for similar properties in similar locations, and (b) liability insurance on the Property against such risks and in such amounts as are reasonable for similar properties in similar locations. Any such required insurance shall be obtained from a nationally recognized provider. We shall be named as an additional named insured and/or loss payee (or as we otherwise direct) under all hazard and liability insurance policies obtained by you, whether or not such insurance is required under this Agreement. You expressly authorize us to communicate directly with all such insurance companies for the purposes of ensuring the maintenance of such insurance policies and the coverage and reimbursement of losses thereunder. If you fail to maintain or obtain the insurance coverage required by this Section 4.1.1, we may obtain coverage on the Property that we, in our sole discretion, deem necessary and appropriate to protect our Point Proceeds as a Preservation Payment.

4.1.2 **No Receiver**. You shall not permit the appointment of a receiver for the Property. If a receiver for the Property is appointed, we may, but are not obligated to, take such action as we in our sole discretion may deem necessary or appropriate to remove such receiver, at your expense.

4.1.3 **Rental Premium**. You shall provide us with prompt written Notice in the event the Property becomes a Non-Owner Occupied Property at any time after the Effective Date. If the Property becomes a Non-Owner Occupied Property at any time within the six-month period prior to a Property Sale or prior to an Appraisal of the Property done for purposes of calculating the Point Proceeds, then you shall pay us the Rental Premium, which will be added to the Point Proceeds. The Rental Premium will not be assessed if (i) the Property is identified as a Non-Owner Occupied Property as of the Effective Date and as indicated in Section 1.1 or (ii) in the event the Ending Agreed Value is less than the Original Agreed Value. Without limiting the foregoing, a Property may not be subject to a rental or lease period that extends beyond



© 2023 Point Digital Finance, Inc.

the Expiration Date without Point's prior written consent.

4.1.4 **Service Fees.** You shall pay all Service Fees imposed by us from time to time in accordance with this Agreement. Service Fees shall include, without limitation: (a) reasonable fees for processing your requests for subordination; (b) reasonable fees for processing your requests for Property title or ownership changes; (c) reasonable fees for processing any reconveyance or renewal recordings of our Option Documents; (d) reasonable fees for processing Preservation Payments; (e) reasonable fees relating to a default by you, including administrative fees for our oversight of the default process; and (f) charges to cover any third party or other out-of-pocket costs relating to any of the foregoing categories (including, for example, charges imposed by title companies and Escrow companies, recording of documents, and reasonable attorneys' fees).

4.1.5 **Existing Loans.** Without our express written approval, you shall not increase, or permit the increase of (whether through negative amortization or otherwise), any existing loans secured by liens on the Property.

4.1.6 **Liens and Secured Obligations.** You shall at all times pay and keep current any and all loans and obligations secured by liens on the Property. You shall not encumber the Property with any secured obligation that is either senior to or could have the effect of impairing Point's lien position.

4.1.7 **Occupancy.** You shall enjoy sole right of occupancy of the Property as an owner and not as a tenant or lessee, whether or not we have exercised the Option, subject to the rights of you and Point to sell the Property pursuant to the terms of this Agreement. The foregoing sole right of occupancy shall be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your right of sole occupancy is not transferable by you except as part of a Property Sale or Exempted Owner Property Transfer, or as otherwise permitted by us in our sole discretion.

4.1.8 **Tax Benefits.** You shall be entitled to the full benefit of any and all tax advantages arising in relation to the Property, including, without limitation, all available deductions for taxes paid by you; provided, however, that you shall not be entitled to any tax benefits arising out of or attributable to any unreimbursed Preservation Payment.

4.1.9 **Obligation to Provide Information to Point.** Upon our reasonable request, you shall answer questions regarding the status of the Property and provide to us such reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage and information available to you concerning the Property and any modifications to the Property. You or your representative shall immediately provide Point with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, or Point's ability to exercise any right conferred by any of the Option Documents, including, without limitation, (a) the death or divorce of any Owner, (b) the death of any Trustee or Trustor (where Owner is/are the Trustee(s) of a Revocable Trust), or (c) the occurrence of an Event of Default.

4.1.10 **Debt Payoff.** A portion of the Option Investment Payment may be paid to settle and discharge your debts and outstanding amounts owed to third party creditors (the "Debt Payoff"). Point and Owner will instruct the Escrow Agent handling the Option Grant Closing to make disbursements for the Debt Payoff. Point and Owner agree that the Debt Payoff Amount represents the amounts due to the creditors and the Debt Payoff Amounts specified in the Option Agreement Estimate and Closing Disclosure are estimates based on the best



© 2023 Point Digital Finance, Inc. 

information we have prior to the Option Grant Closing. You agree that the daily amounts of each debt may fluctuate and that Point may change the final amounts paid to each creditor to best accomplish the parties' intent. These amounts may increase due to accrual of interest between the Effective Date and the date funds are disbursed through escrow. These amounts may also decrease due to payments that You made prior to the Option Grant Closing. Point and Owner agree that the actual amount to be paid through escrow to Owner's creditors will include all interest accrued and due as of the date of the Option Grant Closing and may be an amount greater or lesser than the estimated Debt Payoff Amount indicated on the Closing Disclosure. Any amounts due to creditors in excess of the estimated Debt Payoff Amount will be deducted from the remaining Option Investment Payment due to Owner. Any changes made to the Debt Payoff will not affect the amount of the Option Investment Payment.

Owner is responsible for paying off any existing debts and outstanding amounts owed to third party creditors that are not part of the Debt Payoff.

We will send you written confirmation of the exact amounts paid pursuant to the Debt Payoff following the Option Grant Closing. Within ten days of receiving payment of the Option Investment Payment following the Option Grant Closing, you will initiate payments in accordance with the terms of this Agreement to those third party creditors who were not paid through Escrow in connection with the Option Grant Closing; within 45 days of the Option Grant Closing, you will provide Point with written evidence from your bank or the third party creditors of payments made pursuant to this Section 4.1.10.

4.2 **Covenants and Rights of Point.**

4.2.1 **Point's Interest in the Property.** Until the time you consummate an Owner Option Repurchase or Point closes on the Option Exercise, Point has a contingent ownership interest in the Property. Following the closing of the Option Exercise, Point will have joint ownership rights in the Property.

4.2.2 **Preservation Payments**. To the extent that you fail to take action to protect the Property and Point's Rights as required under this Agreement, we shall have the right in our sole discretion to take such action and pay such money as we deem appropriate to correct your failure to take such required action (**"Preservation Payments"**). We shall give you five Business Days written notice of your failure prior to our taking corrective action. You shall promptly, upon demand for payment, but not later than 10 Business Days after demand, pay or reimburse us for any and all Preservation Payments, including, without limitation, those related to: the placement of insurance, the payment of taxes, expenses to remove or prevent a receiver for Property or the cure of defaulted loans. Point shall be entitled to charge you an interest rate of 8% per annum (or less if limited by applicable law) on any Preservation Payments it makes. Interest will begin to accrue on the date Point makes the Preservation Payment and will continue to accrue until Point is repaid or receives its Point Proceeds.

4.2.3 **Waiver of Right to Partition**. Owner and Point each hereby waive and relinquish all rights either of them may now or hereafter have to seek partition of the Property, whether in kind or by sale; provided, however, that Point shall retain the right to seek a partition: (a) in the event of, and as part of any action arising out of an Event of Default which is not timely cured pursuant to Section 2.3 above; or (b) in connection with any claim or action by Owner which asserts in whole or in part that this Agreement or any portion hereof is against the law or otherwise unenforceable.



© 2023 Point Digital Finance, Inc. 

4.2.4 **Right to Disclose Certain Information.** We may share certain personal and financial information with regard to this Agreement with our affiliates, subsidiaries, assignees and persons with which we intend to conduct business, including, without limitation, the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement.

4.2.5 **No Point Liability and No Point Loans.** Point shall not be liable for (including liability to repay) any loans created or obtained by you whether before or after any exercise of the Option and whether or not consented to, approved of, or subordinated to by Point. Further, we shall have no liability for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

4.3 **Appraisals.**

4.3.1 **Appraisal Order.** In the event of (a) a proposed Property Sale; (b) a proposed Owner Option Repurchase; (c) a determination of Ending Agreed Value as of the Expiration Date; (d) any allocation of insurance proceeds; (e) an Event of Default (at any time and on more than one occasion until the cure of such default or until an Owner Option Repurchase or a Property Sale following an Option Exercise After Default); or (f) any determination of Liquidated Damages pursuant to Section 8 of the Security Instrument, we may, in our sole discretion, (i) order an appraisal; (ii) order a broker's price opinion; (iii) order an underwriting-grade automated valuation model; or (iv) conduct any other reasonable valuation method to determine the value of the Property (collectively, an **"Appraisal"**). Subject to this Section 4.3, the value reflected on the Appraisal shall be the **"Appraised Value"** of the Property.

4.3.2 **Owner Cooperation.** You will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any and all relevant documentation in your possession pertaining to conditions that may affect the value of the Property. In addition, upon any Appraisal, you will inform us if the Property has been a Non-Owner Occupied Property in the six-month period prior to the Appraisal and, if currently a Non-Owner Occupied Property or anticipated to be a Non-Owner Occupied Property, the current rental or lease term, and any renewal rights, for the tenant.

4.3.3 **Additional Appraisals.** Subject to this Section 4.3.3, either Owner or Point may elect to order second and third Appraisals when an Appraised Value is needed under this Agreement. If either party desires to have a second Appraisal, then (a) the second Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the first Appraisal, and (b) the Appraised Value will then be the average value of the two Appraisals. If either party desires to have a third Appraisal, then (i) the third Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the second Appraisal, and (ii) the Appraised Value will then be the median value of the three Appraisals.

4.3.4 **Cost of Appraisal.** You shall pay all expenses associated with the first Appraisal on the Property ordered in connection with any event described in Section 4.3.1. The party that orders an additional Appraisal in connection with Section 4.3.3, if any, shall pay all expenses associated with such additional Appraisal. If you fail to pay the expenses associated with the first Appraisal or any additional Appraisal you request, we may subtract such expenses, or direct the payment of such expenses, out of Escrow.

4.4 **Property Destruction or Damage; Insurance.**



© 2023 Point Digital Finance, Inc.

4.4.1 **Repair and Restoration**. If the Property is destroyed or damaged in any material manner, you shall restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with Senior Liens on the Property, you shall apply any and all insurance proceeds (whether or not the underlying insurance was required by us) to such restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you shall be responsible for any shortfall and we shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

4.4.2 **Allocation Where Repair Not Feasible**. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you shall obtain an Appraisal, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any and all insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (a) to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by us) reasonably incurred by you, a senior lender and/or Point in collecting and contesting with the insurers the payments under the relevant insurance policies; (b) to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens; (c) to us, an amount calculated according to the Calculation of Point Proceeds; and (d) to you, the balance of the proceeds.

4.4.3 **Failure to Maintain Adequate Insurance**. If (a) you fail to maintain insurance in amounts required by Section 4.1.1 above or any insurance claim is denied due to your action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to us the entire amount owed as set forth in Section 4.4.2 above, then there shall be an Exercise Payment Insurance Reduction proportional to the decrease in the Property's value as compared to the Appraised Value of the Property immediately prior to the destruction or damage. In this case, we may exercise the Option (if we have not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 2.3 above, except that the Exercise Payment shall be reduced because of the added economic burden and risk imposed on Point by virtue of your failure. The Exercise Payment Insurance Reduction shall be taken into account in the calculation of the amount due to us according to the Calculation of Point Proceeds. The proceeds of any sale pursuant to this Section 4.4.3, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by us), will be allocated as described in Section 4.4.2 above.

4.5 **Condemnation**. If the Property is condemned in whole or in part and the Option has been exercised, then all condemnation proceeds net of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by Point) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds (**"Net Condemnation Proceeds"**) shall be allocated as provided in Section 4.4.2(b) – (d) above. If the Property is condemned in part, and if the Option has not been exercised, then we will have the right to exercise the Option, calculating our Point Proceeds using the Net Condemnation Proceeds as the Ending Agreed Value. The proceeds shall be allocated as provided in Section 4.4.2(b) – (d) above. In the case of a partial condemnation, Point's Rights shall be retained with respect to any portion of the Property that has not been condemned.



© 2023 Point Digital Finance, Inc. 

**Section Five:**
**Representations And Warranties**

5.1 **In General.** The Owner makes the representations and warranties in this Section 5 to, and for the benefit of, Point. The representations and warranties of Owner in this Section 5 shall be deemed made and renewed on and as of: (a) the Effective Date; (b) if you effect an Owner Option Repurchase, the date the repurchase is consummated; (c) if the Option is exercised, the date the exercise is consummated; and (d) upon any permitted assignment by you. The truth, accuracy and completeness of the representations, warranties and covenants set forth in this Section 5 at and as of each date in (a) – (d) above are a condition precedent to any and all of our obligations under each of the Option Documents.

5.2 **Capacity; Authority.** You represent and warrant that you, as the Owner(s) identified above, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. Your fee simple title to the Property is marketable and insurable, free of restrictions, leases, liens and other encumbrances or interests, and except as specifically identified in the Confirmation of Title delivered to Point, except with respect to Acknowledged Pre-Existing Liens. You represent and warrant that you have the full capacity and the legal power, right and authority to grant the Option, to enter into this Agreement and the other Option Documents, and to consummate the transactions contemplated by those documents. If you are the Trustee(s) of a Revocable Trust: (a) such trust has been duly formed; (b) the Trustee(s) of such trust have the capacity and authority to enter into the Agreement and the other Option Documents; and (c) copies of all trust documents (and all amendments and supplements) have been delivered to Point.

5.3 **No Lawsuits, Claims, or Foreclosures.** There is no litigation or arbitration pending or, after your due and diligent inquiry, to the best of your knowledge, threatened against you that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or your ability to perform your obligations under this Agreement. You have not received or are not aware of notice of any special assessment or other proceedings affecting the Property nor of any: (a) default or notice of default with respect to any loan or other obligation secured by the Property; (b) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (c) information or notice that the Property is to be sold or foreclosed upon by a party holding a lien on the Property.

5.4 **No Violations.** You have no knowledge of or information concerning any violations of any laws, regulations, zoning ordinances or other land-use regulation proceedings relating to the Property and no knowledge that any operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by you or others are not, have not been or will not be in all material respects in compliance with all state, federal and local laws, zoning ordinances, and regulations.

5.5 **Environmental Matters.** You have no knowledge of or information concerning any violation of, or claim of violation of any state, federal or local environmental law or regulation, including, without limitation, those relating to hazardous materials (**"Environmental Laws"**). In addition, you have no knowledge of the presence of any hazardous materials on, in, or about the Property or property in the vicinity of the Property. You shall not, and shall not allow others to, violate any laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

5.6 **Documentation and Information Supplied by Owner; Financial Condition of Owner.** Your application to Point and all financial and other documentation and other information (including



© 2023 Point Digital Finance, Inc. 

documentation and information about the Property) supplied or made available by you or your spouse, if applicable, as part of applying for, or in connection with entering into, the Option and the Option Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's) financial condition as of (a) the date supplied, and (b) the Effective Date of this Agreement. There has been no material change in your financial condition as of the Effective Date since your application to Point.

5.7 **Conflict; Enforceability.** You represent and warrant that: (a) the execution and delivery of the Option Documents, the incurrence of the obligations set forth in those documents, the consummation of the transactions contemplated by, or compliance with the terms of, those documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which you are a party or by which any portion of the Property may be bound; and (b) the Option Documents and all other documents required to be executed by you in connection with those documents shall be valid, legally binding obligations of, and enforceable against, you and, if applicable, Trustor(s) and any successors or assignees in accordance with their terms.

**Section Six:**
**Defaults and Remedies For Default**

6.1 **Events of Default.** The occurrence of any of the following shall constitute an Event of Default (**"Event of Default"**) under the Option Documents, in Point's sole discretion:

(a) you breach or fail to perform any obligation or covenant under any of the Option Documents (including but not limited to any failure or refusal to honor Point's Rights), or reject or take any action to terminate the Option or this Agreement, except as expressly permitted under this Agreement;

(b) you fail to timely provide to us any Notice(s) required under this Agreement;

(c) you make any representation or warranty, whether oral or written, to us that is false or misleading as of the time given, including, without limitation, any misrepresentation or suppression of material fact in connection with the amount or kind of consideration given to you in any Property Sale and the representations and warranties in Section 5;

(d) any event of your insolvency, including but not limited to the commencement of any voluntary or involuntary bankruptcy proceeding by or against you or the appointment of a receiver for the Property or you or a conservator of your affairs;

(e) any taxes or assessments on the Property become delinquent;

(f) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with the provisions of this Agreement;

(g) any senior lien that does not have our prior written approval attaches to the Property;

(h) any loans that are secured by liens on the Property, whether recorded or unrecorded, become delinquent (whether or not such loans or liens have been approved or subordinated to by Point);



© 2023 Point Digital Finance, Inc.

(i) you fail to maintain, preserve or repair the Property in good repair and in a condition substantially similar to its condition on the date of this Agreement, except for normal wear and tear;

(j) insurance on the Property is not maintained as prescribed in this Agreement;

(k) any assignment, attempted assignment, or other transfer of the Option or Option Documents in violation of Section 7.7.2 below;

(l) if no Owner or no renter authorized by the Owner uses the Property as regular living and sleeping quarters for more than 730 consecutive days; provided that any non-occupancy due to renovation on the Property will not be counted against such two-year period;

(m) the Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date;

(n) you fail to cooperate with us, which we will determine in our sole discretion, to effect a Property Sale before or after Option Exercise as of Expiration Date or Option Exercise After Default; or

(o) any other action or event occurs which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, Point's right to exercise the Option or Point's Rights.

6.2 **Remedies Following Event of Default.** In an Event of Default, Point may exercise any of the following remedies and any other rights and remedies available to us in law, equity or otherwise:

6.2.1 **Exercise Option and Receive Point Proceeds.** As provided in Section 2.3, upon the occurrence of any Event(s) of Default, we shall have the right, but not the obligation, (a) to exercise the Option and take joint ownership of the Property with you and (b) then solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale, and receive our Point Proceeds in connection with such Property Sale.

6.2.2 **Foreclosure/Power of Sale Under State Laws.** Point shall be entitled, in its sole discretion, to exercise Point's power of sale under the Security Instrument, and to foreclose upon the Property to the extent permissible under applicable law. Point shall follow and be bound by those procedures prescribed under law for foreclosure of residential real property established in the jurisdiction where the Property is located. In the event Point elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 6.2.2, Point may declare any and all of the sums specified as Liquidated Damages immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

6.2.3 **Damages for Breach.** We shall be entitled, in our sole discretion, but are not obligated to, demand damages for any Event(s) of Default, calculated according to the Calculation of Point Proceeds set forth in Schedule 2.

6.2.4 **Specific Performance, Rescission and Injunctive Relief.** You and we agree that if we are not allowed to exercise our rights under any of the Option Documents, or if you fail to comply with your obligations thereunder, the damages to us would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity or otherwise, we shall be entitled to seek specific performance of the covenants, agreements and rights contained in each of the Option Documents, or, as permitted by applicable law, to seek full



© 2023 Point Digital Finance, Inc. 

rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity or otherwise, we shall thereafter be entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

6.3 **Repayment in Bankruptcy**. In the event we are required to and do remit or disgorge one or more dollars paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then Point shall be entitled to assert a claim against you for each such dollar remitted (and permitted costs herein) under the terms and conditions of this Agreement, and such claim by us shall begin to accrue on the date such dollar is actually remitted and shall automatically survive the term of this Agreement.

6.4 **Calculation of Liquidated Damages**. To the extent that enforcement of the Security Instrument and any power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount, Owner and Point agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) default(s) as specified in this Section 6 may be uncertain, depend on many factors, and be extremely difficult to ascertain, and that a good faith effort to determine a method for reasonably estimating and liquidating such damages is the calculation of Liquidated Damages according to the Calculation of Point Proceeds set forth in Schedule 2. The amount in default or liquidated bid amount under any remedy may also include all, or any, of the following: (i) the sum of all monetary obligations owed to us by you under this Agreement; and (ii) any and all amounts, properly chargeable to you as necessary to satisfy your obligations with respect to your mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

6.5 **Remedies Concurrent and Not Exclusive**. The remedies set forth in this Section 6 shall be concurrent, cumulative and not exclusive, to the extent permitted by law. Every right, power and remedy granted to Point in the Option Documents shall be in addition to all those rights, powers and remedies granted to Point at law or in equity or by statute, and each such right, power and remedy may be exercised from time to time and as often and in such order as may be deemed expedient by Point to the extent permitted by law, and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.

## Section Seven: Miscellaneous

7.1 **Indemnification by Owner and Maximum Liability**. You hereby agree to defend, indemnify and hold Point harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees, to the extent permissible) of every kind arising out of or relating to: (a) a breach of any of your representations or warranties under this Agreement or the other Option Documents; (b) any act or omission by you or your agents; or (c) the Property. Notwithstanding your indemnification obligation under this Section 7.1, at our election, we may defend any third party claim subject to your indemnification obligation with counsel of our own choosing and without your participation. You shall not, without our prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING OWNER'S INDEMNIFICATION OBLIGATION, IN NO EVENT SHALL POINT'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO



© 2023 Point Digital Finance, Inc. 

THIS AGREEMENT OR THE PROPERTY EXCEED THE AMOUNT OF THE OPTION INVESTMENT PAYMENT.

7.2 **Asset Administration.** You acknowledge and consent to any assignment whereby the Asset Administrator's responsibilities, including, but not limited to, the right to enforce the Option Documents, are transferred from us to a third party. You will be notified of any change in the Asset Administrator within 30 days of such change.

7.3 **Covenants to Run With Land.** The provisions of this Agreement shall be deemed to be covenants running with the land so long as this Agreement remains in effect. We shall record a Notice of Option Purchase Agreement reflecting this fact in the public records. Upon valid termination of this Agreement, the Notice of Option Purchase Agreement shall automatically terminate, and we shall cause to be recorded such documents as are required to reflect such termination.

7.4 **Relationship.** Point shall not be deemed a partner, joint venturer, trustee, or fiduciary with, or of, Owner. Owner shall not be permitted to execute any document or enter into any agreement on behalf of Point. The Option is intended to be and shall be treated for all purposes (including, without limitation, tax purposes) as an option to purchase real property and not as a purchase, or joint venture.

7.5 **Multiple Owners and Revocable Trusts.**

7.5.1 **Multiple Owners.** If Owner is more than one person or entity: (i) the Option Documents must be signed by each such Owner; (ii) all rights and powers specified for Owner in the Option Documents must be approved and exercised unanimously by all such multiple Owners; (iii) all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under the Option Documents; (iv) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 7.13; and (v) Point may treat any notice received from any one Owner as notice from all Owners.

7.5.2 **Revocable Trusts.** If any Owner is/are the Trustor(s) or Trustee(s) of a Revocable Trust: (i) all Trustors must sign the Option Documents in their capacities as individuals and as Trustors; (ii) all Trustees must sign the Option Documents in their capacities as Trustees; (iii) each Trustee and Trustor who signs this Agreement hereby represents and warrants that all Trustees and Trustors have been disclosed to Point; (iv) all rights and powers specified for, and all actions required of, Owner in the Option Documents must be approved and exercised by all Trustees unanimously; (v) all Trustors, in their capacities as individuals, shall be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under the Option Documents; (vi) all representations and warranties by Owner in the Option Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (vii) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of the Trustees using the contact information set forth in Section 7.13 of this Agreement; and (viii) Point may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

7.6 **Delegation of Duties.** We may execute any of our duties under this Agreement or any other Option Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel shall be deemed to have been taken in good faith. We shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.



© 2023 Point Digital Finance, Inc. 

7.7 **Successors and Assignees; Owner's Estate**. The Option Documents shall be binding upon and insure to the benefit of Owner and Point and their respective heirs, successors and assignees. If the Owner dies, then the Option Documents shall be binding on the Owner's Estate. The death of the Owner shall not terminate any of the Option Documents. However, nothing in this provision shall permit assignment of any of the Option Documents contrary to the express provisions of this Agreement.

7.7.1 **Assignment by Point**. Point may assign, participate, hypothecate or sell, in whole or in part, Point's right and title to, and interest in, any of the Option Documents at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any assignment, Point may in its sole discretion disclose any and all documents and information in its possession relating to Owner and the Property, subject to its assignee's agreement to continue to observe Point's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Point's assignee shall automatically have all the rights and remedies of Point under the Option Documents. Point and Owner shall execute and deliver in recordable form, if requested, at Point's expense, such other documents as are appropriate to reflect the assignment of the Option and the other Option Documents. Point and Owner agree to cooperate with such assignee and execute such additional documents as may be necessary to insure assignee's interest in the Property. Point shall notify Owner no later than 60 Business Days after the effective date of any such assignment.

7.7.2 **Assignment of Agreement by Owner**. Absent Point's prior written consent, which consent may be withheld in Point's sole discretion, Owner may not assign or otherwise transfer any of the Option Documents. Notwithstanding the foregoing, Point will generally not unreasonably withhold consent to such assignment to: (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse who acquires an undivided interest in the Property; provided that in each case the assignee (including, in the case of a Revocable Trust, any Trustor): (A) was alive as of the Effective Date, (B) executes this Agreement and, if applicable, the Notice of Option Purchase Agreement, and (C) executes such assignment with the assignor (hereinafter, **"Exempted Owner Assignment(s)"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, shall continue to remain liable under the Option Documents.

7.7.3 **Exempted Owner Property Transfer**. If Owner obtains Point's prior written consent, the Owner may Transfer the Property into the name of (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse; provided that the requirements for an Exempted Owner Assignment under Section 7.7.2(A) – (D) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer will not be considered a Property Sale and will not trigger Point's right to exercise the Option.

7.8 **Survival**. The following provisions shall survive any termination of this Agreement: (a) the indemnification and liability cap provisions of Section 7.1; (b) the obligations to repay any and all Preservation Payments and Service Fees; (c) the obligation to remove any liens on the Property and pay any Sales Commissions, Closing Costs and or other expenses properly chargeable to Owner under Section 2; (d) any and all provisions which entitle Point to monetary remedies, fees, costs and expenses in connection with any Event of Default under Section 6; and (e) Sections 7.6 through 7.22 of this Agreement.



© 2023 Point Digital Finance, Inc. 

7.9 **Injunction.** If we are stayed or enjoined from exercising the Option, commencing or initiating Option notice and exercise procedures hereunder (whether as a result of Owner's bankruptcy or otherwise), or enforcing any right of Point under this Agreement, the Option shall not expire until 90 Business Days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period prescribed in the Option Documents which we are prevented or prohibited from observing by operation of law or by court order, shall automatically be stayed for the duration of such stay, injunction or legal prohibition until such stay, injunction, or legal prohibition is no longer applicable or is lifted by final order of the appropriate court.

7.10 **Choice of Law; Venue.** The Option, this Agreement and the other Option Documents shall be determined under, governed by, and construed in accordance with California law, without regard to its conflict of law principles; provided, however, that to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws shall be deemed to govern and control. Subject to Section 7.20, the parties agree that all actions or proceedings arising in connection with this Agreement shall be arbitrated at a JAMS arbitration location, or injunctive relief sought only in the state and federal courts located in or having jurisdiction in the city or county in which the Property is located.

7.11 **Further Assurances.** The parties agree, from time to time, as and when requested by any other party to this Agreement and the other Option Documents or by its successors or assignees to: (a) execute and deliver, or cause to be executed and delivered, all such instruments; and (b) take, or cause to be taken, all such further or other actions as may be reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Option Documents.

7.12 **Severability; Waivers.** Each provision of this Agreement, and of the other Option Documents, shall be severable from every other provision for the purpose of determining the legal enforceability of any provision, which shall be construed separately and as separately enforceable from every other provision hereunder. No waiver by Point of any of its rights or remedies in connection with this Agreement or the other Option Documents shall be effective unless such waiver is in writing and signed by Point and Owner, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No delay or waiver by Point in exercising any right shall be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse. To the extent that enforcement of any provision, or exercise of any right, under this Agreement or the other Option Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then such provision shall be considered separately and apart from the remaining provisions, and any and all other remaining provisions shall continue to be fully enforceable under law.

7.13 **Notice.** Each party shall deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a **"Notice"**) in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address. Owner shall promptly notify Point of Owner's change of address. Notice to any one Owner shall constitute notice to all Owners unless applicable law expressly requires otherwise. Notice from any one Owner shall constitute notice from all Owners unless applicable law expressly requires otherwise. Each party shall deliver all Notices by first class mail, personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission). Except as otherwise provided in this Agreement, a notice to Owner



© 2023 Point Digital Finance, Inc. 

in connection with this Agreement shall be deemed to have been given to Owner when mailed by first class mail or when actually delivered to Owner's notice address if sent by other means. Any notice in connection with this Agreement shall not be deemed to have been given to Point until actually received by Point. If any notice required by the Security Instrument is also required under applicable law, such requirement of the applicable law will satisfy the corresponding requirement under this Agreement.

| | |
|---|---|
| **POINT:**<br>Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>**Personal or Overnight Delivery:**<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, CA 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | **OWNER:**<br>James B. Muskal<br>1312 N ASTOR ST<br>CHICAGO, IL 60610<br>Phone: (312) 616-5630<br>Email: jmuskal@leydig.com |

7.14 **Entire Agreement; Amendment.** The Schedules and Exhibits below, and any riders to this Agreement, are incorporated herein by this reference. This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the other written agreements made by and between Owner and Point as of the Effective Date together constitute the entire agreement between the parties pertaining to the subject matter contained in them. Except as expressly agreed in writing, all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Option Documents, and the transaction which is the subject matter thereof, including but not limited to any and all offer letters, terms sheets and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the party against whom enforcement is sought.

7.15 **No Third-Party Beneficiaries.** This Agreement and the other Option Documents are entered into for the protection and benefit of Point and Owner and their respective heirs, permitted successors, affiliates and assignees with regard to their respective present and contingent ownership interests in the Property. No other Person shall have any rights or causes of action under this Agreement or the other Option Documents.

7.16 **Counterparts; Electronic Signatures.** This Agreement and the other Option Documents may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law,



© 2023 Point Digital Finance, Inc. 

including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.17 **Registered Domestic Partnerships and Civil Unions**. An Owner shall have the same rights and obligations with respect to Owner's Civil Union Partner or Registered Domestic Partner as the Owner shall have with respect to its spouse for all purposes under the Option Documents, including Sections 7.7.2, 7.7.3 and 7.18 of this Agreement, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

7.18 **Consent of Spouse**. If you are married on the date of this Agreement and your spouse is not listed on the title to the Property, your spouse must execute and deliver to us a notarized Consent of Spouse in the form of Exhibit B attached to this Agreement (**"Consent of Spouse"**). If you should marry or remarry after the Effective Date, within 30 days after the marriage, you and your spouse shall execute and deliver to us a notarized Consent of Spouse. The Consent of Spouse will not be deemed to confer or convey to your spouse any rights in the Property that do not otherwise exist by operation of law.

7.19 **WAIVER OF JURY TRIAL**. TO THE FULLEST EXTENT PERMITTED BY LAW, POINT AND OWNER HEREBY VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE OPTION DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE OPTION DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN POINT AND OWNER.

7.20 **ARBITRATION.**

7.20.1 ***Arbitration***. OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE **"RULES"**) OF, AND PURSUANT TO THE STATE LAW OF, THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2.

7.20.2 ***Procedure***. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS (**"JAMS"**), AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. THE PARTIES SHALL BE ENTITLED TO PRE-HEARING DISCOVERY AND THE EXCHANGE OF NON-PRIVILEGED INFORMATION RELEVANT TO THE DISPUTE, CONSISTENT WITH JAMS' RULES AND CALIFORNIA LAW, AND AS OVERSEEN BY THE ARBITRATOR. OWNER AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. OWNER ALSO



© 2023 Point Digital Finance, Inc. 

AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. OWNER UNDERSTANDS THAT POINT WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

7.20.3 ***Remedy***. EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND POINT. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR POINT WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

7.20.4 ***Availability of Injunctive Relief***. BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF POINT ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE POINT PROCEEDS IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

7.20.5 ***Small Claims Court***. BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION.

7.20.6 ***Class Action Waiver***. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR WE MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

7.21 **TAX MATTERS**. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN OPTION TO PURCHASE AN INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT POINT HAS REQUESTED THAT OWNER DISCUSS THIS



© 2023 Point Digital Finance, Inc. 

AGREEMENT WITH TAX, LEGAL AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

7.22 **NO ADVICE**. IN ENTERING INTO THE OPTION DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND SHALL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY POINT, ITS AGENTS, ITS AFFILIATES, OR ANY OF THEIR OFFICERS, EMPLOYEES OR AGENTS, REGARDING: (A) THE VALUE OF THE PROPERTY OR THAT THE ORIGINAL AGREED VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE OR FAIR MARKET VALUE OF THE PROPERTY; (B) THE ADVISABILITY OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE; OR (C) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY POINT TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

7.23 **Cancellation**. You may cancel this Agreement at any time within three Business Days from the date you sign this Agreement. If you wish to cancel this Agreement, you must send written notice to us in accordance with Section 7.13 within three Business Days from the date you sign this Agreement. If you cancel this Agreement and have already received the Option Investment Payment, you agree to immediately repay the amount of the Option Investment Payment to us.

7.24 **Consent to be Contacted**. You expressly authorize us, our agents, representatives, affiliates, successors, and assigns to contact you for any purpose arising out of or relating to the Option or Option Documents at any phone number that you have provided us or will provide us in the future, including but not limited to autodialed or prerecorded phone calls or text messages, regardless of whether the phone number is a cellular telephone number or landline. You represent and warrant that you are the owner or regular user of any phone numbers that you provide us and acknowledge that your carrier's telephone minute and text charges may apply. You also agree to notify us immediately whenever you stop using any mobile numbers that you have provided us.

**[Signatures on Following Pages]**



© 2023 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**POINT:**

POINT DIGITAL FINANCE, INC., a Delaware corporation

By: [signature]

Name: Jordan D. Fox

Title: Assistant Secretary



© 2023 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**OWNER:**

James B. Muskal



© 2023 Point Digital Finance, Inc.

## APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below:

**Acknowledged Pre-Existing Lien**. A perfected lien upon the Property securing an Acknowledged Pre-Existing Loan that is senior to (a) the lien of the Security Instrument, (b) the covenants running with the land under this Agreement, and (c) the Option; (i) of which Point had actual written notice under a title report, title search or title commitment obtained in connection with this Option transaction; and (ii) that is acknowledged in writing by Point before or upon Point's execution of this Agreement.

**Acknowledged Pre-Existing Loan**. An obligation secured by an Acknowledged Pre-Existing Lien, including, without limitation, any and all principal, interest, and expenses.

**Agreement**. This Point Digital Finance Option Purchase Agreement between Owner and Point and all exhibits, schedules, attachments, riders, and all amendments, supplements, and addenda now or hereafter executed by the parties.

**Aggregate Principal Balance of Indebtedness**. The amount of the total principal balance of the loans or any other indebtedness secured by liens on the Property plus the amount of the Point Proceeds as it is calculated at the time of determining the Aggregate Principal Balance of Indebtedness. In the case of an open-end line of credit, the unused portion of any line of credit shall be considered principal indebtedness.

**Appraisal**. Is defined in Section 4.3.1.

**Appraised Value**. Is defined in Section 4.3.1.

**Appreciation**. Is calculated as the Ending Agreed Value minus the Original Agreed Value.

**Arm's Length Transaction**. A transaction in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, as by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property. An Arm's Length Transaction would presumptively not include a transaction between family members or business associates, or where there are hidden terms or agreements or special understandings between the parties, whether written or oral, for the seller to regain ownership of the Property or the buyer to immediately resell the Property within 90 Business Days and the seller to receive any proceeds from such resell transaction.

**Asset Administrator**. The entity responsible for monitoring Owner's compliance with, and discharging Point's responsibilities and maintaining Point's rights under, this Agreement and the other Option Documents. Initially, the Asset Administrator will be Point Digital Finance, Inc.

**Business Days**. Any day other than a Saturday, a Sunday, Good Friday, the day after Thanksgiving, or a day on which commercial banks in New York or California are required or authorized to be closed.

**Calculation of Point Proceeds**. Is defined in Schedule 2.

**Civil Union Partner and Registered Domestic Partner**. The natural person having such status under the California Family Code Section 299 or applicable state law.



© 2023 Point Digital Finance, Inc.

**Closing Costs.** All (a) ordinary and customary costs in connection with any sale or other Transfer of the Property or any assignment or exercise of the Option related to such Transfer, including, without limitation, recording fees and costs, reconveyance fees, Escrow fees, title insurance fees or fees incurred in obtaining the Confirmation of Title elected by Point, transfer taxes and documentary transfer taxes, and (b) federal, state or local taxes (excluding income taxes) arising, incurred or owed in connection with (i) Point's exercise or sale of the Option, (ii) a Property Sale, (iii) any related closing of that sale, or (iv) any related Escrow. However, the term "Closing Costs" shall not include costs that are owed or incurred by a third party other than Point in connection with a sale of the Property to that third party.

**Confirmation of Title.** Confirmation of good and marketable title in and to the Property in fee simple and free of any liens or encumbrances of whatever character, subject only to the Permitted Encumbrances, to be provided, in Point's sole discretion, in the form either of a policy of title insurance issued to, or for the benefit of, Point or Point's assignee at the time that this Agreement is entered into (or at such other times as may be required by Point under this Agreement) and insuring Point's or Point's assignee's rights under the Option Documents; or of a written title report, abstract of title or other title search documentation reflecting, to Point's satisfaction, confirmation of its good and marketable title to Point's ownership interest in the Property.

**Consent of Spouse.** Is defined in Section 7.18.

**Debt Payoff.** Is defined in Section 4.1.10.

**Debt Payoff Amount.** The amount of the Option Investment Payment that Point and Owner agree will be paid, either through Escrow in connection with the Option Grant Closing or by Owner pursuant to Section 4.1.10, to settle existing debts and obligations of the Owner. An estimate of the Debt Payoff Amount is set forth in the Option Agreement Estimate and Closing Disclosure, and the exact amounts paid pursuant to the Debt Payoff will be set forth in a written confirmation from Point following the Option Grant Closing.

**Effective Date.** Is defined in the first paragraph of this Agreement.

**Effective Sale Price.** The monetary amount for which the Property is to be sold or transferred by Owner or Point, as applicable, to a Third Party Buyer, as adjusted, as set forth below. The Effective Sale Price shall be the sum of all amounts set forth or that would otherwise be set forth in the Closing Disclosure promulgated under TILA-RESPA rules (or any successor form) prepared by an Escrow Agent (which shall include the fair market value of any non-cash consideration received by, or for the benefit of, Owner and/or Point in connection with the sale of the Property). The Effective Sale Price will also be increased to capture agreements that benefit the Owner and decrease the sale price of the Property, including but not limited to below-market or free rent-back periods or assumptions of debt by the Third Party Buyer (such as a PACE or solar loans). The calculation of the Effective Sale Price shall not include any deduction for any: (a) Closing Costs; (b) liens on the Property; (c) outstanding taxes; (d) Sales Commissions; (e) appraisal expenses; (f) loans secured by the Property; (g) credits made by Seller to closing costs; and/or (h) amounts payable to Point hereunder.

**Ending Agreed Value.** The value of the Property as used in the Calculation of Point Proceeds and the determination of which is set forth in Schedule 2.

**Environmental Laws.** Is defined in Section 5.5.

**Escrow.** A transaction settlement, typically consisting of an exchange and disbursement of consideration, costs, and proceeds, and documentation of clear title to the Property, using the services of an Escrow



© 2023 Point Digital Finance, Inc.

Agent.

**Escrow Agent**. A title company reasonably acceptable to Point as contemplated by Section 2 or any neutral third party Escrow agent, settlement agent, title agent or attorney closing firm that closes or settles any transaction contemplated hereunder.

**Event of Default**. Is defined in Section 6.1.

**Exempted Owner Assignment**. Is defined in Section 7.7.2.

**Exempted Owner Property Transfer**. Is defined in Section 7.7.3.

**Exercise Payment**. The amount of the Option Consideration minus the Option Investment Payment, as such amount may be reduced pursuant to Section 4.4.3. The purchase by Point of its Option Percentage in the Property occurs by payment or debit of the Exercise Payment. The Exercise Payment is a defined term used in various calculations made under this Agreement, and when so used shall refer to the applicable dollar amount employed whether or not the Option is, in fact, exercised.

**Exercise Payment Escrow Account**. Is defined in Section 2.2.2.

**Exercise Payment Insurance Reduction**. Is defined in Section 4.4.3.

**Expiration Date**. The day described in Section 1.1.

**Grant Deed**. A grant deed, executed by Owner and notarized, in form and substance acceptable to the Escrow Agent, that, when recorded, will deliver to Point, or its assignee (or to a Third Party Buyer, where applicable), good and marketable fee simple title to Point's undivided percentage interest in the Property, subject to (a) the standard printed exceptions described in the policy of title insurance covering the Property, or, where applicable, any written exceptions disclosed in the Option Confirmation of Title; (b) the standard printed exceptions of the Escrow Agent, if any; and (c) the Permitted Encumbrances, provided that all outstanding obligations under the Permitted Encumbrances are current.

**JAMS**. Is defined in Section 7.20.2.

**Net Condemnation Proceeds**. Is defined in Section 4.5.

**Non-Owner Occupied Property**. Property that is rented or leased by the Owner to third parties while there is not at least one Owner regularly occupying the Property as a residence for living and sleeping quarters, provided that a Property will not be deemed a Non-Owner Occupied Property if it has short term rentals (with rental periods less than 30 days) where such short term rentals occur an aggregate of less than three months out of a six month period. A Non-Owner Occupied Property may not be subject to any lease or rent agreement that extends beyond the Expiration Date.

**Notice**. Is defined in Section 7.13.

**Notice of Option Exercise After Default**. Is defined in Section 2.3.1.

**Notice of Option Exercise as of Expiration Date**. Is defined in Section 2.2.2(a).

**Notice of Option Exercise Upon a Sale**. Is defined in Section 2.1.2.



© 2023 Point Digital Finance, Inc.

**Notice of Option Purchase Agreement.** Is defined in Section 1.5.

**Notice of Right to Cure Default.** Is defined in Section 2.3.1.

**Option.** Is defined in Section 1.1.

**Option Consideration.** Is defined in Section 1.1.

**Option Documents.** This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the Consent of Spouse, and any riders, amendments or supplements to any of these documents.

**Option Exercise.** Is defined as Point's election to purchase the Option Percentage.

**Option Exercise After Default.** Is defined in Section 2.3.

**Option Exercise as of Expiration Date.** Is defined in Section 2.2.

**Option Exercise Upon a Sale.** Is defined in Section 2.1.

**Option Grant Closing.** Is defined in Section 1.3.1.

**Option Investment Payment.** Is defined in Section 1.1.

**Option Percentage.** Is defined in Section 1.1.

**Option Term.** Is defined in Section 1.2.

**Original Agreed Value.** The starting value of the Property, for purposes of this Agreement only, determined by Point in reliance on various factors, such as independent appraisals, automated valuation models, and Point's proprietary valuation and risk assessment methods, and agreed to by the Owner at the time of the origination of the Option, as specified in Section 1.1. In some cases, the Original Agreed Value may be less than the Appraised Value of the Property as of the Effective Date as a reflection of certain risk adjustments.

**Owner.** All of the persons or entities, individually and collectively, who appear on the record title to the Property as holding fee simple title to 100% of the Property as of the Effective Date.

**Owner's Estate.** Collectively the executor, personal representative and other persons charged with the administration and distribution of the Property following the death of the Owner, and the heirs, beneficiaries, persons and trusts who are entitled to receive the Property when it is distributed following the death of the Owner, whether pursuant to form of title on the Property, the deceased Owner's will or Revocable Trust, the laws of intestacy, or any other means.

**Owner Occupied Property.** Property that is not rented or leased and that at least one Owner (or if the Property is held in a Revocable Trust, one Owner or one Trustor) regularly occupies as a residence for living and sleeping quarters.

**Owner Option Repurchase.** Is defined in Section 1.4.



© 2023 Point Digital Finance, Inc.

**Permitted Encumbrances**. All licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject at the time the Option Documents become effective: (a) that are stated as exceptions on the Confirmation of Title, or (b) to which Point has expressly agreed in writing that the Property will remain subject following any exercise of the Option by Point. In no event will "Permitted Encumbrances" include any Senior Loans, Senior Liens, or any other liens that secure the payment of any loans or the performance of any obligations owed to any creditor.

**Permitted Sale**. Is defined in Section 2.1.1.

**Person**. An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing.

**Point Proceeds**. The amount calculated as the monetary interest of Point under the Agreement and Option Documents, as further defined and calculated under Schedule 2.

**Point Proceeds Cap**. Is defined in Section 1.4.

**Point's Rights**. The Point Proceeds due to Point, together with all interests and rights that Point has with regard to the Property (matured or unmatured, contingent or non-contingent, present or prospective), whether the Option has or has not been exercised, and all other rights that Point may have under the Option Documents.

**Preservation Payments**. Is defined in Section 4.2.2.

**Property**. The residential real property owned by Owner that is the subject of the Option Documents. The legal description of the Property is set forth in Schedule 1 to this Agreement. The Property shall include only the real property described in that Schedule 1 and the fixtures appurtenant to that real property, and shall not include any other personal property of Owner.

**Property Sale**. A sale or Transfer by Owner (or by Point following exercise of Option) of all, or an interest in, the Property. This term excludes the sale of Point's ownership interest pursuant to the Option. A Property Sale by the Owner must also be a Permitted Sale. An Exempted Owner Property Transfer is not considered a Property Sale.

**Registered Domestic Partner**. See "Civil Union Partner and Registered Domestic Partner" above.

**Rental Premium**. A premium added to the Point Proceeds to account for potential loss of value of the Property resulting from use of the Property as a rental property. The Rental Premium shall equal 10% of the Appreciation multiplied by the Option Percentage, where Appreciation is calculated as the Ending Agreed Value minus the Original Agreed Value [Rental Premium = 10% × (Ending Agreed Value - Original Agreed Value) × Option Percentage]. If the Ending Agreed Value is less than the Original Agreed Value, no Rental Premium will apply. An example follows:

- Original Agreed Value of Home at $500,000, and Ending Agreed Value at $1,000,000. Point has 20% Option Percentage.
- Appreciation is $500,000 = $1,000,000 (Ending Agreed Value) – $500,000 (Original Agreed Value).
- Rental Premium is $10,000 = 10% × $500,000 (Appreciation) × 20% (Option Percentage).



© 2023 Point Digital Finance, Inc.

**Revocable Trust.** A revocable trust, revocable living trust, *inter vivos* trust, revocable family trust or similar trust established in accordance with the laws of any state.

**Rules.** Is defined in Section 7.20.1.

**Sales Commissions.** All broker fees, sales commissions, finder fees and all other fees and costs owed to any broker, real estate agent or finder and incurred in connection with a sale or Transfer of the Property or any interest in the Property.

**Security Instrument.** Is defined in Section 1.5.

**Senior Liens.** Liens on the Property that are perfected prior to or are otherwise senior to Point's Point Proceeds.

**Senior Loans.** Loans or other obligations that are secured by Senior Liens.

**Service Fees.** Fees, costs and charges of the type further described in Section 4.1.4, which Service Fees are designed to compensate the Asset Administrator for the time, effort, costs and expenses incurred by the Asset Administrator in responding to requests from Owner or defaults by Owner under the Option Documents or in performing other necessary and reasonable acts pursuant to the Option Documents.

**Transfer.** A sale, exchange, transfer, conveyance or assignment of all or any part of the Property or any legal or beneficial interest in the Property, unless the sale, exchange, transfer, conveyance or assignment is to a surviving Owner or estate of an Owner in the event of a death of an Owner.

**Third Party Buyer.** The Person that purchases, or proposes to purchase, the Property in a Property Sale or Transfer of the Property.

**Trustee(s).** The Person or Persons designated as the "trustee" of a Revocable Trust in its formation documents and any subsequent amendments, and any successor trustees under such Revocable Trust.

**Trustor(s).** The Person or Persons designated as the "trustor", "settlor" or "grantor" of a Revocable Trust in its formation documents and any subsequent amendments.



© 2023 Point Digital Finance, Inc.

**Schedule 1**

**LEGAL DESCRIPTION**

The following described real estate in the County of Cook, State of Illinois, to-wit:
The North 18.33 feet of Subdivision Lot 1 (measured on a right angle from the North Line of said Lot) in the
Subdivision of Lots 9, 10 and 11 in Block 4 in Stone's Resubdivision of part of Astor's Addition to Chicago in
Section 3, Township 39 North Range 14 East of the Third Principal Meridian, in Cook County, Illinois.
Subject to: Covenants, conditions and restrictions of record; private, public and utility easements and roads and
highways, if any; party wall rights and agreements, if any; special taxes or assessments for improvements not yet
completed; any unconfirmed special tax or assessment; general taxes for the year 1978 and subsequent years
including taxes which may accrue by reason of now and additional improvements during the years 1977 and
1978.
Commonly Known As: 1312 North Astor Street, Chicago, IL 60610
Parcel ID: 17-03-106-017-0000

PARCEL NUMBER: 17-03-106-017-0000

[end of legal description]



© 2023 Point Digital Finance, Inc.

## Schedule 2

## CALCULATION OF POINT PROCEEDS

A. **Formula for Calculation of Point Proceeds.** Except as otherwise provided in this Agreement, any calculation of the value of the Point Proceeds under this Agreement, the other Option Documents, or otherwise shall be calculated as the total of the following (**"Calculation of Point Proceeds"**):

**Point Proceeds** = Lesser of {**Point Proceeds Cap** and [(**Ending Agreed Value** × **Option Percentage**) – **Exercise Payment** + **Rental Premium**†]} + **Service Fees**† + **Preservation Payments**†

† if applicable

- the *lesser* of the following:
  - › the **Point Proceeds Cap,** as calculated in Section B below, and
  - › the *sum* of the following:
    - » the **Ending Agreed Value** as specified in Section C below *multiplied* by the **Option Percentage;**
    - » *minus* the **Exercise Payment**, subject to reductions[(1)] and adjustments[(2)] below;
    - » *plus* the **Rental Premium** if a designated **Owner-Occupied Property** has been rented or leased in the previous six month period and Ending Agreed Value exceeds Original Agreed Value;
- *plus* all monetary amounts owed to Point in the form of unpaid **Service Fees** and unreimbursed **Preservation Payments** (including any unpaid interest and other fees and charges associated with such Preservation Payments), provided that Owner has not already delivered any such amounts

---

(1) The Exercise Payment amount will be reduced if an Exercise Payment Insurance Reduction is deemed to be applicable under Section 4.4.3.

(2) If Point has previously delivered the Exercise Payment to Owner at an Option Exercise pursuant to Sections 2.2 or 2.3, then the value of the Exercise Payment shall not be deducted from the Point Proceeds to be paid to Point.

B. **Calculating the Point Proceeds Cap.** The Calculation of the Point Proceeds takes into account the Point Proceeds Cap, which may limit the amount an Owner is obligated to pay to Point. The Point Proceeds Cap is calculated as follows:

**Point Proceeds Cap** = **Option Investment Payment** × [1 + (**Point Proceeds Cap Factor** / 12)]$^{M}$

where **M,** used as an exponent, represents the number of months (including partial months) that have fully elapsed since the Effective Date.

C. **Determining Ending Agreed Value.** The following Ending Agreed Values shall apply to the Calculation of Point Proceeds:

(1) **Property Sale**. Except as provided in C.2. below, in any Property Sale, the Ending Agreed Value shall be the greater of (a) the Effective Sale Price and (b) the Appraised Value, if available.

(2) **Property Sale or Owner Option Repurchase After Event of Default.** In the event of a Property Sale initiated by us following an Option Exercise After Default in accordance with Section 2.3.4 or an Owner Option Repurchase in accordance with Section 2.3.6, the Ending Agreed Value shall



© 2023 Point Digital Finance, Inc.

be the greater of (a) the Effective Sale Price, if any, (b) the highest Appraised Value of the Property calculated between the date of an Event of Default through the date of closing of such Property Sale or Owner Option Repurchase, and (c) the Original Agreed Value.

(3) **Owner Option Repurchase.** Except as otherwise provided in Section 1.4.1, in any Owner Option Repurchase during the Option Term not involving a Property Sale or Event of Default, the Ending Agreed Value shall be the Appraised Value of the Property at the time of the Owner Option Repurchase.

(4) **Insurance Allocation.** In any insurance allocation under Section 4.4, the Ending Agreed Value shall be the Appraised Value of the Property immediately prior to the destruction or damage.

(5) **Condemnation.** In any total condemnation or partial condemnation of the Property, the Ending Agreed Value shall be the Net Condemnation Proceeds under Section 4.5.

D. **Damage Calculations.** In any calculation of damages due to Point following an Event of Default, or any calculation of Liquidated Damages under this Agreement, the Ending Agreed Value for determining the Point Proceeds shall be the highest Appraised Value of the Property calculated between the date of any Event of Default through the date Point accepts payment from Owner in discharge of Point's Rights hereunder; and provided, further, that in the event of any calculation of damages or Liquidated Damages following any Event of Default under Section 6.4 of the Agreement, the Ending Agreed Value shall be the higher of (a) the highest Appraised Value of the Property calculated between the date of any Event of Default hereunder through the date Point accepts payment from Owner in full discharge of Point's Rights hereunder; and (b) the Original Agreed Value.



© 2023 Point Digital Finance, Inc.

**EXHIBIT A**

**SECURITY INSTRUMENT**

© 2023 Point Digital Finance, Inc. DOCSET: IL22.1

**EXHIBIT B**

**CONSENT OF SPOUSE**

© 2023 Point Digital Finance, Inc.



POINT

**Prepared by, recording requested by, and when recorded mail to:**

Point Digital Finance, Inc.
PO Box 192
Palo Alto, CA 94302

point.com

Option Agreement ID:
2022155-ESOLO

Parcel Number:
17-03-106-017-0000

C-IL849467

(Space Above for Recorder's Use)

# MORTGAGE

**NOTICE: THIS MORTGAGE CONTAINS A SUBORDINATION CLAUSE WHICH MAY RESULT IN MORTGAGEE'S SECURITY OR OTHER INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

This **MORTGAGE**, together with any riders hereto (**"Security Instrument"**), is made as of January 20, 2023 (**"Effective Date"**), among James B. Muskal and Cheryll Collins-Muskal (individually or collectively, **"Mortgagor"**) and Point Digital Finance, Inc., a Delaware corporation, and its successors and assignees (**"Mortgagee"**).

The following riders are to be executed by Mortgagor [check box as applicable]:

☐ Condominium Rider

☐ Planned Unit Development Rider

## RECITALS

A. This Security Instrument is given in connection with the execution of that certain Point Digital Finance Option Purchase Agreement (**"Option Agreement"**), entered into by and between Mortgagor and Mortgagee, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase (**"Option"**) an undivided percentage interest (the **"Option Percentage"**) in that certain real property and improvements thereon in County of Cook, State of Illinois, as more particularly described in Schedule A attached hereto and incorporated herein by this reference, and commonly known as 1312 N ASTOR ST, CHICAGO, IL 60610 (**"Real Property"**). The initial term of the Option shall commence on the Effective Date and shall expire

© 2023 Point Digital Finance, Inc

on January 20, 2053. In exchange for granting the Option to Mortgagee, Mortgagee paid to Mortgagor an Option Investment Payment amount equal to $350,000.00.

B. Mortgagee desires to secure the rights granted to it in the Option Agreement and the performance of Obligations (hereinafter defined).

C. This Security Instrument is given pursuant to the Option Agreement, and payment, fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument in accordance with the terms set forth herein.

D. Capitalized terms used in this Security Instrument shall have the meanings specified herein, or if not defined herein, in the Option Agreement. The Option Agreement and certain other ancillary documents (which documents, together with the Security Instrument, are collectively termed the **"Option Documents"**) are executed by Mortgagor and Mortgagee concurrently herewith.

**1. Grant**. MORTGAGOR HEREBY IRREVOCABLY mortgages, grants, transfers and assigns to Mortgagee, and its successors and assignees, a security interest, with power of sale, for the benefit of Mortgagee and its successors and assigns in and to the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the **"Property"**):

**a.** Real Property. The Real Property together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property.

**b.** Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Real Property, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the **"Leases"**) and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees

© 2023 Point Digital Finance, Inc

from any and all sources arising from or attributable to the Real Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Mortgagor and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the **"Rents"**) and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Point Proceeds. As used herein, **"Creditors Rights Laws"** shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

**c.** Insurance Proceeds. All insurance proceeds in respect of the Real Property under any insurance policies covering the Real Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Real Property (collectively, the **"Insurance Proceeds"**).

**d.** Condemnation Awards. All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Real Property (collectively, the **"Awards"**).

**CONDITIONS TO GRANT**: TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever, WITH THE POWER OF SALE, to secure Mortgagor's payment to Mortgagee of the Point Proceeds and the performance of the Obligations at the time and in the manner provided in the Option Documents and this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly (a) pay to Mortgagee the Point Proceeds at the time and in the manner provided in the Option Agreement, this Security Instrument and the other Option Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument and the other Option Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument and the other Option Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Mortgagor's obligation to indemnify and hold harmless Mortgagee pursuant to the provisions hereof shall survive any such payment and release.

**2. Secured Obligations.**

**a.** Obligations. Mortgagor makes the mortgage, grant, transfer and assignment set forth in Section 1 above for the purpose of securing the following **"Obligations"**:

**(1)** the payment of the Point Proceeds;

**(2)** all other obligations of Mortgagor contained herein;

**(3)** each obligation of Mortgagor contained in the Option Agreement and any ancillary document;

**(4)** each obligation of Mortgagor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Option Agreement;

**(5)** any expenditures made by Mortgagee pursuant to, or under, this Security Instrument; and

**(6)** payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively **"Attorneys' Fees"**)) incurred by Mortgagee in the enforcement and collection of the obligations listed above and the protection of Mortgagee's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

**b.** Option Investment Payment. Mortgagor shall not be obligated to repay any part of the Option Investment Payment (as such term is defined in the Option Agreement); and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Mortgagor to be paid pursuant to the Option Agreement.

**3. Uniform Commercial Code Security Agreement and Fixture Filing**. This Security Instrument also is intended to be and shall constitute a security agreement under the Illinois Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Illinois Uniform Commercial Code. Mortgagor hereby grants to Mortgagee a security interest in those items to secure the performance and payment of the Obligations.

**a.** Mortgagor agrees that Mortgagee may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index

and/or in the Office of the Illinois Secretary of State, as a financing statement for any of the items specified above as part of the Property.

**b.** This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the Illinois Uniform Commercial Code, and any similar or successor provisions.

**c.** Mortgagee may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

**d.** Mortgagor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Mortgagee may reasonably require.

**e.** On any default hereunder, Mortgagee shall have the remedies of a secured party under the Illinois Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Mortgagee may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Mortgagee's remedies under the Illinois Uniform Commercial Code or the remedies in Section 7 below.

**4.** **Assignment of Leases and Rents**. Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

**a.** Mortgagor hereby gives to, and confers upon, Mortgagee the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving unto Mortgagor the right, prior to any default by Mortgagor in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

**b.** Upon any such default, Mortgagee may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Mortgagee may determine.

**c.** The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this

Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Mortgagor to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

**5.** **Covenants of Mortgagor Regarding the Property**. Mortgagor hereby agrees as follows:

**a.** To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Mortgagee; and to pay all costs and expenses of Mortgagee (including cost of evidence of title and Attorneys' Fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Mortgagee may appear, and in any suit brought by Mortgagee to foreclose this Security Instrument or to collect the Obligations or to protect Mortgagee's rights under this Security Instrument; and/or (ii) in connection with the enforcement of any provisions of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

**b.** To pay at least ten days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

**(1)** If Mortgagor fails to make any payment or to do any act as provided in this Security Instrument, Mortgagee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Mortgagee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Security Instrument.

**(2)** Such performance by Mortgagee shall not require notice to, or demand on, Mortgagor and shall not release Mortgagor from any obligation under this Security Instrument.

**(3)** Mortgagee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Mortgagee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Mortgagee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

**c.** To pay immediately upon demand all sums expended by Mortgagee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Mortgagee at the rate specified in the Option Agreement from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

**6.** **Power of Attorney**. Mortgagor hereby irrevocably appoints Mortgagee as Mortgagor's attorney-in-fact (such agency being coupled with an interest). As such attorney-in-fact Mortgagee may, after providing notice to Mortgagor pursuant to the Option Agreement (without the obligation to do so) in Mortgagee's name, or in the name of Mortgagor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Mortgagee's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Mortgagor; provided, however, that Mortgagee as such attorney-in-fact shall be accountable only for such funds as are actually received by Mortgagee.

**7.** **Default and Foreclosure and Power of Sale**. Upon Mortgagor's default under or breach of any of the rights and Obligations that are secured by this Security Instrument as specified above, Mortgagee may declare all performance and sums secured by this Security Instrument immediately due by delivery to Mortgagor of written declaration of default. Mortgagee shall give notice of default to Mortgagor prior to acceleration following Mortgagor's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Mortgagor, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the performance secured by this Security Instrument and sale of the Property. The notice shall further inform Mortgagor of the right to cure after acceleration and the right to bring an action to assert the non-existence of a default or any other defense of Mortgagor to acceleration and sale. If the default is not cured on or before the date specified in the notice, Mortgagee at its option may require immediate performance in full of all obligations secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Mortgagee shall be entitled to collect all expenses incurred in pursuing the remedies provided herein, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Mortgagee invokes the power of sale, Mortgagee shall execute a written notice of Mortgagee's election to cause the Property to be sold as prescribed by applicable law. Mortgagee shall mail copies of the notice as prescribed by applicable law to Mortgagor and to the other persons prescribed by applicable law. Mortgagee shall give public notice of sale to the persons and in the manner prescribed by applicable law.

After the time required by applicable law, Mortgagee, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of

sale in one or more parcels. Mortgagee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

Mortgagee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Mortgagor or Mortgagee as defined in this Security Instrument, may purchase at such sale.

**a.** After deducting all costs, fees and expenses (including Attorneys' Fees) Mortgagee shall apply the proceeds of sale to payment: (i) to Mortgagee, all sums expended and performance due under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by law in effect on the Effective Date of this Security Instrument; (ii) to Mortgagee, all other sums then secured hereby; and (iii) the remainder, if any, to the person or persons legally entitled thereto.

**b.** Notice provided to Mortgagor under this Security Instrument shall be delivered to the address specified in Section 19 of this Security Instrument in accordance with the applicable terms and conditions of the Option Agreement unless otherwise required by applicable law.

**c.** Exercise of Mortgagee's remedies under this Security Instrument shall be in compliance with applicable law.

**8.** **Liquidated Damages**. Liquidated Damages means an amount equal to the sum of

**a.** the Point Proceeds as calculated pursuant to the Option Agreement;

**b.** in connection with Mortgagor's failure to make any monetary payment, the sum of all monetary obligations (including, without limitation, all Preservation Payments) owed to Mortgagee by Mortgagor under the Option Agreement; and

**c.** any and all amounts, properly chargeable to Mortgagor as necessary to satisfy Mortgagor's obligations under the Option Agreement with respect to Mortgagor's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

**9.** **Late Performance**. By accepting performance of any obligation after its due date, Mortgagee does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.

**10.** **Defeasance**. If Mortgagor shall well and truly satisfy all Obligations secured hereby at the time and in the manner provided in this Security Instrument and in the Option Agreement, and Mortgagor shall well and truly abide by and comply with each and every covenant and

condition set forth in this Security Instrument and in the Option Agreement, then these presents and the lien and interest hereby transferred and assigned shall cease, terminate and be void. Mortgagee shall release the Property and renounce any other rights granted to it herein and shall execute, at the request of the Mortgagor, a release of this Security Instrument and any other instrument to that effect deemed necessary or desirable, upon performance being made on the Obligations secured hereby.

**11.** **Successors**. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "Mortgagee" shall include any successor or assignee of Mortgagee's rights in the Option Agreement and in this Security Instrument, whether or not named as Mortgagee in this Security Instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

**12.** **Joint and Several Liability**. If more than one person signs this Security Instrument as Mortgagor, the obligations of each signatory shall be joint and several.

**13.** **Multiple Mortgagors**. If there are multiple Mortgagors of the Property:

**a.** this Security Instrument must be signed by each such Mortgagor;

**b.** all rights and powers specified for Mortgagor in this Security Instrument must be approved and exercised unanimously by all such multiple Mortgagors;

**c.** all such multiple Mortgagors shall be jointly and severally liable for all liabilities and obligations specified for Mortgagor under this Security Instrument;

**d.** notice required to be given by, or to, Mortgagor will be deemed adequately given if given by, or to, any of Mortgagors using the contact information set forth in Section 19 of this Security Instrument; and

**e.** Mortgagee may treat any notice received from any one Mortgagor as notice from all Mortgagors.

**14.** **Revocable Trust**. If any Mortgagor is/are the trustee(s) of a Revocable Trust (as defined in the Option Agreement):

**a.** all trustees of the Revocable Trust and all individuals having the power to revoke the Revocable Trust (referred to herein as "owners of the Revocable Trust") must sign this Security Instrument in their respective capacities as trustees and/or owners of the Revocable Trust, and each trustee and owner of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and owners of the Revocable Trust have been

disclosed to Mortgagee;

**b.** any trustee of the Revocable Trust who is also an owner of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as owner of the Revocable Trust;

**c.** all rights and powers specified for, and all actions required of, Mortgagor in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

**d.** all trustees and all owners of the Revocable Trust shall be jointly and severally liable for all liabilities and obligations specified for Mortgagor under this Security Instrument;

**e.** all representations and warranties by Mortgagor in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all owners of the Revocable Trust;

**f.** notice required to be given by, or to, any Mortgagor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in Section 19 of this Security Instrument; and

**g.** Mortgagee may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Mortgagor.

**15.** **Extent of Lien**. The lien granted under this Security Instrument shall encumber Mortgagor's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

**16.** **No Merger**. So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Mortgagee otherwise consents in writing, the fee estate of Mortgagor in the Property or any part thereof (including the estate of Mortgagee after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Mortgagee or in any other Person.

**17.** **Subordination of Homestead and Waivers**. If Mortgagor heretofore has acquired or hereafter acquires an estate of homestead in the Property, Mortgagor hereby agrees, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount due under the Option Agreement and to all renewals, extensions and modifications of this Security Instrument or the Option Agreement, and that said homestead estate is subject to all of the rights of Mortgagee under this Security Instrument and the Option Agreement and all renewals, extensions and modifications of this Security Instrument and the Option Agreement, and is subordinate to the lien evidenced by this

Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Mortgagor waives and relinquishes all rights of curtesy and dower in the Property.

**18.** __**Notice of Option Purchase Agreement**__. Mortgagor hereby provides notice that Mortgagor and Mortgagee have entered into the Option Agreement, as more particularly described in Schedule B attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Mortgagee. The Option Agreement is irrevocable by Mortgagor and expires on January 20, 2053. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

**19.** __**Notices**__. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| | |
|---|---|
| **POINT:**<br>Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>__**Personal or Overnight Delivery:**__<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, California 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | **MORTGAGOR:**<br>James B. Muskal<br>1312 N ASTOR ST<br>CHICAGO, IL 60610 |

**Do not lose or destroy this Security Instrument or the Option Agreement that it secures. All must be delivered to Mortgagee for cancellation before discharge will be made.**

**[Signatures on Following Page]**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH MORTGAGEE, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT AND OPTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN MORTGAGOR AND MORTGAGEE AS OF THE EFFECTIVE DATE.

**MORTGAGOR HEREBY DECLARES THAT MORTGAGOR HAS READ THIS SECURITY INSTRUMENT, HAS RECEIVED A COMPLETELY FILLED IN COPY OF IT WITHOUT CHARGE THEREFOR AND HAS SIGNED THIS SECURITY INSTRUMENT AS OF THE EFFECTIVE DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Security Instrument as of the date set forth above.

**MORTGAGOR(S):**

____________________ Date: 1/20/23.
James B. Muskal

____________________ Date: 1/20/23
Cheryll Collins-Muskal

**ACKNOWLEDGMENT**

State of ~~Illinois~~ AZ )
) §
County of MARICOPA )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT Samuel B Muskal Cheryll Collins-Muskal, personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person, and acknowledged that [he/she] signed, sealed and delivered the said instrument as [his/her] free and voluntary act for the uses and purposes therein set forth.

Given under my hand and official seal, this 20 day of Jan, 2023.

(Signature of Notary)

(Seal of Notary)

KERRY L. DEAN
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 640215
Expires January 14, 2027

© 2023 Point Digital Finance, Inc

## SCHEDULE A

## LEGAL DESCRIPTION

The following described real estate in the County of Cook, State of Illinois, to-wit:
The North 18.33 feet of Subdivision Lot 1 (measured on a right angle from the North Line of said Lot) in the
Subdivision of Lots 9, 10 and 11 in Block 4 in Stone's Resubdivision of part of Astor's Addition to Chicago in
Section 3, Township 39 North Range 14 East of the Third Principal Meridian, in Cook County, Illinois.
Subject to: Covenants, conditions and restrictions of record; private, public and utility easements and roads and
highways, if any; party wall rights and agreements, if any; special taxes or assessments for improvements not yet
completed; any unconfirmed special tax or assessment; general taxes for the year 1978 and subsequent years
including taxes which may accrue by reason of now and additional improvements during the years 1977 and
1978.
Commonly Known As: 1312 North Astor Street, Chicago, IL 60610
Parcel ID: 17-03-106-017-0000

PARCEL NUMBER: 17-03-106-017-0000

[end of legal description]

## SCHEDULE B

## NOTICE OF OPTION

This Notice of Option (**"Option Notice"**) provides notice of that certain Option Agreement entered into as of January 20, 2023 (**"Effective Date"**), by and between James B. Muskal and Mortgagee, and supplements the Security Instrument of the same date between the same parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

RECITALS

1. Mortgagor hereby declares that as of the Effective Date, Mortgagor and Mortgagee have entered into that certain unrecorded Point Digital Finance Option Purchase Agreement (**"Option Agreement"**), which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase (**"Option"**) an undivided percentage interest (the **"Option Percentage"**) of fee simple title ownership in the Property. In exchange for granting the Option to Mortgagee, Mortgagee paid to Mortgagor an Option Investment Payment equal to **$350,000.00**. The Option is irrevocable by Mortgagor and expires on **January 20, 2053**.

2. Pursuant to the Option Agreement, Mortgagor has made certain covenants and promises to, or for the benefit of, Mortgagee in connection with the Property, all as more particularly described, and on the terms and conditions stated in the Option Agreement.

3. Mortgagor has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Mortgagor as to the Mortgagee, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Mortgagor's interest in the Property so long as the Option Agreement has not expired or been terminated.

TERMS

A. Notice. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

B. Covenants. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

1. restrictions on Mortgagor's right to transfer the Property without giving prior written notice to the Mortgagee and requirements that Mortgagor comply with

© 2023 Point Digital Finance, Inc

specific sale procedures set forth in the Option Agreement;

2. requirements that Mortgagor maintain insurance on the Property against certain hazards and risks;
3. restrictions on Mortgagor's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;
4. requirements that Mortgagor keep the Property free of liens not approved by Mortgagee; and
5. requirements that Mortgagor protect and maintain the Property.

2022155-ESOLO James B. Muskal

POINT

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**

Initials: I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.

Initials: I am responsible for paying off any of my debts that are not paid off with the funds received from Point.

Initials: I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.

Initials: Point is **not** buying part of my home today. Instead, Point is buying the right to 44.2000% of my home's future change in value. This right is called the "option."

Initials: When I am ready to repay Point, Point will determine my home's change in value by subtracting the Original Agreed Value from the Ending Agreed Value. To determine the Original Agreed Value, Point lowered the assessed value of my home by 28.00%. This is called the risk adjustment. The Original Agreed Value for my home is $1,584,000.00. To determine my home's Ending Agreed Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).

Initials: My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount is the result of applying an annual rate to the funds I receive from Point. This rate is called the Point Proceeds Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.

Initials: If my home value increases, my repayment amount will also increase. Even if my home value does not increase, my repayment amount may increase over time. This is because the Original Agreed Value is less than my home's current assessed value.

Initials: I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.

Initials: If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.

Initials: Lenders may not be willing to refinance my mortgage unless I also repay Point.

EXHIBIT 2

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Closing Disclosure

*This form is a statement of final option terms and closing costs. Compare this document with your Option Agreement Estimate.*

## Closing Information

| | |
|---|---|
| **Date Issued** | 07/15/2024 |
| **Effective Date** | 07/18/2024 (projected) |
| **Disbursement Date** | 07/24/2024 (projected) |
| **Settlement Agent** | Vantage Point Title |
| **Escrow Account #** | C-AZ892254 |
| **Property** | 6023 E TURQUOISE AVE<br>PARADISE VALLEY, AZ 85253 |

## Transaction Information

| | |
|---|---|
| **Homeowners** | Cheryl C. Collins-Muskal<br>James B. Muskal |
| **Homeowner Address** | 1312 N Astor St<br>Chicago, IL 60610 |
| **Investor** | Point Digital Finance, Inc |
| **Option Agreement #** | 2024252-TEDOG |
| **Occupancy Type** | Non-Owner Occupied Property |

## Option Terms

***Except for the Estimated Debt Payoff Amount, the Option Terms below will not change after closing.***

***There are no monthly payments and no interest accrues.***

| | | |
|---|---|---|
| **Investment Amount** | $210,000.00 | *This is the amount Point will invest in your Property in exchange for an Option in your Property.* |
| **Appraised Value** | $2,800,000.00 | *This is the value determined by Point in reliance on various methods, such as traditional appraisals or automated valuation models.* |
| **Homeowner Protection Cap** | 19.0% | *An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 of your Option Agreement.* |
| **Appreciation Starting Value** | $2,044,000.00 | *This is the beginning value of your Property used to calculate Point's share of the Property's appreciation and the Point Proceeds. The Property's appreciation value can be positive or negative depending on the Final Home Value. The Point Proceeds is the amount you pay Point upon your repurchase, a sale of the Property, or at the end of the term. In all cases, the Point Proceeds will be subject to the Homeowner Protection Cap.* |
| **Investment Term** | 30 Years | |
| **HEI Percentage** | 34.5000% | *This is the percentage of appreciation you will pay Point upon repayment, unless the result is more than the Capped Repayment Amount.* |
| **Estimated Debt Payoff Amount** | $42,217.80 | *The estimated amount of the Investment Amount that will be paid to settle existing debts and obligations.* |
| **Acknowledged Pre-Existing Loans** | $1,469,203.95 | *This is the current sum of debt obligations on your Property.* ***Contact Point immediately if this is not correct.*** |

## Closing Summary

***See Calculating Cash to Homeowner on page 3 for details.***

| | | |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $625.00 | Includes $1,901.55 in Option Agreement Costs<br>+ $30.00 in Other Costs - $1,306.55 Paid by Point |
| **Cash to Homeowner** | $167,157.20 | After deducting Closing Costs Paid by Homeowner and Payoffs Made at Closing Through Escrow. |



EXHIBIT 3

POINT

PO Box 192
Palo Alto, CA 94302
1-888-764-6823

# Option Agreement Estimate

*Save this Estimate to compare with your Closing Disclosure.*

| | | | |
|---|---|---|---|
| **Option Agreement #** | 2024252-TEDOG | **Estimate Revision** | 1 |
| **Date Issued** | 06/18/2024 | **Homeowners** | James B Muskal<br>Cheryll C Collins-Muskal |
| **Property** | 6023 E TURQUOISE AVE<br>PARADISE VALLEY, AZ 85253 | **Homeowner Address** | 1312 N Astor St<br>Chicago, IL 60610 |
| **Occupancy Type** | Non-Owner Occupied Property | **Investor** | Point Digital Finance, Inc |

## Option Terms

***There are no monthly payments and no interest accrues. The terms below are estimates based on information in your application and are subject to change until final pricing. After closing, these terms will not change.***

| | | |
|---|---|---|
| **Investment Amount** | $300,000.00 | *This is the amount Point will invest in your Property in exchange for an Option in your Property.* |
| **Appraised Value** | $2,800,000.00 | *This is the value determined by Point in reliance on various methods, such as traditional appraisals or automated valuation models. At initial application, it is based on your stated home value.* |
| **Homeowner Protection Cap** | 19.0% | *An annual rate, compounded monthly, that is applied to the Investment Amount to determine the Capped Repayment Amount; the Capped Repayment Amount is the maximum amount you may pay Point, the calculation of which is set forth in Schedule 2 of your Option Agreement.* |
| **Appreciation Starting Value** | $2,044,000.00 | *This is the beginning value of your Property used to calculate Point's share of the Property's appreciation and the Point Proceeds. The Property's appreciation value can be positive or negative depending on the Final Home Value. The Point Proceeds is the amount you pay Point upon your repurchase, a sale of the Property, or at the end of the term. In all cases, the Point Proceeds will be subject to the Homeowner Protection Cap.* |
| **Investment Term** | 30 Years | |
| **HEI Percentage** | 45.8000% | *This is the percentage of appreciation you will pay Point upon repayment, unless the result is more than the Capped Repayment Amount.* |
| **Estimated Debt Payoff Amount** | $40,000.00 | *The estimated amount of the Investment Amount that will be paid to settle existing debts and obligations.* |
| **Acknowledged Pre-Existing Loans** | $670,000.00 | *This is the current sum of debt obligations on your Property.* ***Contact Point immediately if this is not correct****.* |

## Closing Summary

***See Calculating Cash to Homeowner on page 3 for details.***

| | | |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $13,267.60 | Includes $14,702.15 in Option Agreement Costs<br>+ $60.00 in Other Costs - $1,494.55 Paid by Point |
| **Cash to Homeowner** | $246,732.40 | After deducting Closing Costs Paid by Homeowner and Payoffs Made at Closing. |

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION
NO. 2584CV00469-BLS2

COMMONWEALTH OF MASSACHUSETTS

vs.

HOMETAP EQUITY PARTNERS, LLC and
HOMETAP MANAGEMENT HOLDINGS, LLC

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

The Commonwealth of Massachusetts has brought five claims of unfair and deceptive acts and practices under G. L. c. 93A, § 2 against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC (together Hometap) in connection with Hometap's product, the Home Equity Investment (HEI). The Commonwealth alleges the HEI is an illegal mortgage loan (Count I), violates the criminal usury statute (Count II), has been marketed deceptively (Count III), was unaccompanied by required state and federal loan disclosures (Count IV), and is an unfair, oppressive or otherwise unconscionable product (Count V). The Commonwealth seeks a declaration that all HEI contracts with Massachusetts consumers are unlawful mortgage loans and subject to the criminal usury statute, a permanent injunction barring further violations of G. L. c. 93A, reformation of the HEIs in the Commonwealth, an order requiring Hometap to pay restitution, and an award of civil penalties and costs.

Hometap moves to dismiss the Complaint pursuant to Mass. R. Civ. P. 12(b)(6). Hometap argues that three of the Commonwealth's counts are based on the incorrect premise that the HEI is a loan when, according to Hometap, the HEI is an option contract (Counts I, II, and IV). As to the remaining counts, Hometap argues the

Commonwealth has not alleged facts that plausibly suggest the HEI is unfair or unconscionable (Count V) or that the HEIs have been marketed deceptively (Count III).

After hearing and review, and for the reasons stated below the Motion to Dismiss is **DENIED**.

## BACKGROUND

I recite the relevant facts asserted in the Complaint, "taking them as true for purposes of evaluating the motion to dismiss." Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). Although, in general, I do not accept as true conclusory allegations or legal conclusions, see Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008), because the Commonwealth proceeds in the public interest and pursuant to G. L. c. 93A, § 4, I include a brief description of Massachusetts regulations governing various mortgage products as detailed in the Complaint. Further, I consider and address the exhibits attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Lastly, because the Complaint is lengthy and complex, I provide only an overview of the factual allegations regarding the HEI product and Hometap's conduct. Some facts are reserved for discussion below.

### A. Reverse and Subprime Mortgages

In the 1980s and 1990s a new form of home mortgage, reverse mortgages, began to proliferate. A reverse mortgage is typically marketed to homeowners with equity but insufficient assets to cover expenses. The lender provides cash in exchange for an interest in the homeowner's equity. The borrower makes no monthly payments because the lender recoups its investment through a voluntary or involuntary sale of the home. This differs from a traditional mortgage which the borrower pays monthly and the home serves as collateral for the risk of default. In a traditional mortgage, a homeowner's debt decreases with monthly payments at the same time the homeowner's equity increases. In a reverse mortgage, the homeowner's debt increases

over the life of the loan which is called negative amortization.

Reverse mortgages are almost always non-recourse meaning the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers.

To protect elderly homeowners, Massachusetts regulations provide that reverse mortgages mature only upon death, default, a sale of the property or when the borrower moves out of the property. In addition, reverse mortgages are limited to owner-occupiers who are over age 60, who receive counseling, and are permitted a seven day rescission period. Reverse mortgages that are federally insured must also comply with federal regulations including limits on the amount of origination fees and closings costs.

In the late 1990s and early 2000s, subprime mortgage lending, another non-traditional form of mortgage, expanded. These mortgage products were marketed nationwide to people with limited access to mainstream loans, often by nonbank entities to avoid oversight. Loans were offered against the value of the home with no regard to or investigation into the borrower's ability to pay the loan. These loans were called "low doc" or "no doc" loans. The mortgages were often sold onto the secondary mortgage market to offload risk. Subprime lenders would also repeatedly refinance loans in short periods of time to generate fees. Subprime loans also often included the following features: negative amortization, interest-only periods, higher rates than disclosed initially, and balloon payments requiring repayment of the principal in a single payment at the end of the loan.

Subprime mortgages led to a mortgage crisis with millions of homeowners unable to pay their mortgages and ultimately losing their homes in a wave of foreclosures. The crisis ultimately led to a nationwide recession.

The Commonwealth enacted regulations to limit subprime loan practices including limiting high cost loans, limiting adjustable-rate subprime loans, allowing borrowers to cure defaults, and permitting borrowers to modify certain loans.

**B. Hometap's HEI**

Hometap, founded in 2018, originates, advertises and markets HEIs in Massachusetts. The Commonwealth alleges that HEIs include four key features: an upfront cash payment without underwriting to assess income, jobs or other assets; acquisition of a percentage interest in the homeowner's equity at two times the value of the cash payment; a return that can and does exceed a twenty percent annual interest rate; and a ten-year balloon payment.

*HEI Structure*. Hometap uses a form Option Purchase Agreement (Option Agreement). It provides that the homeowners sell Hometap an "exclusive and irrevocable option to acquire an undivided percentage interest of a fee simple title ownership" in the borrower's property (Option) in exchange for an "Investment Amount" which is a cash payment less fees and costs, some of which Hometap retains. The percentage equity option in the premises that Hometap holds is two times the amount the Investment Amount (Hometap Percentage).[1] When a homeowner signs the Option Agreement, the value of the Hometap Percentage exceeds the Investment Amount. Thus, as described in the Complaint, with an Investment Amount of $100,000, the homeowner would receive approximately $97,000 and Hometap would hold the option to purchase home equity of $200,000.

The homeowner must repay the Investment Amount (settle) within ten years, or earlier if title is transferred or other events of default occur. The value of Hometap's share in the property (Hometap Share) at settlement is calculated by multiplying the

[1] The Commonwealth alleges Hometap does not adequately disclose the 2x delta between the Investment Amount and the Hometap Percentage.

Hometap Percentage by the property's value when the option is exercised, determined by an appraisal. According to the Commonwealth, Hometap's profit is driven by equity devaluation and not home value appreciation because the homeowner must pay Hometap twice the Investment Amount before factoring in appreciation. "Thus, it is Hometap's devaluation of homeowner's equity rather than home appreciation that is truly responsible for Hometap's profit," to the detriment of the homeowner.

The Option Agreement caps the annualized rate of return at twenty percent of the Investment Amount by limiting the total value of the Hometap Share to an amount equal to that annualized rate of return (Hometap Cap). According to the Commonwealth, the Hometap Cap "functions as a compounding interest rate" and is applied against the total Investment Amount, including fees that Hometap retained. Thus, HEIs that settle at the Hometap Cap "uniformly exceed a 20% simple interest rate on the amount advanced."

Hometap protects its "contractual and economic interest in the Option" through a Mortgage and Security Agreement recorded when the Option Agreement is executed. The Mortgage provides that, upon an event of default, Hometap may take possession of the property without any foreclosure action and have the right to sell the property at a nonjudicial foreclosure sale.

Homeowners can settle before the ten-year window. In addition, property values can decline. But even in these scenarios, the homeowner's equity is still devalued – at a rate of 33% rather than 50%. Hometap ensures it will be repaid the Investment Amount because the average home "would need a realized decline of 25% before Hometap would lose its first dollar of principal." Thus, "regardless of what happens to property values, homeowners will pay back vastly more than they receive from Hometap" and Hometap's principal would never be at risk. Included within the Complaint is an analysis of the anticipated repayment amounts and effective interest

rates based on a $100,000 Investment Amount, using various assumptions in the change in home value showing that, even in the worst real estate market, Hometap would earn a six percent return on its Investment Amount. Thus, Hometap is not investing in equity because its investment is never meaningfully at risk.

Marketing and Sales. Until at least the spring of 2024, Hometap claimed on its website that it would "invest alongside homeowners" and would do so "without any . . . interest over the life of the investment," which would lead homeowners to believe that only home appreciation drives Hometap's returns. To its investors, however, Hometap, markets the HEI as providing downside protection "even during times of declining home values" and that it includes "an adequate cushion" to minimize potential losses. The cushion is, in fact, equity devaluation which insures Hometap against any risk of loss of its investment. Such advertising would lead an average homeowner to believe that Hometap's investment is equal to its equity option and not twice the value of its investment.

Hometap employs sales representatives who use scripts to explain the HEI to homeowners. At times, these representatives explain to homeowners that Hometap would share in any loss if the property were to depreciate. The representatives also imply they are neutral "guides," not employed to convince the homeowner to take out an HEI when they are, in fact, employed by Hometap to sell HEIs. They also do not explain that the homeowner may be eligible for less costly loans or that the HEI might make it more difficult to refinance in the future. Nor are homeowners provided the actual cost of the HEI – such as by including an Annual Percentage Rate or effective interest in various scenarios – such that homeowners can comparison shop. "The representations in Hometap's Marketing and made by its Investment Managers had, on net, a tendency to obscure the true cost of the Hometap HEI and the reality that the Hometap HEI is dramatically more costly to homeowners than other mainstream

mortgage products or that Hometap's marketing materials and sales scripts communicated."

*Subsequent HEIs.* Hometap offers homeowners an option to pay off the first HEI with a new larger HEI to obtain additional cash, initially called a "double tap" and later an "investment increase." In those circumstances, Hometap charges the homeowner the same fees charged earlier. Changing the name from "double tap" to "investment increase" falsely implies the new HEI is only an increase and thus, the homeowner will not have to pay all the fees and costs. The Commonwealth described a scenario where a homeowner entered into an HEI for $227,950, and less than a year later entered into a second for an additional $29,000. Hometap charged and the homeowner paid nearly $4,000 in fees plus a 23.9% effective interest rate on the first HEI. Hometap, as a result, owned the right to 50% of the value of the homeowner's $1 million home having paid the homeowner only $257,000 after fees.[2] Further, Hometap did not always disclose it would charge additional fees.

*Third Party Costs*. Hometap misleads homeowners in connection with alleged third party costs for appraisals. First, because Hometap refers to the costs as "third-party" costs, the homeowners believe the amount is paid to a third party whereas Hometap retains the vast majority of the fee. Second, although Hometap charges $299 for a virtual appraisal, the appraisal it conducts costs less than $100. The same is true with respect to the $599 Hometap charges for a traditional, physical appraisal – Hometap keeps most of the fee. Hometap thus profits, significantly, from both types of appraisals. Further, Hometap requires a formal appraisal when the HEI is paid off, but not when the HEI is generated. Because physical appraisals result in higher valuations,

---

[2] The Complaint alleges another homeowner entered into a double tap that resulted in Hometap owning fifty percent of the homeowner's home value even though it paid less than twenty percent of the value.

Hometap receives a higher profit if it does not use the same valuation at the beginning and end of the HEI.

_Renovation Adjustments_. Hometap markets the HEIs as a financing source for renovations and offers a "renovation adjustment" to allay concerns homeowners may have about giving Hometap a percentage of equity prior to a renovation. For renovations of at least $25,000, the renovation adjustment is advertised as an appraiser determined value of the property post renovation compared to an appraisal without the renovation. But Hometap does not disclose that the amount of the adjustment is limited to the lesser of the amount actually spent or the difference. Thus, if a homeowner spent $50,000 on a renovation resulting in $100,000 in increased value the homeowner would be entitled to only the $50,000. The restriction is disclosed only in the lengthy contract which is provided only after the application and underwriting is complete.

_Targeted Homeowners_. "A substantial fraction of Hometap's customers are homeowners facing financial vulnerability such as lack of income, high debts, or high expenses." That is because Hometap markets HEIs' to homeowners who cannot qualify for a traditional loan, retirees, and the unemployed. Hometap also markets to consumers seeking to pay off debt and has persuaded customers to use higher cost HEI's to pay off lower cost unsecured debt. Hometap also markets HEIs' to homeowners who had obtained COVID forbearances without disclosing other, lower cost options.

_Lack of Underwriting_. Hometap does not determine whether a homeowner can repay the HEI using income or assets and makes no assessment of the homeowner's ability to pay taxes, insurance, maintenance expenses, or existing mortgage payments, "even though failure to make these payments" triggers the homeowner's obligation to repay the HEI. The only evaluation Hometap conducts is whether the homeowner can repay the HEI through a sale or refinancing of the property. The lack of assessments

result in the homeowner's ability to get money quickly, and without documentation, and may lead them to choose an HEI over loans that cost less and have safeguards.

Hometap can only provide cash quickly if the HEI product is not governed by the regulations put in place with respect to reverse and subprime mortgages. Thus, in marketing the HEI, Hometap neither insures that it provides money only to homeowners with the ability to repay, as with traditional mortgages, nor complies with the strict regulatory limits on reverse mortgages.

*Structural Unfairness*. A significant percentage of Hometap customers will not be able to afford the purchase repayment when due after ten years through income, assets or a refinancing because their income and credit history will not support a loan large enough to pay off an original mortgage plus the HEI. In that event, Hometap can take joint ownership and exercise its right to foreclose or sell the property.

## DISCUSSION

In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I "look beyond the conclusory allegations in the complaint," Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." Iannacchino, 451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true "such inferences as may be drawn [from those facts] in the plaintiff's favor." Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I conclude that the Commonwealth has alleged sufficient facts to state plausible entitlements to relief on all counts.

### I. Counts I, II, and IV

Counts I, II, and IV all allege violations of G. L. c. 93A based on the illegal provision of unlawful mortgage loans. Count I alleges that HEIs are illegal reverse

mortgage and high-cost mortgage home loans that do not comply with Massachusetts law. Count II alleges the HEIs are usurious loans that violate G. L. c. 271, § 49. And Count IV alleges deceptive marketing related to the provision of loans. Hometap argues that Counts I, II, and IV must be dismissed because they are all based on the incorrect premise that the HEI is a loan.

The parties' respective positions center on whether the HEI is an option or a loan. Hometap argues the HEI is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment.[3] Hometap argues that options to compel the conveyance of real property are common and generally permissible. No one disagrees. See Certified Corp. v. GTE Prods. Corp., 392 Mass. 821, 824 (1984) ("An option to purchase property which binds the successors and assigns of

---

[3] Hometap asserts that it has offered HEIs in the Commonwealth for years; the Massachusetts Division of Banks (DOB) publicly recognizes that HEIs are critically distinct from loans and has indicated that it does not have the legislative authority to regulate such shared equity products; state legislators have recognized the HEI product is not a loan; and that bills are pending before the legislature that would allow the creation of a regulatory framework for products such as HEIs. Hometap also asserts that prior to offering HEIs in the Commonwealth, Hometap met with both the DOB and the Attorney General's Office (AGO) and neither expressed concern. Thus, the AGO "sat on its hands for years" permitting Hometap to invest significant sums in the Commonwealth prior to determining the product was unfair.

Against that backdrop, Hometap argues that the AGO's pursuit of G. L. 93A claims in this case "short-circuits" and "contravenes" the legislative process and violates Hometap's due process rights. Those issues, however, are not squarely presented before me on the instant motion. And, to the extent I accept Hometap's assertions without converting the motion to one for Summary Judgement, see Mass. R. Civ. P. 12(b), the argument that the AGO is ahead of the DOB or the legislature in taking steps to protect consumers from a product the AGO believes, and alleges is unfair and unconscionable, or has perhaps reached a different conclusion as to the fairness of HEIs after they were offered to Massachusetts consumers is not a basis on which to grant a Motion to Dismiss. Today, I evaluate only whether the Commonwealth has stated claims for relief ultimately subject to judicial review.

each party, and which includes mutual covenants involving the property, creates a contingent equitable interest in the option holder."). With that understanding, Hometap argues the HEIs are options because Hometap pays homeowners for the right to obtain a percentage possessory interest in the homeowner's property in the future upon the occurrence of various contingencies, including the homeowner's failure to repay (settle) the option payment (Investment Amount) within ten years.

The Commonwealth responds that the HEIs are merely disguised loans, and that the nomenclature does not control, because Hometap delivers money with the expectation that it will be repaid via settlement or through a forced sale of the property. See Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 746 (1980) (defining a "loan" as "(d)elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest."), quoting Black's Law Dictionary 844 (5th ed. 1979).

Assuming the facts asserted in the Complaint are true, as I must, the Commonwealth has sufficiently alleged that HEIs are, in substance, loans. The Commonwealth alleges that Hometap provides money to homeowners with a requirement that it be repaid and that the HEI structure ensures there is *no substantial risk* that Hometap will lose its principal.[4] The money is either repaid in ten years, with a substantial increase, which the Commonwealth alleges constitutes interest, or Hometap exercises its option and its right to foreclose or force a sale. The Complaint also alleges that Hometap explicitly markets its products to homeowners in need of cash *in the short term* who will, therefore, be unlikely to be able to settle in ten years. And, neither the

[4] Hometap's insistence that the *contract* does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten years. See *infra*.

homeowner nor Hometap anticipate that Hometap will actually retain a possessory interest in the property. Put elsewise, Hometap never intended to be a joint equity owner with any homeowner. Those allegations make the HEI – in substance – more akin to a loan than an option to purchase real estate.[5] See In re J.G. Wentworth Originations, LLC, No. 17-2188-C, 2017 WL 3573537, at *1 (Mass. Super. Aug. 10, 2017) (Gordon, J.) (structured sale of personal injury payments at a 34.2% discount "is in function and economic substance—if not nominally in form—a loan" subject to usury law).

That the HEIs are non-recourse does not necessarily mean they are not loans as a matter of law. See In re Stone St. Cap., LLC, No. NOCV2012-01891, 2013 WL 3341052, at *3 (Mass. Super. May 10, 2013) (Salinger, J.) ("A loan of money made on a non-recourse basis – meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, other assets, or third-party obligation – is still a loan."), citing Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan" for purposes of applying Internal Revenue Code). See also G. L. c. 167E, § 7(h) (defining "non-recourse reverse mortgage loan" as "a reverse mortgage loan which limits the lender's recovery solely to the value of the property at the time the loan becomes due and payable").

Nor does labelling the transaction and operative agreement as an "option" control. It is the substance of the transaction that governs not the labels. See Singhal v. Unison Agreement Corp., No. 22-60656-CIV, 2023 WL 2734230, at *5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of the transaction rather than the form is

---

[5] The possibility that Hometap may recover less than its investment amount may be provable. But on a Rule 12(b)(6) motion I must accept as true the Commonwealth's factual allegations that the equity devaluation inherent in the HEI's structure makes that possibility illusory because the property would have to decrease by more than 25% for that eventuality to occur.

examined to determine whether the transaction should be considered a loan."). Indeed, more than a century ago, the Supreme Judicial Court (SJC) considered whether the transaction at issue – nominally a real estate purchase with an option to repurchase – was a real purchase or a "conveyance received by the defendants as security for a loan made by them to the plaintiff[.]" Southwick v. Bigelow, 237 Mass. 299, 304 (1921). Based on a master's factual findings that the parties "contemplated the payment within a year of the $12,000 advanced by the defendants, and that the deed and agreement were given as security therefor," the SJC held the purported sale was "not one in reality." Id. at 305. Rather, the transaction constituted a loan with a mortgage. Id. Thus, Southwick teaches two things – the substance and not the form controls – and the determination of the true nature of a transaction like the one at issue here is a question of fact. Id. Accord Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-153 (1920) (option to purchase real estate does not create an interest in real estate).

The Commonwealth also is correct that a typical option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised. See, e.g., Thacher v. Weston, 197 Mass. 143, 146 (1908) (option contract provided that, in consideration of $25, plaintiff held option to purchase real property for $10,000); FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, No. 1881CV00304-B, 2021 WL 2584131, at *2 (Mass. Super. June 16, 2021) (Salinger, J.), aff'd in part, rev'd in part on other grounds, 489 Mass. 702 (2022) (option contract for land on which to build a casino included monthly payments of $100,000 "in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for $75 million" if option holder was awarded a casino license) Here, the Commonwealth alleges that all the value for the percentage possessory interest in the real property is paid as consideration for the alleged option and not when the option is exercised. As noted, it also alleges that the mortgage does

not secure the option, as Hometap argues, but repayment because Hometap "has no intention of becoming a joint owner" of any homeowner's property. Those alleged facts would support a conclusion that the arrangement is not a true option but a loan.

At the end of the day, the Commonwealth's allegations, if true – that Hometap pays money to homeowners who are subject to foreclosure and a forced sale if they fail to repay Hometap approximately two times Hometap's investment – would support the conclusion that the transaction at issue is not an option but a loan. At this stage of the litigation, it is premature to conclude one way or the other, but the Commonwealth has alleged facts which plausibly suggest the HEIs are loans and thus violate G. L. c. 93A because they are illegal mortgage loans (Count I), violate the criminal usury statute (Count II), and violate required state and federal loan disclosures (Count IV).

Hometap's other arguments are not persuasive at this stage of the litigation. First, Hometap relies on In re Yang, No. 23-00075-RLM-11, 2023 WL 7104764, at *1 (Bankr. S.D. Ind. Oct. 23, 2023) for the proposition that a "home equity sharing agreement" in which a company paid cash to acquire an option for a future interest in real property was an option contract. Again, there is no dispute that real estate option contracts can be valid. Indeed, In re Yang involved a more traditional option contract, as discussed above, where the company paid "paid $54,250.00 for the future right to purchase a 70.00% interest in the property for *an additional payment of* $157,325.00." Id. (emphasis added). There, unlike here, most of the consideration for the acquisition of the property interest (three times the option amount) was paid upon exercise of the option.

Hometap argues next that its return on investment is not interest because it is not a charge calculated as a product of principal, interest, and length of loan. But additional compensation to a lender need not be calculated in any particular way to constitute interest. "The word interest in its usual sense is the compensation fixed by the parties

or allowed by law for the use of money or as damages for its detention." Begelfer v. Najarian, 381 Mass. 177, 181 (1980), citing Hayes v. Commissioner of Corps. & Taxation, 261 Mass. 134, 136 (1927). See G. L. c. 271, § 49(a) (defining "interest or expenses" for purposes of criminal usury to include "all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan").

Next, Hometap's reliance on Foster v. Equitykey Real Est. Invs. L.P., No. 17-CV-00067-HRL, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017) does not require dismissal. The option at issue there was a payment of "$196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000." Id. at *3. While recognizing that the intent of the parties is "an important factor in determining whether a loan was created," the court held the payment was not a loan but an option because there was "no guarantee that the payment received by Mr. Foster need ever be returned." Id. at *4. The differences are clear. In Foster, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation. For the same reason, Hometap's reliance on the comments to 12 Code. Fed. Regs. Part 1026 does not persuade me that dismissal is appropriate. Those comments note that the Federal Truth in Lending Act (TILA) does not apply to option contracts in which the party advancing money to a homeowner risks the loss of the capital advance. See 12 Code Fed. Regs. § 226, Supplement I, Subpart A, 2(a)(14)(vii) (TILA does not apply to "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."). Here, as oft noted already, the Commonwealth alleges

*as a matter of fact* that Hometap risks no such loss. The truth of that assertion will be tested in this case but is sufficient to avoid dismissal.

Finally, Hometap argues that Count I must be dismissed because the Commonwealth alleges both that the HEI is an unlawful reverse mortgage that fails to comply with G. L. c. 167E, §§ 7, 7A, and a "high cost mortgage loan" as defined by G. L. c. 183C, § 2, and "no product can be both a reverse mortgage and a high cost home mortgage loan." The Commonwealth responds that it has alleged facts which would support the conclusion that HEIs are unlawful reverse mortgages. I agree. The Commonwealth alleges that the HEI is a non-recourse cash payment, secured by a mortgage, and any shared appreciation, principal, or interest are due only upon certain circumstances or at the end of a fixed term and that Hometap did not comply with the regulations governing such loans. (See Com. Mem. at 12-13). The Commonwealth also responds that it has alleged that the HEI is a high cost loan under G. L. c. 183C, § 2. I agree as well.[6] Based on the facts in the Complaint, the Commonwealth has alleged a loan secured by a homeowner's principal dwelling with an annual percentage rate that will exceed nine percent.

For all the above reasons, the Motion to Dismiss Counts I, II, and IV must be **DENIED**.

**II. Count III**

Count III alleges deceptive marketing in connection with the HEI. The Commonwealth alleges that Hometap's marketing and sales communications would lead consumer to believe that Hometap's returns stem from the Hometap fee and from

[6] A plaintiff may plead alternative and overlapping theories of liability and any redundancy, if it exists, is more appropriately addressed on a full record via a motion in limine or pursuant to Rule 56. See Massachusetts Port Auth. v. Turo, Inc., No. 1984CV01773BLS1, 2020 WL 2617169, at *4 (Mass. Super. Apr. 14, 2020) (Green, J.).

home price appreciation when, in actuality, Hometap's return comes from devaluing the homeowner's equity and purchasing it at below market value. In support of its motion, Hometap argues that the Hometap marketing graphic included in the Complaint discloses all the facts from which a reasonable consumer could understand that, at settlement, for a $100,000 payment, Hometap would be entitled to fifteen to twenty percent of the home's value which, in the footnote, is disclosed as home worth $1 million. Further, Hometap argues that the Option Agreement and Investment Term Sheet fully disclose the structure of the HEI and explain in detail how the Hometap Share would be calculated. As a matter of law, then, Hometap argues the marketing could not be deceptive.

This is a closer question. Homeowners are entitled to enter contracts of their choosing – so long as statutorily and regulatorily compliant – and are assumed to have read and understood the contracts and other material provided to them. However, marketing is deceptive if it "directly, *or by implication*, or by failure to adequately disclose additional relevant information, has the capacity *or tendency* or effect of deceiving buyers or prospective buyers in any material respect." 940 Code Mass. Regs. § 3.05(1) (emphasis added). Thus, advertising need not be "totally false in order to be deemed deceptive in the context of G. L. c. 93A. . . . The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an *over-all misleading impression* through failure to disclose material information." Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 320 (2018), quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394-395 (2004) (emphasis added). Here, the ultimate price of the HEI is certainly material, and the Commonwealth has alleged that Hometap's marketing would mislead an objective homeowner as to the ultimate price he or she would have to pay or face foreclosure or a forced sale. Hometap argues that the Commonwealth's other alleged misleading material – related to third party costs,

successive HEIs, and the renovation adjustment – are insufficient either because the disclosures or lack of disclosures were not material or because all were disclosed.

After careful review of the Complaint, the questions of deception and causation are ones that must be developed in discovery, as the "analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis . . . and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." Exxon Mobil Corp., 479 Mass. at 316, citing Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and Travis v. McDonald, 397 Mass. 230, 232 (1986). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times.").[7]

For all the above reasons, the Motion to Dismiss Count III must be **DENIED**.

### III. Count V

Count V alleges that the HEI is an unfair, oppressive or otherwise unconscionable product. The claim is based primarily on the structure, as described above, and the allegation that Hometap markets to financially vulnerable consumers who are in debt and cannot qualify for traditional loans, without any investigation regarding whether those homeowners can settle the HEI. The Commonwealth asserts that conduct – whether or not an HEI is a loan – falls within the penumbra of unfairness protected by Chapter 93A.

---

[7] With respect to the allegations concerning Hometap's sales representatives, although puffery and statements of opinion will not support a G. L. 93A claim, see von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), the Commonwealth has alleged more than mere puffery, including failures to disclose meaningful information. Reliance and causation must await resolution at a later stage.

Hometap argues that the Commonwealth cannot rely on mortgage lending regulations or the usury statute to allege unfairness because the HEIs cannot and should not be measured against regulations that govern loans. According to Hometap, it is not "logical to hold an equity product to the cost limitations of debt products because equity costs more than debt in the market because the equity investor takes on more risk" and "applying the usury limitation to an equity-based product is novel." (Hometap Mem. at 16). I am not persuaded.

Chapter 93A, although more than a half a century old at this point, remains "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 822 (2014), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Further, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law." H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (quotations and citations omitted). "To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses' " Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 587 (2024), quoting, H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 14 (2022).

It is not *inappropriate* to measure the HEI against statutes and regulations protecting homeowner mortgagees or other consumer borrowers. In Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 742 (2008), the Court rejected the argument that the defendant did not violate any established concept of unfairness when it originated its

loans because "new rules or standards for defining what is unfair" could not be applied retroactively. The Court reiterated that Chapter 93A "creates *new* substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute," and that the concept of unfairness is not frozen in time because "[t]here is no limit to human inventiveness in this field.' " Id., quoting Kattar v. Demoulas, 433 Mass. 1, 13 (2000). Given G. L. c. 93A's flexibility, "[w]hat is significant is the particular circumstances and context in which the term is applied." Fremont, 452 Mass. at 743.

Here, Hometap concedes that it created a new option for homeowners seeking to access their home's equity. It also concedes that the product is currently unregulated.[8] Therefore, it is not impermissible when considering whether the HEI is unfair or oppressive to consider the guardrails that are in place to protect homeowners who seek to access their equity through traditional or reverse mortgages, as well as the harms those provisions seek to prevent and remedy.

The Commonwealth alleges that the HEI is unconscionably expensive because it provides Hometap a right to a home equity share worth more than twice what it paid the homeowner.[9] It alleges HEI features akin to those found to violate G. L. 93A in Fremont namely the failure to consider the homeowner's ability to repay or settle without losing their home, a balloon payment after ten years, and deliberate marketing to individuals with high debt and low credit, which make it highly likely that

---

[8] That bills may be "pending" is of no import in connection with a motion to dismiss for failure to state a claim.

[9] I do not view this argument as an attempt to amend the complaint where the factual allegations regarding the alleged excessive cost of the product are contained within the Complaint.

homeowners were/are doomed to "default" at the ten-year term.[10] Cf. Fremont, 452 Mass. at 743. Characterized as debt or equity, the Commonwealth alleges that Hometap enters into contracts with homeowners knowing that the homeowners will not be able to satisfy their obligation to "settle" up with Hometap and will, therefore, lose their homes. Cf. Drakopoulos v. U.S. Bank Nat. Ass'n, 465 Mass. 775, 786 (2013) (Chapter 93A "prohibits the origination of a home mortgage loan that the lender should recognize at the outset [ ] the borrower is not likely to be able to repay"). Those allegations support the claim that the HEI violates Chapter 93A.

Finally, whether the AGO will establish a right to recover penalties, costs or attorney's fees by establishing that Hometap knew or should have known that the HEI violated G. L. c. 93A cannot be decided at this stage.

**ORDER**

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **DENIED**.

Debra A. Squires-Lee
Justice of the Superior Court

August 21, 2025

[10] It is immaterial that some of Hometap's customers had better credit ratings or sought funds for purposes other than to pay off high interest, unsecured consumer debt.